Jonathan D. Lupkin (JL-0792)
Michael B. Smith (MS-3281)
LUPKIN PLLC
80 Broad Street, Suite 1301
New York, New York 10004
(646) 367-2771
(646) 219-4870 (fax)
jlupkin@lupkinpllc.com
msmith@lupkinpllc.com
*Counsel for Plaintiff Raj Rajaratnam*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAJ RAJARATNAM, an individual, | |
| Plaintiff, | |
| -against- | Case No. 18-CV-3234 |
| MOTLEY RICE, LLC, a South Carolina limited liability company, MICHAEL E. ELSNER, an individual, JAYAT P. KANETKAR aka JAY KANETKAR, an individual, RUDRA, an individual named pseudonymously, BRIAN P. MALLON, an individual, and JOHN "HANK" ALLISON, an individual, | **COMPLAINT** JURY TRIAL DEMANDED |
| Defendants. | |

## TABLE OF CONTENTS

**NATURE OF THE ACTION** ......................................................................... 1

    Motley Rice Falsely Accuses Mr. Rajaratnam ..................................... 3

    The Vanity Fair Article ........................................................................ 5

    Motley Rice's Scheme Begins to Unravel ........................................... 6

    Motley Rice Tries to Conceal the Extent of its Wrongdoing................. 9

    Working Backwards:  Motley Rice's Pattern of Deception ................. 9

**PARTIES**.......................................................................................................11

**RELEVANT NON-PARTIES**................................................................... 12

**JURISDICTION AND VENUE** ............................................................... 13

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS** ................ 14

    Mr. Rajaratnam ................................................................................. 14

    Ness Motley and the Asbestos Money Machine................................. 17

    Motley Rice Discovers the Value of Government Information ............ 20

    Rosetta Research: Monetizing Government Information .................... 26

    Motley Rice's Attack on Mr. Rajaratnam ........................................ 31

    Motley Rice's Attempted Cover Up .................................................. 33

    The Vanity Fair Article...................................................................... 36

**COUNT I: RICO § 1962(c)** ...................................................................... 39

    Bribery/Tampering............................................................................ 40

    Mail and Wire Fraud......................................................................... 41

i

Fraud in Foreign Labor Contracting ................................................................... 42

**COUNT II: RICO § 1962(c)** ...................................................................... **43**

Bribery/Tampering ............................................................................................ 44

Mail and Wire Fraud ......................................................................................... 45

Fraud in Foreign Labor Contracting ................................................................. 46

**COUNT III: RICO § 1962(a)** ..................................................................... **46**

**COUNT IV: RICO § 1962(d)** ..................................................................... **47**

**COUNT V: Defamation** .............................................................................. **48**

**JURY DEMAND** ......................................................................................... **49**

**PRAYER FOR RELIEF** .............................................................................. **49**

---

*"Our profession is good, if practiced in the spirit of it; it is damnable fraud and iniquity when its true spirit is supplied by a spirit of mischief-making and money-catching."*

-Daniel Webster, Letter to James Hervey Bingham, January 19, 1806

---

Plaintiff Raj Rajaratnam, by his undersigned attorneys, Lupkin PLLC, as and for his Complaint, hereby alleges upon knowledge with respect to his own acts and status, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is the story of Motley Rice, a South Carolina law firm that holds itself out as a champion of the downtrodden, but which, as part of a broader scheme to enrich its partners and their co-conspirators, has engaged in unsavory, unethical, and criminal conduct. Worse, it has done so by capitalizing on the misfortune of others to generate a revenue stream that pays for the firm's private planes and lavish ocean-side offices and finances the extravagant lifestyles of its partners.

2.      Since September 11, 2011, Motley Rice has exploited victims of terror for its own gain. First, it identifies victims of heinous terrorist violence, tracking public reports on terrorist attacks around the world. Second, Motley Rice looks for any "deep-pocket" it can tie to the regions where the attacks took place—regardless of whether it can tie them to the terrorist acts. Third, Motley Rice uses classified information obtained through a clandestine and rogue intelligence network to build a case against the "deep pocket" defendants.

1

3.      Motley Rice banks upon the negative publicity from the filing of these lawsuits and the risk that the heart-wrenching suffering of the victims will overshadow the facts if the case were to be tried. The strategy is simple; to force these "deep pockets" to settle, regardless of the merits of the claims. Such settlements provide a substantial financial windfall for Motley Rice, both enriching their lawyers and funding their next litigation targets. This is the latest iteration of a scheme that dates back over three decades to the overwhelming and indiscriminate flood of asbestos claims Motley Rice's predecessor firm used to leverage hundreds of millions of dollars in settlements.

4.      For a firm that trades on its "white knight" image to employ such cynical and nakedly opportunistic tactics is bad enough. However, Motley Rice's clever, if morally-suspect, tactics have crossed the line from unseemly to unlawful. Motley Rice illicitly taps into taxpayer-funded government investigations for its own private, commercial use through bribes and other improper inducements. Motley Rice brokers these untoward agreements in the shadows, out of view of the courts supervising litigations, the government conducting criminal investigations, and the defendants who are the targets of Motley Rice's schemes. Until now.

5.      Motley Rice targeted Plaintiff Raj Rajaratnam, an American citizen who happens to be an ethnic Tamil born in Sri Lanka, as a "deep pocket" in its efforts to profit off the tragic suffering of victims of the Sri Lankan civil war.

6.      Motley Rice has alleged in a publicly filed lawsuit that Mr. Rajaratnam donated to a U.S.-based Sri Lankan charity for the purpose of funding terrorism in his home country. Motley Rice's allegations are nonsense; Mr. Rajaratnam has a long history of generous philanthropy in Sri Lanka and elsewhere and in fact has been recognized by the Sri Lankan government for his

contributions to stop the civil war. But those truths are of no moment to the Motley Rice business model.

7.      Unlike others, Mr. Rajaratnam fought back. He has challenged Motley Rice's sources of misinformation and, as a result, has forced the law firm to disclose and admit certain of its previously hidden arrangements and machinations. Motley Rice must now be held accountable.

### *Motley Rice Falsely Accuses Mr. Rajaratnam*

8.      From 1983 until 2009, the country of Sri Lanka was in a state of armed conflict between the government of Sri Lanka and the separatist Liberation Tigers of Tamil Eelam ("LTTE"), more commonly known as the "Tamil Tigers". A cease-fire, brokered by international diplomatic efforts, went into effect in 2002, but by 2007 that cease-fire had broken down. The LTTE finally surrendered in 2009. The 25-year war was brutal. Early on, the LTTE was designated a terrorist organization. The Sri Lankan government was accused of human rights abuses as well. Tens of thousands of civilians were killed. In this horrific conflict, Motley Rice saw an opportunity.

9.      Mr. Rajaratnam fit Motley Rice's business plan to a tee. He was, by any measure, very wealthy. From 2002 through 2006 (*i.e.*, during the cease-fire), Mr. Rajaratnam and his father, both native Sri Lankans, had donated generously to the Tamil Rehabilitation Organization ("TRO"), a Maryland-based 501(c)(3) organization, alongside numerous foreign governments and non-governmental organizations.

10.      In 2007, allegations arose that the TRO was funding LTTE. On November 15, 2007, the United States Department of the Treasury designated the TRO under Executive Order 13224, desired to financially isolate U.S. designated foreign terrorist groups and their support

3

network. Under this order, the Department of the Treasury froze all assets held by the TRO and its designees in U.S. territories, and formally prohibited U.S. citizens from transacting with the TRO or its members.

11.     Upon learning of the Treasury Department's action in 2007, Mr. Rajaratnam ceased all donations to TRO.

12.     On October 16, 2009, Mr. Rajaratnam was charged by the Department of Justice with violations of insider trading laws, in a highly-publicized criminal prosecution.

13.     On October 22, 2009, no doubt assuming Mr. Rajaratnam would not be able or willing to defend himself in a civil suit while distracted by the insider trading case, Motley Rice pounced. It sued Mr. Rajaratnam and his then octogenarian and now deceased father, J.M. Rajaratnam, in the United States District Court for the District of New Jersey (the "New Jersey Litigation"). Motley Rice alleged that Mr. Rajaratnam and his father intended to fund the terrorist attacks of the LTTE when they made donations to the TRO.

14.     But Mr. Rajaratnam and his father never sought to aid terrorist activity, in their native Sri Lanka or anywhere else. To the contrary, Mr. Rajaratnam and his father have donated not only to the TRO, but also to numerous other charities in Sri Lanka that benefit all Sri Lankans, on both sides of its civil war.

15.     The Sri Lankan government specifically recognized Mr. Rajaratnam's charitable efforts *to combat LTTE terrorist activities* by funding the purchase of mine-sniffing dogs, awarding him a plaque for his philanthropy and commitment to the safety of all Sri Lankans.

16.     Mr. Rajaratnam has also donated generously to numerous other humanitarian organizations, including the Firefighter's Fund after the terrorist attacks on September 11, 2001 and the Harlem Children's Zone.

17.     When allegations arose publicly in 2007 that the TRO was suspected of having ties to the LTTE, Mr. Rajaratnam—alongside the foreign governments and non-governmental organizations who also had donated to TRO during the cease-fire—stopped donating to the TRO. Mr. Rajaratnam has continued to support other Sri Lankan charities.

### *The* **Vanity Fair** *Article*

18.     Motley Rice's initial gambit failed: despite being consumed by his defense of the insider trading prosecution, Mr. Rajaratnam vigorously defended himself against Motley Rice's false allegations.

19.     Unbeknownst to Mr. Rajaratnam or the presiding judge in the District of New Jersey, Motley Rice had a contingency plan to increase the pressure on Mr. Rajaratnam.

20.     On September 30, 2011, *Vanity Fair* published an article entitled "Crouching Tiger, Hidden Raj." The article falsely stated that Mr. Rajaratnam was a supporter of the terrorist LTTE organization, apparently corroborating Motley Rice's allegations.

21.     The *Vanity Fair* article quoted two seemingly independent "sources," who had never before commented publicly: "Rudra," a confidential government informant, and Jayat P. Kanetkar, a former Joint Terrorism Task Force ("JTTF") agent. Both men claimed to have been involved in the government's investigation of the LTTE.

22.     The article also referred to Motley Rice's lawsuit. It quoted Motley Rice partner Michael Elsner, its lead attorney in the New Jersey Litigation, who shared heartbreaking stories of LTTE terrorist bombing victims who suffered from LTTE attacks, which he claimed were "paid for" by Mr. Rajaratnam. The article did not suggest any connection between Rudra or Kanetkar, on the one hand, and Motley Rice, on the other.

5

23.     The *Vanity Fair* article amplified and lent apparent credence to Motley Rice's allegations, devastating to Mr. Rajaratnam's reputation and many of his personal relationships. As described in further detail below, it has been subsequently determined that the statements orchestrated by Motley Rice are demonstrably false and intended to defame Mr. Rajaratnam.

24.     There can hardly be a more socially-disqualifying event than being tied to terrorism in a supposedly well-sourced article from a highly respected international publication. Without question, Motley Rice's gambit increased the pressure on Mr. Rajaratnam. Nevertheless, determined to fight against Motley Rice's false allegations, he did not waver.

### *Motley Rice's Scheme Begins to Unravel*

25.     Unsealed correspondence in the proceedings before the New Jersey District Court show that Motley Rice steadfastly stonewalled inquiries into the purported basis for its allegations. For example, Motley Rice fought to keep secret the identity of the investigator(s) who developed the facts alleged in Motley Rice's complaint. The nature and identity of Motley Rice's sources was particularly important because, as correspondence shows, Motley Rice's evidence consisted almost entirely of files and reports from U.S. government law enforcement agencies.

26.     Correspondence also demonstrates that Motley Rice was unable to provide meaningful contact information for the lion's share of the plaintiffs. When Motley Rice provided its original list of expected witnesses, a public database search revealed that two had died before Motley Rice even filed the complaint.

27.     Motley Rice's apparent ignorance about its own clients and its reliance on undisclosed government sources raised questions; Mr. Rajaratnam's search for answers began to chip away at the wall of secrecy Motley Rice had erected around its case.

6

28.     The first major crack in that wall materialized in September 2016, when Motley Rice disclosed that one of its purported witnesses was in fact a former Confidential Human Source with the United States government (the "CI"). Motley Rice offered no explanation for how it contacted a government confidential informant, whose identities are closely-held government secrets for obvious investigative and security reasons, nor did it initially disclose the CI's identity to Mr. Rajaratnam's attorneys. These revelations by Motley Rice were included in correspondence that was subsequently unsealed and made publicly available.

29.     The second crack came in November 2016, when the court ordered Motley Rice to disclose the identity of its investigator(s). Motley Rice then grudgingly disclosed for the first time that it had retained three former JTTF law enforcement agents—Jayat P. Kanetkar of the Federal Bureau of Investigations ("FBI") (and one of the "sources" for the *Vanity Fair* article), Brian P. Mallon of the U.S. Immigration and Naturalization Service ("INS") and John "Hank" Allison of the FBI (collectively, the "Former JTTF Agents")—to serve as "consultants" for its litigation against Mr. Rajaratnam. This information too was subsequently unsealed and publicly available.

30.     Former federal law enforcement agents tend to be excellent investigators, and it is not uncommon for law firms to hire former agents to assist them in connection with contemplated or ongoing litigation. However, once Motley Rice was forced to reveal their identities, it became apparent that Motley Rice had not hired these men for their investigative prowess, but rather for the information they had obtained while working for the U.S. Government.

7

31.     The Former JTTF Agents had investigated LTTE terrorism activity on behalf of the United States government on taxpayer-funded salaries until as late as 2006,[1] when Motley Rice hired them. In other words, each of Motley Rice's investigators had first-hand knowledge of secret government information pertaining to federal criminal investigations into the same subject matter as the New Jersey Litigation.

32.     The third crack appeared when Mr. Rajaratnam's counsel learned that Motley Rice had paid the CI roughly $40,000 over the course of the New Jersey Litigation, even though there had been no hearing, deposition, or similar proceeding that would have required him to spend $40,000 worth of time preparing to testify. Apparently, the payments by Motley Rice were used to fund living arrangements, consumer goods and extraneous travel for the CI, among other non-litigation items. Such payments to a witness are prohibited by law.

33.     Unlocking the secret arrangement between Motley Rice, the former JTTF agents, and the paid CI brought clarity to other seeming oddities about the New Jersey Litigation, including Motley Rice's possession and production of copious government investigative materials.

34.     Moreover, the *Vanity Fair* article now could be understood in a completely different light. A comparison of available information about Motley Rice's CI and the "Rudra" quoted in the article made clear they were one and the same. Thus, presumably unbeknownst to *Vanity Fair,* Elsner, Kanetkar, and Rudra were actively working together both prior to and at the time of the interviews that formed the basis for "Crouching Tiger, Hidden Raj." Specifically,

---

[1] The criminal cases related to these investigations are captioned *United States of America v. Thavaraja et al.,* Case No. 1:06-cr-00616 (RJD) (EDNY 2006); *United States of America v. Patpanthan et al.,* Case No. 1:06-cr-00606 (RJD) (EDNY 2006); and *United States of America v. Sarachandran et al.,* Case No. 1:06-cr-00615 (RJD) (EDNY 2006).

Elsner had retained Kanetkar as a "consultant" for the litigation and had, by the time of the article, made substantial payments to Rudra. While portrayed in the Vanity Fair article as independent sources, Elsner, Kanetkar and Rudra were part of a united scheme.

### *Motley Rice Tries to Conceal the Extent of its Wrongdoing*

35.     Despite the mounting evidence of misconduct, Motley Rice insisted it had done nothing wrong. Yet, Motley Rice was forced to admit, in a December 9, 2016 letter to Mr. Rajaratnam's counsel, that it had not sought authorization or permission from the United States Government to hire the Former JTTF Agents or for Rudra to participate in the New Jersey Litigation. Even more galling, it simultaneously took the position that Mr. Rajaratnam could not subpoena their testimony without "obtain[ing] prior authorization from the Department of Justice."

36.     Motley Rice also had to concede to the court that the Former JTTF Agents had not received authorization or permission from the United States government to participate on Motley Rice's behalf in the New Jersey Litigation. Motley Rice further admitted that it had taken no steps to screen any classified or otherwise sensitive information learned by the Former JTTF Agents through the grand jury subpoena process or other government processes in Motley Rice's work with the Former JTTF Agents.

### *Working Backwards: Motley Rice's Pattern of Deception*

37.     Further investigation prompted by the revelations in the New Jersey Litigation has revealed that Motley Rice's misconduct in the Rajaratnam lawsuit is part of a broader strategy employed by Motley Rice in other cases.

38.     Motley Rice began to capitalize on terrorism after 9/11. In 2002, Motley Rice filed a lawsuit against a laundry list of financial institutions, charities and wealthy individuals on

behalf of victims of the 9/11 attacks, which was subsequently consolidated in the Southern District of New York and is still pending (the "9/11 Litigation"). Although the lawsuit garnered much public praise for Motley Rice, most of those claims have been dismissed as being legally without merit. Litigation is continuing with respect to the few remaining defendants and causes of action.

39.     Public sources reveal that, in connection with the 9/11 Litigation—as with the New Jersey Litigation—Motley Rice devoted significant efforts to developing relationships with dubious "investigators," present and former government agents and narcotics traffickers to gain access unlawfully to sensitive (and valuable) government intelligence.

40.     Motley Rice's 9/11 lawsuit was based, in part, on information falsified by Motley Rice's then lead investigator, Jean-Charles Brisard. After Brisard's fraud became an international scandal, Motley Rice replaced him with a mysterious individual who claimed to have ties to military intelligence: Michael Asimos.

41.     With Asimos's help, Motley Rice furthered its pecuniary interests by organizing and funding a network of lawyers, government employees, and former government employees who operated to acquire, share and sell sensitive information across interstate and international borders. Motley Rice devoted enormous resources to developing this network to secure for itself exclusive civilian access to otherwise classified or confidential government information.

42.     Through a pattern of fraud and bribery, Motley Rice and its associates obtained access to restricted information, locations, and people throughout the U.S., Europe, and the Middle East. Motley Rice shared attorney-client privileged information with government operatives, and their "captive" government operatives provided secret information to Motley

Rice. At times, Motley Rice even funded a shell company that trafficked in this sensitive and improperly derived information.

43.     Motley Rice continues to rely on this scheme to pursue both the New Jersey Litigation and the 9/11 Litigation. As indicated by Motley Rice's own website, it is also pursuing civil litigation ostensibly on behalf of other victims of terrorist attacks. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice also is utilizing improperly-derived government information in those litigations.

44.     The scheme described above, and other variations on this scheme described more fully in this Complaint, constitute a pattern of racketeering by Motley Rice and its predecessors and co-conspirators that appears to go back decades and continues to the present. Since 2009, the Defendants' scheme has cost Mr. Rajaratnam over $3,000,000, which includes, among other things, legal expenses and reputational damage.

45.     The Defendants have profited from a pattern of illegal conduct at the expense of Mr. Rajaratnam and many others. Mr. Rajaratnam has commenced this action under the Federal Racketeer Influenced and Corrupt Organizations Act, as well as under principles of common law, to recover his losses and to hold Motley Rice and those who acted in concert with it accountable for their illegal activity.

## **PARTIES**

46.     Defendant Motley Rice, LLC is a well-known plaintiff-side litigation firm founded in 2003. A South Carolina limited liability company, Motley Rice is registered to do business in the State of New York and maintains an office in New York County. Motley Rice's predecessor-in-interest was the law firm of Ness, Motley, Loadholt, Richardson & Poole.

47.     Defendant Michael E. Elsner ("Elsner") is a member of Motley Rice and a resident of South Carolina. Elsner is counsel of record for the plaintiffs in *Krishanthi v. Rajaratnam, et al.*, Civil Action No. 2:09-cv-05395, pending before the United States District Court for the District of New Jersey (the "New Jersey Litigation"), and the 9/11 Litigation.

48.     Defendant "Rudra" was and may still be a Confidential Human Source for the Federal Bureau of Investigation ("FBI"). Rudra is named by pseudonym as a courtesy in consideration of that fact. Rudra is believed currently to be a resident of Sri Lanka.

49.     Defendant Jayat P. Kanetkar a/k/a Jay Kanetkar ("Kanetkar") is a former FBI Special Agent assigned to the JTTF and was Rudra's "handler." Kanetkar is believed to be a resident of New Jersey. Kanetkar maintains a professional investigation services business in New Jersey and is also an attorney and an active member of the New Jersey bar.

50.     Defendant Brian P. Mallon ("Mallon") is a former Special Agent with the U.S. Immigration and Naturalization Service assigned to the JTTF. Upon information and belief, Mallon is a resident of New Jersey.

51.     Defendant John "Hank" Allison ("Allison" and, together with Elsner, Rudra, Kanetkar, and Mallon, the "Individual Defendants") is a former FBI Special Agent assigned to the JTTF. Upon information and belief, Allison is a resident of New Jersey.

52.     Mr. Rajaratnam is an ethnic Sri Lankan Tamil who left Sri Lanka when he was 14 years old and became a naturalized United States citizen in 1986. Mr. Rajaratnam permanently resides in New York, New York but is currently incarcerated at the Federal Medical Center, Devens, in Ayers, Massachusetts.

## RELEVANT NON-PARTIES

53.     Non-Party Joseph Rice is a founding member of Motley Rice.

54.     Non-Party Ron Motley was a co-founder of Motley Rice. Motley died in 2013.

55.     Non-Party Jean-Charles Brisard was Motley Rice's lead investigator in connection with the 9/11 Litigation. Brisard falsified a key document to incriminate one of the defendants in that litigation.

56.     Non-Party Michael Asimos replaced Brisard as Motley Rice's lead investigator. While acting as Motley Rice's investigator, Asimos routinely claimed that he was acting on behalf of government agencies or high-ranking officials to gain access to information.

57.     Non-Party Rosetta Research and Consulting LLC ("Rosetta") was a shell company formed by Motley Rice in 2003 to monetize the information Asimos, Mallon, and others were collecting for Motley Rice, ostensibly in connection with the 9/11 investigation.

58.     Non-Party Steven Bucci was a colonel in the Office of the Secretary of Defense who helped Motley Rice establish relationships with law enforcement and national security personnel.

59.     Non-Party Mike Dick was a friend of Mallon's who secretly worked for Rosetta while he was still employed by the FBI.

## JURISDICTION AND VENUE

60.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because this action arises under 18 U.S.C. § 1962.

61.     This Court also has supplemental jurisdiction over claims in this matter pursuant to 28 U.S.C. § 1367.

62.     Venue in this judicial district is proper pursuant to 18 U.S.C. § 1965 because Defendants Kanetkar, Mallon, and Allison, as JTTF members, transacted their affairs in the Eastern District of New York. More specifically, these defendants "handled" Defendant Rudra as

13

a CI, and procured much of the information misused by Motley Rice against Mr. Rajaratnam in connection with investigations conducted (and prosecutions brought) in the Eastern District of New York.

63.    This Court has personal jurisdiction over defendants as follows:

    a.  Pursuant to CPLR 302(1), because one or more of the defendants transacted business in State of New York;

    b.  Pursuant to CPLR 302(2), because one or more of the defendants committed a tortious act within the State of New York;

    c.  Pursuant to CPLR 302(3), because one or more of the defendants committed a tortious act outside the State of New York and engaged in a persistent course of conduct within the State of New York;

    d.  Pursuant to 18 U.S.C. § 1965, which confers personal jurisdiction within the Eastern District of New York over all defendants when, as here, at least one of the defendants (as noted above) conducted his affairs within the district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### *Mr. Rajaratnam*

64.    A dedicated philanthropist, Raj Rajaratnam has made significant donations to various charitable causes across the globe. Among other things, he has donated millions of dollars to provide medical, social, and educational services across Sri Lanka, a country ravaged by natural disasters and by a civil war between its majority Sinhalese and minority Tamil populations.

65.     Mr. Rajaratnam's philanthropy is neither politically nor ethnically driven. To the contrary, as one of the largest individual donors of humanitarian aid in Sri Lanka, and as one of the largest investors in the Sri Lankan economy, Mr. Rajaratnam has made contributions to Sri Lankan charities to address the impact of the civil war and aid all Sri Lankan people harmed by the conflict.

66.     For example, Mr. Rajaratnam has funded the clearing of land mines in war-affected areas of Sri Lanka and has donated funds to the Sri Lankan army for mine-detection dogs. For these contributions, Mr. Rajaratnam received a commemorative plaque from the Sinhalese-dominated Government of Sri Lanka.

67.     One of the organizations to which Mr. Rajaratnam once donated money was the TRO. The TRO was an international charity made up of at least 19 separate national branches around the world. Its U.S. branch was registered as a 501(c)(3) nonprofit charitable organization, and its primary branch in Sri Lanka was registered as a charitable organization in Sri Lanka.

68.     Hundreds of sovereign governments, NGOs, and individuals donated millions to the TRO in the aftermath of the 2004 tsunami. The government of Norway, for instance, donated $236 million to the TRO. The Government of Denmark donated $174 million to the TRO. The Government of Australia similarly channeled humanitarian assistance through the TRO, as did relief groups and NGOs like the United Nations Children's Fund (UNICEF), the United Nations Development Programme (UNDP), the Danish Refugee Council, Operation USA, OXFAM International, and numerous other respected charities.

69.     The Government of Sri Lanka itself made financial contributions to the TRO. In fact, in honor of the TRO's work in building over 10,000 temporary shelters and providing

tsunami relief to those most affected by the tsunami, President Chandrika Kumaratunga of Sri Lanka presented the TRO with a Presidential Award.

70.     A Sri Lanka-based accounting firm—as well as many of the foreign governments, NGOs, and relief organizations that themselves donated to the TRO—audited the TRO's accounts and projects every year from 2002 until 2006. The TRO published these audited financial statements.

71.     In 2005, former U.S. President Bill Clinton traveled to Sri Lanka and met with the TRO's Executive Director to discuss logistical issues facing the TRO in providing aid to impoverished regions of Sri Lanka.

72.     However, in late 2007, the U.S. Government designated the TRO as a foreign terrorist organization acting as a front for the LTTE. According to the U.S. Department of Treasury, the "TRO's efforts worldwide reportedly have allowed the LTTE to use humanitarian aid, which TRO collected from the international community after the December 2004 tsunami, to launch new campaigns to strengthen LTTE military capacity."

73.     Mr. Rajaratnam, an American citizen living in the United States at the time, was unaware of the TRO's alleged diversion of funds to LTTE, as, presumably, were the high-ranking U.S. and foreign government officials who engaged with the TRO on behalf of the Sri Lankan people during the relevant period.

74.     Mr. Rajaratnam has not donated to the TRO since it was designated as a foreign terrorist organization by the U.S. Government.

75.     The governments of the United States and Sri Lanka both investigated the connection between the TRO and the LTTE. Mr. Rajaratnam voluntarily and fully cooperated with those investigations, without counsel, and no allegations were ever made by any

16

government against Mr. Rajaratnam. To the contrary, the investigations unit chief of the Central Bank of Sri Lanka declared in 2009 that "[a]t the time Mr. Rajaratnam made the donations, the TRO was not banned by the Sri Lankan government, nor the U.S. It was a donation made in good faith."

76.     On October 16, 2009, the FBI arrested Mr. Rajaratnam for insider trading.

77.     Six days later, Motley Rice pounced, naming Mr. Rajaratnam as a defendant in a civil lawsuit alleging, in part, that Mr. Rajaratnam provided financial and other support to the LTTE. As of today, Motley Rice's lawsuit against Mr. Rajaratnam is still ongoing in the United States District Court for the District of New Jersey.

78.     As detailed below, that lawsuit is but one of a series of abuses by Motley Rice and its co-conspirators in furtherance of a scheme designed to profit from the assertion of meritless claims and trafficking in sensitive government information.

---

*"[Motley Rice partner Joe] Rice is regarded by the people in this litigation as more mercenary than missionary.""*

- "Smokin Joe", *The American Lawyer* Vol. XX, No.4 (ALM May 1998)

---

### *Ness Motley and the Asbestos Money Machine*

79.     Motley Rice founders Ron Motley and Joseph Rice rose to prominence with their previous firm, Ness, Motley, Loadholt, Richardson & Poole, representing plaintiffs in personal injury cases involving asbestos. Ness Motley became so effective at "recruiting" putative plaintiffs that it leveraged the unfortunate consequences of corporate negligence into a formidable litigation factory, flooding the federal and state judicial systems with tens, if not hundreds, of thousands of often frivolous cases.

80.     Ness Motley's enormous inventory of cases made it impossible for any court or company to meaningfully evaluate the merits of individual claims, forcing defendants to "buy in bulk"—*i.e.*, to settle lawsuits indiscriminately, in large batches. Presaging the mortgage-backed securities that brought down the global economy, Ness Motley bundled meritorious claims together with "subprime" claims that had little or no merit (*i.e.*, claims brought on behalf of plaintiffs who had no asbestos-related illness). Ness Motley then "sold" those bundles to putative defendants in mass settlements.

81.     Ness Motley profited immensely from this practice, taking hundreds of millions of dollars in contingency fees off the top of settlement payments. Typically, the large amounts plaintiffs' lawyers recover in contingency cases can be justified by the magnitude of the risk they assume. In this case, however, Ness Motley's commodification and securitization of the claims made the outcomes far more predictable, and the cost more manageable. Yet, Ness Motley did not lower its fees to account for this.

82.     Moreover, by diluting the meritorious claims with the "filler" claims, Ness Motley spread what was left of the settlement payments after the law firm took its cut more thinly, thus further diminishing the amounts paid to seriously ill victims of asbestos poisoning.

83.     In 2001, Ness Motley's conduct drew a lawsuit alleging, among other things, that Ness Motley improperly induced medical "experts" to testify falsely—a federal crime under 18 U.S.C. § 1512 (witness tampering); used threats and intimidation to prevent legislative reform of asbestos litigation—also a federal crime (obstruction under 18 U.S.C. § 1505); and fraudulently induced—and then breached—settlement agreements worth hundreds of millions of dollars.

18

84.     The complaint describes in detail Joe Rice's meetings with companies supporting the passage of the "Fairness in Asbestos Compensation Act"—an act that would cripple Motley Rice's business model by prioritizing the claims of seriously ill plaintiffs.

85.     The description of Rice's conduct at that meeting brings to mind the dinner party scene in "The Untouchables" in which Al Capone (played by Robert De Niro) extolls the virtues of teamwork with a baseball bat in his hand:

> Rice stated that efforts to promote or support the Act were viewed by [Ness Motley and other plaintiffs' counsel] as starting a "nuclear war." He said that the defendants were prepared to "fight on whatever level necessary" to defeat the legislation. He also stated that further support for the Act would result in "war" that would break out on every front, and that any company that did not renounce its support for the legislation would be engulfed in asbestos litigation that "will rage like a fire you will never control."

*G-I Holdings Inc. v. Baron & Budd, et al.*, SDNY Case No. 01-cv-0216, Third Amended Complaint at ¶ 135.

86.     At a subsequent meeting, Rice demanded the companies sign letters *opposing* the Act, stating "that the asbestos plaintiffs' attorneys had agreed that companies 'supporting the legislative effort do not have common interest with the rest of us,' and 'shouldn't be here.'" *Id.*, ¶ 140. As noted above, such threats constitute criminal obstruction of proceedings before a department or agency of the United States, in violation of 18 U.S.C. § 1505.

87.     Motley and Rice then turned their attention to litigation against the tobacco companies, again raking in billions of dollars in fees through "bulk" settlements. It was reported that they became wealthier than many of the executives they sued. Motley, for example, owned a private plane, a mansion on an island, and a 156-foot yacht named Themis, after the Greek titan of law.

88.     Not all of the tobacco lawyers were as happy with the results. Joe Rice negotiated an $11.3 billion settlement with the tobacco companies that changed the way the lawyers had agreed to be compensated—without telling all the lawyers. Many of Rice's colleagues were angry; one lawyer, Bob Kerrigan, told Rice "[y]ou're too fast, too slick, and I don't like the way you operate." Another lawyer involved in the tobacco litigation said of Rice, "he's not a trustworthy guy…. [H]e'll do whatever he has to to maximize his and his firm's interests."

---

*"What the stock market and the Internet bubble were to the 1990's, the counterterrorism bubble was to the first years of the New Millennium and there was a cadre of men willing and able to take advantage."*

- James Risen, *Pay Any Price: Greed, Power, and Endless War*" (2015)

---

### Motley Rice Discovers the Value of Government Information

89.     James Risen, a Pulitzer Prize-winning national security journalist formerly with the New York Times, wrote in his book, *Pay Any Price: Greed, Power, and Endless War* ("*Pay Any Price*"), that after the tobacco litigation Ron Motley "was like a shark out of water." Motley's firm had milked the tobacco companies for all they were worth, and "by September 11, 2001, he was searching for his next big case."

90.     The firm immediately sought out deep pockets, and the deepest pockets it could find were in Saudi Arabia. Thus, in 2002, Ness Motley (soon to become Motley Rice) filed a trillion-dollar lawsuit accusing Saudi banks, charities, and members of the Saudi royal family of financing al Qaeda.

20

91.    As recounted by Mr. Risen and his many sources, Motley Rice used the 9/11 litigation as a pretext to embed itself with unscrupulous or duped government officials and amass a valuable database of sensitive information.

92.    In 2002, Motley Rice hired as its lead investigator a French author and analyst named Jean-Charles Brisard, who claimed to have ties with French intelligence and rose to notoriety when he published a book blaming the Saudis for 9/11.

93.    In 2003, Motley Rice sent Brisard to Bosnia to try to gain access to a secret document obtained by the CIA. The U.S. Department of Justice resisted Motley Rice's efforts to obtain the highly sensitive document, which the DOJ was using as evidence in an ongoing criminal prosecution.

94.    Eager to get its hands on the document, Motley Rice dismissed the DOJ's concerns about the integrity of their criminal case and pushed back—hard. The DOJ ultimately agreed to share the document with Motley Rice after Motley Rice obtained an order from the Bosnian Supreme Court asking the U.S. Government to do so.

95.    The document, known as "the golden chain," supposedly was a list of donors to Osama bin Laden. The document obviously was not helpful enough, because when Brisard translated the document, he falsified at least one name on the list, changing "bin Mahfoodh" to "Khalid bin Mahfouz"—the name of one of the richest men in Saudi Arabia.

96.    Not coincidentally, Motley Rice had named Khalid bin Mahfouz as a defendant in the 9/11 action.  Brisard's falsification of the document ultimately came to light, and Motley Rice replaced Brisard with Michael Asimos.

97.     Like Brisard, Asimos claimed to have connections in the intelligence community. Motley Rice could not resist the lure of such connections—and the promise of access to information unavailable to any other plaintiffs' firm—and hired him.

98.     Asimos' *modus operandi* was to ingratiate himself to low-level government operatives by offering to share intelligence with them. Defendant Michael Elsner and other lawyers at Motley Rice knew Asimos was sharing information collected and generated for the 9/11 cases—including privileged materials—with people at the Department of Defense and encouraged such unethical conduct in the hopes of receiving a quid pro quo (*i.e.*, access to equally sensitive information from government investigations).

99.     Over the course of the next several years, with the help of Asimos and others both within and outside of the government, Motley Rice established a network that, through unsavory and often illegal means, gave Motley Rice unique—and unauthorized—access to information it hoped to sell to the government and/or commercial interests. It also obtained secret government information that it used to further that scheme, and to commodify "anti-terrorism litigation" as they had with the asbestos and tobacco cases.

100.    Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice did not tell its clients that it had allowed Asimos and his government contacts to use the lawsuit as a covert intelligence-gathering operation. In short, Motley Rice never disclosed to the terror victims that its resources were not being applied exclusively to the investigation and prosecution of their claims, but to a broader, more amorphous and often unlawful information-gathering apparatus designed to profit Motley Rice, not to benefit the victims of terror.

101.     As detailed in *Pay Any Price*, "numerous sources familiar with the matter [told Risen that Ron] Motley was open to providing information to the Bush administration but always hoped that the government would reciprocate, perhaps by giving Motley Rice access to classified intelligence reports on Saudi involvement in terrorist finance." This, not altruism, was the principal reason Motley Rice focused significant resources and attention on the priorities of the government agents with whom it had developed relationships.

102.     In other words, the Motley Rice attorneys working on the 9/11 cases sidelined their professional obligations as attorneys to their clients to play spy games they hoped would give them unique access to sensitive information they could either sell or use to develop new cases, even as the 9/11 cases languished (and continue to languish).

103.     Asimos and his "right-hand man," former INS agent Brian Mallon, were as effective at gathering information and intelligence in Afghanistan as they were at blurring the line between the law firm and the intelligence community. For example, at one point Asimos traveled to Kabul and returned with a document identifying Al Qaeda operatives who were authorized to carry weapons in Afghanistan. He was taking the document to the Pentagon but showed it to Motley Rice attorneys first. Although the document had no apparent relevance to the 9/11 lawsuit, lawyers working alongside Motley Rice in the litigation stopped the investigators from taking the document to the Pentagon until they had secured a copy for themselves. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that those attorneys were working in concert with Motley Rice to divert the document.

104.     Asimos had a friend, Col. Steven Bucci, in the Office of the Secretary of Defense ("OSD"). Bucci was under Asimos's thrall, and willing to aid and abet his deceptions. Bucci told

23

Risen he helped Motley Rice establish a relationship with the Defense Intelligence Agency

("DIA"), and they began sharing information.

105.    Bucci also told Risen:

> [Asimos] is very, very talented at trying to stay alive, and the environments he
> was operating in require some degree of verbal manipulation skills. I was an
> intel collector… and you get paid to tell people they're your friend… when you
> don't really care whether they're your friend or not. So in the intel gathering
> business, the fact that he is a good liar perhaps is not necessarily a character
> flaw. It's called a skill. I never got the impression that Mike ever lied to me about
> any of the things he was doing or had done. The fact that we're very good friends
> is unfailingly true. If people took that to mean that I was his handler, that wasn't
> true.

106.    When others questioned Asimos's claims that he was working under the aegis of

the Pentagon—and, in particular, under the authority of Deputy Secretary of Defense Paul

Wolfowitz—Asimos would direct them to Bucci, who would corroborate Asimos's claims.

However, senior officials in Wolfowitz's office, including Wolfowitz himself, say they were

unaware of any relationship with Asimos. As Bucci himself put it, "I basically vouched for

him—that he was doing legitimate stuff, that the information he was gathering had been of use to

our intel people in the past and that he was a legitimate guy…."

107.    Using Bucci to vouch for him, Asimos was able to persuade a staffer on the

Senate Judiciary Committee to assist in Asimos's clandestine operations. Soon after the U.S.

invasion of Iraq in March 2003, Asimos wanted to get into that country. He called Mark

Heilbrun, a congressional staffer who worked with Senator Arlen Specter, and told him

Wolfowitz wanted Asimos in Iraq—secretly, of course—and he needed help getting in-country.

108.    Heilbrun told Risen he was puzzled as to why the Department of Defense would

be unable to transport their own agent into Iraq, but Asimos gave him Bucci's cell phone

number, and Bucci backed up Asimos's claims. Heilbrun then got Senator Specter to call Deputy

24

Secretary of State Richard Armitage, who put them in touch with the U.S. ambassador to Turkey—all to get Asimos, who was supposedly working directly for OSD, into Iraq.

109.    Asimos's use of interstate and/or international communications transmitted by wire to deceive Mr. Heilbrun, Senator Specter, and Deputy Secretary Armitage in March 2003, for the benefit of Motley Rice, constituted wire fraud in violation of 18 U.S.C. § 1343.

110.    In April 2003, Asimos arrived in Iraq carrying $25,000 in cash. Once there, he made contact with a small military force affiliated with Ahmed Chalabi's Iraqi National Congress ("INC"). Chalabi, an Iraqi exile, was the U.S. Government's choice to fill the vacuum left by the overthrow of Saddam Hussein.

111.    Asimos told an officer that the Pentagon had sent him to help. On the strength of that representation, Asimos was allowed to fall in with the force. Having wormed himself into Chalabi's inner circle, Asimos worked to persuade Chalabi's aides to give him access to documents they were collecting from Iraqi government ministries — including the Iraqi intelligence service.

112.    Not surprisingly, it turned out that the Pentagon already had a liaison officer assigned to the INC: Col. Ted Seel, who was bemused by Asimos's unexplained presence there. Asimos told him he was there on behalf of OSD and Motley Rice, and that there were people he needed to interview in Baghdad for the lawsuit.

113.    Another American embedded with Chalabi—Chalabi spokesman Francis Brooke—thought Asimos "didn't smell right." Asimos tried to allay Brooke's concerns with his usual line: he told him to call Bucci. Instead, Brooke called a senior aide to Paul Wolfowitz. Wolfowitz's office told Brooke they had no idea who Asimos was. Brooke confronted Asimos with his lies and told him to leave immediately. Asimos fled before the OSD called back to ask

the INC to detain Asimos. Even Bucci later admitted that Asimos was not in Iraq on assignment from the Department of Defense.

114.     Asimos's use of interstate and/or international communications transmitted by wire to deceive Mr. Brooke and others in April 2003, for the benefit of Motley Rice, constituted wire fraud in violation of 18 U.S.C. § 1343.

---

*"The web of relationships that developed among Motley Rice, Mike Asimos, Rosetta, the Pentagon, the FBI, and the DEA operated completely outside the U.S. government's normal intelligence-gathering processes."*

- James Risen, *Pay Any Price*

---

### *Rosetta Research: Monetizing Government Information*

115.     Soon after Asimos returned from Iraq, Motley Rice helped him form Rosetta Research and Consulting LLC, through which Mallon, Asimos, and the other investigators would continue their clandestine investigations. Motley Rice believed that, by using a separate legal entity, it could secure profitable government contracts and—even better—sell the information it had been gathering (ostensibly for the 9/11 Litigation) to commercial customers.[2]

116.     Formal government contracts never materialized through Rosetta, but Motley Rice continued to rely on Asimos's deceptions to gain access to sensitive information. Although Rosetta's primary mission was supposed to be performing investigative work to support the 9/11

---

[2] In 2010, Kanetkar founded Guaranteed Investigations, Inc., a private investigation company "consisting of security professionals with Federal and State Law Enforcement, Military, and Business Security experience."

lawsuit, Asimos spent most of his time exploiting government contacts to obtain information that, for the most part, had little relevance to the 9/11 litigation—but was helping build the massive database of information that Risen called "the most valuable asset Motley Rice ever got out of the 9/11 case."

117.    By 2004, no doubt in part because Bucci's usefulness had diminished once others in the OSD became aware of his relationship with Asimos, Rosetta turned its attention from the Department of Defense to the Department of Justice.

118.    Motley Rice's investigators eventually found a "Bucci" in the FBI: Mallon's friend Mike Dick. Using a clichéd, if effective, tactic, Rosetta offered to feed Dick information for free (at first), in exchange for his assistance with Rosetta's operations. Soon, agent Dick became an integral part of the Rosetta family. The FBI Agent even had his own Rosetta email address. Motley Rice's offer, through Rosetta, of valuable information to a federal employee to persuade him to collude in Motley Rice's fraudulent scheme constitutes bribery of a public official in violation of 18 U.S.C. § 201(b)(1).

119.    Although Dick later claimed the flow of information was one-way (*i.e.*, from Motley Rice to the FBI), there do not appear to have been any procedures a responsible government agent or law firm would put in place to protect sensitive information from Motley Rice, or privileged information from the government.

120.    For example, the Washington Post reported in 2008 that Rosetta took an unnamed FBI employee on a house-hunting trip "in anticipation of being hired by Rosetta," and that the employee gave Rosetta information taken from FBI databases. Motley Rice's offer, through Rosetta, of employment and perhaps other things of value (such as a house) to a federal

27

employee to induce that person to disclose confidential government information constitutes bribery of a public official in violation of 18 U.S.C. § 201(b)(1).

121.    According to Risen, internal Rosetta documents show that Motley Rice's investigators were using FBI databases to obtain background on existing and potential sources.

122.    One such source was a man who had worked with the Islamic Development Bank. Rosetta paid for this individual to travel to the United States, where he met first with the government and then with lawyers from Motley Rice. After the meeting, Dick reported back to Rosetta what the source had told the FBI. Presumably, if the government wanted Motley Rice to be privy to their conversations with the source, they would have invited Motley Rice to the meeting.

123.    Another of the sources Rosetta cultivated was an Afghan diplomat in London. To keep him happy, Rosetta arranged to provide his friends with legal assistance, jobs, etc., and even made cash payments directly to him on Motley Rice's dime. Those payments and favors to a foreign official constitute violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq.*

124.    Motley Rice was becoming frustrated that Rosetta was not turning a profit and looking to convert Rosetta's informal relationship with Dick into a formal government contract. FBI senior management, who were just learning the extent of Dick's "extracurricular activities" with Rosetta, rejected Rosetta's bid for a formal contract.

125.    Dick's relationship with Rosetta ultimately led to a "severe verbal reprimand" for involving Rosetta in an operation without getting prior approval from his superiors, an inquiry by the DOJ's Office of the Inspector General, a referral to the FBI's Office of Professional Responsibility, and a recommendation that Dick be dismissed.

126.    In 2004, Motley Rice decided they wanted to bring Haji Bashir Noorzai, a notorious Afghan drug lord, into the United States to serve as a witness in the 9/11 litigation. No longer able to help Rosetta directly, Dick put Rosetta in touch with a friend at the DEA, who agreed to work with Rosetta to bring Noorzai into the country.

127.    What Motley Rice and Rosetta did not know at the time was that the DEA had been working for five years to build a case against Noorzai and were planning to arrest him when he entered the country.

128.    When they finally realized what the DEA's intentions were, Mallon and Asimos tried to persuade the DEA not to arrest Noorzai, but ultimately decided to go along with the DEA operation. Thus it transpired that Motley Rice's civilian investigators, after trying to persuade a federal law enforcement agency not to arrest a notorious Afghan drug lord with ties to the Taliban, induced that drug lord to come to the United States under false pretenses—ostensibly to act as a witness in Motley Rice's lawsuit—and delivered him instead to the DEA for arrest and prosecution. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice offered to employ Noorzai as a witness.

129.    By persuading a foreign national to come to the United States under false pretenses using promises of employment in the United States, Motley Rice's agents committed criminal fraud in violation of 18 U.S.C. § 1351.

130.    Although evidence of Rosetta's involvement in the Noorzai operation ultimately was excluded from Noorzai's criminal trial, and Noorzai was sentenced to life in prison, Motley Rice's interference with the federal government's criminal investigation to secure a witness for their civil case could have compromised the prosecution.

131.    By 2005, Rosetta still had not procured a single government contract, had lost its

unofficial contacts at the DOD and DOJ, was not turning a profit from the sale of its information

to the private sector, and could not afford to keep bribing its informants. Meanwhile, the 9/11

litigation for which this all supposedly had been done lay stagnant.

132.    Tellingly, Joe Rice's recollection of the Rosetta project runs contrary to the

narrative that Motley Rice was altruistically assisting the federal government, but rather fits with

Rice's reputation as "more mercenary than missionary." As Risen recounts:

> Joe Rice was furious that the government, by willingly exploiting Rosetta, had
> effectively commandeered Motley Rice's 9/11 lawsuit. "All we got were
> promises, and they got all our work product," he says. As Rice recounted with
> simmering resentment: "how much money are we out on the 9/11 lawsuit and
> Rosetta? A bunch. A whole bunch. It's a big number. It would be in your
> millions type number."

133.    As it turns out, Risen's description of Motley Rice's illicit activity in connection

with the 9/11 litigation could just as easily describe the conduct that Mr. Rajaratnam ultimately

uncovered—and is still uncovering—in the New Jersey Litigation:

> The web of relationships that developed among Motley Rice, Mike Asimos,
> Rosetta, the Pentagon, the FBI, and the DEA operated completely outside the
> U.S. government's normal intelligence-gathering processes. The relationships
> were so dependent on personal connections that few people in the government
> have ever had the nerve to go back and try to unravel exactly what happened. It
> appears that the investigators for the Justice Department's inspector general,
> who conducted an inquiry into Rosetta's relationship with the FBI, were so
> confounded by the tale that they decided to focus simply on the question of
> whether a couple of FBI employees got too close to Rosetta.

134.    While the Justice Department may have narrowly focused its investigation in the

interest of expediency, to avoid political backlash, and because it was simply "confounded," Mr.

Rajaratnam has no intention of giving Motley Rice and the former agents a "free pass" for their

abuses—particularly those Motley Rice has employed against Mr. Rajaratnam personally.

135.     In the section that follows, we describe Motley Rice's efforts to conceal its misconduct from Mr. Rajaratnam and the Court, Mr. Rajaratnam's gradual uncovering (with the Court's assistance) of that misconduct, and Motley Rice's subsequent efforts to obscure or justify its misconduct.

---

*"[Former federal agents Mallon, Kanetkar, and Allison] have not provided Plaintiff's counsel with any material contained in the files of the Department of Justice nor has Plaintiff's counsel requested such from them."*

- Motley Rice, in a letter to the
United States District Court for the District of New Jersey

---

### Motley Rice's Attack on Mr. Rajaratnam

136.     For years after Motley Rice filed the New Jersey Litigation, Mr. Rajaratnam, through his counsel, repeatedly requested that Motley Rice provide information regarding the identities of any investigators it retained in connection with its lawsuit against Mr. Rajaratnam. Motley Rice consistently refused those requests.

137.     In numerous filings, Motley Rice referred to any such individuals in letters to Mr. Rajaratnam's counsel and to U.S. Magistrate Judge Joseph A. Dickson using vague labels, including "investigators," "consultants," "agents," "non-testifying consultants," "non-testifying investigators," "experts," "non-testifying consulting experts," or even likening them to "paralegal[s]".

138.     It was not until November 14, 2016—after the close of the first phase of discovery in the New Jersey Litigation—that the District Court in New Jersey compelled Motley Rice to

31

disclose the names of its investigators. It then disclosed that it had retained three former special agents from the JTTF who had investigated, for the government, the very same subject matter that Motley Rice was pursuing in its litigation against Mr. Rajaratnam.

139.     One of those investigators was defendant Brian Mallon, Asimos's "right hand man." Motley Rice engaged Mallon and his colleagues from the JTTF, former FBI agents Jay Kanetkar and John "Hank" Allison.

140.     While on the JTTF, Mallon, Kanetkar, and Allison worked on an investigation into the LTTE, which ultimately led to a series of criminal prosecutions in the Eastern District of New York. The agents' familiarity with the criminal investigation allowed Motley Rice to easily identify and obtain the information it wanted to draft a complaint against Mr. Rajaratnam—which is why Motley Rice hired them.

141.     Motley Rice did not inquire from the government whether Mallon, Kanetkar and/or Allison were permitted to assist Motley Rice with respect to the New Jersey Litigation prior to their retention of the former agents.

142.     Motley Rice did not establish any "screens" to prevent Mallon, Kanetkar and/or Allison from sharing with Motley Rice either classified information or grand jury information that the agents learned from their work with the government.

143.     Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Mallon, Kanetkar and/or Allison advised Motley Rice in connection with Motley Rice's submission of *Touhy* requests and/or Freedom of Information Act Requests to seek formally information and evidence that it had already improperly received or learned of from the agents and used as the basis for the complaint initiating the New Jersey Litigation.

144.    Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice later tried to use these formal requests to whitewash its illicit and unlawful use of information known to the former JTTF agents solely through their work on the federal criminal investigation. Motley Rice's first *Touhy* request was not served on the Government until November 8, 2011, two years *after* Motley Rice had filed its Complaint against Mr. Rajaratnam.

145.    Motley Rice also obtained from Kanetkar and Mallon the secret identity of the Confidential Human Source who goes by the code-name "Rudra." Kanetkar and Mallon had worked with Rudra while they were agents of the JTTF. After Motley Rice hired them, Kanetkar and Mallon introduced Rudra to Motley Rice and helped to secure Rudra's assistance with the New Jersey Litigation. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice solicited that information from the agents.

### *Motley Rice's Attempted Cover-up*

146.    Motley Rice worked assiduously to keep the involvement of Mallon, Kanetkar, Allison and Rudra in the New Jersey Litigation a secret from federal law enforcement, the U.S. District Court in New Jersey, and Mr. Rajaratnam.

147.    Motley Rice did not disclose Rudra's existence until years after it filed the complaint. Even then, Motley Rice intentionally misspelled Rudra's (real) name in four different ways on eight different occasions in the New Jersey Litigation, to prevent Mr. Rajaratnam's counsel from investigating Rudra or connecting him to documents that referenced him.

148.    On December 2, 2016, Mr. Rajaratnam's counsel participated in a meet-and-confer with Motley Rice's attorneys. During the meet-and-confer, Motley Rice made several

representations to Mr. Rajaratnam's counsel regarding its retention of the former agents and its work with the Confidential Human Source:

> a. Motley Rice conceded that it did not know whether any of the former agents were authorized by the government to work with Motley Rice in connection with the New Jersey Litigation.
>
> b. Motley Rice conceded that it did not put any processes in place to "screen" the agents from sharing information learned from their former government service.

149.    On December 9, 2016, Motley Rice sent a letter to counsel for Mr. Rajaratnam in which it confirmed that it had not received authorization from the government to retain the former agents. Motley Rice also stated that it did not intend to inform the government that it had retained former federal agents in connection with the very subject matter of their work for the government.

150.    On December 13, 2016, Mr. Rajaratnam's counsel submitted a letter under seal (which subsequently was unsealed as Document 325 on the docket of the New Jersey Litigation) to Judge Dickson in the United States District Court for the District of New Jersey. In its letter, Mr. Rajaratnam's counsel shared the limited, but alarming, discoveries that it had made since Motley Rice was forced to disclose the identities of its investigators.

151.    It is inconceivable that Motley Rice retained three former government agents as investigators in connection with a lawsuit covering the same subject matter the agents had investigated while on the JTTF for any purpose other than to obtain information they acquired through the criminal investigation.

152.    Indeed, there is at least one piece of information known only to the government and its agents that Motley Rice admits it obtained from the Former JTTF Agents: the identity of Rudra.

153.    The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources ("AG Guidelines"), signed on December 13, 2006 and effective June 2007, establish protocols involving and governing Confidential Human Sources like Rudra.

154.    Paragraph I(D)(3) of the AG Guidelines states that:

> DOJ personnel have a continuing obligation after leaving employment with the Department of Justice to maintain as confidential the identity of any Confidential Human Source and the information that Source provided, unless disclosure is appropriate under one of the exceptions referenced below in paragraph D(4).

None of the exceptions in paragraph D(4) apply to Rudra's identity.

155.    Furthermore, section 15.1 of the FBI Confidential Human Source Policy Manual, revised September 5, 2007 (FBI Manual), which was created under the authority of the AG Guidelines, states that:

> protection of a CHS's identity is of primary importance and **disclosure should only be approved when it is absolutely necessary** to achieve important investigative, public policy, and safety goals. **FBI policy requires that the CHS's identity and relationship with the FBI be protected** from disclosure except to those who need to know this information **in order to carry out their official duties** and except as legally required. This policy is firmly recognized in federal law and the FBI will do everything within its lawful authority to enforce the policy.

(emphasis added).

156.    Motley Rice's representations to the court that it did not seek confidential information, did not receive confidential information, and complied with the guidelines governing disclosure of confidential government information all were demonstrably false. By making those representations via electronic communications, Motley Rice committed wire fraud in violation of 18 U.S.C. § 1343.

157.    In addition, Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice has paid Rudra at least approximately $40,000.

158.    Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will also show Motley Rice paid some or all of that to procure Rudra's cooperation and testimony in the New Jersey Litigation—a violation of the federal bribery statute, 18 U.S.C. § 201(c)(2).

### *The* Vanity Fair *Article*

159.    On or about September 30, 2011 *Vanity Fair* published an article entitled "Crouching Tiger, Hidden Raj" (the "Article"). The Article included quotations attributed by author David Rose to defendants Elsner, Kanetkar, and Rudra.

160.    There was no indication in the Article that Kanetkar and Rudra were working for Motley Rice at the time they gave their interviews to *Vanity Fair*.

161.    The Vanity Fair Article stated that, on November 2, 2002, Mr. Rajaratnam attended an event in Somerset, New Jersey to mark the 25th anniversary of the Ilankai Tamil Sangam (the "November Event"), an organization that is self-described as an "Association of Tamils of Sri Lanka in the U.S.A." Mr. Rajaratnam's speech focused on the importance of philanthropy and support for the Tamil community.

162.    The *Vanity Fair* Article describes Kanetkar as "Rudra's main F.B.I. handler from 1999 until he left the bureau in June 2006." It describes Elsner as "the attorney from Charleston, South Carolina, whose law firm, Motley Rice, has filed a claim against Mr. Rajaratnam…on behalf of Tamil Tiger victims."

36

163.   In the Article, Rudra and Kanetkar make numerous knowingly false and defamatory statements regarding Mr. Rajaratnam.

164.   Rudra made the following false and defamatory statements regarding Mr. Rajaratnam:

a.   According to the Article, "Rudra's secret recordings included detailed accounts by Tiger leaders of how money was transferred from the T.R.O. to the terrorist group itself, and in this case there is a copious documentary record of the role played by Mr. Rajaratnam." No such "copious documentary record" exists.

b.   According to the Article, Rudra attended the November Event. Rudra claims in the Article that he was "equipped with a concealed recording device," and "sa[id] his memory of what Mr. Rajaratnam said at the [November Event] is clear, and it is supported by his former F.B.I. handlers, who heard the recordings when they were made." Rudra is quoted in the Article as saying, about Mr. Rajaratnam's speech at the November Event:

"He got up and, flanked by L.T.T.E. flags, he said, 'Everyone must support the Tigers' cause,'" Rudra recalls. "He mentioned the fact that his wife was an Indian Sikh [a minority group from which some had also mounted a terrorist campaign aimed at creating a separate state]. Mr. Rajaratnam said: 'They're terrorists. We're terrorists. We are all freedom fighters.' Everyone laughed. Then he added: 'They're our terrorists, and you all must support the struggle.'"

i.   An unclassified transcript of Rudra's recording of the November Event demonstrates that Rudra's "quotation" of Mr. Rajaratnam's supposed remarks was false.

ii.   The transcript demonstrates that Mr. Rajaratnam never said that "[e]veryone must support the Tigers' cause."

iii.   The transcript demonstrates that Mr. Rajaratnam never said, "They're terrorists. We're terrorists."

iv.   The transcript demonstrates that Mr. Rajaratnam never said, "They're our terrorists and you must all support the struggle."

165.   Kanetkar made the following false and defamatory statements regarding Mr. Rajaratnam.

37

    a.   Kanetkar falsely stated that two Tamil Tiger members went to Mr. Rajaratnam's house "to arrange to get the money."

    b.   Kanetkar falsely stated that the LTTE had given Mr. Rajaratnam money to invest.

166.    Kanetkar and Rudra were agents and/or employees of Motley Rice at the time that they made these false and defamatory statements to *Vanity Fair*.

167.    Motley Rice, Elsner, Kanetkar, and Rudra knew of, made and coordinated the dissemination of these false and defamatory statements to *Vanity Fair* in furtherance of the New Jersey Litigation, knowing and intending the statements would be widely disseminated via interstate wires on *Vanity Fair's* website. Each transmission of the website was a separate instance of wire fraud in violation of 18 U.S.C. § 1343.

168.    There is no evidence that Kanetkar or Rudra received authorization from the government to speak with *Vanity Fair*.

169.    There is similarly no evidence that Kanetkar received authorization from the government, as required by Section 15.1.1 of the FBI Manual, the AG Guidelines, and related federal laws and regulations, to introduce the author of *Vanity Fair* to Rudra, a Confidential Human Source.

170.    Mr. Rajaratnam, who had dedicated so much of his life and personal wealth towards ending the humanitarian crisis in his family's home country of Sri Lanka, had been publicly branded a terrorist funder and sympathizer. Given the magazine's wide readership and name recognition, news of the Article spread quickly. The Article's availability on the *Vanity Fair* website made it easy for readers to share, repost, and access the article at their convenience.

* * *

171.    Motley Rice has been operating outside of the law for decades to advance its pecuniary interests.

38

172.    Mr. Rajaratnam brings this action against Motley Rice, its lead lawyer, and the former agents and the Confidential Human Source they hired, to clear his name and to bring the Defendants to justice.

## COUNT I: RICO § 1962(c)
### (Individual Defendants - Motley Rice Enterprise)

173.    The allegations of paragraphs 1 through 172 are incorporated herein by reference.

174.    At all times relevant to this complaint, Motley Rice (and its predecessors-in-interest, including Ness Motley, Loadholt, Richardson & Poole), Joseph Rice, Ron Motley, Michael Elsner, Jay Kanetkar, Brian Mallon, John Allison, Rosetta Research and Consulting LLC, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra were all "person[s]" within the meaning of 18 U.S.C. § 1961(3).

175.    At all times relevant to this complaint, Motley Rice was a limited liability company, partnership, or other legal entity constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Motley Rice Enterprise").

176.    Joseph Rice, Ron Motley, and defendant Michael Elsner (collectively, the "Motley Rice Members") were members and agents of the Motley Rice Enterprise.

177.    Jay Kanetkar, Brian Mallon, John Allison, Rudra, Mike Asimos, Jean-Charles Brisard, and Rosetta (collectively, the "Motley Rice Agents") were agents of the Motley Rice Enterprise.

178.    As set forth more fully above, the Motley Rice Members and the Motley Rice Agents corrupted the Motley Rice Enterprise and caused Mr. Rajaratnam damage through a pattern of racketeering activity.

179.    As set forth more fully above, the Motley Rice Members and the Motley Rice Agents were persons associated with the Motley Rice Enterprise and conducted or participated,

directly or indirectly, in the operation and management of the Motley Rice Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and 1962(c). This pattern of racketeering activity entailed at least two acts of racketeering by the Motley Rice Members and/or the Motley Rice Agents, at least one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering.

180. The foregoing constitutes an open-ended pattern of racketeering spanning from at least the early 1990's to as late as June 19, 2017. As alleged above, that pattern of racketeering is part of the way Motley Rice regularly does business, and Motley Rice has employed it in connection with multiple schemes and litigations. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice's ongoing pattern of racketeering extends to other litigations and investigations. The New Jersey Litigation remains ongoing, and Motley Rice continues to maintain it did nothing wrong by employing the Former JTTF Agents and Rudra. In short, there is a strong likelihood that the ongoing racketeering activity of the Motley Rice Enterprise will continue indefinitely.

181. The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under, *inter alia*, 18 U.S.C. §§ 201, 1341, 1343, 1351, and 1512 and are within the scope of 18 U.S.C. § 1961(1)(A) and (1)(B). As set out more fully herein, the commission of those related predicate acts over the period of time alleged constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5).

**Bribery/Tampering**

182. As part of and in furtherance of the fraudulent schemes and artifices described above, the Motley Rice Agents and the Motley Rice Members directly or indirectly, corruptly,

gave, offered, or promised money and other things of value, or offered or promised public officials to give money, services, or other things of value to others, with the intent to induce such public official, including, without limitation, Mike Dick and the unnamed FBI employee referenced in paragraph 120 above, to commit or aid in committing, or collude in, or allow, or make opportunity for the commission of, fraud on the United States and/or to do or omit to do acts in violation of such official's lawful duty. Those acts constituted offenses indictable as crimes under, *inter alia*, 18 U.S.C. § 201(b), bribery of public officials.

183.    As part of and in furtherance of the fraudulent schemes and artifices described above, the Motley Rice Agents and the Motley Rice Members directly or indirectly, gave, offered, or promised money and other things of value to persons, including, without limitation, putative medical experts and Rudra, because of the testimony under oath or affirmation given or to be given by such persons as witnesses in litigation. Those acts constituted offenses indictable as crimes under, *inter alia*, 18 U.S.C. § 201(c) (bribery of witnesses) and/or 18 U.S.C. § 1512 (witness tampering).

**Mail and Wire Fraud**

184.    As part of and in furtherance of the fraudulent schemes and artifices described above, the Motley Rice Agents and the Motley Rice Members made repeated use of, or had reason to believe that others would use, the U.S. Postal Service, interstate overnight couriers and/or the interstate wires to transmit various documents or oral communications, including, without limitation, the communications identified in paragraphs 109, 114, 156, and 167 (each a "Transmission").

185.    Each Transmission constituted either the transmittal by means of wire communication in interstate or international commerce of signals, sounds or writings; the use of

41

the U.S. Postal Service; or the use of interstate overnight couriers for the purpose of executing or in connection with the aforementioned schemes and artifices to defraud.

186.    The Motley Rice Agents and the Motley Rice Members made or caused to be made these Transmissions with the specific intent of defrauding, *inter alia*, the United States District Court for the Southern District of New York, the United States District Court for the District of New Jersey, Senator Arlen Specter, Deputy Secretary Richard Armitage, the FBI, the Department of Defense, the Iraqi National Congress, and the American public.

187.    Each of these Transmissions furthered the aforementioned schemes and artifices to defraud, which were intended to and did proximately cause injury to Mr. Rajaratnam and others in their business and property and deprived Motley Rice of the intangible right to honest services by its members, Joe Rice, Ron Motley, and Michael Elsner. Those acts constituted offenses indictable as crimes under, *inter alia*, the "mail fraud" and "wire fraud" statutes, 18 U.S.C. §§ 1341, 1343, and 1346.

**Fraud in Foreign Labor Contracting**

188.    As part of and in furtherance of the fraudulent schemes and artifices described above, Rosetta, Mallon, Asimos, and the Motley Rice Members, knowingly and with intent to defraud, did recruit, solicit, or hire a person outside the United States, or caused another person to recruit, solicit, or hire a person outside the United States, including, without limitation, Haji Bashir Noorzai, or attempted to do so, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

189.    Those acts constituted offenses indictable as crimes under, *inter alia*, 18 U.S.C. § 1351 (fraud in foreign labor contracting).

190.     As a direct and proximate result of the foregoing pattern of racketeering, Mr. Rajaratnam has been injured in an amount to be determined at trial, but not less than $6 million before trebling.

## COUNT II: RICO § 1962(c)
### (All Defendants - Motley Rice Association)

191.     The allegations of paragraphs 1 through 190 are incorporated herein by reference.

192.     At all times relevant to this complaint, Joseph Rice, Ron Motley, Michael Elsner, Jay Kanetkar, Brian Mallon, John Allison, Rosetta Research and Consulting LLC, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra were all "person[s]" within the meaning of 18 U.S.C. § 1961(3).

193.     At all times relevant to this complaint, Motley Rice had an ongoing business relationship with one or more of: Joe Rice, Ron Motley, Michael Elsner, Jay Kanetkar, Brian Mallon, John Allison, Rosetta, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra, such that their relationship constituted an "association in fact" enterprise, within the meaning of 18 U.S.C. § 1961(4), that was engaged in, or the activities of which affected, interstate or foreign commerce (the "Motley Rice Association").

194.     The members of the Motley Rice Association had defined roles, and the enterprise as a whole had an ongoing existence, structure, and hierarchy.

195.     As set forth more fully above, the members of the Motley Rice Association corrupted the Motley Rice Association and caused Mr. Rajaratnam damage through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and 1962(c). This pattern of racketeering activity entailed at least two acts of racketeering by the members of the Motley Rice Association, at least one of which occurred after the 1970 effective date of RICO,

43

and the last of which occurred within ten years after the commission of a prior act of racketeering.

196.    The foregoing constitutes an open-ended pattern of racketeering spanning from at least the early 1990's to as late as June 19, 2017. As alleged above, that pattern of racketeering is part of the way Motley Rice regularly does business, and Motley Rice has employed it in connection with multiple schemes and litigations. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that the Motley Rice Association's ongoing pattern of racketeering extends to other litigations and investigations. The New Jersey Litigation remains ongoing, and Motley Rice continues to maintain it did nothing wrong by employing the Former JTTF Agents and Rudra. In short, there is a strong likelihood that the ongoing racketeering activity of the Motley Rice Association will continue indefinitely.

197.    The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under, *inter alia*, 18 U.S.C. §§ 201, 1341, 1343, 1351, and 1512 and are within the scope of 18 U.S.C. § 1961(1)(A) and (1)(B). As set out more fully herein, the commission of those related predicate acts over the period of time alleged constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5).

**Bribery/Tampering**

198.    As part of and in furtherance of the fraudulent schemes and artifices described above, the members of the Motley Rice Association, including the Defendants, directly or indirectly, corruptly, gave, offered, or promised money and other things of value, or offered or promised public officials to give money, services, or other things of value to others, with the intent to induce such public official, including, without limitation, Mike Dick and the FBI

employee referenced in paragraph 120 above, to commit or aid in committing, or collude in, or allow, or make opportunity for the commission of, fraud on the United States and/or to do or omit to do acts in violation of such official's lawful duty. Those acts constituted offenses indictable as crimes under, *inter alia*, 18 U.S.C. § 201(b), bribery of public officials.

199.     As part of and in furtherance of the fraudulent schemes and artifices described above, the members of the Motley Rice Association, including the Defendants, directly or indirectly, gave, offered, or promised money and other things of value to persons, including, without limitation, putative medical experts and Rudra, because of the testimony under oath or affirmation given or to be given by such persons as witnesses in litigation. Those acts constituted offenses indictable as crimes under, *inter alia*, 18 U.S.C. § 201(c) (bribery of witnesses) and/or 18 U.S.C. § 1512 (witness tampering).

**Mail and Wire Fraud**

200.     As part of and in furtherance of the fraudulent schemes and artifices described above, the members of the Motley Rice Association, including the Defendants, made repeated use of, or had reason to believe that others would use, the U.S. Postal Service, interstate overnight couriers and/or the interstate wires to transmit various documents or oral communications, including, without limitation, the communications identified in paragraphs 109, 114, 156, and 167 (each a "Transmission").

201.     Each Transmission constituted either the transmittal by means of wire communication in interstate or international commerce of signals, sounds or writings; the use of the U.S. Postal Service; or the use of interstate overnight couriers for the purpose of executing or in connection with the aforementioned schemes and artifices to defraud.

202.    The members of the Motley Rice Association, including the Defendants, made or caused to be made these Transmissions with the specific intent of defrauding, *inter alia*, the United States District Court for the Southern District of New York, the United States District Court for the District of New Jersey, Senator Arlen Specter, Deputy Secretary Richard Armitage, the FBI, the Department of Defense, the Iraqi National Congress, and the American public.

203.    Each of these Transmissions furthered the aforementioned schemes and artifices to defraud, which were intended to and did proximately cause injury to Mr. Rajaratnam. Those acts constituted offenses indictable as crimes under, *inter alia*, the "mail fraud" and "wire fraud" statutes, 18 U.S.C. §§ 1341, 1343, and 1346.

**Fraud in Foreign Labor Contracting**

204.    As part of and in furtherance of the fraudulent schemes and artifices described above, Motley Rice, Rosetta, Mallon, Asimos, and Elsner, knowingly and with intent to defraud, did recruit, solicit, or hire a person outside the United States, or caused another person to recruit, solicit, or hire a person outside the United States, including, without limitation, Haji Bashir Noorzai, or attempted to do so, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

205.    Those acts constituted offenses indictable as crimes under, *inter alia*, 18 U.S.C. § 1351 (fraud in foreign labor contracting).

206.    As a direct and proximate result of the foregoing pattern of racketeering, Mr. Rajaratnam has been injured in an amount to be determined at trial, but not less than $6 million before trebling.

## COUNT III: RICO § 1962(a)
### (Motley Rice, Elsner)

207.    The allegations of paragraphs 1 through 206 are incorporated herein by reference.

208.    As described above, the Motley Rice Enterprise and the Motley Rice Association engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and 1962(c).

209.    Defendants Motley Rice and Elsner received income derived from that pattern of racketeering, including in the form of settlements extracted in the asbestos and tobacco cases through wrongful means.

210.    Defendants Motley Rice and Elsner used and invested that income to commence and prosecute the unfounded New Jersey Litigation against Mr. Rajaratnam.

211.    As a direct and proximate result of the New Jersey Litigation funded with Defendants' ill-gotten gains, Mr. Rajaratnam has been injured in an amount to be determined at trial, but not less than $6 million before trebling.

## COUNT IV: RICO § 1962(d)
### (Elsner, Mallon, Kanetkar, Rudra)

212.    The allegations of paragraphs 1 through 211 are incorporated herein by reference.

213.    As set forth above, Defendants Elsner, Mallon, Kanetkar, and Rudra unlawfully and willfully combined, conspired, confederated and agreed between and among each other to violate 18 U.S.C. § 1962(c), *i.e.*, to conduct and participate, directly and indirectly, in the affairs of the Motley Rice Enterprise and the Motley Rice Association through a pattern of racketeering, all in violation of 18 U.S.C. § 1962(d).

214.    As part of this conspiracy, each of the Defendants personally agreed to commit and in fact committed two or more racketeering acts and agreed to conduct and in fact conducted the affairs of the Motley Rice Enterprise and the Motley Rice Association through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as described more fully above. In addition, and as set forth more fully above, each of the Defendants was aware of violation of 18

47

U.S.C. § 1962(c) by the Motley Rice Enterprise and the Motley Rice Association, adopted as a goal the violation of § 1962(c), and facilitated the commission of the § 1962(c) violation by the Motley Rice Enterprise and the Motley Rice Association.

215.     As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Mr. Rajaratnam has been injured in an amount to be determined at trial, but not less than $6 million before trebling.

## COUNT V: Defamation
### (Motley Rice, Kanetkar, Rudra)

216.     The allegations of paragraphs 1 through 215 are incorporated herein by reference.

217.     As set forth more fully above, Defendants Motley Rice and its agents, Kanetkar, and Rudra, made false and defamatory statements of fact regarding Mr. Rajaratnam to David Rose of *Vanity Fair*.

218.     Defendants knew, when they made those statements, that they were demonstrably false.

219.     Defendants made those statements deliberately and maliciously, without authorization or privilege, with the intent to cause Mr. Rose to publish those defamatory statements in *Vanity Fair*, a well-known publication with wide international circulation, thus causing Mr. Rajaratnam financial and reputational harm.

220.     Mr. Rose did publish Defendants' false and defamatory statements, and Mr. Rajaratnam did suffer severe financial and reputational harm because of Defendants' defamatory statements.

221.     Defendants' false and defamatory statements exposed Mr. Rajaratnam to public contempt, disgrace, personal and professional reputational harm, and ridicule.

222.     Defendants' false and defamatory statements jeopardized Mr. Rajaratnam's personal safety.

223.     Defendants, through their false and defamatory statements, have forever deprived Mr. Rajaratnam of his ability to integrate back into, and interact with, society in the United States, in his family's homeland of Sri Lanka, and abroad.

224.     Defendants' false and defamatory statements charged Mr. Rajaratnam with a serious crime (to wit, funding terrorists), and are of the sort that tend to injure a plaintiff in his or her business, trade, or profession. As such, Defendants' statements constitute defamation *per se*.

225.     Mr. Rajaratnam did not learn the identity of Rudra, or that Rudra was acting at the direction of Motley Rice, until on or after November 14, 2016.

226.     Mr. Rajaratnam did not learn that Kanetkar was acting at the direction of Motley Rice until on or after November 14, 2016.

227.     The false and defamatory statements made by Rudra and Kanetkar are attributable to Motley Rice, who coordinated, directed, compensated, and conspired with Rudra and Kanetkar in connection with the publication of those statements.

228.     As a direct and proximate result of Defendants' false and defamatory statements, Mr. Rajaratnam has been injured in an amount to be determined at trial, but not less than $3 million.

## JURY DEMAND

229.     Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment in his favor, and against Defendants, as follows:

a.　　against all Defendants except Motley Rice on the first count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

b.　　against all Defendants on the second count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

c.　　against Defendants Motley Rice and Elsner on the third count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(a), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

d.　　against Defendants Elsner, Mallon, Kanetkar, and Rudra on the fourth count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

e.　　against Defendants Motley Rice, Kanetkar, and Rudra on the fifth count, awarding Mr. Rajaratnam compensatory, presumed, and punitive damages, in an amount to be determined at trial, but not less than $3 million.

Dated:   New York, New York
         June 1, 2018

                          **LUPKIN PLLC**


                     By: /s/ Jonathan D. Lupkin
                          Jonathan D. Lupkin (JL-0792)
                          Michael B. Smith (MS-3281)

                     80 Broad Street, Suite 1301
                     New York, NY 10004
                     Tel: (646) 367-2771
                     Fax: (646) 219-4870
                     jlupkin@lupkinpllc.com
                     msmith@lupkinpllc.com

                     *Counsel for Plaintiff Raj Rajaratnam*

4851-4063-1903, v. 32

51