Jonathan D. Lupkin (JL-0792)
Michael B. Smith (MS-3281)
LUPKIN PLLC
80 Broad Street, Suite 1301
New York, New York 10004
(646) 367-2771
(646) 219-4870 (fax)
jlupkin@lupkinpllc.com
msmith@lupkinpllc.com
*Counsel for Plaintiff Raj Rajaratnam*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAJ RAJARATNAM, an individual, | |
| Plaintiff, | |
| -against- | Case No. 18-CV-3234 |
| MOTLEY RICE, LLC, a South Carolina limited liability company, MICHAEL E. ELSNER, an individual, JAYAT P. KANETKAR aka JAY KANETKAR, an individual, RUDRA, an individual named pseudonymously, BRIAN P. MALLON, an individual, and JOHN "HANK" ALLISON, an individual, | **AMENDED COMPLAINT** |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

    Defendants Operate a Criminal Enterprise that Exploits Government Secrets .................... 1

    Mr. Rajaratnam is a Victim of Defendants' Criminal Enterprise............................................ 3

PARTIES......................................................................................................................... 4

JURISDICTION AND VENUE ................................................................................. 8

FACTUAL ALLEGATIONS COMMON TO ALL COUNTS ................................................. 9

    The Enterprise Uses Witness Tampering and Obstruction to Force Settlements.................. 9

    The Enterprise Usurps Government Secrets for Profit.......................................................11

    The Enterprise Usurps Military Intelligence for its Own Benefit........................................ 13

    The Enterprise Defrauds Government Agents to Gain Access to Military Intelligence ...... 14

    The Enterprise Traffics in Government Intelligence ............................................................ 15

    The Enterprise Bribes FBI Personnel to Gain Access to FBI Databases ............................ 18

    The Enterprise Interferes with a DEA Investigation to Manipulate a Witness ................... 20

    The Enterprise Gains Access to Joint Terrorism Task Force Materials and Information .... 21

    The Enterprise Targets Mr. Rajaratnam ............................................................................. 23

    The Enterprise Uses its Unlawful Access to Protected Government Assets to Go After Mr.
        Rajaratnam in the Courts ................................................................................. 24

    The Enterprise Bribes a Government Witness .................................................................... 25

    The Enterprise Uses its Unlawful Access to Protected Government Assets to Go After Mr.
        Rajaratnam in the Press ................................................................................... 27

    Motley Rice and the Former Agents Fraudulently Conceal their Crimes for Years ........... 30

    The Enterprise's Fraudulently-Concealed Bribery of Rudra is Finally Revealed ............... 35

The Enterprise's Fraudulently-Concealed Use of Government Materials is Finally Revealed ........................................................................................................ 36

The Enterprise's Fraudulently-Concealed Orchestration of the *Vanity Fair* Article is Finally Revealed ............................................................ 38

The Enterprise Finally Tacitly Concedes It Lied About Mr. Rajaratnam ............................ 39

**COUNT I: RICO § 1962(c)** ......................................................................... **40**

**COUNT II: RICO § 1962(c)** ........................................................................ **46**

**COUNT III: RICO § 1962(a)** ....................................................................... **51**

**COUNT IV: RICO § 1962(d)** ...................................................................... **52**

**COUNT V: Defamation** ............................................................................ **53**

**JURY DEMAND** ..................................................................................... **55**

**PRAYER FOR RELIEF** ............................................................................. **55**

Plaintiff Raj Rajaratnam, by his undersigned attorneys, Lupkin PLLC, as and for his Amended Complaint, hereby alleges upon knowledge with respect to his own acts and status, and upon information and belief with respect to all other matters,[1] as follows:

## PRELIMINARY STATEMENT

### *Defendants Operate a Criminal Enterprise that Exploits Government Secrets*

1.      For decades, through a shadowy network of unethical lawyers and compromised government agents—and in violation of a panoply of laws and regulations—Defendants have operated a criminal enterprise that illicitly obtains sensitive information from federal law enforcement and national security agencies and exploits that information for profit.

2.      Defendants' criminal enterprise (the "Motley Rice Enterprise") seeks to exploit its pipeline of government secrets in various ways. One is by selling or trading the information. Another is to use the information to "shake down" targets with deep pockets.

3.      In the latter case, the Motley Rice Enterprise uses illicitly-acquired information to identify wealthy targets with some perceived or tangential connection to the confidential

---

[1] A recurring theme in Mr. Rajaratnam's original complaint, and this one, is Motley Rice's determination to conceal its criminal activity. A continuing example of this is Motley Rice's vigorous opposition to the modification of a Discovery Confidentiality Order (the "DCO", DNJ ECF 203, 215) in its lawsuit against Mr. Rajaratnam (the "New Jersey Litigation").  Defendants here have designated documents in the New Jersey Litigation as confidential under the DCO, thereby preventing the undersigned from viewing them or learning their contents. The undersigned are informed by Jones Day, counsel for Mr. Rajaratnam in the New Jersey Litigation, that many of the documents Defendants have designated directly support the allegations herein, and evidence additional wrongdoing by Defendants. Jones Day is currently constrained by the DCO—to which they object—from sharing substantively the information in these documents.  By extension, the undersigned are constrained in their ability to fully describe the criminal enterprise and its acts. Nevertheless, the undersigned believe the facts currently alleged herein are sufficient to plead the elements of each cause of action asserted by Mr. Rajaratnam.

1

government investigations to which the Motley Rice Enterprise unlawfully gained access. Motley Rice then uses the enterprise's access to the fruits of criminal and national security investigations to craft lengthy and salacious complaints accusing its targets of supporting terrorism.

4.      The Motley Rice Enterprise also uses its illicit connections to former government officials to plant false stories from apparently credible sources who are secretly participants in the criminal enterprise. The Motley Rice Enterprise uses this "fake news" to further increase unlawful pressure on its targets to settle.

5.      The Motley Rice Enterprise's targets do not have access to the information the enterprise exploits. To obtain it legally, the targets must go through proper government channels (*i.e.*, FOIA or *Touhy* requests), which can take months if not years to bear fruit, and from which sensitive information the Motley Rice Enterprise already obtained may be redacted or withheld by the government. Proceeding through proper channels does not further the Motley Rice Enterprise's profit motive.

6.      If its target does not immediately capitulate, the Motley Rice Enterprise uses the informational asymmetry created by its illegal pipeline of secret government information to withhold evidence and/or manufacture false evidence that cannot be refuted until and unless the target is able to gain access to the evidence the Motley Rice Enterprise unlawfully obtained.

7.      Where necessary to maintain its illegal advantage and to protect its scheme from being discovered, the Motley Rice Enterprise has even defrauded the courts.

8.      The settlements the Motley Rice Enterprise extorts through its pattern of racketeering provide it with a substantial financial windfall, which in turn is used to fund the ongoing scheme (and the enterprise participants' lavish lifestyles).

### *Mr. Rajaratnam is a Victim of Defendants' Criminal Enterprise*

9.      Mr. Rajaratnam is one of the many victims of the Motley Rice Enterprise's criminal scheme.

10.      Consistent with the business model described above, the Motley Rice Enterprise used its unlawful access to government secrets to manufacture a lawsuit that would frighten Mr. Rajaratnam into a quick settlement. The cornerstone of Motley Rice's complaint was a false allegation that Mr. Rajaratnam knowingly provided funds for the purpose of supporting terrorist activity in Sri Lanka, his birthplace.

11.      When Mr. Rajaratnam did not immediately settle the case, as expected, the Motley Rice Enterprise again exploited its unlawful access to government assets. This time, Motley Rice coordinated with and paid a former government agent and a confidential government informant to plant false information about Mr. Rajaratnam in a story published in a prominent international publication.

12.      When that also failed to bludgeon Mr. Rajaratnam into submission, Defendants committed additional acts of fraud, bribery, and witness tampering in a years-long effort to conceal evidence of their criminal enterprise, prolonging the lawsuit and forcing Mr. Rajaratnam to expend millions more to uncover that evidence and defend against Motley Rice's fraudulent claims. Defendants did this all in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

13.      Defendants' criminal scheme has caused—and continues to cause—Mr. Rajaratnam substantial injury to his business and property. But for the acts of bribery, witness tampering, wire fraud, and trafficking in unlawfully-obtained property described herein, the Motley Rice Enterprise would not have been able to concoct and widely promulgate the false

allegation that Mr. Rajaratnam knowingly and purposefully supported terrorists. That allegation was the key to the execution of the Motley Rice Enterprise's fraudulent scheme to use unlawfully-acquired government information to wrongfully obtain money from Mr. Rajaratnam.

14.     Among other things, Defendants' fraudulent scheme has caused Mr. Rajaratnam to lose numerous investment opportunities in Sri Lanka.

15.     Defendants' fraudulent scheme also has caused regulatory and banking officials to block the return and repatriation to Mr. Rajaratnam of $3 million in funds currently being held in Sri Lanka, thus depriving him of his money and property.

16.     Defendants' fraudulent scheme also has prolonged and complicated the New Jersey Litigation, including by forcing Mr. Rajaratnam to fight for years to uncover the truth about Defendants' criminal conduct, thereby incurring substantial costs litigating issues that would not have arisen were the Defendants not trying to perpetrate, protect, and conceal their criminal scheme.

17.     Defendants' fraudulent scheme has even impeded Mr. Rajaratnam's ability to make charitable donations in Sri Lanka and elsewhere.

## **PARTIES**

18.     Defendant **Motley Rice, LLC** is a well-known plaintiff-side litigation firm founded in 2003. A South Carolina limited liability company, Motley Rice is registered to do business in the State of New York and maintains an office in New York County. Motley Rice's predecessor-in-interest was the law firm of Ness, Motley, Loadholt, Richardson & Poole. Defendants have perverted Motley Rice into a criminal enterprise that has operated as a member of an association-in-fact that is itself a criminal enterprise. In furtherance of the fraudulent

scheme and pattern of racketeering described herein, Motley Rice has committed, among other crimes, the following predicate criminal acts enumerated in 18 U.S.C. § 1961(1):

- bribery, in violation of 18 U.S.C. § 201 (*see, e.g.,* ¶¶ 43-46, 90-96 below);

- mail fraud, in violation of 18 U.S.C. § 1341 (*see, e.g.,* ¶¶ 43-46 below);

- wire fraud, in violation of 18 U.S.C. § 1343 (*see, e.g.,* ¶¶ 43-46, 97-108, 132-152 below);

- obstruction of proceedings, in violation of 18 U.S.C. § 1505 (*see, e.g.*, ¶ 33 below);

- witness tampering, in violation of 18 U.S.C. § 1512 (*see, e.g.,* ¶¶ 33, 90-96, 109-131 below);

- engaging in monetary transactions regarding property derived from unlawful activity, in violation of 18 U.S.C. § 1957 (*see, e.g.*, ¶¶ 55-60, 72-79 below);

- transportation of property derived from unlawful activity, in violation of 18 U.S.C. § 2314 (*see, e.g.,* ¶¶ 55-60 below); and

- sale or receipt of property derived from unlawful activity, in violation of 18 U.S.C. § 2315 (*see, e.g.*, ¶¶ 55-60, 72-79, 138-141 below).

19.     Defendant **Michael E. Elsner** ("Elsner") is a member of Motley Rice and a resident of South Carolina, and an active member of the New York bar. Elsner is counsel of record for the plaintiffs in the 9/11 Litigation and the New Jersey Litigation (each defined below). Elsner has taken a lead role in the misconduct in the New Jersey Litigation and has made numerous false and misleading statements to the court in that litigation in furtherance of the Defendants' broader scheme.  In furtherance of the fraudulent scheme and pattern of racketeering described herein, Elsner has committed, among other crimes, the following predicate criminal acts enumerated in 18 U.S.C. § 1961(1):

- bribery, in violation of 18 U.S.C. § 201 (*see, e.g.,* ¶¶ 90-96 below);

- wire fraud, in violation of 18 U.S.C. § 1343 (*see, e.g.,* ¶¶ 97-106, 132-152 below);

- witness tampering, in violation of 18 U.S.C. § 1512 (*see, e.g.,* ¶¶ 90-96, 109-131 below); and

- sale or receipt of property derived from unlawful activity, in violation of § 2315 (*see, e.g.,* ¶¶ 72-79).

20.     Defendant **Brian P. Mallon** ("Mallon") is a former Special Agent with the U.S. Immigration and Naturalization Service ("INS") assigned to the Joint Terrorism Task Force ("JTTF"). Upon information and belief, Mallon is a resident of New Jersey. In furtherance of the fraudulent scheme and pattern of racketeering described herein, Mallon has committed, among other crimes, the following predicate criminal acts enumerated in 18 U.S.C. § 1961(1):

- bribery, in violation of 18 U.S.C. § 201 (*see, e.g.,* ¶¶ 61-65, 90-96 below);

- wire fraud, in violation of 18 U.S.C. § 1343 (*see, e.g.,* ¶¶ 68-71, 132-143 below);

- witness tampering, in violation of 18 U.S.C. § 1512 (*see, e.g.,* ¶¶ 90-96, 109-131 below);

- engaging in monetary transactions regarding property derived from unlawful activity, in violation of 18 U.S.C. § 1957 (*see, e.g.,* ¶¶ 72-79 below);

- transportation of property derived from unlawful activity, in violation of 18 U.S.C. § 2314 (*see, e.g.,* ¶¶ 55-60, 72-79, 138-141 below); and

- sale or receipt of property derived from unlawful activity, in violation of 18 U.S.C. § 2315 (*see, e.g.,* ¶¶ 55-60, 72-79 below).

21.     Defendant **John "Hank" Allison** ("Allison") is a former Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the JTTF. Upon information and belief, Allison is a resident of New Jersey. In furtherance of the fraudulent scheme and pattern of racketeering described herein, Allison has committed, among other crimes, the following predicate criminal acts enumerated in 18 U.S.C. § 1961(1):

- bribery, in violation of 18 U.S.C. § 201 (*see, e.g.,* ¶¶ 90-96 below);

- wire fraud, in violation of 18 U.S.C. § 1343 (*see, e.g.,* ¶¶ 132-137 below);

6

- witness tampering, in violation of 18 U.S.C. § 1512 (*see, e.g.,* ¶¶ 90-96, 109-131 below);

- engaging in monetary transactions regarding property derived from unlawful activity, in violation of 18 U.S.C. § 1957 (*see, e.g.*, ¶¶ 72-79 below);

- transportation of property derived from unlawful activity, in violation of 18 U.S.C. § 2314 (*see, e.g.*, ¶¶ 72-79, 138-141 below); and

- sale or receipt of property derived from unlawful activity, in violation of 18 U.S.C. § 2315 (*see, e.g.,* ¶¶ 72-79 below).

22.     Defendant **"Rudra"** was and may still be a Confidential Human Source for the FBI. Rudra is named by pseudonym as a courtesy to the United States government in consideration of that fact. Rudra is believed currently to be a resident of Sri Lanka. In furtherance of the fraudulent scheme and pattern of racketeering described herein, Rudra has committed, among other crimes, the following predicate criminal acts enumerated in 18 U.S.C. § 1961(1):

- wire fraud, in violation of 18 U.S.C. § 1343 (*see, e.g.,* ¶¶ 99-108 below);

- engaging in monetary transactions regarding property derived from unlawful activity, in violation of 18 U.S.C. § 1957 (*see, e.g.*, ¶¶ 72-79 below);

- transportation of property derived from unlawful activity, in violation of 18 U.S.C. § 2314 (*see, e.g.*, ¶¶ 72-79 below); and

- sale or receipt of property derived from unlawful activity, in violation of 18 U.S.C. § 2315 (*see, e.g.,* ¶¶ 72-79 below).

23.     Defendant **Jayat P. "Jay" Kanetkar** ("Kanetkar" and, together with Elsner, Rudra, Allison, and Mallon, the "Individual Defendants") is a former FBI Special Agent assigned to the JTTF and was Rudra's "handler." Kanetkar is believed to be a resident of New Jersey. Kanetkar maintains a professional investigation services business in New Jersey and is also an attorney and active member of the New Jersey bar. In furtherance of the fraudulent scheme and

pattern of racketeering described herein, Kanetkar has committed, among other crimes, the following predicate criminal acts enumerated in 18 U.S.C. § 1961(1):

- bribery, in violation of 18 U.S.C. § 201 (*see, e.g.,* ¶¶ 61-65, 90-96 below);

- wire fraud, in violation of 18 U.S.C. § 1343 (*see, e.g.,* ¶¶ 68-71, 132-143 below);

- witness tampering, in violation of 18 U.S.C. § 1512 (*see, e.g.,* ¶¶ 90-96, 109-131 below);

- engaging in monetary transactions regarding property derived from unlawful activity, in violation of 18 U.S.C. § 1957 (*see, e.g.*, ¶¶ 72-79 below);

- transportation of property derived from unlawful activity, in violation of 18 U.S.C. § 2314 (*see, e.g.*, ¶¶ 55-60, 72-79, 138-141 below); and

- sale or receipt of property derived from unlawful activity, in violation of 18 U.S.C. § 2315 (*see, e.g.,* ¶¶ 55-60, 72-79 below).

24. **Raj Rajaratnam** is an ethnic Sri Lankan Tamil who left Sri Lanka when he was 14 years old and became a naturalized United States citizen in 1986. Mr. Rajaratnam permanently resides in New York, New York but is currently incarcerated at the Federal Medical Center, Devens, in Ayers, Massachusetts.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because this action arises under 18 U.S.C. § 1962.

26. This Court also has supplemental jurisdiction over claims in this matter pursuant to 28 U.S.C. § 1367.

27. Venue in this judicial district is proper pursuant to 18 U.S.C. § 1965 because Defendants Kanetkar, Mallon, and Allison, as JTTF members, transacted their affairs in the Eastern District of New York. More specifically, these defendants "handled" Defendant Rudra as a Confidential Human Source and procured much of the information misused by Motley Rice

8

against Mr. Rajaratnam in connection with investigations conducted (and prosecutions brought) in the Eastern District of New York.

28.     This Court has personal jurisdiction over defendants as follows:

    a.   Pursuant to CPLR 302(1), because one or more of the defendants transacted business in the State of New York;

    b.   Pursuant to CPLR 302(2), because one or more of the defendants committed a tortious act within the State of New York;

    c.   Pursuant to CPLR 302(3), because one or more of the defendants committed a tortious act outside the State of New York and engaged in a persistent course of conduct within the State of New York; and

    d.   Pursuant to 18 U.S.C. § 1965, which confers personal jurisdiction within the Eastern District of New York over all defendants when, as here, at least one of the defendants (as noted above) conducted his affairs within the district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

29.     To understand how Mr. Rajaratnam became a target of Defendants' scheme, how he was injured thereby, and how he ultimately uncovered the fraudulently-concealed evidence of Defendants' criminal conduct, it is necessary to understand the scheme itself, and the pattern of criminal activity that has sustained that scheme for decades.

### *The Enterprise Uses Witness Tampering and Obstruction to Force Settlements*

30.     Motley Rice's pattern of using criminal conduct to extort massive settlements dates back to the 1970's. Motley Rice founders Ron Motley and Joseph Rice rose to prominence with their previous firm, Ness, Motley, Loadholt, Richardson & Poole, representing plaintiffs in personal injury cases involving asbestos. Ness Motley became so effective at "recruiting" putative plaintiffs that it leveraged the unfortunate consequences of corporate negligence into a

formidable litigation factory, flooding the federal and state judicial systems with tens of thousands, if not hundreds of thousands, of often frivolous cases.

31.     Presaging the mortgage-backed securities that brought down the global economy, Ness Motley bundled meritorious claims together with "subprime" claims that had little or no merit (*i.e.*, claims brought on behalf of plaintiffs who had no asbestos-related illness). Ness Motley then "sold" those bundles to putative defendants in mass settlements. Ness Motley profited immensely from this practice, taking hundreds of millions of dollars in contingency fees off the top of settlement payments.

32.     Somewhere along the way, Ness Motley's conduct crossed the line from unsavory to criminal.

33.     In 2001, Ness Motley's conduct drew a lawsuit alleging, among other things, that Ness Motley improperly induced medical "experts" to testify falsely—a federal crime under 18 U.S.C. § 1512 (witness tampering) and used threats and intimidation to prevent legislative reform of asbestos litigation—also a federal crime (obstruction under 18 U.S.C. § 1505)—in order to secure settlement agreements worth hundreds of millions of dollars.

34.     Motley and Rice then turned their attention to litigation against the tobacco companies, again raking in billions of dollars in fees through "bulk" settlements. It was reported that they became wealthier than many of the executives they painted as greedy opportunists. Motley, for example, owned a private plane, a mansion on an island, and a 156-foot yacht named Themis, after the Greek titan of law.

35.     The same year Ness Motley was accused of witness tampering and obstruction, terrorists destroyed the Twin Towers. Where most Americans saw an unspeakable loss, the criminal element within Ness Motley (soon to become Motley Rice) saw a lucrative opportunity.

### *The Enterprise Usurps Government Secrets for Profit*

36.     After the Towers fell on September 11, 2001, the firm immediately sought out deep pockets, and the deepest pockets it could find were in Saudi Arabia. Thus, in 2002, Ness Motley filed a trillion-dollar lawsuit accusing Saudi banks, charities, and members of the Saudi royal family of financing al Qaeda.

37.     As recounted by James Risen, a Pulitzer Prize-winning national security journalist formerly with the New York Times, in his book, *Pay Any Price: Greed, Power, and Endless War*, Motley Rice used the 9/11 litigation as a pretext to embed itself with unscrupulous or duped government officials and amass a valuable database of sensitive information.

38.     In 2002, Motley Rice hired as its lead investigator a French author and analyst named Jean-Charles Brisard, who claimed to have ties with French intelligence and rose to notoriety when he published a book blaming the Saudis for 9/11.

39.     In 2003, Motley Rice sent Brisard to Bosnia to try to gain access to a secret document obtained by the CIA. The U.S. Department of Justice resisted Motley Rice's efforts to obtain the highly sensitive document, which the DOJ was using as evidence in an ongoing criminal prosecution.

40.     Eager to get its hands on the document, Motley Rice dismissed the DOJ's concerns about the integrity of their criminal case and pushed back—hard. The DOJ ultimately agreed to share the document with Motley Rice after Motley Rice obtained an order from the Bosnian Supreme Court asking the U.S. Government to do so.

41.     The so-called "golden chain" document supposedly was a list of donors to Osama bin Laden. The document obviously was not helpful enough, because when Brisard translated the

document he falsified at least one name on the list, changing "bin Mahfoodh" to "Khalid bin Mahfouz"—the name of one of the richest men in Saudi Arabia.

42. Not coincidentally, Motley Rice named Khalid bin Mahfouz as a defendant in the 9/11 action. Indeed, Brisard told Risen that he personally "participat[ed] in the selection process of defendants." Brisard's falsification of the "golden chain" document ultimately came to light, and Motley Rice replaced Brisard with Michael Asimos.

43. Asimos' *modus operandi* was to ingratiate himself to low-level government operatives by offering to share intelligence with them. Defendant Michael Elsner and other lawyers at Motley Rice knew Asimos was sharing information collected and generated for the 9/11 cases[2] with people at the Department of Defense, and Elsner encouraged such unethical conduct in the hopes of receiving a *quid pro quo* (*i.e.*, to obtain access to equally sensitive information from government investigations through false or fraudulent pretenses).

44. Each of the government operatives with whom Asimos offered to share intelligence was a "public official" as that term is defined in the criminal bribery statute, 18 U.S.C. § 201. Mr. Rajaratnam is informed and believes that, multiple times between 2003 and 2006 or later, Asimos and/or Motley Rice directly or indirectly offered valuable information to those public officials with the intent to influence those officials to provide the Motley Rice Enterprise with unauthorized access to government intelligence. Each such offer was a separate violation of the federal bribery statute, 18 U.S.C. § 201, that was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18

---

[2] Mr. Rajaratnam is informed and believes that the information offered or disclosed to government officials included privileged materials that should not have been (but were) disclosed without the informed consent of Motley Rice's clients, the plaintiffs in the 9/11 Litigation.

U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

45.     Mr. Rajaratnam is informed and believes that, on multiple occasions between 2003 and 2006 or later, Asimos and Motley Rice transmitted, or caused to be transmitted, this information to their government contacts by means of interstate or international wires or the Postal Service. Each time Motley Rice and Asimos made or caused such a transmission, they violated the federal wire and mail fraud statutes, 18 U.S.C. §§ 1341 and 1343, for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

46.     Over the course of the next several years, with the help of Asimos and others both within and outside of the government, Motley Rice established a network that, through unsavory and often illegal means, gave Motley Rice unique—and unauthorized—access to information it hoped to sell to the government and/or commercial interests. It also used that information to commodify "anti-terrorism litigation" as it had with the asbestos and tobacco cases. Additional detail regarding the Motley Rice Enterprise's pattern of criminal fraud and bribery is provided below.

### *The Enterprise Usurps Military Intelligence for its Own Benefit*

47.     Asimos and his "right-hand man," former INS agent Defendant Brian Mallon, were as effective at gathering information and intelligence as they were at blurring the line between the law firm and the intelligence community. For example: at one point, Asimos traveled to Kabul, ostensibly on behalf of the U.S. Government, and returned with a document identifying Al Qaeda operatives who were authorized to carry weapons in Afghanistan. He was supposed to

be taking the document to the Pentagon, but disclosed it to Motley Rice attorneys first. Although the document had no apparent relevance to the 9/11 lawsuit, lawyers working alongside Motley Rice in the litigation stopped the investigators from taking the document to the Pentagon until they had secured a copy for themselves.

48.     Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that those attorneys were working in concert with Motley Rice to divert the document—delaying its delivery to the Pentagon and potentially impeding an ongoing criminal investigation.

### *The Enterprise Defrauds Government Agents to Gain Access to Military Intelligence*

49.     Asimos had a friend, Col. Steven Bucci, in the Office of the Secretary of Defense ("OSD"). Bucci knew about the Motley Rice Enterprise's fraudulent scheme and repeatedly covered for Asimos to protect Motley Rice's information-sharing relationship with elements within the Defense Intelligence Agency ("DIA"). Bucci told Risen he helped Motley Rice establish that relationship.

50.     Soon after the U.S. invasion of Iraq in March 2003, Asimos wanted to get into that country to gather intel for Motley Rice. He called Mark Heilbrun, a congressional staffer who worked with Senator Arlen Specter, and falsely told him that Deputy Secretary of Defense Paul Wolfowitz wanted Asimos in Iraq—secretly, of course—and he needed help getting in-country.

51.     Heilbrun told Risen he was puzzled as to why the Department of Defense would be unable to transport their own agent into Iraq, but Asimos gave him Bucci's cell phone number, and Bucci backed up Asimos's false claims. Heilbrun then got Senator Specter to call Deputy Secretary of State Richard Armitage, who put them in touch with the U.S. ambassador to

Turkey. All this was intended to get Asimos into Iraq under false pretenses to gather sensitive information for Motley Rice—an unauthorized civilian entity.

52.     Asimos's fraud ultimately got him into Iraq, where, by again falsely representing himself as a representative of the Pentagon, he obtained access to Ahmed Chalabi's[3] Iraqi National Congress ("INC") and—more importantly—the documents they were collecting from Iraqi government ministries, including the Iraqi intelligence service.

53.     Asimos's fraud eventually was discovered by Chalabi spokesman Francis Brooke. When Brooke called the OSD to confirm Asimos's *bona fides*, Wolfowitz's office told Brooke they had no idea who Asimos was and asked him to detain Asimos. Asimos fled before he could be detained.

54.     Asimos's and Bucci's use of interstate and/or international communications transmitted by wire to deceive Mr. Heilbrun, Senator Specter, Deputy Secretary Armitage, Mr. Brooke, and others in March and April 2003, for the purpose of executing the Motley Rice Enterprise's scheme to defraud, constituted multiple violations of the federal wire fraud statute, 18 U.S.C. § 1343. Each of those violations was for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

### *The Enterprise Traffics in Government Intelligence*

55.     Soon after Asimos returned from Iraq, Motley Rice helped him form—and funded—Rosetta Research and Consulting LLC ("Rosetta"), through which Mallon, Asimos, and

---

[3] Chalabi, an Iraqi exile, was the U.S. Government's choice to fill the vacuum left by the overthrow of Saddam Hussein.

the other investigators would continue their clandestine investigations on behalf of Motley Rice.

Motley Rice believed that, by using a separate legal entity, it could secure profitable government

contracts and—even better—sell the information it had been gathering (ostensibly for the 9/11

Litigation, but in reality for the pecuniary benefit of the Motley Rice Enterprise) to commercial

customers.[4]

56.     Formal government contracts never materialized through Rosetta, but Motley

Rice continued to rely on its agents' deceptions to gain access to sensitive information. Although

Rosetta's ostensible mission was performing investigative work to support the 9/11 lawsuit,

Asimos spent most of his time exploiting government contacts to obtain information that, for the

most part, had little relevance to the 9/11 litigation. Rosetta's true purpose was to build a massive

database of government intelligence on terrorism, which Risen called "the most valuable asset

Motley Rice ever got out of the 9/11 case."

57.     From June 2003 until 2006 or later, Motley Rice, Asimos, and Mallon used

Rosetta as an instrument and conduit of the Motley Rice Enterprise's scheme to obtain, transport,

transmit, and/or transfer in interstate or foreign commerce documents worth more than $5,000

obtained by means of false or fraudulent pretenses, representations, and/or promises, thus

committing multiple violations of 18 U.S.C. § 2314. Each of those violations was intended to

contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as

---

[4] Not long after joining Motley Rice's criminal enterprise, Kanetkar founded Guaranteed
Investigations, Inc., a private investigation company "consisting of security professionals with
Federal and State Law Enforcement, Military, and Business Security experience." This directly
parallels the creation and use by the Motley Rice Enterprise of Rosetta.  The undersigned
respectfully submit that discovery may reveal that the Motley Rice Enterprise is using
Guaranteed Investigations to further its scheme, as it did with Rosetta.

defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

58.     By funding Rosetta with millions of dollars from 2003 until 2006 or later, Motley Rice engaged in one or more monetary transactions intended to fund the purchase or sale of criminally-derived documents worth more than $10,000 in violation of 18 U.S.C. § 1957. Each of those violations was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

59.     By knowingly receiving, possessing, storing, bartering, and/or selling documents worth more than $5,000 which crossed state or U.S. boundaries after being unlawfully converted or taken, between 2003 and 2006 or later, Asimos, Mallon, and Rosetta committed multiple violations of 18 U.S.C. § 2315. Each of those violations was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

60.     By knowingly receiving documents worth more than $5,000 which crossed state or U.S. boundaries after being unlawfully converted or taken, between 2003 and 2006 or later, Motley Rice committed multiple violations of 18 U.S.C. § 2315. Each of those violations was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

## *The Enterprise Bribes FBI Personnel to Gain Access to FBI Databases*

61.     The Motley Rice Enterprise also had a mole in the FBI: Mallon's friend Mike Dick. Using a clichéd, if effective, tactic, Rosetta offered to feed Dick information for free (at first), in exchange for his assistance with Rosetta's operations. Soon, Dick became an integral part of the Rosetta family. The FBI agent even had his own Rosetta email address.

62.     As a person acting for or on behalf of a federal agency, Mike Dick was a "public official" as defined in the federal bribery statute, 18 U.S.C. § 201. In or about 2003-2004, Rosetta and Mallon corruptly offered valuable information—some of it protected by privileges held by the plaintiffs in the 9/11 litigation, who had not consented to the disclosure—to Dick with the intent to influence him to (a) give the Motley Rice Enterprise unauthorized access to confidential FBI information in violation of his lawful duty and (b) facilitate the Motley Rice Enterprise's fraudulent scheme to embed itself in government investigations and gain access to the fruits of those investigations. Each such offer was a violation of 18 U.S.C. § 201 and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

63.     Dick's relationship with Rosetta ultimately led to a "severe verbal reprimand" for involving Rosetta in an operation without getting prior approval from his superiors, an inquiry by the DOJ's Office of the Inspector General, a referral to the FBI's Office of Professional Responsibility, and a recommendation that Dick be dismissed.

64.     Dick was not the only FBI official the Motley Rice Enterprise bribed. Risen reports that, in or about late 2004, an unnamed FBI analyst was working for Rosetta as well, searching confidential FBI databases on behalf of the Motley Rice Enterprise and performing

18

records checks on people Asimos was meeting or trying to recruit as informants. Mr. Rajaratnam is informed and believes that Rosetta and Motley Rice were not authorized to access those databases for their own commercial purposes.

65.     As an employee of a federal agency, the unnamed FBI analyst was a "public official" as that term is defined in the federal bribery statute, 18 U.S.C. § 201. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Asimos, Mallon, and/or another agent of Rosetta and/or the Motley Rice Enterprise offered things of value to that FBI analyst with the intent to influence him to (a) give the Motley Rice Enterprise unauthorized access to confidential FBI information in violation of his lawful duty and/or (b) facilitate the Motley Rice Enterprise's fraudulent scheme to embed itself in government investigations and gain access to the fruits of those investigations. Each such offer was a violation of 18 U.S.C. § 201 and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

66.     The Washington Post reported in 2008 that Rosetta took an unnamed FBI employee on a house-hunting trip "in anticipation of being hired by Rosetta," and that the employee gave Rosetta information taken from FBI databases "to provide information to placate [Rosetta's] investors"—*i.e.*, Motley Rice. Mr. Rajaratnam is informed and believes that this occurred in or around 2004 and that Rosetta and Motley Rice were not authorized to access those databases for their own commercial purposes.

67.     As an employee of a federal agency, the unnamed FBI employee was a "public official" as that term is defined in the federal bribery statute, 18 U.S.C. § 201. Rosetta offered

things of value to that FBI analyst with the intent to influence him to (a) give the Motley Rice Enterprise unauthorized access to confidential FBI information in violation of his lawful duty and/or (b) facilitate the Motley Rice Enterprise's fraudulent scheme to embed itself in government investigations and gain access to the fruits of those investigations. Each such offer was a violation of 18 U.S.C. § 201 and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

### *The Enterprise Interferes with a DEA Investigation to Manipulate a Witness*

68.     In 2004, Motley Rice decided it wanted to bring Haji Bashir Noorzai, a notorious Afghan drug lord, into the United States to serve as a witness in the 9/11 litigation. No longer able to help Rosetta directly, Dick put Rosetta in touch with a friend at the DEA, who agreed to work with Rosetta to bring Noorzai into the country.

69.     What Motley Rice and Rosetta did not know at the time was that the DEA had been working for five years to build a case against Noorzai and was planning to arrest him when he entered the country.

70.     When they finally realized what the DEA intended to do, Mallon and Asimos initially tried to persuade the DEA not to arrest Noorzai, but ultimately decided to go along with the DEA operation. Thus it transpired that, in April 2005, after trying to persuade a federal law enforcement agency not to arrest a notorious Afghan drug lord with ties to the Taliban, Motley Rice's civilian investigators induced that drug lord to come to the United States under false pretenses—ostensibly to act as a witness in Motley Rice's lawsuit—and delivered him instead to the DEA for arrest and prosecution.

20

71.     In or about April 2005, Mallon and Asimos transmitted false promises of employment to Noorzai via international wire to persuade him to come to the United States, intending that by doing so they would (a) ingratiate themselves to the DEA agents, thus furthering the Motley Rice Enterprise's scheme to gain unauthorized access to government investigations; and/or (b) obtain confidential information from Noorzai himself, in furtherance of the Motley Rice Enterprise's fraudulent scheme to trade on government information. This was an act of criminal wire fraud in violation of 18 U.S.C. § 1343, for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

### *The Enterprise Gains Access to Joint Terrorism Task Force Materials and Information*

72.     In or before 2009, Mallon—by then a longtime member of the Motley Rice Enterprise—enlisted two of his colleagues from the JTTF, former FBI agents Jay Kanetkar and John "Hank" Allison, into the conspiracy.

73.     While they were agents of the JTTF, Kanetkar and Mallon had worked with a Confidential Human Source who goes by the code-name "Rudra".

74.     In or about 2009, Kanetkar and Mallon introduced Rudra to Motley Rice. As a Confidential Human Source, Rudra's identity was a closely-guarded government secret. By disclosing Rudra's identity to Motley Rice, Kanetkar and Mallon violated the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources ("AG Guidelines").

75.     On multiple occasions between 2009 and 2018, Mallon, Kanetkar, and Allison (the "Former Agents") and Rudra transported, transmitted, and/or transferred to Motley Rice, via interstate or foreign wire or by travelling across state lines, copies of documents and materials

received from Rudra, and which Rudra had obtained while working on behalf of the FBI. Those documents were worth more than $5,000 to Motley Rice, and the Former Agents and Rudra knew that the disclosure of those documents to Motley Rice was unlawful. Each such action was a separate violation of 18 U.S.C. § 2314 and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

76.     On multiple occasions between 2009 and 2018, Motley Rice, Elsner, the Former Agents, and Rudra received, possessed, and/or stored those documents, in violation of 18 U.S.C. § 2315. Each such violation was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

77.     During that time, Rudra also requested additional documents from the FBI, outside the *Touhy* process, which he would provide to the Former Agents for use by Motley Rice. The Former Agents did not have the appropriate authorization from the U.S. Government to disclose this confidential information to Motley Rice.

78.     On several occasions between 2009 and 2018, the Former Agents and/or Motley Rice compensated Rudra for these documents—each an exchange of funds for documents worth more than $10,000 and procured in violation of, among others, 18 U.S.C. §§ 2314 and 2315. Each of those unlawful payments was a separate violation of 18 U.S.C. § 1957 and was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity,

as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

79.     It was entirely within the Former Agents' discretion and control what documents and information they chose to share with Motley Rice in perpetuation of the Motley Rice Enterprise's fraudulent scheme. The Former Agents also were responsible for managing Rudra's role in the enterprise. In this way, among others, each of the Former Agents participated in the operation or management of the Motley Rice Enterprise.

### *The Enterprise Targets Mr. Rajaratnam*

80.     The Former Agents had worked together on a JTTF investigation into the Liberation Tigers of Tamil Eelam, a terrorist organization known as the "Tamil Tigers" or "LTTE". That investigation ultimately led to a series of criminal prosecutions in the Eastern District of New York. The Former Agents had access to confidential documents and information from that criminal investigation.

81.     Mr. Rajaratnam was approached in connection with that investigation because of donations he and his father—alongside numerous foreign governments and non-governmental organizations—had made to the Tamil Rehabilitation Organization (the "TRO"), a Maryland-based 501(c)(3), between 2002 and 2006.

82.     In 2007, allegations arose that the TRO was funding LTTE. On November 15, 2007, the United States Department of the Treasury designated the TRO under Executive Order 13224, designed to financially isolate U.S. designated foreign terrorist groups and their support network. Upon learning of the Treasury Department's action in 2007, Mr. Rajaratnam ceased all donations to the TRO.

83.     As the Former Agents would have known, Mr. Rajaratnam voluntarily and fully cooperated with that investigation (as well as a parallel investigation by the Sri Lankan government), without counsel, and no prosecutions were ever brought against Mr. Rajaratnam regarding terrorism. To the contrary, in 2009, the investigations unit chief of the Central Bank of Sri Lanka declared that, "[a]t the time Mr. Rajaratnam made the donations, the TRO was not banned by the Sri Lankan government, nor the U.S. It was a donation made in good faith."

84.     The Former Agents knew of Mr. Rajaratnam, his donations to the TRO, and—most importantly—his wealth. They shared this information—along with far more sensitive government materials—with Motley Rice.

### *The Enterprise Uses its Unlawful Access to Protected Government Assets to Go After Mr. Rajaratnam in the Courts*

85.     On October 16, 2009, in connection with an entirely unrelated investigation, the FBI arrested Mr. Rajaratnam for insider trading. Six days later, Motley Rice pounced, naming Mr. Rajaratnam as a defendant in a civil lawsuit.[5]

86.     Motley Rice's lawsuit against Mr. Rajaratnam turned, in large part, on a false allegation regarding an event Mr. Rajaratnam attended in Somerset, New Jersey on November 2, 2002 (the "November Event"). That event marked the 25th anniversary of the Ilankai Tamil Sangam, an organization that is self-described as an "Association of Tamils of Sri Lanka in the U.S.A." Mr. Rajaratnam's speech focused on the importance of philanthropy and support for the Tamil community.

---

[5] The substance and merits of the New Jersey Litigation are of tangential relevance to this case, which is directed at the fraudulent scheme of which that litigation is an instrumentality and the crimes Defendants have committed (including in connection with the New Jersey Litigation) to perpetuate that scheme.

87.     Motley Rice falsely alleged that, at the November Event, Mr. Rajaratnam encouraged those in attendance to support LTTE and described them as both "terrorists" and "freedom fighters." *See* DNJ ECF No. 1 ¶ 113. At the time Motley Rice filed the lawsuit, the FBI had a recording and transcript of the event at which he allegedly made that statement—concrete and unimpeachable evidence that Motley Rice's allegations were false. This information was known and available to Defendants, but not to Mr. Rajaratnam.

88.     The Defendants knew the allegations were false but persisted with them anyway, secure in the knowledge that Mr. Rajaratnam lacked the means to disprove it. Until and unless Mr. Rajaratnam somehow gained access to secret FBI recordings, it would be his word against that of former government agents.

89.     No doubt Motley Rice expected that the wealthy Mr. Rajaratnam, recently arrested and facing a very public criminal trial, would eagerly pay handsomely to make Motley Rice's horrific—but false—allegations go away.

### *The Enterprise Bribes a Government Witness*

90.     The Former Agents were among a select group of government officials who knew of Rudra's identity or the extent of the work that he performed as a confidential source for the U.S. Government. The Former Agents nonetheless shared this information with Motley Rice and Elsner and managed Rudra's efforts on Motley Rice's and Elsner's behalf, just as they had done for the U.S. government—but this time it was for profit, not public service, and the law was not on their side.

91.     Between 2009 and 2018, Motley Rice and/or the Former Agents made multiple payments to Rudra totaling over $75,000. Those payments were far beyond the permissible "reasonable cost of travel and subsistence incurred and the reasonable value of time lost in

attendance at [a] trial, hearing, or proceeding"—particularly since Rudra is not an expert witness who had to prepare an expert report, only recently (*i.e.*, in 2018) sat for his deposition, and has not yet appeared at any trial or evidentiary hearing. *See* DNJ ECF No. 382 at 2. Apparently, the payments were used to fund living arrangements, consumer goods, and extraneous travel unrelated to Rudra's testimony. Far from being reasonably related to his time spent in providing testimony in a formal legal forum, Motley Rice and the former Agents made those payments to secure and influence Rudra's testimony in the New Jersey Litigation—including false testimony regarding the November Event.

92.     Each payment Motley Rice and the Former Agents directly or indirectly made to Rudra was a separate violation of 18 U.S.C. § 201, and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

93.     Mr. Rajaratnam is informed and believes that, between 2009 and 2018, Motley Rice, Elsner, and the Former Agents directly or indirectly gave, offered, or promised additional funds or other things of value to Rudra or to other persons or entities with the intent to influence Rudra's testimony under oath in the New Jersey Litigation. Each such payment, delivery, offer, or promise was a separate violation of 18 U.S.C. § 201, and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

94.     On or about February 5, 2010, Motley Rice procured an affidavit from Rudra in connection with the New Jersey Litigation. *See* DNJ ECF No. 325 Ex. 4. Motley Rice hid that

affidavit for over six years, waiting until the last possible moment—the deadline for close of discovery on September 30, 2016—to produce it. *See* DNJ ECF No. 382 at 1. That affidavit contains demonstrably false statements.

95.     In July 2018, Rudra gave four days of deposition testimony in the New Jersey Litigation. *See* DNJ ECF No. 382 at 4.

96.     Mr. Rajaratnam is informed and believes that, since at least 2009, Motley Rice, Elsner, and the Former Agents have repeatedly and corruptly persuaded, or attempted to persuade, Rudra to cooperate, as described above, with the intent to influence his testimony in the New Jersey Litigation. Each such offer, promise, or other instance of persuasion was a separate violation of the federal witness tampering statute, 18 U.S.C. § 1512, which was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

### *The Enterprise Uses its Unlawful Access to Protected Government Assets to Go After Mr. Rajaratnam in the Press*

97.     On or about October 23, 2009, Motley Rice issued a press release that included, among other things, the false representation that, "[i]n November 2002, Rajaratnam, speaking at a fundraiser for the Association of Tamils of Sri Lankan USA ("ITSA"), called those supporting the Tamils' struggle in Sri Lanka 'terrorists,' later adding that they were not just terrorists but also 'freedom fighters.'"[6] The press release had a dual purpose: to increase the pressure on Mr. Rajaratnam to settle and to garner publicity for Motley Rice's corrupt "anti-terrorism-financing litigation" practice led by Elsner.

---

[6] *See* https://www.prweb.com/pdfdownload/3097964.pdf

98.     Motley Rice and Elsner transmitted that website, or caused it to be transmitted, on Motley Rice's website and via interstate or international wire to various press agencies. Each such transmission was a violation of the federal wire fraud statute, 18 U.S.C. § 1343, committed by Motley Rice and Elsner for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

99.     When Mr. Rajaratnam did not immediately capitulate to Motley Rice's "shock and awe" assault, the Motley Rice Enterprise tried a different tactic. It exploited its unique and unlawful access to government assets by orchestrating and planting "fake news" that appeared to come from legitimate and independent sources, but which came exclusively from members of the Motley Rice Enterprise who knew their statements were false.

100.    On or about September 30, 2011 *Vanity Fair* published an article entitled "Crouching Tiger, Hidden Raj" (the "Article"). The Article included quotations attributed by author David Rose to defendants Elsner, Kanetkar, and Rudra.

101.    The *Vanity Fair* Article describes Kanetkar as "Rudra's main F.B.I. handler from 1999 until he left the bureau in June 2006." It describes Elsner as "the attorney from Charleston, South Carolina, whose law firm, Motley Rice, has filed a claim against Mr. Rajaratnam…on behalf of Tamil Tiger victims." The Article does not, however, indicate that Kanetkar and Rudra were working for Motley Rice at the time they gave their interviews to *Vanity Fair*.

102.    In the Article, Rudra and Kanetkar make numerous knowingly false and defamatory statements regarding Mr. Rajaratnam.

103.    Rudra made the following false and misleading statements regarding Mr. Rajaratnam:

28

a. According to the Article, "Rudra's secret recordings included detailed accounts by Tiger leaders of how money was transferred from the T.R.O. to the terrorist group itself, and in this case there is a copious documentary record of the role played by Mr. Rajaratnam." No such "copious documentary record" exists.

b. According to the Article, Rudra attended the November Event. Rudra claims in the Article that he was "equipped with a concealed recording device," and "sa[id] his memory of what Mr. Rajaratnam said at the [November Event] is clear, and it is supported by his former F.B.I. handlers, who heard the recordings when they were made." Rudra is quoted in the Article as saying, about Mr. Rajaratnam's speech at the November Event:

> "He got up and, flanked by L.T.T.E. flags, he said, 'Everyone must support the Tigers' cause,'" Rudra recalls. "He mentioned the fact that his wife was an Indian Sikh [a minority group from which some had also mounted a terrorist campaign aimed at creating a separate state]. Mr. Rajaratnam said: 'They're terrorists. We're terrorists. We are all freedom fighters.' Everyone laughed. Then he added: 'They're our terrorists, and you all must support the struggle.'"

   i. A now-unclassified transcript of Rudra's recording of the November Event demonstrates that Rudra's "quotation" of Mr. Rajaratnam's supposed remarks was false.

   ii. The transcript demonstrates that Mr. Rajaratnam never said that "[e]veryone must support the Tigers' cause."

   iii. The transcript demonstrates that Mr. Rajaratnam never said, "They're terrorists. We're terrorists."

   iv. The transcript demonstrates that Mr. Rajaratnam never said, "They're our terrorists and you must all support the struggle."

104. Kanetkar made the following false and misleading statements regarding Mr. Rajaratnam.

a. Kanetkar falsely stated that two Tamil Tiger members went to Mr. Rajaratnam's house "to arrange to get the money."

b. Kanetkar falsely stated that the LTTE had given Mr. Rajaratnam money to invest.

105. Kanetkar and Rudra were agents and/or employees of Motley Rice at the time that they made these false and misleading statements to *Vanity Fair*.

29

106.     Motley Rice, Elsner, Kanetkar, and Rudra knew of, made, and coordinated the
dissemination of these false statements to *Vanity Fair* in furtherance of the Motley Rice
Enterprise's fraudulent scheme to wrongfully obtain money from Mr. Rajaratnam. By means of
their fraud, Motley Rice, Elsner, Kanetkar, and Rudra caused the false statements to be widely
disseminated via interstate wires on *Vanity Fair's* website for the purpose of executing the
Motley Rice Enterprise's fraudulent scheme to wrongfully obtain money from Mr. Rajaratnam.

107.     The transmission of that article, with its false assertions and omissions, was a
violation of the federal wire fraud statute, 18 U.S.C. § 1343, committed by Motley Rice, Elsner,
Kanetkar, and Rudra for the purpose of executing the Motley Rice Enterprise's fraudulent
scheme to unlawfully obtain and exploit confidential government information for pecuniary gain
through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

108.     Mr. Rajaratnam is informed and believes that neither Kanetkar nor Rudra obtained
the necessary authorization from the U.S. Government to speak with the author of the *Vanity
Fair* article or to disclose Rudra's existence or any facts pertaining to the JTTF investigation.

### *Motley Rice and the Former Agents Fraudulently Conceal their Crimes for Years*

109.     When neither the lawsuit nor the PR campaign worked to leverage the hoped-for
settlement, the Motley Rice Enterprise found itself in a hole of its own digging. Having lied to
the press, the Court, Mr. Rajaratnam, and the public at large to extort what it expected to be a
quick settlement, it now had to keep those lies concealed as the discovery phase of the litigation
moved forward—ever closer to the possibility that not only the lies but the entire criminal
enterprise would be exposed.

110.     The Motley Rice Enterprise thus did everything it could to delay, avoid, or prevent
discovery while increasing the cost and complexity of the litigation in the hopes of winning a

30

war of attrition against Mr. Rajaratnam before Motley Rice was forced to show its hand. In this, Motley Rice was largely successful for many years—prolonging the litigation and forcing Mr. Rajaratnam to spend enormous sums trying to get Motley Rice to turn over basic information that Motley Rice knew could expose its criminal enterprise. Those damages continue to mount as Motley Rice continues to resist disclosure of the truth.

111.    For years after Motley Rice filed the New Jersey Litigation, Mr. Rajaratnam, through his counsel, repeatedly requested that Motley Rice provide information regarding the identities of any investigators it retained in connection with its lawsuit against Mr. Rajaratnam. Motley Rice consistently refused those requests. Motley Rice's persistent refusal forced Mr. Rajaratnam to seek the Court's assistance.

112.    Mr. Rajaratnam's concerted efforts to get that basic information did not yield fruit until late 2016—*two years* after the close of discovery and more than seven years after the filing of the original complaint—when Motley Rice finally disclosed the information Mr. Rajaratnam had been seeking for so long. Those disclosures were the first "storm warnings" Mr. Rajaratnam had that Motley Rice was involved in something much bigger—and more sinister—than the pursuit of frivolous litigation.

113.    The first red flag arose in September 2016, when Motley Rice disclosed that one of its purported witnesses was in fact a former Confidential Human Source with the United States Government. Motley Rice had concealed Rudra's existence for years. Even when it finally disclosed his existence, Motley Rice intentionally misspelled Rudra's (real) name in four different ways on eight different occasions in the New Jersey Litigation, to prevent Mr. Rajaratnam's counsel from investigating Rudra or connecting him to documents that referenced him.

114.     The second red flag came in November 2016, when the Court finally granted Mr. Rajaratnam's motion to compel Motley Rice to disclose the identity of its investigators—a motion Motley Rice fought vigorously at every turn. *See* DNJ ECF No. 268. Motley Rice then grudgingly disclosed for the first time that it had retained three former JTTF law enforcement agents to serve as "non-testifying experts". *See* DNJ ECF No. 325. Once he learned their identities, Mr. Rajaratnam was able to discover that the Former Agents had participated in the JTTF investigation into LTTE terrorism and, thus, had first-hand knowledge of secret government information pertaining to federal criminal investigations into the same subject matter as the New Jersey Litigation.

115.     The third red flag appeared in December 2016, when Mr. Rajaratnam's counsel learned that Motley Rice had paid Rudra roughly $40,000 over the course of the New Jersey Litigation—a sum far beyond what could reasonably have been necessary to compensate Rudra for his travel and time as a witness. *See* DNJ ECF No. 382 at 2.

116.     These red flags brought some clarity to other seeming oddities about the New Jersey Litigation, including Motley Rice's possession and production of copious government investigative materials, documents which Motley Rice originally obtained in violation of 18 U.S.C. §§ 1957, 2314 and 2315. They also revealed the connection between Rudra, Kanetkar, and Motley Rice, putting the *Vanity Fair* article in a whole new light.

117.     In late 2017, Rudra retained independent counsel. Shortly thereafter, Rudra's newly-retained independent counsel began producing documents—many of which Motley Rice had been withholding over the last nine years. Rudra's productions hint at the extent to which Motley Rice and the Former Agents have been working to conceal their crimes and thus protect their longstanding and highly profitable criminal enterprise.

32

118.    On January 24, 2018, Rudra's newly-retained independent counsel produced a 17-page print-out of cell phone text messages between Rudra and Elsner. *See* DNJ ECF No. 382 at 2.

119.    On March 13, 2018, Rudra's counsel produced over 3,000 pages of documents and correspondence between Rudra and Motley Rice and/or the Former Agents. *See id*.

120.    On May 8, 2018, Motley Rice produced 60 more pages of expense records, which revealed over $35,000 of previously-undisclosed payments to Rudra. *See id*.

121.    During a status conference with the New Jersey District Court on May 15, 2018, just weeks before the scheduled deposition of Rudra, Motley Rice represented to the Court that it would conduct a thorough search of its agents' documents within seven days. *See* DNJ ECF No. 382 at 3.

122.    One month later, Motley Rice had produced nothing from the Former Agents' files. Accordingly, on June 15, 2018, Mr. Rajaratnam subpoenaed the Former Agents. *See id*.

123.    On June 20, 2018, Motley Rice advised that it would either produce responsive documents or submit a letter detailing that no additional documents were located by the end of that week. *See* DNJ ECF No. 382 at 3 (citing DNJ ECF No. 369, Ex. E). It did neither. *See id*.

124.    Thus, Mr. Rajaratnam's counsel was forced to take Rudra's deposition in July 2018 without the benefit of those documents. *See id*.

125.    One month *after* that deposition (and three months after Motley Rice falsely advised the Court that it would act swiftly to produce the agents' documents) Motley Rice finally made a limited production of documents that had been in the Former Agents' possession. *See id*.

126.    That production included 155 pages of critical documents and interview memoranda that have been in Motley Rice's and/or the Former Agents' possession since before the filing of the Complaint in October 22, 2009. *See id.*

127.    An examination of the metadata from Motley Rice's August 17, 2018 production revealed that Motley Rice *still* has not produced all responsive documents. *See id.*

128.    Thirty minutes after making this incomplete production, Motley Rice filed a letter with the Court seeking leave to file a motion to quash the subpoenas served on the Former Agents. *See id.*

129.    Soon thereafter, Motley Rice filed a motion asking the Court to order an end to all non-damages-related fact discovery. *See id.*

130.    Mr. Rajaratnam is informed and believes that Motley Rice still has not produced documents Rudra requested from the FBI and provided to the Former Agents, and which the Former Agents passed on to Motley Rice.

131.    Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that, on multiple occasions beginning at least as early as 2010, (a) Motley Rice and Elsner corruptly persuaded, or attempted to persuade, the Former Agents to withhold key documents and other evidence from Mr. Rajaratnam and the Court and (b) Motley Rice, Elsner, and the Former Agents corruptly persuaded or attempted to persuade Rudra to do the same. Each such attempt was a separate violation of the federal witness tampering statute, 18 U.S.C. § 1512, and each was intended to contribute and did contribute to the Motley Rice Enterprise's pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

### *The Enterprise's Fraudulently-Concealed Bribery of Rudra is Finally Revealed*

132.     It was only in December 2016, seven years after filing the lawsuit, and two years after the discovery cut-off, that Motley Rice first acknowledged that it had paid Rudra, disclosing payments of roughly $40,000 over the course of the New Jersey Litigation. *See* DNJ ECF No. 382 at 2. As discussed above, each of those payments was an act of criminal bribery in furtherance of the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain.

133.     Despite the mounting evidence of misconduct, Motley Rice insisted it had done nothing wrong—and so did the Former Agents. On December 20, 2016, Elsner electronically filed, on behalf of Motley Rice, affidavits from each of the Former Agents in support of that claim. *See* DNJ ECF No. 382 at 3 (citing DNJ ECF No. 276 Ex. A).

134.     It was entirely within the Former Agents' discretion and control what representations, if any, they made to the Court in connection with the Motley Rice Enterprise's fraudulent scheme. In this way also, each of the Former Agents participated in the operation or management of the Motley Rice Enterprise.

135.     Allison's affidavit states, in part: "I have provided no payments or promise of payments to [Rudra] on my own behalf or on behalf of Motley Rice LLC." Mallon's affidavit states, in part, "I provided no payments or promise of payments to [Rudra] on my own behalf or on behalf of Motley Rice LLC other than to pay for his out-of-pocket expenses and travel expenses related to his role as a fact witness in this case." *See id.*

136.     In 2018, Rudra produced documents that revealed that Allison and Mallon's statements were false. *See, e.g.,* DNJ ECF No. 382 at 3 (citing DNJ ECF No. 344, Certification of Thomas R. Valen, Ex. H (discussing money "loaned" to Rudra by Former JTTF Agent), Ex. Q

(coordinating "loan" to Rudra between Former Agents), Exs. D, U, V (detailing payments for extensive and inappropriate travel, etc.)).

137.    On or about December 20, 2016, Motley Rice, Elsner, Allison, and Mallon transmitted or caused to be transmitted to the Court, Mr. Rajaratnam, and others, by means of interstate wire, false statements intended to further the Motley Rice Enterprise's fraudulent scheme. Each such transmission was a separate instance of wire fraud committed by Motley Rice, Elsner, Allison, and Mallon in violation of 18 U.S.C. § 1343 for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

### *The Enterprise's Fraudulently-Concealed Use of Government Materials is Finally Revealed*

138.    In his December 20, 2016 letter to the Court, Elsner represented that Motley Rice's complaint was based entirely on publicly-available material. See DNJ ECF No. 377 at 1, n.1 (citing DNJ ECF No. 276 at 4). Mallon's and Kanetkar's affidavits both state, in identical language: "I never provided Motley Rice LLC with any FBI files or FBI documents or materials," and Allison's affidavit states: "I never provided Motley Rice LLC with any documents or materials." *See* DNJ ECF No. 382 at 3 (citing DNJ ECF No. 276, Ex. A).

139.    In the same letter, Elsner represented that Motley Rice's retention of the Former Agents "coincided with Plaintiffs' filing of the Complaint in this case on October 22, 2009." *See* DNJ ECF No. 382 at 5.

140.    On June 19, 2017, Elsner electronically filed a letter, on behalf of Motley Rice, in which he represented to the Court that "[Motley Rice] have not received, and do not intend to offer any, classified documents or secret information." *See* DNJ ECF No. 329.

141.    Elsner's, Mallon's, Kanetkar's, and Allison's statements were false: a 2009 memorandum produced on August 17, 2018 reveals that the Former Agents mailed Motley Rice hard copies of documents and materials received from Rudra, which Rudra obtained by working on behalf of the FBI. *See id.* In so doing, the Former Agents transported, transmitted, and/or transferred in interstate commerce documents worth more than $5,000 to Motley Rice, knowing the same to have been unlawfully converted and/or obtained by fraud, in violation of 18 U.S.C. § 2314. By receiving the same documents across state lines, the Former Agents and Motley Rice violated 18 U.S.C. § 2315.

142.    In a further attempt to conceal its crimes, Motley Rice has asserted work product privilege over documents created by the Former Agents *before* October 22, 2009. *See id.* That privilege would only attach if the Former Agents were working for Motley Rice prior to the filing of the complaint; thus, in order to avoid producing more incriminating documents, Motley Rice has been forced to admit that Elsner's, Mallon's, and Kanetkar's statements to the Court were false.

143.    As described above, on or about December 20, 2016, Motley Rice, Elsner, Mallon, Allison, and Kanetkar transmitted or caused to be transmitted to the Court, Mr. Rajaratnam, and others, by means of interstate wire, false statements intended to further the Motley Rice Enterprise's fraudulent scheme. Each such transmission was a separate instance of wire fraud committed by Motley Rice, Elsner, Mallon, and Kanetkar in violation of 18 U.S.C. § 1343 for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

144.     As also described above, on or about June 19, 2017, Motley Rice and Elsner transmitted or caused to be transmitted to the Court, Mr. Rajaratnam, and others, by means of interstate wire, false statements intended to further the Motley Rice Enterprise's fraudulent scheme. Each such transmission was a separate instance of wire fraud committed by Motley Rice and Elsner in violation of 18 U.S.C. § 1343 for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

### *The Enterprise's Fraudulently-Concealed Orchestration of the Vanity Fair Article is Finally Revealed*

145.     Mr. Rajaratnam is informed and believes that, on May 17, 2017, Elsner electronically filed, on behalf of Motley Rice, a letter to the Court in which Elsner represented to the Court that Motley Rice was "not involved in the creation or 'orchestration' of the *Vanity Fair* article." *See* DNJ ECF No. 377 at 1, n.2 (citing DNJ ECF No. 300 at 1).

146.     Metadata from Motley Rice's August 17, 2018 production reveals that the Former Agents forwarded detailed information about Rudra to the author of the *Vanity Fair* article as early as April 29, 2011 (five months before the article was published). *See id.*

147.     Thus, on or about May 17, 2017, Motley Rice and Elsner transmitted or caused to be transmitted to the Court, Mr. Rajaratnam, and others, by means of interstate wire, false statements intended to further the Motley Rice Enterprise's fraudulent scheme. Each such transmission was a separate instance of wire fraud committed by Motley Rice and Elsner in violation of 18 U.S.C. § 1343 for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

### *The Enterprise Finally Tacitly Concedes It Lied About Mr. Rajaratnam*

148.     On October 22, 2009, June 13, 2014, and March 8, 2016, Motley Rice electronically filed, or caused to be electronically filed, pleadings endorsed by Elsner in which Motley Rice falsely alleged that Mr. Rajaratnam had solicited support for LTTE during the November Event. *See* DNJ ECF Nos. 1 ¶ 43, 163 ¶ 166, and 225 ¶ 143.

149.     After Rudra's 2018 disclosures exposed the criminal enterprise, Mr. Rajaratnam's counsel in the New Jersey Litigation served Motley Rice with a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. On October 3, 2018, Motley Rice moved for leave to amend its complaint to withdraw the false allegation regarding the November Event. *See* DNJ ECF No. 375. A corrected pleading was filed on November 13, 2018. *See* DNJ ECF No. 384.

150.     Motley Rice represented to the Court that it withdrew the allegation "to avoid unnecessary and wasteful Rule 11 litigation" and that the amendment "is not an acknowledgement that the withdrawn allegations are incorrect or false" (DNJ ECF No. 375-2 at 6). However, Rudra described the speech to Motley Rice's investigators months before the filing of the Complaint (*see* DNJ ECF No. 377 at 1, n.1) and the transcript and recording of Mr. Rajaratnam's speech make clear that Motley Rice's allegations were false. Motley Rice repeated these allegations in public filings knowing they were false.

151.     Moreover, Motley Rice appears to have amended its press release regarding the New Jersey Litigation to remove the false allegations regarding the November Event.[7]

---

[7] Compare https://www.prweb.com/pdfdownload/3097964.pdf to https://www.motleyrice.com/article/sri-lankan-terrorism-hedge-fund-manager.

Obviously, that correction was not necessary to "avoid unnecessary and wasteful Rule 11 litigation." Rather, it is one more instance of Motley Rice trying to cover up its past misdeeds.

152.    On or about October 22, 2009, June 13, 2014, and March 8, 2016, Motley Rice and Elsner transmitted or caused to be transmitted to the Court, Mr. Rajaratnam, and others, by means of interstate wire, false statements intended to further the Motley Rice Enterprise's fraudulent scheme. Each such transmission was a separate instance of wire fraud committed by Motley Rice and Elsner in violation of 18 U.S.C. § 1343 for the purpose of executing the Motley Rice Enterprise's fraudulent scheme to unlawfully obtain and exploit confidential government information for pecuniary gain through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1).

* * *

153.    Motley Rice and its agents and co-conspirators have been operating outside of the law for decades to advance their criminal enterprise and their own pecuniary interests.

154.    Mr. Rajaratnam brings this action against Motley Rice, its lead lawyer, the Former Agents, and Rudra to clear his name and to bring an end to the Motley Rice Enterprise.

## COUNT I: RICO § 1962(c)
### (All Defendants - the RICO Association)

155.    The allegations of paragraphs 1 through 154 are incorporated herein by reference.

156.    At all times relevant to this complaint, Joseph Rice, Ron Motley, Michael Elsner, Jay Kanetkar, Brian Mallon, John Allison, Rosetta Research and Consulting LLC, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra were all "person[s]" within the meaning of 18 U.S.C. § 1961(3).

157.    At all times relevant to this complaint, Motley Rice had an ongoing business relationship with one or more of: Joe Rice, Ron Motley, Michael Elsner, Jay Kanetkar, Brian

Mallon, John Allison, Rosetta, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra, such that their relationship constituted an "association in fact" enterprise, within the meaning of 18 U.S.C. § 1961(4), that was engaged in, or the activities of which affected, interstate or foreign commerce (the "RICO Association").

158.    The members of the RICO Association had defined roles, and the enterprise as a whole had an ongoing existence, structure, and hierarchy.

159.    As set forth more fully above, the members of the RICO Association corrupted the RICO Association and caused Mr. Rajaratnam damage through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and 1962(c). This pattern of racketeering activity entailed at least two acts of racketeering by the members of the RICO Association, at least one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering.

160.    Specifically, the following persons committed the following predicate acts of racketeering in furtherance of the RICO Association's fraudulent scheme:

| Person | Predicate Act(s) | Statute | Date(s) | Described at: |
|--------|------------------|---------|---------|---------------|
| *Motley Rice* | bribery | 18 U.S.C. § 201 | 2003-2006<br>2009-2018 | ¶¶ 43-46<br>¶¶ 90-96 |
| | mail fraud | 18 U.S.C. § 1341 | 2003-2006 | ¶¶ 43-46 |
| | wire fraud | 18 U.S.C. § 1343 | 2003-2006<br>10/22/2009<br>10/23/2009<br>9/30/2011<br>6/13/2014<br>3/8/2016<br>12/20/2016<br>5/17/2017<br>6/19/2017 | ¶¶ 43-46<br>¶¶ 146-150<br>¶¶ 97-98<br>¶¶ 99-108<br>¶¶ 148-152<br>¶¶ 148-152<br>¶¶ 132-143<br>¶¶ 145-147<br>¶¶ 138-144 |
| | obstruction | 18 U.S.C. § 1505 | pre-2001 | ¶ 33 |

41

| | | | | |
|---|---|---|---|---|
| | witness tampering | 18 U.S.C. § 1512 | pre-2001<br>2009-2018<br>2010-present | ¶ 33<br>¶¶ 90-96<br>¶¶ 109-131 |
| | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2003-2006<br>2009-2018 | ¶¶ 55-60<br>¶¶ 72-79 |
| | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006 | ¶¶ 55-60 |
| | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006<br>2009-2018<br>2009 | ¶¶ 55-60<br>¶¶ 72-79<br>¶¶ 138-141 |
| *Asimos* | bribery | 18 U.S.C. § 201 | 2004<br>2003-2006 | ¶¶ 64-65<br>¶¶ 43-46 |
| | mail fraud | 18 U.S.C. § 1341 | 2003-2006 | ¶¶ 43-46 |
| | wire fraud | 18 U.S.C. § 1343 | 2003-2006<br>March-April 2003<br>April 2005 | ¶¶ 43-46<br>¶¶ 49-54<br>¶¶ 68-71 |
| | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006 | ¶¶ 55-60 |
| | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006 | ¶¶ 55-60 |
| *Bucci* | wire fraud | 18 U.S.C. § 1343 | March-April 2003 | ¶¶ 49-54 |
| *Rosetta* | bribery | 18 U.S.C. § 201 | 2003-2004<br>2004 | ¶¶ 61-62<br>¶¶ 64-67 |
| | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006 | ¶¶ 55-60 |
| | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006 | ¶¶ 55-60 |
| *Elsner* | bribery | 18 U.S.C. § 201 | 2009-2018 | ¶¶ 90-96 |

|  | wire fraud | 18 U.S.C. § 1343 | 10/22/2009 | ¶¶ 146-150 |
|---|---|---|---|---|
|  |  |  | 10/23/2009 | ¶¶ 97-98 |
|  |  |  | 9/30/2011 | ¶¶ 99-108 |
|  |  |  | 6/13/2014 | ¶¶ 148-152 |
|  |  |  | 3/8/2016 | ¶¶ 148-152 |
|  |  |  | 12/20/2016 | ¶¶ 132-143 |
|  |  |  | 5/17/2017 | ¶¶ 145-147 |
|  |  |  | 6/19/2017 | ¶¶ 138-144 |
|  | witness tampering | 18 U.S.C. § 1512 | 2009-2018 | ¶¶ 90-96 |
|  |  |  | 2010-present | ¶¶ 109-131 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |
| *Mallon* | bribery | 18 U.S.C. § 201 | 2003-2004 | ¶¶ 61-62 |
|  |  |  | 2004 | ¶¶ 64-65 |
|  |  |  | 2009-2018 | ¶¶ 90-96 |
|  | wire fraud | 18 U.S.C. § 1343 | April 2005 | ¶¶ 68-71 |
|  |  |  | 12/20/2016 | ¶¶ 132-143 |
|  | witness tampering | 18 U.S.C. § 1512 | 2009-2018 | ¶¶ 90-96 |
|  |  |  | 2010-present | ¶¶ 109-131 |
|  | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
|  | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006 | ¶¶ 55-60 |
|  |  |  | 2009 | ¶¶ 138-141 |
|  |  |  | 2009-2018 | ¶¶ 72-79 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006 | ¶¶ 55-60 |
|  |  |  | 2009-2018 | ¶¶ 72-79 |
| *Kanetkar* | bribery | 18 U.S.C. § 201 | 2009-2018 | ¶¶ 90-96 |
|  | wire fraud | 18 U.S.C. § 1343 | 9/30/2011 | ¶¶ 97-106 |
|  |  |  | 12/20/2016 | ¶¶ 138-143 |
|  | witness tampering | 18 U.S.C. § 1512 | 2009-2018 | ¶¶ 90-96 |
|  |  |  | 2010-present | ¶¶ 109-131 |

43

|  |  |  |  |  |
|---|---|---|---|---|
|  | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
|  | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2009-2018<br>2009 | ¶¶ 72-79<br>¶¶ 138-141 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |
| *Allison* | bribery | 18 U.S.C. § 201 | 2009-2018 | ¶¶ 90-96 |
|  | wire fraud | 18 U.S.C. § 1343 | 12/20/2016 | ¶¶ 132-137 |
|  | witness tampering | 18 U.S.C. § 1512 | 2009-2018<br>2010-present | ¶¶ 90-96<br>¶¶ 109-131 |
|  | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
|  | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2009<br>2009-2018 | ¶¶ 138-141<br>¶¶ 72-79 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |
| *Rudra* | wire fraud | 18 U.S.C. § 1343 | 9/30/2011 | ¶¶ 99-108 |
|  | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
|  | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2009-2018 | ¶¶ 72-79 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |

161.    The foregoing constitutes an open-ended pattern of racketeering that began at least as early as the 1990's and which continues through the present day. That pattern of racketeering is part of the way Motley Rice regularly does business, and Motley Rice has employed it in connection with multiple schemes and litigations. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that the RICO Association's ongoing pattern of racketeering extends to other litigations and investigations. As discussed above, Motley Rice and the Former Agents continue to fraudulently conceal their wrongdoing and pursue wrongfully obtaining money from Mr. Rajaratnam. In short, there is a strong likelihood that the ongoing racketeering activity of the RICO Association will continue indefinitely.

162.    The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under, *inter alia*, 18 U.S.C. §§ 201, 1341, 1343, 1351, 1505, 1512, 1957, 2314, and 2315 and are within the scope of 18 U.S.C. § 1961(1)(A) and (1)(B). As set out more fully herein, the commission of those related predicate acts over the period of time alleged constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5).

163.    As a direct and proximate result of the foregoing pattern of racketeering, Mr. Rajaratnam has been and continues to be injured in an amount to be determined at trial, but not less than $6 million before trebling. Among other things, Defendants' actions have caused Mr. Rajaratnam to lose substantial commercial and investment opportunities, blocked the return and repatriation of millions of dollars held in Sri Lanka, forced Mr. Rajaratnam to incur substantial costs litigating issues that would not have arisen were the Defendants not trying to perpetrate,

protect, and conceal their criminal scheme, and even impeded Mr. Rajaratnam's ability to make charitable donations in Sri Lanka and elsewhere.

## COUNT II: RICO § 1962(c)
### (Individual Defendants - The RICO Enterprise)

164.    The allegations of paragraphs 1 through 154 are incorporated herein by reference.

165.    At all times relevant to this complaint, Motley Rice (and its predecessors-in-interest, including Ness Motley, Loadholt, Richardson & Poole), Joseph Rice, Ron Motley, Michael Elsner, Jay Kanetkar, Brian Mallon, John Allison, Rosetta Research and Consulting LLC, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra were all "person[s]" within the meaning of 18 U.S.C. § 1961(3).

166.    At all times relevant to this complaint, Motley Rice was a limited liability company, partnership, or other legal entity constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "RICO Enterprise").

167.    Joseph Rice, Ron Motley, and defendant Michael Elsner (collectively, the "Motley Rice Members") were members and agents of the RICO Enterprise.

168.    Jay Kanetkar, Brian Mallon, John Allison, Rudra, Mike Asimos, Jean-Charles Brisard, and Rosetta Research and Consulting LLC (collectively, the "Motley Rice Agents") were agents of the RICO Enterprise.

169.    The members of the RICO Enterprise had defined roles, and the RICO Enterprise as a whole had an ongoing existence, structure, and hierarchy.

170.    As set forth more fully above, the Motley Rice Members and the Motley Rice Agents corrupted the RICO Enterprise and caused Mr. Rajaratnam damage through a pattern of racketeering activity.

171.     As set forth more fully above, the Motley Rice Members and the Motley Rice Agents were persons associated with the RICO Enterprise and conducted or participated, directly or indirectly, in the operation and management of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and 1962(c). This pattern of racketeering activity entailed at least two acts of racketeering by the Motley Rice Members and/or the Motley Rice Agents, at least one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering.

172.     Specifically, the following Motley Rice Members and Motley Rice Agents committed the following predicate acts of racketeering in furtherance of the RICO Enterprise's fraudulent scheme:

| Person | Predicate Act(s) | Statute | Date(s) | Described at: |
|--------|------------------|---------|---------|---------------|
| *Asimos* | bribery | 18 U.S.C. § 201 | 2004<br>2003-2006 | ¶¶ 64-65<br>¶¶ 43-46 |
| | mail fraud | 18 U.S.C. § 1341 | 2003-2006 | ¶¶ 43-46 |
| | wire fraud | 18 U.S.C. § 1343 | 2003-2006<br>March-April 2003<br>April 2005 | ¶¶ 43-46<br>¶¶ 49-54<br>¶¶ 68-71 |
| | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006 | ¶¶ 55-60 |
| | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006 | ¶¶ 55-60 |
| *Bucci* | wire fraud | 18 U.S.C. § 1343 | March-April 2003 | ¶¶ 49-54 |
| *Rosetta* | bribery | 18 U.S.C. § 201 | 2003-2004<br>2004 | ¶¶ 61-62<br>¶¶ 64-67 |

| | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006 | ¶¶ 55-60 |
|---|---|---|---|---|
| | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006 | ¶¶ 55-60 |
| **Elsner** | bribery | 18 U.S.C. § 201 | 2009-2018 | ¶¶ 90-96 |
| | wire fraud | 18 U.S.C. § 1343 | 10/22/2009<br>10/23/2009<br>9/30/2011<br>6/13/2014<br>3/8/2016<br>12/20/2016<br>5/17/2017<br>6/19/2017 | ¶¶ 146-150<br>¶¶ 97-98<br>¶¶ 99-108<br>¶¶ 148-152<br>¶¶ 148-152<br>¶¶ 132-143<br>¶¶ 145-147<br>¶¶ 138-144 |
| | witness tampering | 18 U.S.C. § 1512 | 2009-2018<br>2010-present | ¶¶ 90-96<br>¶¶ 109-131 |
| | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |
| **Mallon** | bribery | 18 U.S.C. § 201 | 2003-2004<br>2004<br>2009-2018 | ¶¶ 61-62<br>¶¶ 64-65<br>¶¶ 90-96 |
| | wire fraud | 18 U.S.C. § 1343 | April 2005<br>12/20/2016 | ¶¶ 68-71<br>¶¶ 132-143 |
| | witness tampering | 18 U.S.C. § 1512 | 2009-2018<br>2010-present | ¶¶ 90-96<br>¶¶ 109-131 |
| | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
| | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2003-2006<br>2009<br>2009-2018 | ¶¶ 55-60<br>¶¶ 138-141<br>¶¶ 72-79 |

|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2003-2006 2009-2018 | ¶¶ 55-60 ¶¶ 72-79 |
|---|---|---|---|---|
| *Kanetkar* | bribery | 18 U.S.C. § 201 | 2009-2018 | ¶¶ 90-96 |
|  | wire fraud | 18 U.S.C. § 1343 | 9/30/2011 12/20/2016 | ¶¶ 97-106 ¶¶ 138-143 |
|  | witness tampering | 18 U.S.C. § 1512 | 2009-2018 2010-present | ¶¶ 90-96 ¶¶ 109-131 |
|  | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
|  | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2009-2018 2009 | ¶¶ 72-79 ¶¶ 138-141 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |
| *Allison* | bribery | 18 U.S.C. § 201 | 2009-2018 | ¶¶ 90-96 |
|  | wire fraud | 18 U.S.C. § 1343 | 12/20/2016 | ¶¶ 132-137 |
|  | witness tampering | 18 U.S.C. § 1512 | 2009-2018 2010-present | ¶¶ 90-96 ¶¶ 109-131 |
|  | engaging in monetary transactions in property derived from unlawful activity | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |
|  | transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2009 2009-2018 | ¶¶ 138-141 ¶¶ 72-79 |
|  | sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |
| *Rudra* | wire fraud | 18 U.S.C. § 1343 | 9/30/2011 | ¶¶ 99-108 |
|  | engaging in monetary transactions in | 18 U.S.C. § 1957 | 2009-2018 | ¶¶ 72-79 |

49

| | | | |
|---|---|---|---|
| property derived from unlawful activity | | | |
| transportation of property derived from unlawful activity | 18 U.S.C. § 2314 | 2009-2018 | ¶¶ 72-79 |
| sale or receipt of property derived from unlawful activity | 18 U.S.C. § 2315 | 2009-2018 | ¶¶ 72-79 |

173.    The foregoing constitutes an open-ended pattern of racketeering that began at least as early as the 1990's and continues through the present day. That pattern of racketeering is part of the way Motley Rice regularly does business, and Motley Rice has employed it in connection with multiple schemes and litigations. Mr. Rajaratnam believes that, after a reasonable opportunity for further investigation or discovery, the evidence will show that Motley Rice's ongoing pattern of racketeering extends to other litigations and investigations. As discussed above, Motley Rice and the Former Agents continue to fraudulently conceal their wrongdoing and pursue wrongfully obtaining money from Mr. Rajaratnam. In short, there is a strong likelihood that the ongoing racketeering activity of the RICO Enterprise will continue indefinitely.

174.    The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under, *inter alia*, 18 U.S.C. §§ 201, 1341, 1343, 1351, 1505, 1512, 1957, 2314, and 2315 and are within the scope of 18 U.S.C. § 1961(1)(A) and (1)(B). As set out more fully herein, the commission of those related predicate acts over the period of time alleged constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5).

175.    As a direct and proximate result of the foregoing pattern of racketeering, Mr.

Rajaratnam has been and continues to be injured in an amount to be determined at trial, but not

less than $6 million before trebling. Among other things, Defendants' actions have caused Mr.

Rajaratnam to lose substantial commercial and investment opportunities, blocked the return and

repatriation of millions of dollars held in Sri Lanka, forced Mr. Rajaratnam to incur substantial

costs litigating issues that would not have arisen were the Defendants not trying to perpetrate,

protect, and conceal their criminal scheme, and even impeded Mr. Rajaratnam's ability to make

charitable donations in Sri Lanka and elsewhere.

## COUNT III: RICO § 1962(a)
### (Motley Rice, Elsner)

176.    The allegations of paragraphs 1 through 175 are incorporated herein by reference.

177.    As described above, the RICO Enterprise and the RICO Association engaged in a

pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and 1962(c).

178.    Defendants Motley Rice and Elsner received income derived from that pattern of

racketeering, including by selling or trading government information and in the form of

settlements extracted in litigation through wrongful means.

179.    Defendants Motley Rice and Elsner used and invested that income to further their

criminal enterprise, including to commence and prosecute the unfounded New Jersey Litigation

against Mr. Rajaratnam and to compensate the Former Agents and Rudra for their participation in

the fraudulent scheme.

180.    As a direct and proximate result of Defendants' fraudulent scheme to use

unlawfully-acquired government information to wrongfully obtain money from Mr. Rajaratnam,

funded as it was by the Motley Rice Enterprise's ill-gotten gains, Mr. Rajaratnam has been and

continues to be injured in an amount to be determined at trial, but not less than $6 million before

51

trebling. Among other things, Defendants' actions have caused Mr. Rajaratnam to lose substantial commercial and investment opportunities, blocked the return and repatriation of millions of dollars held in Sri Lanka, forced Mr. Rajaratnam to incur substantial costs litigating issues that would not have arisen were the Defendants not trying to perpetrate, protect, and conceal their criminal scheme, and even impeded Mr. Rajaratnam's ability to make charitable donations in Sri Lanka and elsewhere.

**COUNT IV: RICO § 1962(d)**
**(Individual Defendants)**

181.    The allegations of paragraphs 1 through 180 are incorporated herein by reference.

182.    As set forth above, Defendants Elsner, Mallon, Allison, Kanetkar, and Rudra agreed to pursue the criminal objectives of the RICO Enterprise and the RICO Association, shared the common purpose of profiting from the exploitation of confidential government information for pecuniary gain, and intended by their actions to further or facilitate the criminal endeavor described herein.

183.    Each of the Individual Defendants unlawfully and willfully combined, conspired, confederated and agreed between and among each other to violate 18 U.S.C. § 1962(c), *i.e.*, to conduct and participate, directly and indirectly, in the affairs of the RICO Enterprise and the RICO Association through a pattern of racketeering, all in violation of 18 U.S.C. § 1962(d).

184.    Although not necessary for them to be found liable for violation of 18 U.S.C. § 1962(d), each of the Defendants not only facilitated the racketeering acts of others in the criminal enterprise but personally agreed to commit and in fact committed two or more racketeering acts and agreed to conduct and in fact conducted the affairs of the RICO Enterprise and the RICO Association through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as described more fully above.

185.   In addition, and as set forth more fully above, each of the Individual Defendants was aware that the RICO Enterprise and the RICO Association violated 18 U.S.C. § 1962(c), adopted as a goal the violation of § 1962(c), and facilitated the commission of the § 1962(c) violation by the RICO Enterprise and the RICO Association.

186.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Mr. Rajaratnam has been and continues to be injured in an amount to be determined at trial, but not less than $6 million before trebling. Among other things, Defendants' actions have caused Mr. Rajaratnam to lose substantial commercial and investment opportunities, blocked the return and repatriation of millions of dollars held in Sri Lanka, forced Mr. Rajaratnam to incur substantial costs litigating issues that would not have arisen were the Defendants not trying to perpetrate, protect, and conceal their criminal scheme, and even impeded Mr. Rajaratnam's ability to make charitable donations in Sri Lanka and elsewhere.

## COUNT V: Defamation
### (Motley Rice, Kanetkar, Rudra)

187.   The allegations of paragraphs 1 through 154 are incorporated herein by reference.

188.   As set forth more fully in paragraphs 99 through 108 above, Defendants Motley Rice and its agents, Kanetkar, and Rudra, made false and defamatory statements of fact regarding Mr. Rajaratnam to David Rose of *Vanity Fair*.

189.   Defendants knew, when they made those statements, that they were demonstrably false.

190.   Defendants made those statements deliberately and maliciously, without authorization or privilege, with the intent to cause Mr. Rose to publish those defamatory

53

statements in *Vanity Fair*, a well-known publication with wide international circulation, thus causing Mr. Rajaratnam financial and reputational harm.

191.    Mr. Rose did publish Defendants' false and defamatory statements, and Mr. Rajaratnam did suffer severe financial and reputational harm because of Defendants' defamatory statements.

192.    Defendants' false and defamatory statements exposed Mr. Rajaratnam to public contempt, disgrace, personal and professional reputational harm, and ridicule.

193.    Defendants' false and defamatory statements jeopardized Mr. Rajaratnam's personal safety.

194.    Defendants, through their false and defamatory statements, have forever deprived Mr. Rajaratnam of his ability to integrate back into, and interact with, society in the United States, in his family's homeland of Sri Lanka, and abroad.

195.    Defendants' false and defamatory statements charged Mr. Rajaratnam with a serious crime (to wit, funding terrorists), and are of the sort that tend to injure a plaintiff in his or her business, trade, or profession. As such, Defendants' statements constitute defamation *per se*.

196.    Mr. Rajaratnam did not learn the identity of Rudra, or that Rudra was acting at the direction of Motley Rice, until on or after November 14, 2016.

197.    Mr. Rajaratnam did not learn that Kanetkar was acting at the direction of Motley Rice until on or after November 14, 2016.

198.    The false and defamatory statements made by Rudra and Kanetkar are attributable to Motley Rice, who coordinated, directed, compensated, and conspired with Rudra and Kanetkar in connection with the publication of those statements.

54

199.    As a direct and proximate result of Defendants' false and defamatory statements, Mr. Rajaratnam has been and continues to be injured in an amount to be determined at trial, but not less than $3 million.

## JURY DEMAND

200.    Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment in his favor, and against Defendants, as follows:

a.    against all Defendants on the first count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

b.    against all Defendants except Motley Rice on the second count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

c.    against Defendants Motley Rice and Elsner on the third count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(a), in an amount to be determined at trial, but not less than $6 million before trebling and $18 million after trebling;

d.    against Defendants Elsner, Mallon, Allison, Kanetkar, and Rudra on the fourth count, awarding Mr. Rajaratnam treble the damages suffered by reason of injury to Mr. Rajaratnam's business and property as a result of Defendants' violation of 18 U.S.C. § 1962(d),

in an amount to be determined at trial, but not less than $6 million before trebling and $18

million after trebling;

       e.     against Defendants Motley Rice, Kanetkar, and Rudra on the fifth count,

awarding Mr. Rajaratnam compensatory, presumed, and punitive damages, in an amount to be

determined at trial, but not less than $3 million.

Dated:     New York, New York
            January 18, 2019

**LUPKIN PLLC**

By: /s/ Jonathan D. Lupkin
     Jonathan D. Lupkin (JL-0792)
     Michael B. Smith (MS-3281)

80 Broad Street, Suite 1301
New York, NY 10004
Tel: (646) 367-2771
Fax: (646) 219-4870
jlupkin@lupkinpllc.com
msmith@lupkinpllc.com

*Counsel for Plaintiff Raj Rajaratnam*

4812-0007-3605, v. 20