UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAJ RAJARATNAM, an individual,

                    Plaintiff,

      -against-

MOTLEY RICE, LLC, a South Carolina limited liability company, MICHAEL E. ELSNER, an individual, JAYAT P. KANETKAR, an individual, RUDRA, an individual named pseudonymously, BRIAN P. MALLON, an individual, and JOHN "HANK" ALLISON, an individual,

                    Defendants.

Case No: 18-cv-3234-KAM-RML

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ALLISON, KANETKAR AND MALLON'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Larry H. Krantz
Lisa A. Cahill
Nicolas J. Rovner
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009
*Attorneys for Defendants*
*Jayat P. Kanetkar, Brian P. Mallon, and*
*John "Hank" Allison*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL ALLEGATIONS ......................................................................................................2

ARGUMENT ..............................................................................................................................3

    I.    **COUNTS I AND II MUST BE DISMISSED AGAINST THE JTTF DEFENDANTS BECAUSE THE COMPLAINT FAILS TO PLEAD ADEQUATELY ANY COGNIZABLE PREDICATE ACTS COMMITTED BY THEM** ............................3

        A.    Motion to Dismiss Standard ...........................................................................3

        B.    Failure to Allege RICO Predicate Acts .........................................................4

            1.    Hank Allison ......................................................................................7

            2.    Jay Kanetkar......................................................................................10

            3.    Brian Mallon .....................................................................................12

            4.    Allegations Against The "Former Agents"........................................12

    II.   **COUNTS I AND II MUST BE DISMISSED AGAINST THE JTTF DEFENDANTS BECAUSE THEY FAIL TO ALLEGE A PATTERN OF RACKETEERING** ..........15

        A.    The Predicate Acts Alleged Against Allison and Kanetkar Amount to a "Single Scheme" Which Cannot Give Rise to RICO Liability..........................................15

        B.    The Additional Predicate Acts Alleged Against Mallon Fail Because they Involve Disparate Transactions and Unrelated Victims........................................16

    III.  **COUNTS I AND II MUST BE DISMISSED FOR FAILURE TO PLAUSIBLY ALLEGE PARTICIPATION IN OPERATION OR MANAGEMENT OF THE ALLEGED RICO ENTERPRISE** ...........................................................................17

    IV.  **COUNTS I AND II MUST BE DISMISSED AS TIME BARRED** ...........................19

    V.   **COUNT IV CANNOT SURVIVE DISMISSAL OF THE SUBSTANTIVE RICO CLAIM**..............................................................................................................26

    VI.  **COUNT V, THE DEFAMATION CLAIM AGAINST KANETKAR, IS TIME BARRED** ...........................................................................................................26

CONCLUSION..........................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs.,*
483 U.S. 143 (1987) ........................................................................................ 20

*Anschutz Corp. v. Merrill Lynch & Co., Inc.,*
690 F.3d 98 (2d Cir. 2012). ............................................................................ 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................. 3,4,13,15

*Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................... 3,4,13,15

*Bigsby v. Barclays Capital Real Est., Inc.,*
298 F. Supp. 3d 708 (S.D.N.Y. 2018) ............................................................ 15

*Boda v. Phelan*, No. 11-cv-00028 (KAM),
2014 U.S. Dist. LEXIS 104955 (E.D.N.Y. July 20, 2014) .............................. 26

*Cohen v. S.A.C. Trading Corp.,*
711 F.3d 353 (2d Cir. 2013) ........................................................................... 20,21

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.,*
758 F.Supp.2d 153 (E.D.N.Y. 2010) .............................................................. 4,9,10

*D'Addario v. D'Addario*, 901 F.3d 80 (2d Cir. 2018) ...................................... 18

*Daddona v. Gaudio,* 156 F. Supp. 2d 153 (D. Conn. 2000) ............................. 9

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ............................................. 5

*Dempsey v. Sanders*, 132 F. Supp. 2d 222 (S.D.N.Y. 2001) ............................ 15

*DirecTV, Inc. v. Lewis,* No. 03–cv–6241,
2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005) ............................................... 9

*First Capital Mgmt. v. Satinwood, Inc.,*
385 F.3d 159 (2d Cir. 2004) ........................................................................... 26

*Grace International Assembly Of God, V. Gennaro Festa & Falcon General Construction
Services, Inc.*, No. 17-cv-7090 (SJF), 2019 WL 1369000 (E.D.N.Y. Mar. 26, 2019) ............ 17

*G-I Holdings, Inc. v. Baron & Budd,*
179 F. Supp. 2d 233 (S.D.N.Y. 2001) ............................................................ 15

*Hecht v. Commerce Clearing House, Inc.,*
897 F.2d 21 (2d Cir. 1990) ............................................................................. 17

*In re Basic Food Grp., LLC*, No. 15-10892 (JLG),
2016 WL 3677673 (Bankr. S.D.N.Y. July 1, 2016) ....................................... 17

*In re Merrill Lynch Ltd. P'ships Litig.,*
154 F.3d 56 (2d Cir. 1998) ............................................................................. 20

*In re Vericker*, 446 F.2d 244 (2d Cir. 1971) .................................................... 8

*Isaac v. City of New York*, No. 16-cv-4729 (KAM),
2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018)....................................................... 3,4

*Kimm v. Chang Hoon Lee & Champ, Inc.*,
196 F. App'x 14 (2d Cir. 2006) ........................................................................ 11

*Kimm v. Lee*, No. 04-cv-5724 (HB),
2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ......................................................... 11

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012) ....................................................................*Passim*

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
951 F. Supp. 1071 (S.D.N.Y. 1996) ................................................................. 19

*Matthews v. Kidder, Peabody & Co.*,
260 F.3d 239 (3d Cir. 2001) .......................................................................... 25

*Nakahara v. Bal*, No. 97-cv-2027,
1998 WL 35123, (S.D.N.Y. Jan. 30, 1998) .......................................................... 9

*New York v. Solvent Chem. Co.*,
166 F.R.D. 284 (W.D.N.Y. 1996)..................................................................... 13

*Pier Connection, Inc. v. Lakhani*,
907 F. Supp. 72 (S.D.N.Y. 1995) ..................................................................... 16

*Plitman v. Leibowitz*, 990 F. Supp. 336 (S.D.N.Y. 1998)...................................... 27,28

*Prasad v. MML lnv'rs Servs., Inc.*, No. 04-cv-380 (RWS),
2004 WL 1151735 (S.D.N.Y. May 24, 2004) ................................................. 13,14

*Reich v. Lopez*, 858 F.3d 55
(2d Cir.), *cert. denied,* 138 S. Ct. 282 (2017) .................................................. 17

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)................................................... 17-19

*Shams v. Fisher*, 107 F. Supp. 2d 266 (S.D.N.Y. 2000)........................................ 19

*SPCA of Upstate New York v. American Working Collie Ass'n*,
18 N.Y.3d 400 (2012) ................................................................................. 28

*Uni-Sys, LLC v. USTA,* No. 17-cv-147 (KAM)
2018 U.S. Dist. LEXIS 172638 (E.D.N.Y. Oct. 5, 2018)....................................*Passim*

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012)............................................ 6,8

*United States v. Farraj*,
142 F. Supp. 2d 484 (S.D.N.Y. 2001) ................................................................ 8

*United States v. Schultz,* 333 F.3d 393 (2d Cir. 2003)............................................. 8

*United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016) ........................................... 16

*World Wrestling Ent., Inc. v. Jakks Pacific, Inc.*,
328 Fed. App'x 695 (2d Cir. 2009) .................................................................. 20

*Yarusso v. Arbotowicz*, 41 N.Y.2d 516 (1977) .................................................. 27,28

iii

**Statute**

C.P.L.R. § 207........................................................................................................*Passim*

C.P.L.R. § 215........................................................................................................ 26

C.P.L.R. § 302........................................................................................................ 28,29

C.P.L.R. § 308........................................................................................................ 28

C.P.L.R. § 313........................................................................................................ 28,29

Fed. R. Civ. P.12(b)(6).......................................................................................... 1,3,29

18 U.S.C. § 201.....................................................................................................*Passim*

18 U.S.C. § 798..................................................................................................... 5

18 U.S.C. § 1343...................................................................................................*Passim*

18 U.S.C. § 1512................................................................................................... 12,14

18 U.S.C. § 1905................................................................................................... 5

18 U.S.C. § 1957...................................................................................................*Passim*

18 U.S.C. § 1962................................................................................................... 4,5,17

18 U.S.C. § 2314...................................................................................................*Passim*

18 U.S.C. § 2315...................................................................................................*Passim*

**Secondary Sources**

DAVID D. SIEGEL, NEW YORK PRACTICE § 53 (5th ed. 2011) ........................................ 27

DAVID B. SMITH, TERRANCE G. REED, CIVIL RICO, ¶ 5.04[3][A] (2017) ...................... 18

3 LEONARD B. SAND, ET AL., MODERN FEDERAL JURY INSTRUCTIONS, ¶ 52.04, Instr. 52-25, Comment (Supp. 2016)........................................................................................ 18

Defendants John Allison ("Allison"), Jayat P. Kanetkar ("Kanetkar") and Brian P. Mallon ("Mallon") (collectively, "the JTTF Defendants") submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss with prejudice the Amended Complaint ("Complaint" or "Compl.") filed against them by plaintiff Raj Rajaratnam ("Rajaratnam").   The JTTF Defendants join also in the arguments and additional grounds for dismissal (insofar as applicable) set forth in their co-defendants' motion to dismiss.

## PRELIMINARY STATEMENT

This motion is directed at an amended civil RICO complaint that should never have been filed.  Rajaratnam's second bite at the apple, while adding numerous RICO predicates and allegations, once unpacked, fails to state a claim and must be dismissed.  At bottom, the Complaint is a transparent attempt to transform a baseless and unripe malicious prosecution claim, coupled with a baseless and time-barred defamation claim, into a federal RICO action. Once Rajaratnam's conclusory and melodramatic rhetoric is put aside, it is apparent that the Complaint wholly fails to plead a claim under the RICO Act.  The catalogue of deficiencies is vast.  Indeed, the Complaint is subject to valid challenge as to virtually every required element. Civil RICO claims are often brought for abusive purposes, and given the rigid pleading requirements, few survive judicial scrutiny.  The instant Complaint is no exception.

This conclusion is true as to all the defendants, but it is particularly so as to defendants Allison, Kanetkar and Mallon, all former federal agents whom Rajaratnam irresponsibly alleges have been "compromised."  The allegations against the JTTF Defendants are anemic in terms of legal adequacy; indeed, these defendants appear to be collateral damage in a litigation playing out between Rajaratnam and Motley Rice, the law firm that has sued him in the District of New Jersey.  By this lawsuit, the JTTF Defendants have been swept up into this drama.  Rajaratnam implausibly seeks to hold *them* responsible for alleged acts – occurring over decades of time – in

1

which they had little to no conceivable involvement, and for alleged injuries they plainly did not cause, and for which they have no legal responsibility.

The gravamen of Rajaratnam's allegations against the JTTF Defendants is that they learned information about him while they were government agents, and subsequently disclosed that information, and government documents, to Motley Rice for its use in the New Jersey case. The fundamental fallacy of this central aspect of the Complaint is that even if that were true (which must be assumed for purposes of this motion only*), that conduct fails to allege a crime at all, let alone a crime that constitutes a specifically enumerated RICO predicate act.*

For this primary reason, and other reasons arising out of the appropriately demanding RICO pleading standards in the Second Circuit, the Complaint against the JTTF Defendants must be dismissed because: (1) it fails plausibly to allege that these defendants engaged in *any* predicate acts cognizable under the RICO Act; (2) the alleged predicates otherwise fail to constitute a racketeering "pattern"; (3) the RICO claims fail plausibly to allege that these defendants participated in the "operation or management" of the enterprise; (4) the RICO substantive claims and the defamation claim are time-barred; and, (5) the RICO conspiracy claim falls necessarily alongside the deficient substantive RICO claims.

## FACTUAL ALLEGATIONS

Rajaratnam is the defendant in a terrorism financing suit filed in the District of New Jersey in 2009 (the "New Jersey Action").   Compl.  ¶¶ 85-86.  The plaintiffs in that action, alleged victims of the Sri Lankan terrorist organization called the Liberation Tigers of Tamil Eelam ("LTTE"), are represented by the law firm Motley Rice (the JTTF Defendants' co-defendant in this case).  The terrorism victims in that action allege that Rajaratnam funneled millions of dollars into the Tamil Rehabilitation Organization ("TRO"), a charity which in 2007

was designated by the U.S. Department of the Treasury as a front for funding terrorism activities

by the LTTE.

JTTF Defendants Allison, Kanetkar and Mallon are former members of the federal Joint

Terrorism Task Force ("JTTF").  Compl. ¶¶ 20, 21, 23.  Rajaratnam alleges that Motley Rice

hired the JTTF Defendants because of information they could provide related to LTTE terrorism

activities.  *Id.* ¶¶ 72-75, 90.  The Complaint suggests that Motley Rice allegedly used this

information, along with related government documents obtained from the JTTF Defendants, as

the basis for the lawsuit filed against Rajaratnam in the District of New Jersey in 2009.  *See,*

*e.g.*, *id.* ¶¶ 84, 87, 90.  Significantly, the Complaint does not (and could not) allege the disclosure

of any "classified" information or documents.

Rajaratnam goes on to allege a decades-long scheme by Motley Rice of "using criminal

conduct to extort massive settlements."  *Id.* ¶ 30.  He claims Motley Rice and its agents used

military connections to conduct "clandestine investigations" and "exploit confidential

government information for pecuniary gain."  *Id.* ¶¶ 55, 57.  These vast allegations, however, are

entirely unrelated to the alleged "scheme" against Rajaratnam, save for the presence of Motley

Rice as attorneys.

## ARGUMENT

I.   **COUNTS I AND II MUST BE DISMISSED AGAINST THE JTTF DEFENDANTS BECAUSE THE COMPLAINT FAILS TO PLEAD ADEQUATELY ANY COGNIZABLE PREDICATE ACTS COMMITTED BY THEM**

### A. Motion to Dismiss Standard

This Court has restated the now familiar *Twombly* and *Iqbal* principles guiding a court's

review of the pleading on a motion to dismiss.  *See Uni-Sys, LLC v. USTA,* No. 17-cv-147

(KAM), 2018 U.S. Dist. LEXIS 172638, *20-22 (E.D.N.Y. Oct. 5, 2018); *Isaac v. City of New*

*York*, No. 16-cv-4729 (KAM), 2018 WL 5020173, at *4 (E.D.N.Y. Aug. 6, 2018).  To survive

the defendants' motions to dismiss, Rajaratnam's Complaint must contain sufficient facts that, accepted as true, state a claim for relief that is plausible on its face. *Isaac*, 2018 WL 5020173, at \*4. A claim is plausible when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id*. This does not require a showing of a "probability" of misconduct, but it does demand more than a "sheer possibility" that the defendant has acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint providing only "labels and conclusions" or "a formulaic recitation" of the elements of a cause of action will not suffice. *USTA,* 2018 U.S. Dist. LEXIS 172638, at \*21. Rajaratnam's entitlement to relief must be above the speculative level – if he does not nudge the claims across the line from conceivable to plausible, they must be dismissed. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).[1]

## B. Failure to Allege RICO Predicate Acts

In Counts I and II of the Complaint, Rajaratnam alleges substantive RICO violations against the JTTF Defendants under 18 U.S.C. § 1962(c). These claims must fail because the Complaint contains no plausible allegations that these defendants committed *any* predicate acts at all, let alone the two or more required to constitute a "pattern." *See Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp.2d 153, 168 (E.D.N.Y. 2010) (dismissing substantive RICO claims where "plaintiffs have failed as a matter of law to plead any underlying predicate acts which could form the basis for a 'pattern of racketeering activity'"); *see also*

---

[1] This Court has acknowledged the heightened importance in applying these principles in the RICO context. *See Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F.Supp.2d 153, 166-67 (E.D.N.Y. 2010). Racketeering allegations, particularly when made against former federal law enforcement agents, are stigmatizing, and the stress of a treble damages award is incalculable. Thus, there is "a particular imperative" to "flush out frivolous [civil] RICO allegations at an early stage of the litigation." *Curtis*, 758 F. Supp. 2d at 166-67.

*DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) ("The requirements of section 1962(c) must be established as to *each individual defendant.*") (emphasis added).

The essence of the RICO scheme alleged against all three of the former JTTF agents is that they improperly shared government information and documents with Motley Rice, and that this conduct was in violation of Attorney General ("AG") guidelines and was otherwise unauthorized. *See* Compl. ¶¶ 74, 90, 114 (as to information) and 75-77 (as to documents). However, an alleged violation of AG guidelines does not constitute a federal crime and is not cognizable under RICO. Moreover, the Complaint does not (and could not) allege the disclosure of any "classified" information, which *would* be a crime, although *not* a RICO predicate. *See* 18 U.S.C. § 798.

Additionally, even if the information and documents allegedly disclosed constituted "confidential information" (an allegation not made in the Complaint), those disclosures *would not constitute a crime or a RICO predicate either*. That is because the federal statute criminalizing disclosure of "confidential information" by a federal employee, Title 18, U.S.C. § 1905: (1) is a misdemeanor statute that is not included on the list of RICO predicates, and (2) requires that the information disclosed concern "trade secrets, processes, operations [or other delineated aspects] of any person, firm, partnership, corporation or association." That statute is plainly inapplicable here. Thus, the very essence of the scheme alleged against the JTTF defendants – the purported use of government information to further civil lawsuits – simply does not allege a crime at all, let alone a crime that qualifies as a RICO predicate act. It is for that reason that plaintiff strains so hard to shoe-horn this case into allegations of *other* criminal violations, none of which are applicable.

5

In his Amended Complaint, Rajaratnam seeks in vain to turn these allegations into RICO offenses by alleging violations of 18 U.S.C. §§ 2314 and 2315 (interstate transportation or possession of stolen property) and 18 U.S.C. § 1957 (money laundering). These allegations, however, fail to plead a violation of the applicable statutes because, as explained below, (1) the Complaint fails to allege that any documents were actually "stolen," as required by each statute relied upon; and, (2) Second Circuit precedent makes clear that FBI documents do not constitute "goods, wares or merchandise," and thus fall outside the scope of the statutes.[2]

The Complaint further alleges the JTTF Defendants committed wire fraud when they supposedly lied in affidavits filed in the New Jersey Action about whether they had provided government documents to Motley Rice, or made any improper payments to Rudra.  This alleged predicate act also must fail because, assuming for purposes of this motion only that the affidavits contained falsehoods, those documents fall squarely within the "litigation activities" safe harbor.  Moreover, the allegations are more properly cast as a claim for malicious prosecution and not wire fraud.

Once these patently insufficient allegations are set aside, the Complaint comes up empty as to the JTTF Defendants.  Specifically, as to Allison, the Complaint contains no other allegations that he committed *any* specific predicate acts.  As to Kanetkar, the Complaint unsuccessfully attempts to shoehorn defamation allegations into a wire fraud predicate, despite the absence of any plausible allegations of the requisite scheme to defraud or intent to defraud,

---

[2] Rajaratnam alleges that the "Former Agents" generally (Compl. ¶ 90), as well as Kanetkar and Mallon specifically *(id.* at ¶ 74), also shared "information" with Motley Rice, *e.g.*, Rudra's identity. Presumably because he cannot as a matter of law, Rajaratnam does not specifically charge that this alleged conveyance of "information" falls within the scope of the stolen property statutes.  *See United States v. Aleynikov,* 676 F.3d 71, 77 (2d Cir. 2012) (intangible property not cognizable under 18 U.S.C. § 2314).

6

and where case law is hostile to precisely such an effort.  As to Mallon, the Complaint's only other specific alleged predicate acts are based on conduct entirely unrelated to Rajaratnam. We address the claims against each defendant below and then address the broadly alleged predicate acts against the "Former Agents."

### 1. John "Hank" Allison

Allison, according to the Complaint, is a former agent of the Federal Bureau of Investigation ("FBI") and the JTTF.  Compl. ¶ 21.  Sometime in or before 2009, Allison allegedly began to work with Motley Rice.  *Id.* ¶ 72.  Allison is alleged by name to have participated in four RICO predicate acts: 18 U.S.C. §§ 2314 and 2315 (interstate transportation or possession of stolen property), 18 U.S.C. § 1957 (money laundering), and 18 U.S.C. § 1343 (wire fraud).  Rajaratnam has failed to properly plead these alleged predicates.

#### a.    Failure to Properly Plead Transportation or Sale of Stolen Property

The Complaint alleges that, in violation of 18 U.S.C. §§ 2314 and 2315 (interstate transportation or possession of stolen property), Allison transferred documents obtained by Rudra, an FBI Confidential Human Source, to Motley Rice.  *Id.* ¶¶ 75, 141.  The Complaint further alleges that the "Former Agents and/or Motley Rice" compensated Rudra for the documents allegedly in violation of 18 U.S.C. § 1957 (money laundering).  *Id.* ¶¶ 78, 91.  The relevant portion of 18 U.S.C. § 2314, criminalizing transportation of stolen goods, states:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . .  [shall be subject to a fine and/or imprisonment].

Alternatively, 18 U.S.C. § 2315 criminalizes receiving or possessing stolen goods:

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more… which have crossed a state or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken . . . [shall be subject to a fine and/or imprisonment].

Notably, the Complaint never alleges that Allison, Rudra, or any other member of the alleged "enterprise" ever *stole* these documents purportedly obtained from the FBI.  The Complaint merely alleges that Rudra "had obtained" "copies of documents and materials . . . while working on behalf of the FBI" and "requested [and presumably received] additional documents from the FBI."  Compl. ¶¶ 75, 77.   The JTTF defendants are accused of transporting those copies across state lines to Motley Rice.  *Id.*  Because the Complaint fails to allege that these documents were ever "stolen, converted or taken by fraud," the conduct pled cannot set forth a RICO predicate act.  *See United States v. Schultz,* 333 F.3d 393, 399 (2d Cir. 2003) ("[18 U.S.C. § 2314] applies to goods that are 'stolen, unlawfully converted, or taken.'") (citation omitted);  *United States v. Aleynikov*, 676 F.3d 71, 78 (2d Cir. 2012) ("However, there is no violation of the statute [18 U.S.C. § 2314] unless the good is transported with knowledge that 'the same' has been stolen.").  Similarly, 18 U.S.C. § 1957 applies to "criminally derived property," which cannot include these "documents" if they were not stolen.  For this reason alone, the Complaint is fatally deficient.

Yet a second fatal deficiency is that FBI "documents" plainly do not constitute "goods, wares, or merchandise."  Indeed, as the Second Circuit expressly held, FBI documents are *not* covered under 18 U.S.C. §§ 2314 or 2315 because they are not the type of "goods . . . ordinarily bought or sold in commerce."  *See In re Vericker*, 446 F.2d 244, 248 (2d Cir. 1971); *see also United States v. Farraj*, 142 F. Supp. 2d 484, 487 (S.D.N.Y. 2001) ("The FBI documents at issue in *Vericker* detailed the criminal activity of certain individuals. . . Judge Friendly reasoned that

8

the FBI documents were not 'good, wares, [or] merchandise' within the meaning of the statute because the substance contained in the documents was not ordinarily the subject of commerce.") (internal citation omitted).

Because the Complaint does not, and cannot, allege that these documents were "stolen," or were actually "goods, wares or merchandise" as required by the statutes, the alleged violations cannot survive as RICO predicates.

### b.   Failure to Plead Wire Fraud for "Litigation Activities"

The fourth predicate act alleged against Allison claims he violated 18 U.S.C. § 1343 (wire fraud) when he "transmitted to the Court [in the New Jersey action] . . . false statements." *Id.* ¶ 143; *see also id.* ¶¶ 135-36, 138, 141.  These alleged "false statements" were contained in an affidavit submitted to the court under a cover letter from co-defendant Michael Elsner, a member of Motley Rice.  Allison's affidavit allegedly states, "I never provided Motley Rice LLC with any documents or materials," *id.* ¶ 138, and "I have provided no payments or promise of payments to [Rudra] on my own behalf or on behalf of Motley Rice LLC."  *Id.* ¶ 135.

Because this submission to the court was clearly a protected "litigation activity," the alleged false statements cannot "properly form the basis for RICO predicate acts."  *See Curtis,* 758 F. Supp. 2d at 171.  As found by this Court in *Curtis*, and supported by a long line of cases, "allegations such as those here more properly may be classified as claims sounding in abuse of process or malicious prosecution."  *Id.*; *see also Daddona v. Gaudio,* 156 F. Supp. 2d 153, 162 (D. Conn. 2000); *DirecTV, Inc. v. Lewis,* No. 03–cv–6241, 2005 WL 1006030, at *8 (W.D.N.Y. Apr. 29, 2005); *Nakahara v. Bal*, No. 97-cv-2027, 1998 WL 35123, at *7 (S.D.N.Y. Jan. 30, 1998).   Indeed, allowing this type of allegation to serve as a RICO predicate would "result in the inundation of federal courts with civil RICO actions that could potentially subsume all other state

and federal litigation in an endless cycle where the victorious litigant immediately sues opponents for RICO violations." *Curtis*, 758 F. Supp. 2d at 171.  Moreover, the alleged submission of this false affidavit fails in any event to constitute a wire fraud because it is entirely disconnected from any properly pleaded "scheme to defraud."

### 2.  Jay Kanetkar

The Complaint alleges that Kanetkar was an FBI agent assigned to the JTTF.  Compl. ¶ 23.  He allegedly was Rudra's handler.  *Id.*  Kanetkar is specifically alleged to have participated in five RICO predicate acts: 18 U.S.C. §§ 2314 and 2315 (interstate transportation or possession of stolen property), 18 U.S.C. § 1957 (money laundering), and 18 U.S.C. § 1343 (two separate acts of wire fraud).   As with Allison, the first three RICO predicates alleged against Kanetkar, violations of 18 U.S.C. §§ 2314, 2315 and 1957, all fail because the copies of documents described in the Complaint are not alleged to have been "stolen," and in any event do not constitute "goods, wares or merchandise."  Similarly, the fourth predicate alleged against Kanetkar, wire fraud related to statements submitted to the court in the New Jersey Action, also must fail because it amounts, at best, to "litigation activities" and is unconnected to any properly pleaded scheme to defraud.  Thus, the first four predicate acts alleged are plainly deficient.

### a.  Defamation Improperly Pled as Wire Fraud

The Complaint's alleged fifth predicate against Kanetkar arises from two alleged defamatory statements attributed to him in the *Vanity Fair* article, which Rajaratnam seeks to improperly cast as wire fraud in violation of 18 U.S.C. § 1343.  Compl. ¶¶ 100-108.  Courts have assiduously resisted efforts by plaintiffs to shoehorn garden variety torts into predicate acts under the RICO Act.  In the case of defamation, this is for especially good reasons.  Defamation claims relate, typically, to efforts to injure another's good name and reputation, not to defrauding

another out of money or property, as required to sustain a wire fraud charge.  *Kimm v. Lee*, No. 04-cv-5724, 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005), *aff'd sub nom. Kimm v. Chang Hoon Lee & Champ, Inc.,* 196 F. App'x 14 (2d Cir. 2006) (dismissing RICO claims where alleged predicates "are – at best – thinly clothed defamation claims" and plaintiff failed to allege "property injury" or reliance on the wire fraud claims).

Here, the Complaint lodges allegations analogous to those found deficient in *Kimm,* where the plaintiff alleged that defendants bribed reporters to spread false news articles "attacking [Kimm's] professional name and reputation" and that as a result numerous defamatory articles were published.  *Kimm,* 2005 WL 89386, at *2.  Because Kimm may well have suffered reputational injury, but was not "induced to part with anything of value as a result," the court concluded that the wire fraud allegation must be dismissed.  *Id.* at *4.  Rajaratnam, like the plaintiff in *Kimm*, has made no plausible allegation that he was deprived of money or property because he, or anyone else, relied on the allegedly false statements.

Rajaratnam tries in vain to morph the *Vanity Fair* article into a "scheme to defraud" by patching together disconnected allegations from the article and vaguely suggesting that it was somehow intended to drive Rajaratnam to settle the New Jersey action.  *See* Compl. ¶¶ 99, 106-107, 109. Such a conclusory, speculative and far-fetched scheme is simply too vague and implausible to satisfy the RICO pleading standard, set forth above.  Moreover, allowing this type of allegation to proceed would potentially give rise to a RICO wire fraud predicate any time a plaintiff's attorney, or witness, commented on a case to the press in a manner that the defendant believed to be false.

Since Rajaratnam fails to allege plausibly that Kanetkar made comments to the *Vanity Fair* journalist in connection with any attempt to defraud Rajaratnam, or to induce him to part with money or property, the purported wire fraud predicate fails to state a claim.

### 3. Brian Mallon

Mallon, according to the Complaint, was a Special Agent with Immigration and Naturalization Services ("INS") assigned to the JTTF. Compl. ¶ 20. Mallon is specifically alleged to have participated in four substantive RICO predicate acts: 18 U.S.C. §§ 2314 and 2315 (interstate transportation or possession of stolen property), 18 U.S.C. § 1957 (money laundering), and 18 U.S.C. § 1343 (wire fraud).[3]

As with Allison and Kanetkar, because the documents, as alleged in the Complaint, were not "stolen," and cannot be considered "goods," Rajaratnam has not properly pled RICO predicates under 18 U.S.C. §§ 2314 and 2315. Because a crime has not properly been alleged, 18 U.S.C. § 1957 (money laundering) also has not been properly pled and cannot serve as a predicate. Finally, the fourth predicate alleged against Mallon (as with Allison and Kanetkar), wire fraud related to statements submitted to the court in the New Jersey Action, must fail because it encompasses "litigation activities."

### 4. Allegations Against The "Former Agents"

Two additional RICO predicates, 18 U.S.C. § 201 (bribery) and 18 U.S.C. § 1512 (witness tampering), are alleged against the JTTF Defendants generally, as well as against Motley Rice and Elsner. *See* Compl. ¶¶ 90-96 (bribery); *id.* ¶¶ 131 (witness tampering). These conclusory allegations against the "Former Agents" fail to meet the heightened pleading standard

---

[3] Mallon is alleged to have committed five other RICO predicates unrelated to Rajaratnam or the New Jersey Action. These predicates, in addition to being improperly pled, all fail because they involve separate actors, disparate schemes, and did not contribute in any way to the alleged injuries Rajaratnam allegedly suffered. These alleged predicates are addressed *infra* at section II.B.

of *Iqbal* and *Twombly,* while also failing to provide adequate notice of the alleged conduct of each individual defendant.  *Iqbal*, 556 U.S. at 678.

      **a.**    **Failure to Properly Allege Bribery**

The federal bribery statute, 18 U.S.C. § 201, prohibits certain payments to witnesses, but specifically allows for reimbursement of a witnesses' "reasonable cost of travel and subsistence incurred and the reasonable value of time lost."  18 U.S.C. § 201(d).  This provision encompasses reasonable expenses incurred including non-testimonial participation in litigation. *See Prasad v. MML Inv. Servs.*, *Inc.*, No. 04-cv-380 (RWS), 2004 WL 1151735, at *5-6 (S.D.N.Y. May 24, 2004); *New York v. Solvent Chem. Co*., 166 F.R.D. 284, 289 (W.D.N.Y. 1996).

As Rajaratnam acknowledges, Rudra is "believed currently to be a resident of Sri Lanka." Compl. ¶ 22.  From 2009 to 2018, Rudra, as alleged in the Complaint, was a key player for Motley Rice in the New Jersey Action.  *Id.* ¶¶ 73-77, 94-95, 101-103, 105-107.   Further, Rajaratnam claims that Rudra in July of 2018 was deposed over a period of four days, for which he undoubtedly spent numerous hours preparing.  *Id.* ¶ 95.

Given the time expended by Rudra, the distance between Sri Lanka and New Jersey, the expense of international flights, and the cost of living arrangements and "subsistence" during any trip to the United States to provide information for purposes of the New Jersey Action, the total amount of $75,000 the Complaint alleges was paid to Rudra over nine years (which is assumed to be true solely for purposes of this motion) does not create a plausible inference of an unlawful payment.  *Id.* ¶ 91.  Rather, the allegations of the Complaint fail to take these payments outside of the exception for "witness fees provided by law" and "the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing,

or proceeding." 18 U.S.C. § 201(d). Indeed, there is no indication or allegation in the Complaint that Rudra in any way required compensation in order to give evidence against Rajaratnam. *Prasad,* 2004 WL 1151735, at *5-6.

### b.    Failure to Properly Allege Witness Tampering

Rajaratnam contends that "after a reasonable opportunity for further investigation or discovery," evidence will show that the JTTF Defendants "corruptly persuaded, or attempted to persuade" Rudra to withhold certain "key" documents and other evidence from Rajaratnam and the court, a form of witness tampering allegedly in violation of 18 U.S.C. § 1512(b). Compl. ¶ 131. This allegation is wholly unsupported by any facts, and is therefore plainly deficient. Moreover, the allegation is implausible on its face – imputing to the JTTF Defendants knowledge of the underlying litigation, what documents would be "key" and what documents would be responsive to Rajaratnam's subpoena requests. The Complaint also fails to state how, or the manner in which, Rudra was "corruptly persuaded" not to turn over documents. These omissions are fatal, as outlined by courts addressing RICO claims in this Circuit:

> Although at least one of the individual defendants is charged with a primary act of witness tampering, [plaintiff's] allegations make it impossible to determine which defendant is so charged, and as to each and every other defendant who is charged with aiding and abetting, the Complaint fails to provide those Defendants with any idea of the manner in which they supposedly aided or abetted the witness tampering. Paragraph 104 of the Complaint alleges that the individual defendants "counseled, commanded, induced, procured, and/or caused such threat to be communicated to Mr. Kelly." However, this laundry list is nothing more than a recitation of the language of the aiding and abetting statute, and thus adds nothing to the Defendants' understanding of the charge.
>
> Even under notice pleading requirements, [plaintiff] has fallen short of pleading witness tampering with respect to Kelly. It is not alleged, for example, whether attendance at a particular meeting is alleged to constitute aiding and abetting.

*G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 264 (S.D.N.Y. 2001).   In sum, these

wholly speculative and barebones allegations fall far short of the specific pleading requirements

under *Iqbal* and *Twombly*.

## II.   COUNTS I AND II MUST BE DISMISSED AGAINST THE JTTF DEFENDANTS BECAUSE THEY FAIL TO ALLEGE A PATTERN OF RACKETEERING

### A.   The Predicate Acts Alleged Against Allison and Kanetkar Amount to a "Single Scheme" Which Cannot Give Rise to RICO Liability

To establish a "pattern" of racketeering activity, a plaintiff must plead not only the

commission of at least two predicate acts but must also "show that the predicate acts are related,

and that they amount to, or pose a threat of, continuing criminal activity."  *Bigsby v. Barclays*

*Cap. Real Est., Inc*., 298 F. Supp. 3d 708, 717 (S.D.N.Y. 2018) (internal quotations and citations

omitted).  A "single scheme promulgated for the limited purpose of defrauding a single victim"

cannot establish continuity.  *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 228 (S.D.N.Y. 2001).

The Complaint alleges that Motley Rice and its associates committed numerous predicate

acts beginning in the 1970's *all* entirely unrelated to Rajaratnam and the New Jersey Action.

*See, e.g.,* Compl. ¶ 30.  Importantly, Rajaratnam does not specifically allege Allison or

Kanetkar's involvement in any of the claimed predicate acts prior to 2009, the year the New

Jersey Action commenced.  The first allegations against Kanetkar, chronologically, are that

Mallon "enlisted" him in the conspiracy "[i]n or before 2009," and that Kanetkar (together with

Mallon) allegedly introduced Rudra to Motley Rice.  *Id.* ¶¶ 72, 74**.**  The first allegations against

Allison, chronologically, are that he likewise was brought into the conspiracy "[i]n or before

2009" and that he and his fellow former JTTF Agent colleagues transferred government

documents to Motley Rice beginning in 2009.  *Id.* ¶¶ 72-79.  Second, the Complaint avers that

the "Former Agents" bribed Rudra.  *Id.* ¶¶ 91-93.  Third, Kanetkar allegedly committed wire

fraud when he "coordinated the dissemination of" Rudra's false statements in the *Vanity Fair*

article.  *Id.* ¶ 106.  Fourth, the "Former Agents" allegedly persuaded Rudra to withhold key documents.  *Id.* ¶ 131.  Fifth, Allison is alleged to have submitted false statements about payments to Rudra.  *Id.* ¶¶ 135-36.  Sixth, the "Former Agents" allegedly transmitted false statements about documents received from Rudra.  *Id.* ¶ 138.  These six allegations, at best, allege a single scheme to defraud Rajaratnam.

Because the Complaint alleges, against Allison and Kanetkar, a single scheme against a single victim (Rajaratnam), it cannot establish the requisite RICO "continuity."  *Pier Connection, Inc. v. Lakhani*, 907 F.Supp. 72, 77 (S.D.N.Y. 1995) ("Plaintiffs' claim of open-ended continuity fails because Pier Connection has alleged no facts that would allow the Court to infer that Defendants committed anything other than a single fraudulent scheme. To infer a threat of repeated fraud from a single alleged scheme would in effect render the pattern requirement meaningless.") (citations and internal quotations omitted).

**B.  The Additional Predicate Acts Alleged Against Mallon Fail Because they Involve Disparate Transactions and Unrelated Victims**

As against Mallon, the Complaint, in addition to the "single scheme" alleged against Rajaratnam, attempts to plead a pattern by alleging five separate RICO violations: (1-2) 18 U.S.C. §§ 2314 and 2315, interstate transportation of stolen property for obtaining and transmitting confidential documents related to the 9/11 litigation; (3-4) 18 U.S.C. § 201 for bribery of FBI agent Mike Dick and an unnamed FBI analyst; and (5) 18 U.S.C. § 1343, wire fraud for luring an Afghan drug lord to the United States.  These five acts, importantly, are all unrelated to Rajaratnam and the New Jersey Action.

To "form a pattern of racketeering activity, predicate acts must be related to each other . . . [as well as] the enterprise."  *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016).  Courts have rejected allegations of a pattern where criminal wrongdoing involved disparate transactions

16

and unrelated victims.  *In re Basic Food Grp., LLC*, No. 15-10892 (JLG), 2016 WL 3677673, at

*10 (Bankr. S.D.N.Y. July 1, 2016); *Grace International Assembly Of God, V. Gennaro Festa &*

*Falcon General Construction Services, Inc*., No. 17-cv-7090 (SJF), 2019 WL 1369000, at *6

(E.D.N.Y. Mar. 26, 2019).    For example, in *Reich v. Lopez*, 858 F.3d 55, 58 (2d Cir.), *cert.*

*denied*, 138 S. Ct. 282 (2017), the Second Circuit held that that a pattern was not properly

pleaded where the acts alleged involved dissimilar "victims," means and "results."

The additional predicate allegations against Mallon must fail because they are plainly

disparate transactions not related in any meaningful way to the alleged single scheme against

Rajaratnam.[4]  Indeed, these far-flung allegations—relating to 9/11 and a purported Afghan drug

lord—involve separate actors, separate events, and separate victims.  They have no connection

whatsoever to the alleged scheme against Rajaratnam—save for the involvement of Motley Rice

in its capacity as a law firm.  This connection is plainly insufficient to properly plead a "pattern"

of racketeering activity.  Indeed, it would be absurd to re-litigate the legitimacy of these

disconnected cases in the context of this litigation, as the notion of a "pattern" is simply too

attenuated and implausible.

### III.    COUNTS I AND II MUST BE DISMISSED FOR FAILURE TO PLAUSIBLY ALLEGE PARTICIPATION IN OPERATION OR MANAGEMENT OF THE ALLEGED RICO ENTERPRISE

Subsection 1962(c) of the RICO statute states that it is unlawful for any person

"associated with any enterprise . . . to *conduct or participate*, directly or indirectly, in the

conduct of [an] enterprise's affairs through a pattern of racketeering activity . . ."  18 U.S.C. §

1962(c) (emphasis added).   In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court

defined "conduct or participate,"  concluding that  the words require "*some* part in directing the

---

[4] Because these unrelated acts also caused no injury to Rajaratnam, they must fail.  *See Hecht v. Commerce Clearing House, Inc*., 897 F.2d 21, 23 (2d Cir. 1990).

enterprise's affairs" and participation in the "operation or management of the enterprise itself." *Id.*, at 179, 183-85 (emphasis in original); *see D'Addario v. D'Addario*, 901 F.3d 80, 103 (2d Cir. 2018) (citing *Reves* for the proposition that a "RICO defendant will not be liable for mere participation in a racketeering act").

The Second Circuit "has read *Reves* as providing a degree of protection for low level insiders, requiring that they play some role, however minor, in the *management* of the enterprise, as evidenced by the fact that they 'exercise appreciable discretionary authority.'" DAVID B. SMITH, TERRANCE G. REED, CIVIL RICO, ¶ 5.04[3][a], at 5-46 (2017) (emphasis in original); *see also* 3 LEONARD B. SAND, ET AL., MODERN FEDERAL JURY INSTRUCTIONS, ¶ 52.04, Instr. 52-25, Comment (Supp. 2016) (as for how far "down the ladder" liability attaches, "the Second Circuit has adopted the standard that it applies to anyone with any managerial responsibility and to those others who exercise broad discretion in carrying out the instructions of [the] principal, but not to those whose role is the simple taking of directions and performance of tasks that are necessary or helpful to the enterprise") (internal quotations and footnote omitted).

There are no allegations in the Complaint that any of the JTTF Defendants were consulted – at any point – in decision-making by more senior members of the alleged enterprise. The Complaint also fails to allege plausibly that the JTTF Defendants were aware of the scope of the alleged enterprise, that they stood to profit from the alleged enterprise or, in fact, did profit (nowhere, for example, does the Complaint put any meat on its allegation that the JTTF Defendants benefitted from "the enterprise participants' lavish lifestyles" (Compl. ¶ 8)). Twice, the Complaint attempts to remedy this obvious deficiency by baldly alleging the "Former Agents" exercised "discretion and control" allegedly proving their participation in "operation and management." *Id.* ¶¶ 79, 134. Neither attempt is sufficient.

18

First, the Complaint avers that the "Former Agents" had discretion over which confidential documents, obtained from Rudra, they allegedly shared with "Motley Rice in perpetuation of the Motley Rice Enterprise's fraudulent scheme." *Id.* ¶ 79. It also alleges that the "Former Agents" managed "Rudra's role in the enterprise." *Id.* This minimal level of alleged discretion, however, is plainly inadequate to allege that they had the requisite level of managerial authority *over the enterprise.* Whatever "discretion" they allegedly exercised was plainly as to specific tasks allegedly delegated to them, rather than any discretion as to the management or operation of the alleged enterprise *itself*.

Second, the Complaint alleges that the "Former Agents" had complete discretion and control over representations made by them to the court in the New Jersey Action. *Id.* ¶ 134. However, the allegation that court filings from the JTTF Defendants, as mere investigators, were "entirely within [their] discretion and control" (*id.*), as opposed to within the control of the seasoned litigators initiating the filings, is both unsupported and implausible. Moreover, these limited allegations of management or control fail to rise to the "broad discretion" contemplated by *Reves*, and its progeny. *See, e.g., Shams v. Fisher*, 107 F.Supp.2d 266, 275 (S.D.N.Y. 2000); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F.Supp.1071, 1090 (S.D.N.Y. 1996), *abrogated on other grounds by Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98 (2d Cir. 2012).

On the strength of *Reves* and the paucity of the Complaint's allegations against the JTTF Defendants, Counts I and II of the Complaint should be dismissed against them on this alternative ground as well.

## IV.    COUNTS I AND II MUST BE DISMISSED AS TIME BARRED

It is undisputed that Rajaratnam's RICO claims are subject to a four-year statute of limitations. *See* ECF Nos. 27, 28, 35 (the parties' original pre-motion letters acknowledging the

applicable four-year limitations period); *Agency Holding Corp. v. Malley-Duff & Assocs.,* 483 U.S. 143, 156 (1987).  Because the RICO claims accrued in 2009 at the earliest (when defendant Motley Rice commenced the New Jersey Action against Rajaratnam), or 2011 at the latest (with publication of the Vanity Fair article), the RICO claims, filed in 2018, must be dismissed.

In *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012), the Second Circuit held that accrual of a RICO claim occurs when the RICO injury is discovered ("actual notice") or should have been discovered ("inquiry notice"), starting the limitations clock.  As for "should have discovered the injury," the Second Circuit in *Koch* restated the well-settled inquiry notice concept that a duty to inquire arises when there is knowledge of facts sufficient to suggest to a person of ordinary intelligence the probability that they have been defrauded (in short hand, "storm warnings").  *Id.* at 152-53; *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) ("The triggering information need not detail every aspect of the [subsequently] alleged fraudulent scheme.") (internal quotations omitted); *World Wrestling Ent., Inc. v. Jakks Pacific, Inc.*, 328 Fed. App'x 695, 697 (2d Cir. 2009) (it is inconsequential that "the full extent of the RICO scheme is not discovered until a later date. . .").[5]

If there is no inquiry undertaken, the limitations period runs from the date the duty to inquire arose, penalizing the plaintiff who "shuts his eyes to the facts which call for investigation . . . "  *Koch*, 699 F.3d at 152 (internal quotations and citation omitted).  If, on the other hand, an

---

[5] In undertaking this "storm warnings" analysis and considering what Rajaratnam knew or reasonably should have known, the Court may take judicial notice of press coverage and prior lawsuits, albeit without regard to the truth of their contents, and may also consider documents outside the pleadings, *e.g.*, court documents and other matters of public record, if the parties had notice of their contents and the documents are integral to the complaint.  *See USTA*, 2018 U.S. Dist. LEXIS 172638, at *21.  Circuit precedent is likewise clear that although the inquiry notice determination may be best suited for the trier of fact in certain cases, it certainly can be made by the District Court where the full record leaves little to no doubt on the issue.  *See Cohen*, 711 F.3d at 362; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).

inquiry is undertaken, the would-be plaintiff *may* acquire additional time if the inquiry is a reasonably diligent one. *Id*. at 153.  In that event, the limitations period runs from the date the reasonably diligent inquiry would have revealed the fraud to a person of reasonable intelligence. *Cohen*, 711 F.3d at 361-62;  *Koch*, 699 F.3d at 150-53.  Employing this analysis in *Koch*, the Second Circuit affirmed dismissal of a RICO claim as time-barred — finding that while a reasonably intelligent person would have had reason in October 2000 to suspect a counterfeit, plaintiff did not conduct any investigation until more than four years had passed.  *Koch,* 699 F.3d at 153.

  *Koch* dictates that the Court consider first when Rajaratnam allegedly sustained the RICO injury of which he complains.  That issue is simply addressed — October 22, 2009 — when Motley Rice filed the complaint in the District of New Jersey.  Compl., ¶¶ 10, 13.  The second inquiry is when Rajaratnam actually discovered or a person of ordinary intelligence should have discovered the probability that he was the victim of a fraud.  The gravamen of Rajaratnam's RICO claims, obviously critical to this inquiry, is that Motley Rice and its agents have engaged in a pattern of frauds by identifying so-called "deep pockets" tied to regions where terrorist attacks have occurred and bringing baseless suits against them, assuming that "wealthy targets" like Rajaratnam will "frighten . . . into a quick settlement."  Compl., ¶¶ 2-3, 10, 36.  Accepting the Complaint's far-fetched allegations as true, Rajaratnam was on inquiry notice of sufficient facts – *i.e.*, "storm warnings" – as of the filing of the New Jersey complaint in 2009.  The Complaint alleges, for example, that between September 11, 2001 and the 2009 filing date of the New Jersey complaint, Motley Rice had a track record of looking for "deep-pocket" defendants it could tie to terrorist violence, *e.g.*, suing "members of the Saudi royal family" for allegedly financing al Qaeda.  *See, e.g., id.*, ¶¶ 3, 8, 36.  The New Jersey Action is allegedly only the latest

iteration of a scheme that "dates back to the 1970's," beginning with Motley's involvement in asbestos litigation. *Id*. ¶ 30. Thus, assuming the scheme alleged in the Complaint to be true, when Motley Rice filed the New Jersey complaint against Rajaratnam and others in 2009 alleging their involvement in terrorist financing, Rajaratnam was in an equally good position to have discovered — based on Motley Rice's alleged track record as described in Rajaratnam's own Complaint — that he was the latest victim of Motley Rice's alleged pattern of frauds. Thus, Rajaratnam did not need any additional information to understand, in October 2009, that the same law firm that had sued him had also sued wealthy Saudi individuals in connection with the 9/11 attacks. The 9/11 litigation was highly publicized; so too Motley Rice's role.[6] And no one would be better positioned than Rajaratnam to know whether the allegations against him were fraudulent (or not).

Moreover, to the extent that Rajaratnam claims that he could not have known of his RICO injury until he became aware of facts sufficient to give rise to an inference that Motley Rice allegedly used government information in its 2009 complaint against him, Rajaratnam has claimed that such use of government information was evident in connection with the 9/11 Litigation,[7] and on the face of the 2009-filed New Jersey complaint. As to the latter, in a December 13, 2016 filing in the New Jersey Action, of which this Court may take judicial notice, Rajaratnam claimed that the complaint in that action appeared to be based on government

---

[6] *See, e.g.*, Sue Chan, *Sept. 11 Families Sue Saudis, Sudan* (Aug. 16, 2002), https://www.cbsnews.com/news/sept-11-families-sue-saudis-sudan/; Allan Dodds Frank, $116 Trillion Lawsuit Filed By 9/11 Families (Aug. 16, 2002) www.cnn.com/2002/LAW/08/15/attacks.suit/.

[7] *See* Compl. ¶ 37 ("Motley Rice used the 9/11 litigation as a pretext to embed itself with unscrupulous or duped government officials and amass a valuable database of sensitive information.").

information.[8]  As he stated in that filing, one would have to engage in "a suspension of disbelief"

to "assume . . . that Motley Rice *independently* generated its 67 page, 206 paragraph complaint,

including false *but specific allegations* against the Defendants . . . without the assistance of the

Former JTTF Agents who had been retained by Motley Rice at or before the filing of the

Complaint and long before its receipt of any *Touhy* materials."  Krantz Dec., Exh. A, at 8

(emphasis added).  Of course, that observation was as well-founded (or not) at the time of the

Complaint's filing in October 2009 as it was on December 13, 2016, the date of Rajaratnam's

letter.  Indeed, there are numerous allegations in the New Jersey complaint (a true and correct

copy of which is attached to the Krantz Dec. as Exhibit B)[9] — *specific to Rajaratnam* — from

which Rajaratnam could have drawn the same inference he asserts now, namely, that government

investigative material was used in connection with the filing of the New Jersey complaint.  *See*

Krantz Dec., Exh. B, at ¶¶ 96-97, 100, 113, 119, 122-23.[10]

Moreover, the factual basis for Rajaratnam's inference that government information was

used in filing the 2009 complaint was further reinforced when the *Vanity Fair* article was

---

[8] A true and correct copy of the December 13, 2016 letter from Rajaratnam's counsel to Judge Dickson is attached as Exhibit A to the Declaration of Larry H. Krantz ("Krantz Dec."). The letter is publicly available to all parties and was filed by Rajaratnam in an action in which Motley Rice represents the plaintiffs.  It contains allegations and arguments integral to Rajaratnam's allegations in this case of an alleged Motley Rice cover-up and shows that Rajaratnam was on full notice of this basis for his RICO claim.  *See Koch*, 785 F. Supp. 2d at 112; *USTA*, 2018 U.S. Dist. LEXIS 172638 at *21.

[9] The allegedly baseless New Jersey complaint may be considered here because it is the basis for Rajaratnam's RICO claims in this case.  *See Koch*, 785 F. Supp. 2d at 112.

[10] Rajaratnam knew full well that federal prosecutors in the Eastern District of New York were investigating terrorist financing in Sri Lanka.  *See* Compl.  ¶¶ 81 ("Mr. Rajaratnam was approached in connection with that investigation because of donations he and his father . . . had made to the [TRO]"), 83 ("Mr. Rajaratnam voluntarily and fully cooperated with that investigation"); *see also* Krantz Dec., Exh. C, at 10 (statement by Rajaratnam's counsel, Jonathan Lupkin, that a criminal investigation "occurred here in the Eastern District of New York" and acknowledging that Rajaratnam "was questioned" over the course of that investigation).

published on September 30, 2011 (a true and correct copy of the same is attached to the Krantz

Dec. as Exhibit D).[11]  The article revealed the sources for two highly specific Rajaratnam-related

allegations in the New Jersey complaint:

> New Jersey Complaint Allegation:  "In November 2002, Raj Rajaratnam was a
> guest speaker at an ITSA's fundraising event held in North Brunswick, New
> Jersey.  An LTTE flag and informational brochures concerning the LTTE were
> placed on a table in the conference hall.  In his speech to the organization,
> Rajaratnam referred to the struggle in Sri Lanka and asked those in attendance to
> support the struggle . . .  Rajaratnam described those in attendance who support
> the struggle in Sri Lanka as terrorists, noting that he was married to a terrorist
> because his wife is an Indian Punjabi . . . He further described those supporters in
> attendance as not just terrorists but as freedom fighters."

Krantz Dec., Exh. B, ¶ 113.

> Vanity Fair Article:  In reference to a November 2002 gathering in New Jersey,
> noting that "the flags and videos of the movement's military wing, the Liberation
> Tigers of Tamil Eelam (L.T.T.E.) were on display throughout the hall . . ." and
> that Rajaratnam was the event's "star speaker."  "Unbeknownst to Rajaratnam, his
> audience that night included an F.B.I. informant equipped with a concealed
> recording device.  The informant, who I will call by one of his nicknames, Rudra,
> would eventually make thousands of hours of clandestine recordings in the course
> of his 11-year undercover career, and the Department of Justice has used them as
> the basis of 20 successful criminal prosecutions.  Rudra says his memory of what
> Rajaratnam said at the gala is clear and it is supported by his former F.B.I.
> handlers, who heard the recordings when they were made.  'He got up and,
> flanked by L.T.T.E. flags, he said, 'Everyone must support the Tigers' causes,'
> Rudra recalls.  'He mentioned the fact that his wife was an Indian Sikh [a
> minority group from which some had also mounted a terrorist campaign aimed at
> creating a separate state].  Rajaratnam said:  'They're terrorists, we're terrorists.
> We are all freedom fighters.'  Everyone laughed.  Then he added:  'They're our
> terrorists, and you all must support this struggle.'"

Krantz Dec., Exh. D, at 1-2.

> New Jersey Complaint Allegation:  Referencing a "$1,000,000.00 contribution
> Rajaratnam made in 2000 following the LTTE's successful 'Elephant Pass'
> attack" and that an arrested LTTE operative, Vijayshanthar Patpanathan,

---

[11] The article is part of the record in the New Jersey action and it is the basis for Rajaratnam's defamation
claim against defendant Kanetkar.  *See Koch*, 785 F. Supp. 2d at 112; *USTA*, 2018 U.S. Dist. LEXIS
172638, at *21.

"confirmed to law enforcement sources that Rajaratnam donated $1 million to the LTTE after LTTE's successful 'Elephant Pass' attack in 2000."

Krantz Dec., Exh. B, ¶¶ 96, 122.

Vanity Fair Article:  "Rudra says that Rajaratnam sounded all the more persuasive [at the November 2002 affair] because his own generosity was well established. For example, a few were aware within the Tamil community that Rajaratnam apparently had given the Tamil cause at least $1 million in recognition of the Tamil victory in 2000 over the Sri Lankan army at the strategic Elephant Pass…"

Krantz Dec., Exh. D, at 2.

According to Rajaratnam, "[t]he Article does not . . . indicate that Kanetkar and Rudra were working for Motley Rice at the time they gave their interviews to *Vanity Fair*."  Compl. ¶ 101.  The *Vanity Fair* article, however, did not have to suggest such a connection in order to serve as a "storm warning."  The connection could well have been inferred, since two specific statements attributed to Rudra, who according to the article was "handled" by FBI agent Kanetkar (*see* Compl. ¶ 101), were near perfect matches to specific allegations in Motley Rice's 2009 complaint.  The similarity between the article and the New Jersey complaint constituted a "storm warning" of the RICO scheme conjured by Rajaratnam.  In short, given all of the other information that Rajaratnam possessed at that time, at a minimum, he was obligated to undertake a targeted inquiry, following the article's publication, into any relationship among Motley Rice, Rudra and his alleged FBI handlers.  *See Matthews v. Kidder, Peabody & Co.*, 260 F.3d 239, 255 (3d Cir. 2001) ("The more ominous the warnings, the more extensive the expected inquiry.").

Rajaratnam, in an attempt to show due diligence, alleges in a conclusory fashion that "his counsel repeatedly requested that Motley Rice provide information regarding the identities of any investigators it retained in connection with" the New Jersey Action.  Compl. ¶ 111.  This broad assertion, however, does not cure the fact that Rajaratnam waited over six years before filing this action in the face of extensive "storm warnings" that Motley Rice may have been

25

using former federal agents and government information as the basis for the suit.  Indeed, there is no evidence in the record of which we are aware that, prior to September 30, 2015 (the limitations deadline on the RICO claims if the publication date of the Vanity Fair article is used as the point of accrual), Rajaratnam conducted *any* reasonably targeted inquiry into these "storm warnings."

In sum, Rajaratnam was on notice of the basic facts set forth in this Complaint, and from which he infers a RICO scheme, either as of the filing of the New Jersey action in 2009, or at the very latest, on or about September 30, 2011, with the publication of the Vanity Fair article. Failure to conduct any reasonably diligent inquiry into those "storm warnings" within the following four years leaves the RICO claims clearly time-barred.

## V.   COUNT IV CANNOT SURVIVE DISMISSAL OF THE SUBSTANTIVE RICO CLAIM

Because Rajaratnam's substantive RICO claims are deficient as a matter of law, there can be no properly pleaded RICO conspiracy claim based on an alleged agreement to perform those same acts.   In short, if the alleged acts agreed upon do not constitute a RICO violation *if performed*, an agreement to commit those same acts is equally deficient under the law.  *See First Capital Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004).  Count IV, accordingly, must be dismissed.

## VI.   COUNT V, THE DEFAMATION CLAIM AGAINST KANETKAR, IS TIME BARRED

The defamation claim against Kanetkar, set out in Count V of the Complaint, is subject to a one-year statute of limitations under New York law.  C.P.L.R. § 215(3).   This cause of action accrues when the alleged defamatory statement is published.  *See Boda v. Phelan*, No. 11-cv-00028 (KAM), 2014 U.S. Dist. LEXIS 104955, *25 (E.D.N.Y. July 20, 2014).  According to the Complaint, the Vanity Fair article containing allegedly defamatory statements from defendants

26

Kanetkar and Rudra was published over the internet on September 30, 2011.  Compl. ¶ 100.
Because almost seven years has elapsed between that publication date and the June 1, 2018 filing
of the Complaint, the defamation claim is clearly time-barred.  Defendant Kanetkar joins his co-
defendants in respectfully requesting that the Court exercise its discretion to retain supplemental
jurisdiction over the defamation claim and to dismiss it.

Rajaratnam has acknowledged the one-year limitations period governs, but argues that it
has been tolled pursuant to an antiquated and rarely employed New York State tolling provision,
C.P.L.R. § 207.  ECF No. 35 at p. 5.  That section provides in part that "if, when a cause of
action accrues against a person, he is without the state, the time within which the action must be
commenced shall be computed from the time he comes into or returns to the state."  C.P.L.R. §
207.  Rajaratnam contends that Kanetkar was a non-domiciliary at the time of the article's
publication.  ECF No. 35 at 5.

Rajaratnam ignores that Section 207 contains an exception – applicable here – which
"almost swallows up the rule."  DAVID D. SIEGEL, NEW YORK PRACTICE § 53 (5th ed. 2011).
Section 207 makes clear that there is no tolling if service of the complaint outside the state was
permissible during the limitations period, *e.g.*, on the basis of long-arm jurisdiction.   C.P.L.R. §
207(3) ("This section does not apply . . . while jurisdiction over the person of the defendant can
be obtained without personal delivery of the summons to the defendant within the state."); *see*
*Yarusso v. Arbotowicz*, 41 N.Y.2d 516, 517 (1977) ("We hold that when statutory authorization
exists for obtaining personal jurisdiction by some manner other than personal delivery of the
summons within the State . . . the Statute of Limitations is not tolled under CPLR 207 by
defendant's absence from the State"); *Plitman v. Leibowitz*, 990 F. Supp. 336, 338-39 (S.D.N.Y.
1998) (stating that "under governing New York case law, the tolling provision in § 207 is almost

27

never available to a plaintiff"; further, "in the more than two decades since *Yarusso*, New York

state and federal courts have strictly applied the exception in § 207(3), denying the application of

§ 207's tolling provision in the vast majority of cases.") (collecting cases).  To survive dismissal,

Rajaratnam bears the burden of proving that jurisdiction could not have been obtained over

Kanetkar during the limitations period through extraterritorial service of process.

Although Kanetkar concededly was a non-domiciliary during the limitations period, he

was subject to long-arm jurisdiction under C.P.L.R. § 302(a)(1), thereby triggering the *exception*

to the statutory tolling.  Specifically, as explained below, Rajaratnam could have lawfully served

Kanetkar in New Jersey pursuant to C.P.L.R. § 313 ("Service Without the State Giving Personal

Jurisdiction"), using any of the means specified in C.P.L.R. § 308, *e.g.*, "nail and mail."  *See*

*Plitman*, 990 F. Supp. at 339.  It is true that, motivated by desires not to inhibit freedom of

speech or the press and to avoid a deluge of defamation claims, New York takes a "'narrow

approach' to long-arm jurisdiction where defamation cases are concerned."  *SPCA of Upstate*

*New York v. American Working Collie Ass'n*, 18 N.Y.3d 400, 403 (2012).  The so-called

"tortious act" long-arm jurisdiction provisions of the C.P.L.R. expressly exclude defamation

claims from their scope.  C.P.L.R. §§ 302(a)(2), (3).  But the Court of Appeals in *SPCA* made

clear that on an adequate record, long-arm jurisdiction may be found under the "transact business

within the state" subsection of the long-arm statute, C.P.L.R. § 302(a)(1).  *SPCA*, 18 N.Y.3d at

404-05.  Specifically, an assertion of such jurisdiction over a non-domiciliary will be justified

where there is a "substantial relationship" between purposeful activities in the State and the

transaction giving rise to the defamation claim.  *Id.* at 404.

Such a "substantial relationship" exists here.  The Complaint alleges that Kanetkar and

his colleagues "'handled' Defendant Rudra as a Confidential Human Source and procured much

28

of the information allegedly misused by Motley Rice against Rajaratnam in connection with investigations conducted (and prosecutions brought) in the Eastern District of New York." Compl. ¶ 27; *see also id.* ¶ 80 (the JTTF investigation "ultimately led to a series of criminal prosecutions in the Eastern District of New York.  The Former Agents had access to confidential documents and information from that criminal investigation").  The Complaint further indicates that Kanetkar allegedly shared information obtained over the course of that Eastern District of New York investigation with a *Vanity Fair* reporter, and the magazine published the information, allegedly defaming Rajaratnam in the process.  *Id.* ¶ 108.  Thus, Kanetkar's purposeful activities in New York (the Eastern District of New York specifically) substantially related to the subsequent alleged defamatory statements — indeed, the statements were based on what Kanetkar allegedly learned as part of an investigation based out of the Eastern District of New York.

In summary, because Kanetkar could have been served in New Jersey, pursuant to C.P.L.R. §§ 302 and 313, in the year following publication of the *Vanity Fair* article, there is no tolling of the statute of limitations, and the defamation claim is therefore time-barred.   *See* CPLR § 207(3).

## CONCLUSION

For all the reasons stated above and in the corresponding motion filed by the Motley Rice defendants, defendants John Allison, Jayat P. Kanetkar and Brian P. Mallon respectfully request that the Court grant their motion, brought pursuant to Rule 12(b)(6), to dismiss plaintiff Raj Rajaratnam's Amended Complaint in its entirety with prejudice.

Dated:  New York, New York
         April 12, 2019

                                    **KRANTZ & BERMAN LLP**


By: _____
                                    Larry H. Krantz
                                    Lisa A. Cahill
                                    Nicolas J. Rovner
                                    747 Third Avenue, 32nd Floor
                                    New York, New York 10017
                                    (212) 661-0009
                                    lkrantz@krantzberman.com
                                    lcahill@krantzberman.com