UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

RAJ RAJARATNAM, an individual,

          Plaintiff,

   -against-

MOTLEY RICE, LLC, a South Carolina
limited liability company, MICHAEL E.
ELSNER, an individual, JAYAT P.
KANETKAR aka JAY KANETKAR, an
individual, RUDRA, an individual named
pseudonymously, BRIAN P. MALLON, an
individual, and JOHN "HANK" ALLISON,
an individual,

          Defendants.

Case No. 1:18-cv-03234-KAM-RML

ECF Case

**Oral Argument Requested**

## CONSOLIDATED MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO
## DISMISS THE AMENDED COMPLAINT

Michael B. Smith (MS-3281)
Jonathan D. Lupkin (JL-0792)
LUPKIN PLLC
80 Broad Street, Suite 1301
New York, New York  10004
Tel: (646) 367-2771
Fax: (646) 219-4870
msmith@lupkinpllc.com
jlupkin@lupkinpllc.com

*Counsel for Plaintiff Raj Rajaratnam*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

PRELIMINARY STATEMENT........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT ..................................................................................................................... 6

I.      MR. RAJARATNAM HAS PLEADED AN ACTIONABLE RICO CLAIM ................... 8

   A.    The Amended Complaint Adequately Alleges Cognizable RICO Predicate Acts ........... 9

      1.    The Law Does Not Recognize Categorical "Safe Harbors" For Litigation-Related or Defamatory Conduct ....................................................................................... 10

      2.    The Amended Complaint Adequately Alleges the Elements of Each of the Predicate Acts............................................................................................................... 19

   B.    The Amended Complaint Alleges a "Pattern of Racketeering Activity"....................... 26

      1.    The Predicate Acts are Related ............................................................................ 27

      2.    The Pattern is Continuing ..................................................................................... 30

   C.    The JTTF Defendants are Liable for RICO Violations ................................................. 33

      1.    The JTTF Defendants Participated in the Operation or Management of the RICO Enterprise ............................................................................................................ 33

      2.    The JTTF Defendants Conspired to Violate RICO .............................................. 36

   D.    Mr. Rajaratnam has Alleged a Cognizable RICO Injury.............................................. 37

II.    THE RICO CLAIMS ARE NOT TIME-BARRED ....................................................... 40

III.   THE DEFAMATION CLAIM IS NOT TIME-BARRED ............................................. 44

   A.    Defendants' Fraudulent Concealment Tolled the Statute of Limitations ....................... 44

   B.    The Statute of Limitations was Tolled as to Kanetkar for Jurisdictional Reasons ......... 46

CONCLUSION.................................................................................................................. 48

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ...................................................... 6, 7

*Bailey v. Glover*,
   88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874) ........................................................................ 42

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ......................................................... 6

*Blue Cross and Blue Shield of New Jersey, Inc., v. Philip Morris Inc.*,
   36 F. Supp. 2d. 560 (E.D.N.Y 1999) ........................................................................ 37, 38, 40

*Bridge v. Phoenix Bond & Indemn. Co.*,
   553 U.S. 639, 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008) ...................................................... 19

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
   187 F.3d 229 (2d Cir. 1999) .................................................................................................... 30

*Cohen v. SAC Trading Corp.*,
   711 F.3d 353 (2013) ................................................................................................................ 42

*Creed Taylor, Inc. v. CBS, Inc.*,
   718 F. Supp. 1171 (S.D.N.Y. 1989) ...................................................................................... 18

*Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*,
   758 F. Supp.2d 153 (E.D.N.Y. 2010) ............................................................................... 14, 15

*D. Penguin Bros. Ltd. v. City Nat. Bank*,
   587 Fed.Appx. 663 (2d Cir. 2014) ........................................................................................... 6

*Daddona v. Gaudio*,
   156 F. Supp.2d 153 (D. Conn. 2000) ..................................................................................... 14

*Dandong v. Hu*,
   2017 WL 3328239 (S.D.N.Y. Aug. 3, 2017) .................................................................... 18, 39

*Dempsey v. Sanders*,
   132 F. Supp. 2d 222 (S.D.N.Y. 2001) .................................................................................... 31

*DirecTV, Inc. v. Lewis*,
   2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005) ....................................................................... 15

*Feld Entm't Inc. v. American Society for the Prevention of Cruelty to Animals*,
   873 F.Supp.2d 288 (D.D.C. 2012) .......................................................................................... 12

*Frydman v. Verschleiser*,
   172 F.Supp.3d 653 (S.D.N.Y 2016) ................................................................................. 18, 39

*Gunn v. Palmieri*,
   1989 WL 119519 (E.D.N.Y. Sept. 29, 1989) ......................................................................... 15

*Guzman v. Hecht*,
   2019 WL 1315888 (S.D.N.Y Mar. 22, 2019) ......................................................................... 11

*Harris v. City of New York*,
   186 F.3d 243 (2d Cir. 1999) ............................................................................................. 40, 47

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
   492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) ................................................ passim

*Ideal Steel Supply Corp. v. Anza,*
   652 F.3d 310 (2d Cir. 2011) ................................................................. 6

*In re Basic Food Grp., LLC,*
   2016 WL 3677673 (Bankr. S.D.N.Y. July 1, 2016) ................................ 33

*In re Commodity Exch., Inc.,*
   213 F.Supp.3d 631 (S.D.N.Y. 2016) ..................................................... 42

*Kim v. Kimm,*
   884 F.3d 98 (2d Cir. 2018) .................................................................. 13

*Kimm v. Chang Hoon Lee & Champ, Inc.,*
   196 F. Appx 14 (2d Cir. 2006) ............................................................. 18

*Kimm v. Lee,*
   2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ............................................. 18

*Klehr v. A&O Smith Corp.,*
   521 U.S 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1984) .......................... 41

*Koch v. Christie's Intern. PLC,*
   699 F.3d 141 (2d Cir. 2012) ............................................................ 40, 41

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.,*
   14 F.Supp. 3d 191 (S.D.N.Y. 2014) ..................................................... 40

*Moss v. Morgan Stanley, Inc.,*
   719 F.2d 5 (2d Cir. 1983) ..................................................................... 8

*Muto v. CBS Corp.,*
   668 F.3d 53 (2d Cir. 2012) .................................................................... 7

*Nakahara v. Bal,*
   1998 WL 35123 (S.D.N.Y. Jan. 30, 1998) ............................................ 13

*Napoli v. United States,*
   45 F.3d 680 (2d Cir. 1995) ................................................................. 35

*National Organization for Women, Inc. v. Scheidler,*
   510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1990) ............................. 38

*Odom v. Microsoft Corp.,*
   486 F.3d 541 (9th Cir. 2007) ................................................................. 6

*Pier Connection, Inc. v. Lakhani,*
   907 F.Supp. 72 (S.D.N.Y. 1995) ......................................................... 31

*Reich v. Lopez,*
   858 F.3d 55 (2d Cir. 2017) .............................................................. 29, 32

*Reiter v. Sonotone,*
   442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 ....................................... 40

*Reves v. Ernst & Young,*
   507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ...................... 34, 35

*Richards v. Mileski,*
   662 F.2d 65 (D.C. Cir. 1981) ........................................................... 45, 46

*Rotella v. Wood,*
   528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) ....................... 40

*Schlaifer Nance & Co. v. Estate of Warhol,*
   119 F. 3d 91 (2d Cir. 1997) ................................................................ 27

*Sedima, S.P.R.L. v. Imrex Co.,*
   473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ......................... 6, 37

*Smulley v. Federal Housing Finance Agency,*
    754 Fed.Appx. 18 (2d Cir. 2018) ............................................................ 14, 41
*SPCA of Upstate New York v. American Working Collie Association,*
    18 N.Y.3d 400 (2012) ............................................................................ 46, 47
*State of N.Y. v. Hendrickson Bros.,*
    840 F.2d 1065, 1083 (2d Cir. 1988) ...................................................... 41, 42
*Sykes v. Mel Harris and Associates, LLC,*
    757 F.Supp.2d 413 (S.D.N.Y. 2010) ...........................................................11
*Sykes v. Mel Harris and Associates, LLC,*
    780 F.3d 70 (2d Cir. 2015) ..........................................................................11
*Tran v. Alphonse Hotel Corp.,*
    281 F.3d 23 (2d Cir. 2002) ......................................................................... 41
*United States ex rel. Mooney v. Americare, Inc.,*
    2013 WL 1346022 (E.D.N.Y. Apr. 3, 2013) ................................................ 7
*United States v. Agarwal,*
    726 F.3d 235 (2d Cir. 2013) ....................................................................... 24
*United States v. Allen,*
    155 F.3d 35 (2d Cir. 1998) ............................................................. 34, 35, 36
*United States v. Coppola,*
    671 F.3d 220 (2d Cir. 2012) ....................................................................... 27
*United States v. Eisen,*
    974 F.2d 246 (2d Cir. 1992) ........................................................................11
*United States v. Indelicato,*
    865 F.2d 1370 (2d Cir. 1989) ..................................................................... 27
*United States v. Jones,*
    677 F.Supp. 238 (S.D.N.Y. 1998) .............................................................. 26
*United States v. Northern Adult Daily Health Care Center,*
    205 F.Supp.3d 276 (E.D.N.Y. 2016) ............................................................ 7
*United States v. Rastelli,*
    870 F.2d 822 (2d Cir. 1989) ....................................................................... 37
*United States v. Trapilo,*
    130 F.3d 547 (2d Cir. 1997) ....................................................................... 10
*United States v. Turley,*
    352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957) .................................... 25
*United States v. Zichettello,*
    208 F.3d 72 (2d Cir. 2000) ......................................................................... 37
*Von Bulow by Auersperg v. von Bulow,*
    657 F. Supp. 1134 (S.D.N.Y. 1987) ........................................................... 13
*Weaver v. Boriskin,*
    751 Fed.Appx. 96 (2d. Cir. 2018) .............................................................. 15
*Wexner v. First Manhattan Co.,*
    902 F.2d 169 (2d Cir. 1990) ......................................................................... 7

## Statutes

18 U.S.C. § 201 ............................................................................... 10, 20, 21
18 U.S.C. § 641 ....................................................................................... 26

18 U.S.C. § 798 ...................................................................................................... 25
18 U.S.C. § 1341 .................................................................................................... 10
18 U.S.C. § 1343 ............................................................................................ 10, 19
18 U.S.C. § 1505 .................................................................................................... 10
18 U.S.C. § 1512 ............................................................................................ 10, 21
18 U.S.C. § 1905 .................................................................................................... 25
18 U.S.C. § 1956 .................................................................................................... 23
18 U.S.C. § 1957 .................................................................................... 10, 23, 26
18 U.S.C. § 1961 ............................................................................................ 8, 9, 26
18 U.S.C. § 1962 ........................................................................................... passim
18 U.S.C. § 1964 ............................................................................................ 8, 37, 38
18 U.S.C. § 2314 .................................................................................... 10, 23, 25
18 U.S.C. § 2315 .................................................................................... 10, 23, 25

**Rules**

CPLR § 207 ........................................................................................................... 46
CPLR § 302 ........................................................................................................... 46
Fed. R. Civ. P. 9(b) ........................................................................................ 7, 20
Fed. R. Civ. P. 12(b)(6) ................................................................................. 1, 48

Plaintiff Raj Rajaratnam hereby submits this Consolidated Memorandum of Law in response to the motions filed by (1) defendants Motley Rice, LLC ("Motley Rice") and Michael E. Elsner ("Elsner" and together with Motley Rice the "Motley Rice Defendants") and (2) defendants Jayat P. Kanetkar a/k/a Jay Kanetkar ("Kanetkar"), Brian P. Mallon ("Mallon"), and John "Hank" Allison ("Allison" and together with Kanetkar and Mallon the "JTTF[1] Defendants" or "Former Agents"), pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Mr. Rajaratnam's Amended Complaint (ECF No. 42, hereinafter "Amended Complaint" or "Am. Compl.").[2]

## PRELIMINARY STATEMENT

Defendants' arguments in favor of dismissal bring to mind the parable of the blind men who come across an unfamiliar object (an elephant) and attempt to determine its nature. One man grasps the trunk and declares that the elephant is a very large snake. Another feels the ear and says the elephant is a kind of fan. Another, feeling the leg, argues that the elephant is a stout pillar. The others variously liken it to a wall (the elephant's side), a rope (its tail), and a spear (its tusk). Obviously, none of them is correct—none has perceived the entire elephant.

Like the blind men in the story, Defendants focus only on appendages of the fraudulent scheme alleged in the Amended Complaint. They take the allegations of Defendants' crimes in connection with multiple litigations over a span of decades and say, "the case should be

---

[1] "JTTF" stands for "Joint Terrorism Task Force" and describes small cells of locally-based FBI personnel together with members from state and local agencies and federal agencies, such as the Department of Homeland Security, the U.S. military, Immigration and Customs Enforcement, and the Transportation Security Administration.
(*See* https://www.fbi.gov/investigate/terrorism/joint-terrorism-task-forces.)

[2] Mr. Rajaratnam has been unable to serve the remaining defendant, Rudra (the pseudonymously-named government informant), who lives in Sri Lanka. Rudra has not appeared in this action.

dismissed because it is a malicious prosecution claim." They take the allegations of fraudulent conduct aimed at Mr. Rajaratnam's reputation and say, "the case should be dismissed because it is a defamation claim." They take the allegations of a pattern of predicate acts reaching back years before the Defendants targeted Mr. Rajaratnam and say, "the case should be dismissed because these allegations have nothing to do with Mr. Rajaratnam." They point to the fact that the acts of bribery, witness tampering, and fraud committed by two of the three JTTF Defendants were in connection with the New Jersey Action[3] and say, "these defendants had nothing to do with a broader scheme." As discussed below, Defendants' narrowly-focused attacks are flawed standing alone but—more to the point—they fail to recognize that the allegations in the Amended Complaint must be taken *as a whole*.

The Amended Complaint alleges a pattern of racketeering activity perpetrated and perpetuated over the years by a multitude of crimes, including the enumerated predicate acts of bribery, witness tampering, obstruction, wire fraud, mail fraud, larceny, and money laundering. It tells the detailed story of attorneys, seduced by the promise of easy money, who conspired with government agents to coerce settlements from high-profile, deep-pocketed victims by targeting them with trumped-up lawsuits and character assassination. That scheme dates back—at least—to Motley Rice's criminal procurement of fake witnesses in asbestos litigation during the 1990s. The enterprise expanded over the next decade, incorporating a complex apparatus of government contacts. The members of the enterprise[4] bribed and/or defrauded government officials so that

---

[3] *Krishanthi v. Rajaratnam*, No. 09-cv-05395-JLL-JAD (D.N.J.), is the case filed by Motley Rice in 2009 based on information illegitimately obtained from the JTTF Defendants.

[4] Mr. Rajaratnam has pleaded two enterprises: Motley Rice itself (Am. Compl. ¶ 166) and the "association in fact" comprising all Defendants (Am. Compl. ¶ 157). As Defendants have not challenged either formulation, references to the "enterprise" for the purposes of the arguments advanced herein encompass both the RICO Association and the RICO Enterprise.

Motley Rice and its co-conspirators could profit from litigation Motley Rice brought against one of the richest men in Saudi Arabia based on a fraudulent document created by one of its agents.

The scheme continues to this day, as evidenced by the enterprise's fraudulent assault on Mr. Rajaratnam, made possible by illegally obtained information and given the veneer of truth by Motley Rice's criminal relationship with former law enforcement agents and their informant.[5]

*That* is the elephant in the room: not a "garden variety" tort, but an ongoing criminal enterprise engaged in a pattern of racketeering activity, of which Defendants are members and Mr. Rajaratnam is a victim.[6]

## STATEMENT OF FACTS

The Amended Complaint alleges a coordinated series of predicate acts forming a pattern of racketeering activity that has sustained Defendants' criminal scheme for decades. Since before 2001, Motley Rice and its agents have criminally interfered in each of the three branches of federal government to illicitly obtain and exploit government secrets and to facilitate the coercion of high-profile and high net worth targets. In effectuating this scheme, Defendants have engaged in coordinated acts of bribery, witness tampering, wire fraud and trafficking in unlawfully-obtained government property to wrongfully obtain money from deep-pocket defendants. In particular, the Amended Complaint alleges the following specific facts, each of which the Court must accept as true for purposes of the Defendants' motions to dismiss:

---

[5] In 2018, Motley Rice finally acknowledged its fraud by removing false allegations from its complaint and its website.

[6] To the extent the Amended Complaint's rendering of the "elephant" is lacking in details (and it does not, in any event, lack the detail necessary to survive a pre-answer motion to dismiss), it is because Defendants have concealed those facts or prevented Mr. Rajaratnam from pleading them in this action. *See* Am. Compl. at 1, n.1.

o   Motley Rice bribed medical "experts" to testify falsely in asbestos cases and obstructed the legislative process in connection with efforts to reform asbestos litigation, in order to continue to secure settlement agreements worth hundreds of millions of dollars in cases involving plaintiffs without asbestos-related health issues. Am. Compl. ¶¶ 30-33.

o   Motley Rice's lead investigator falsified critical evidence that enabled Motley Rice to name one of the richest men in Saudi Arabia as a defendant in their 9/11 lawsuit. *Id.* ¶¶ 38-42.

o   Since the commencement of the 9/11 litigation, Motley Rice and its agents have bribed numerous federal agents and deceived—at least—four government officials, to establish an information-sharing relationship with federal agencies and to unlawfully gain access to military intelligence. *Id.* ¶¶ 43-54.

o   In or around June 2003, Motley Rice helped form a private firm, Rosetta Research and Consulting LLC ("Rosetta"), to traffic in unlawfully-obtained government information. In connection with these activities, Motley Rice and its agents violated federal stolen property and anti-money laundering statutes, as well as federal mail and wire fraud statutes. *Id.* ¶¶ 55-60.

o   In furtherance of the scheme, Motley Rice and its agents bribed at least two FBI agents to unlawfully access confidential government information. *Id.* ¶ 61-65.

o   In support of their unlawful efforts to acquire government intelligence, Motley Rice agents, including Defendant Mallon, used the wires to defraud a foreign target and coerce his travel to the United States. *Id.* ¶¶ 68-71.

o  Motley Rice and Elsner corruptly persuaded the Former Agents to withhold key documents and other evidence; Motley Rice and the Former Agents corruptly persuaded Rudra to do the same. *Id.* ¶ 131.

o  On multiple occasions between 2009 and 2018, the Former Agents shared with Motley Rice criminally-derived confidential government documents and, in so doing, violated federal stolen property and anti-money laundering statutes. *Id.* ¶¶ 75-78.

o  Over this same period, Motley Rice/the Former Agents bribed Rudra and persuaded him to provide false testimony in the New Jersey Action and then took steps to fraudulently conceal that wrongdoing. *Id.* ¶¶ 91-96.

o  In October 2009, Motley Rice committed wire fraud when it issued a fraudulent press release that contained knowingly false information designed to wrongfully obtain money from Mr. Rajaratnam. *Id.* ¶¶ 97-98

o  In the latter part of 2011, Motley Rice and its agents (including Defendants Elsner and Kanetkar) orchestrated and planted "fake news" to further amplify the same untruthful statements in a seemingly legitimate and independent forum. *Id.* ¶¶ 99-108.

o  On at least three additional occasions between 2009 and 2016, Motley Rice fraudulently asserted this false information in further violation of the prohibition on wire fraud. *Id.* ¶¶ 148-152.

o  Throughout the life of the scheme, Motley Rice and its agents have done everything they could to fraudulently conceal the enterprise's criminal wrongdoing, including by filing false affidavits, withholding documents, and making false representations to the Court

(including by lying about Motley Rice's involvement in the planting of the *Vanity Fair* article) in numerous further instances of mail and wire fraud. *Id.* ¶¶ 109, 133-147.

On even a cursory reading of the alleged facts, it is apparent that what is described in the pleadings is not a garden variety malicious prosecution or defamation claim. Rather, the Amended Complaint pleads allegations of a long-standing criminal scheme effectuated by a qualifying enterprise that has engaged, and continues to engage, in a pattern of racketeering in violation of the civil RICO statute. Moreover, the allegations in the Amended Complaint are only the tip of the iceberg. Additional evidence of Defendants' pattern of racketeering is currently trapped behind the confidentiality order in the New Jersey Action, and Defendants' slowly crumbling wall of fraudulent concealment.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).[7] A claim has "facial plausibility when the

---

[7] To the extent Defendants suggest that this Court should interpret RICO narrowly or that the pleading requirements for RICO are different from those that apply to other civil cases, they are wrong. The Supreme Court has made clear that "RICO is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (citing Congress's "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes,' [which] are nowhere more evident than in the provision of a private action for those injured by racketeering activity.") (internal citations omitted); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 545-46 (9th Cir. 2007) ("There has been some judicial resistance to RICO, manifested in narrow readings of its provisions by lower federal courts. In four notable cases, the Supreme Court has corrected these narrow readings.") (discussing cases). The Second Circuit has repeatedly reversed district courts that have departed from the liberal *Twombly* standard in connection with RICO claims (except as to allegations of fraud or mistake). *See, e.g., Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011); *D. Penguin Bros. Ltd. v. City Nat. Bank*, 587 Fed.Appx. 663, 666 (2d Cir. 2014) (summary order).

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, the court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012). A complaint need not make "detailed factual allegations," but must contain more than mere "labels or conclusions" or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

"[In] alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, "[i]n cases where the alleged fraudulent scheme is extensive and involves numerous transactions that occurred over a long period of time, courts in this Circuit have held that it is impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *United States v. Northern Adult Daily Health Care Center*, 205 F.Supp.3d 276, 289 (E.D.N.Y. 2016) (internal quotations omitted).

Additionally, "the Second Circuit applies a relaxed pleading standard when a plaintiff is not in a position to know specific facts until after discovery and 'when facts are peculiarly within the opposing party's knowledge.'" *United States ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022 at *3 (E.D.N.Y. Apr. 3, 2013) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). As alleged with great particularity in the Amended Complaint, Defendants have engaged in a concerted campaign to fraudulently conceal their crimes. *See, e.g.,* Am. Compl. ¶¶ 109-144. Moreover, Defendants have designated documents in the New Jersey Action as confidential under a Discovery Confidentiality Order ("DCO") that prevents Mr. Rajaratnam's

counsel in this case from viewing them or learning their contents. Am. Compl. at 1, n.1. Mr. Rajaratnam has alleged that many of the documents Defendants have designated directly support the allegations herein, and evidence additional wrongdoing by Defendants. *Id*. Unfortunately, the terms of the DCO prevent Mr. Rajaratnam from making more specific allegations—even on "information and belief"—concerning that wrongdoing.

## I.     MR. RAJARATNAM HAS PLEADED AN ACTIONABLE RICO CLAIM

To plead a civil violation of the RICO statute, 18 U.S.C. § 1962, a plaintiff must allege "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)). A plaintiff also must allege that he was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

All Defendants challenge Mr. Rajaratnam's pleading of (a) predicate offenses that qualify as "racketeering activity" under section 1961, (b) a "pattern" of racketeering activity, and (c) cognizable injury. In addition, the JTTF Defendants challenge Mr. Rajaratnam's allegations that the former agents participated in the criminal enterprise. As set forth below, Mr. Rajaratnam has plausibly alleged that:

     a)     each defendant committed more than two criminal acts in violation of the statutes enumerated in section 1961(1), including bribery, mail fraud, wire fraud, obstruction, witness tampering, money laundering, and trafficking in stolen property;

b)      those criminal acts constitute a pattern of racketeering activity that goes back at

least two decades, through which the criminal enterprise routinely interfered with

and/or co-opted the legislative, executive, and judicial branches of the federal

government in order to identify deep-pocket targets and use secret and illicit

sources of "evidence" to coerce sizeable monetary settlements through high-

profile litigation and public shaming;

c)      the JTTF Defendants knowingly and voluntarily participated in and profited from

multiple aspects of the criminal enterprise, and exercised broad discretion as to

the nature and extent of their involvement; and

d)      Mr. Rajaratnam, as a victim of that scheme, has suffered and continues to suffer

substantial harm to his business and property, including lost business

opportunities, restrictions on his ability to use his own money, and ever-mounting

litigation costs that flow directly and exclusively from Defendants' unlawful

conduct.

As such, and as discussed herein, Mr. Rajaratnam has satisfied the applicable pleading

standards.

## A.      The Amended Complaint Adequately Alleges Cognizable RICO Predicate Acts

Mr. Rajaratnam has alleged, as to each defendant and many of their co-conspirators, that

they committed more than two predicate acts—*i.e.*, crimes enumerated in the RICO statute, 18

U.S.C. § 1961(1). The Amended Complaint includes two tables (one for each alleged enterprise)

identifying each defendant, their crimes, and the factual allegations describing those crimes. *See*

Am. Compl. pp. 41-44 and 47-50. Defendants argue that Mr. Rajaratnam has failed to plead

cognizable RICO predicate acts on two bases. First, Defendants ask the Court to disregard all

predicate acts that (a) relate to the New Jersey Action or (b) support Mr. Rajaratnam's cause of action for defamation. *See* MR MTD[8] at 10-14. Second, Defendants challenge Mr. Rajaratnam's pleading of the individual elements of the alleged predicate acts. *See id.* at 17-22; JTTF MTD at 4-15.

Defendants' first argument fails because the "safe harbor" for litigation-related activities and defamatory acts on which they rely simply does not exist. Defendants' second argument fails because, as set forth below, Mr. Rajaratnam has adequately pleaded violations of 18 U.S.C. § 201 (bribery), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1505 (obstruction), 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1957 (using unlawfully derived money), and 18 U.S.C. §§ 2314 & 2315 (trafficking in unlawfully derived property).

### 1. The Law Does Not Recognize Categorical "Safe Harbors" For Litigation-Related or Defamatory Conduct

#### a. There is no "Safe Harbor" for Litigation-Related Conduct

Contrary to Defendants' arguments, there is no unqualified "safe harbor" that immunizes litigation-related activities from RICO liability. As detailed below, efforts to articulate any such rule have been repeatedly rejected by courts within (and beyond) the Second Circuit. The law recognizes a distinction between cases in which the plaintiff has alleged litigation misconduct in isolation (if at all) and those cases in which the plaintiff has alleged a scheme to defraud that includes conduct occurring in the context of litigation.[9]

---

[8] The Motley Rice Defendants' motion to dismiss is referred to herein as the "MR MTD"; the JTTF Defendants' motion to dismiss is referred to herein as the "JTTF MTD".

[9] A scheme to defraud is the *sine qua non* of mail or wire fraud under 18 U.S.C. §§ 1341 & 1343. "The term 'scheme to defraud' is measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life

In *United States v. Eisen*, the Second Circuit held that an alleged scheme to deprive civil defendants of money by fraudulently conducted personal injury lawsuits (through a pattern including mail fraud and witness bribery) was capable of constituting mail fraud as a RICO predicate act. 974 F.2d 246 (2d Cir. 1992). In so ruling, the Second Circuit specifically rejected the defendants' argument that permitting mail fraud offenses in relation to litigation activities would conflict with existing law. *Id.* at 253-254 ("We do not doubt that where a series of related state court perjuries occurs, it will often be possible to allege and prove both a scheme to defraud within the meaning of the mail fraud statute as well as the elements of a RICO violation. But in such cases, it will not be the fact of the perjuries *alone* that suffices to bring the matter within the scope of RICO.") (emphasis added).

Similarly, in *Sykes v. Mel Harris and Associates, LLC*,[10] the plaintiffs alleged that the defendants engaged in a "sewer service" scheme in which a law firm conspired with others to purchase consumer debt, commence litigation against those consumers, improperly serve them, and then file fraudulent documents to obtain default judgments. 757 F.Supp.2d at 418-20. There, as here, the conspiracy was led by a law firm and the scheme was executed through litigation. That did not dissuade the court from finding that plaintiffs had sufficiently pleaded a pattern of racketeering.

In *Guzman v. Hecht*,[11] the plaintiff alleged that a New York law firm's misrepresentations in the course of providing legal services led to the law firm committing mail fraud in its

---

of members of society." *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (citations omitted).

[10] *Sykes v. Mel Harris and Associates, LLC,* 757 F.Supp.2d 413 (S.D.N.Y. 2010), *aff'd Sykes v. Mel Harris and Associates, LLC*, 780 F.3d 70 (2d Cir. 2015).

[11] *Guzman v. Hecht,* 2019 WL 1315888 (S.D.N.Y Mar. 22, 2019).

interactions with federal immigration authorities. 2019 WL 1315888 at *5. The court denied

defendants' motion to dismiss the RICO claims, expressly rejecting defendants' argument that,

because the "gravamen" of the complaint was attorney malpractice, the plaintiffs' allegations

could not give rise to liability under civil RICO.

The decision of the District Court for the District of Columbia in *Feld Entm't Inc. v.*

*American Society for the Prevention of Cruelty to Animals,* 873 F.Supp.2d 288 (D.D.C. 2012) is

on point. In that case, the plaintiff alleged RICO violations premised upon alleged wrongdoing in

underlying litigation, including illegal witness payments and wire fraud. In permitting the case to

move forward, after discussing decisions in the Second Circuit (including many of the cases

relied upon by the Defendants), the court distilled the following analytical position:

> [C]ourts have refused to allow "litigation activities" such as filing fraudulent
> documents or engaging in baseless litigation to serve as predicate acts for RICO,
> but ***only in circumstances where such acts constitute "the only allegedly***
> ***fraudulent conduct."***…On the other hand, where "additional allegations of
> extortion or some other pattern of racketeering activity" are involved, courts
> "have found that alleged mail and wire fraud violations arising out of malicious
> prosecution or abuse of process could be RICO predicate acts."

*Id.* at 318-319 (emphasis added) (internal citations omitted).

Courts do not, as a rule, reject litigation-related predicate acts out of hand. Rather, courts

consistently dismiss RICO claims where the plaintiffs fail to allege specific facts supporting the

existence of a fraudulent scheme among defendants to deprive plaintiffs of money or property

through multiple well-pleaded predicate acts. As it happens, plaintiffs whose *sole* basis for

alleging RICO violations is that the defendants filed frivolous claims against them rarely if ever

meet that standard. Those are the cases—inapposite here—on which Defendants rely.

The cases cited by Defendants were based primarily, if not solely, on conclusory

allegations that documents filed or served in connection with litigation were "fraudulent"

because the underlying claims were frivolous. In many cases, the plaintiffs did not even allege the documents themselves were fraudulent. Few, if any, of the plaintiffs in Defendants' cases appears to have ascribed any motive or goal to the defendants beyond the pursuit of litigation against them. The conclusory, vague, and limited allegations of litigation activity in those cases are a far cry from the detailed allegations of in- and out-of-court fraud, bribery, witness tampering, obstruction, theft, and other racketeering activity alleged in the Amended Complaint.

The district courts in *von Bulow*[12] and *Bal*[13] concluded, unsurprisingly, that the tort of malicious prosecution is not a valid RICO predicate. *See von Bulow*, 657 F. Supp. at 1144-45 ("To recognize malicious prosecution as a RICO predicate act would severely undermine the settled state policy of discouraging such actions."); *Bal*, 1998 WL 35123 at *9 ("[T]he Court finds that the plaintiffs' Complaint…pleads a claim for malicious prosecution…and thereby fails adequately to allege predicate acts that may properly serve as a basis for a RICO action."). In both cases, the court found that the *only* well-pleaded allegations of fraud were directly related to the filing or prosecution of supposedly unjustified lawsuits. *See von Bulow*, 657 F. Supp. at 1141; *Bal*, 1998 WL 35123 at *9-10.

In *Kim v. Kimm*,[14] the plaintiff's "predicate acts" consisted of four declarations "prepared, signed, and filed with full knowledge that they contained fraudulent representations intended to persuade the district court to find in favor of [defendant]." 884 F.3d at 103. The Second Circuit specifically distinguished that case from cases—like this one—in which "even

---

[12] *Von Bulow by Auersperg v. von Bulow*, 657 F. Supp. 1134 (S.D.N.Y. 1987).

[13] *Nakahara v. Bal*, 1998 WL 35123 (S.D.N.Y. Jan. 30, 1998).

[14] *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018).

though…defendants used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity." *Id.* at 105.

*Smulley*,[15] *Daddona*,[16] and *Curtis*[17] were *pro se*[18] cases in which the plaintiffs offered only conclusory allegations that they were the targets of frivolous claims. In *Smulley*, the plaintiff based her RICO claim on the contention that the defendants' efforts to enforce a standard multistate condominium rider violated her due process rights; she did not even allege that the defendants had reason to know the allegedly fraudulent communications were false. 754 Fed.Appx. at 23. In *Daddona*, the plaintiff sued his wife, her divorce lawyer, his own divorce lawyer, the judge presiding over litigation over the marital assets, and the United States government for RICO violations, claiming they were all engaged in a conspiracy to deprive him of certain assets; he alleged "no factual details explaining or supporting the allegations of fraud." 156 F.Supp.2d at 155-156.

In *Curtis*, plaintiffs alleged that "[their former] clients, together with their new counsel, have committed mail and wire fraud through 'frivolous litigation' by defending against the fee claims initiated by plaintiffs themselves, and by counter-claiming or separately bringing 'phony' malpractice claims against plaintiffs in the course of such defenses." 758 F.Supp.2d at 164. The "predicate acts" of "mail fraud" in that case consisted largely of ministerial filings, none of which plaintiffs alleged were false or misleading. *Id.* at 169-170, 177-178 ("[P]laintiffs fail to

---

[15] *Smulley v. Federal Housing Finance Agency*, 754 Fed.Appx. 18 (2d Cir. 2018) (Summary Order).

[16] *Daddona v. Gaudio*, 156 F. Supp.2d 153 (D. Conn. 2000).

[17] *Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp.2d 153 (E.D.N.Y. 2010) (KAM).

[18] The *pro se* plaintiffs in *Curtis* were an attorney and his law firm.

allege the existence of a scheme to defraud involving some element of deception. Indeed, the court is at a loss to even decipher whom plaintiffs allege as the intended target of the ambiguously alleged schemes….").

The unreported decisions in *Weaver*,[19] *Gunn*,[20] and *DirecTV*[21] contain little, if any, analysis of the RICO claims asserted therein, but it is clear that none of those rulings is applicable here. *See Weaver*, 751 Fed. Appx. at 98 (plaintiff alleged fraudulent litigation activities occurring within a single litigation, without more); *Gunn*, 1989 WL 119519 at *1 (finding "ridiculous" plaintiff's contention that "serving and filing an answer or a motion…could be considered obstruction of justice."); *DirecTV*, 2005 WL 1006030 at *7 (finding insufficient plaintiff's allegation that DirecTV's pre-litigation demand letters constituted mail fraud and extortion, observing that DirecTV had circumstantial evidence of wrongdoing and demand letters were protected by *Noerr-Pennington* doctrine).

If Mr. Rajaratnam had brought a RICO action against Motley Rice in 2009, when it filed a complaint based on false allegations—or indeed at any time between 2009 and 2016, during which time Motley Rice was clearly engaged in deception and various forms of litigation misconduct—*that* case would have fallen within the ambit of the decisions cited by Defendants. But Mr. Rajaratnam did not file such an action because, at that point, Mr. Rajaratnam could have alleged "no more than 'litigation activities' alone." *Curtis*, 758 F.Supp.2d at 171. But once Mr. Rajaratnam learned about Motley Rice's clandestine relationship with the Former Agents, the agents' connection (through Mallon) to the 9/11 litigation and Rosetta, and all of the instances of

---

[19] *Weaver v. Boriskin*, 751 Fed.Appx. 96 (2d. Cir. 2018) (Summary Order)

[20] *Gunn v. Palmieri*, 1989 WL 119519 (E.D.N.Y. Sept. 29, 1989).

[21] *DirecTV, Inc. v. Lewis,* 2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005).

bribery, witness tampering, obstruction, and theft alleged in the Amended Complaint, Mr. Rajaratnam discovered the "something more" that is missing from each of the cases on which Defendants rely. That is why, in 2018—and not before—Mr. Rajaratnam brought a civil RICO action.

The Amended Complaint pleads much more than simple litigation misconduct.[22] Rather, it alleges a coordinated series of predicate acts that span a long period of time and encompass multiple separate litigations, as well as non-litigation-related predicate acts, effectuated as part of a pattern of racketeering conduct. Specifically, the pleadings detail an overarching scheme to defraud through, among other things, witness tampering and obstruction committed in the course of asbestos litigation conducted by Motley Rice (then known as Ness Motley), usurpation of government secrets for profit in the 9/11 litigation, trafficking in confidential government intelligence through Rosetta Research and Consulting LLC ("Rosetta"), and exploiting confidential government information to coerce a settlement from Mr. Rajaratnam in the New Jersey Action. The cumulative impact of such wrongdoing across multiple schemes, and covering a period of decades, has been—among other things—to corrupt and criminally interfere with the judicial system for pecuniary gain.

The policy considerations cited by Defendants— the desire to avoid usurping state court litigation and creating satellite litigation, eroding doctrines of *res judicata* or impeding the interest in open justice—are not threatened by this case. Although there is obviously a connection between this case and the pending New Jersey Action, they are distinct in critical

---

[22] The fact that Mr. Rajaratnam has raised the Defendants' conduct in the New Jersey Action with the court presiding over that action is not, as Defendants suggest, indicative of an attempt to "re-litigate" the New Jersey Action in this forum. Rather, it is the inevitable and intended consequence of Defendants' fraudulent scheme that Mr. Rajaratnam and the New Jersey court have been distracted from the merits of the New Jersey Action by defendants' criminal conduct.

ways. None of the defendants here is a party to the New Jersey action, nor would it be appropriate to name plaintiffs' counsel and their agents as defendants in that case. Whether or not the plaintiffs prevail in the New Jersey Action (which concerns Mr. Rajaratnam's conduct) Mr. Rajaratnam still would have the RICO claim asserted here (which concerns the conduct of third parties to the New Jersey Action).

If anything, policy considerations weigh in favor of allowing this case to proceed. Defendants, as attorneys and former federal agents, are sworn to uphold the law. Yet the *modus operandi* of their criminal enterprise is to usurp and interfere with the legitimate operation of the government. *See, e.g.,* Am. Compl. ¶¶ 36-71 (bribery and fraud directed at members of the executive branch); 30-71, 85-96 (witness tampering and bribery in connection with pending or anticipated litigation; fraud on the court); 33 (obstruction of legislative proceedings). To be sure, these are serious charges—and it is because they are so serious that this Court should consider the impact of dismissing the case before the evidence Defendants have been concealing for years can be brought to light. We urge the Court also to consider the public interest in deterring such conduct, and the impact of a dismissal—particularly where Defendants argue they should be *immunized* from liability because they used, and continue to use, the courts as a conduit for their fraudulent scheme.

There is nothing in the RICO statute, nor in the case law, that categorically excludes conduct arising in the context of litigation from forming part of a RICO pattern. None of the cases discussed in Defendants' motion papers counsels dismissal in the case—like this one—of an extensive scheme to defraud that incorporates out-of-court actions, including bribery and corruption of federal officials, exploitation of criminally-derived government information, corruption of the litigation process, and intentional concealment of wrongdoing.

### b.      There is no "Safe Harbor" for Defamatory Conduct

As they do with litigation-related conduct, Defendants assert a non-existent exception to the mail and wire fraud statutes for defamatory acts. *Kimm v. Lee*,[23] the case on which they principally rely, does not establish any such exclusion. Rather, *Lee* concerned the transmission of allegedly false information to injure plaintiff's reputational interests alone: plaintiff Kimm had failed to plead a scheme to defraud him of money or property. 2005 WL 89386 at * 4. Defendants' reliance on the decision in *Creed Taylor, Inc. v. CBS, Inc.,* 718 F. Supp. 1171 (S.D.N.Y. 1989) also is inapposite. The plaintiff in that case pleaded "defamation" as a RICO predicate and then sought to advance a *post hoc* argument that "the defamation charge included as a RICO predicate really pleads mail and wire fraud." *Id.* at 1180.

Conversely, courts have found acts constituting defamation to be RICO predicate acts. For example, in *Frydman v. Verschleiser*, the court was satisfied that the defendant's dissemination of defamatory statements by email, website posts and blogs, flyers and posters had caused plaintiff economic harm and constituted valid RICO predicate acts. 172 F.Supp.3d 653 at 667, 669 (S.D.N.Y 2016); *see also Dandong v. Hu*, 2017 WL 3328239 (S.D.N.Y. Aug. 3, 2017) (reputational harm caused to plaintiff by defamatory statement that it "did not honor contracts" sufficient to state a claim for civil RICO).

In short, the use and dissemination of false and defamatory statements as part of a scheme to defraud can constitute the predicate act of mail and wire fraud for purposes of pleading a pattern of racketeering activity under the RICO statute.

---

[23] *Kimm v. Lee*, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) *aff'd Kimm v. Chang Hoon Lee & Champ, Inc.,* 196 F. Appx 14 (2d Cir. 2006).

2.    **The Amended Complaint Adequately Alleges the
            Elements of Each of the Predicate Acts**

a.    **Mail and Wire Fraud**

Setting aside their erroneous contention that litigation-related or defamatory activities

cannot be RICO predicates, Defendants challenge Mr. Rajaratnam's allegations of mail and wire

fraud on the grounds that he has not pleaded reliance. However, it is not necessary to establish

reliance as an element of a civil RICO claim based on mail fraud. *Bridge v. Phoenix Bond &

Indemn. Co.,* 553 U.S. 639, 649, 655-9, 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008). Rather, to

plead a violation of the mail or wire fraud statutes as a RICO predicate act, the plaintiff must

establish (1) existence of a scheme to defraud and defendants' knowing participation in that

scheme; (2) money or property as the object of the scheme; and (3) use of the wires in interstate

commerce in furtherance of the scheme.

The Amended Complaint alleges an overarching scheme to defraud effectuated via

criminal obstruction of the legislative process, coercion and bribery of federal agents, trafficking

in government intelligence, bribing witnesses, and perpetuating fraud on the court—all to "shake

down" deep-pocket targets using false testimony and criminally-derived information to coerce

monetary settlements. With respect to each violation of 18 U.S.C. § 1343, the Amended

Complaint identifies the applicable statement and alleges, with the requisite particularity, how the

use of interstate mail or wires furthered the Motley Rice Enterprise's scheme to defraud others

(including Mr. Rajaratnam) of money or property. *See, e.g.,* Am. Compl. ¶¶ 43-45, 50-54, 71, 97-

98, 106-107, 133-137, 143-144, 145-147, 152. Further, the Amended Complaint adequately

alleges each Defendant's knowing participation in the scheme to defraud with the intent to

coerce Mr. Rajaratnam into paying large sums of money to Motley Rice. *See, e.g.,* Am. Compl.

¶¶ 45, 54, 71, 98, 106-107, 137, 143-144, 147, 152. Finally, Mr. Rajaratnam has adequately

pleaded economic injuries proximately caused by the Defendants' pattern of racketeering. *Id.* ¶¶ 14-16; *see* Section I.D below.

To the extent that Defendants contend that the pleading of mail and wire fraud falls short of the heightened pleading standard in Fed. R. Civ. P. Rule 9(b), responsibility for any lack of specificity at this stage of the litigation rests solely with Motley Rice. This is because Mr. Rajaratnam has been significantly impeded in pleading details of the false statements by the restrictive terms of the DCO.

### b.      Bribery

The federal bribery statute makes it an offense to directly or indirectly give, offer, or promise anything of value to any person with intent to influence that person's testimony under oath. 18 U.S.C. § 201. The Amended Complaint alleges a pattern of bribery that spans decades, including Motley Rice's bribery of medical "experts" in asbestos litigation (Am. Compl. ¶¶ 30-3); its bribery of numerous federal agents to unlawfully gain access to military intelligence (*id.* ¶¶ 43-54); the bribery of at least two FBI agents (*id.* ¶ 61-65); and, in the New Jersey Action, the bribery of Rudra (*id.* ¶¶ 91-96).

The only allegations of bribery with which the Defendants take issue are those relating to Rudra. In that context, the Amended Complaint specifically alleges that (1) Motley Rice and the Former Agents funded Rudra's living arrangements, bought him consumer goods, and paid for travel unrelated to his role as a witness and (2) they gave Rudra that compensation—totaling at least $75,000—to secure and influence his testimony. Am. Compl. ¶ 91. Standing alone, these allegations are sufficient to allege a violation of 18 U.S.C. § 201.

Defendants contend that the $75,000 they paid Rudra was permissible under the bribery statute because it was for Rudra's "reasonable cost of travel and subsistence incurred and the

20

reasonable value of time lost." MR MTD at 18; JTTF MTD at 13 (quoting 18 U.S.C. § 201(d)).
In quoting the exception in the bribery statute, both sets of defendants omitted the key
prepositional phrase at the end of that sentence: "in attendance at [a] trial, hearing, or
proceeding." 18 U.S.C. § 201(d). Defendants' contention is wholly implausible. The only time
Rudra has given live testimony in the New Jersey Action was at his deposition in July 2018. Am.
Compl. ¶ 124. The full $75,000 was paid *before* Rudra "attended" that proceeding (*i.e.*, prior to
May 8, 2018), and most if not all of it was paid *years* before Rudra's deposition (*i.e.*, prior to
December 2016).[24] *See id.* ¶¶ 115, 120. The only thing Rudra did as a witness to earn that
$75,000 was to provide Motley Rice with a perjurious declaration on February 5, 2010. *Id.* ¶ 94.

Even if Defendants could somehow prove that the $75,000 they paid to Rudra was
legitimate, that is a question that must be addressed after discovery has been taken. At this stage,
Mr. Rajaratnam is entitled to the inference supported by his factual allegations: that the
Defendants gave Rudra that money with the intent to influence his testimony.

### c.     Witness Tampering

The Amended Complaint adequately alleges that Motley Rice violated the federal witness
tampering statute, 18 U.S.C. § 1512, by corruptly persuading, or attempting to persuade, at least
five witnesses in separate litigations with the intent to influence their testimony and/or to
withhold key documents and other evidence. Am. Compl. ¶¶ 33, 96, 131. Again, the Defendants
have challenged only those allegations advanced in relation to Motley Rice and its agents'
criminal interference with witnesses in the New Jersey Action, and do not take issue with the
allegations that Motley Rice tampered with expert testimony during prior litigations. *See id.* ¶ 33.

---

[24] The DCO prevents Mr. Rajaratnam from alleging the dates on which the payments were made.

The Defendants ask the Court to disregard Mr. Rajaratnam's "formulaic" allegations of witness tampering. *See* MR MTD at 19-20; JTTF MTD at 14-15. But Mr. Rajaratnam has made specific allegations of fact sufficient to support an inference that Defendants violated the federal witness tampering statute on several occasions. For example, Mr. Rajaratnam alleges that:

o Motley Rice (*née* Ness Motley) improperly induced medical "experts" to testify falsely in asbestos litigation (Am. Compl. ¶ 33);

o Motley Rice, Elsner, and the Former Agents paid Rudra tens of thousands of dollars to give false testimony in the form of a February 5, 2010 affidavit (*id*. ¶¶ 91-94);

o Motley Rice paid or otherwise persuaded the Former Agents to give false testimony in the form of affidavits submitted on December 20, 2016 (*id*. ¶¶ 132-137);

o Motley Rice, Elsner, and the Former Agents paid or otherwise persuaded Rudra to withhold and conceal incriminating evidence—evidence that is described in detail at ¶¶ 117-127, and which was only produced after Rudra distanced himself from the enterprise in late 2017 (*id*. ¶¶ 109-131); and

o Motley Rice and Elsner paid or otherwise persuaded the Former Agents to withhold and conceal incriminating evidence for over nine years (*id.*).

These specific allegations are more than sufficient to plead violations of the federal witness tampering statute. Moreover, Defendants cannot be heard to take issue with the specificity of Mr. Rajaratnam's pleadings in this regard given (1) the extensive evidence of their fraudulent concealment of this precise activity (*infra* Section II) and (2) Mr. Rajaratnam's inability to allege facts protected by the DCO.

### d.    Stolen Property

Mr. Rajaratnam alleges that each of the defendants violated the National Stolen Property

Act, 18 U.S.C. §§ 2314 & 2315 (the "NSPA"), as well as 18 U.S.C. § 1957. Section 2314

criminalizes the transportation of stolen property:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any
> goods, wares, merchandise, securities or money, of the value of $5,000 or more,
> knowing the same to have been stolen, converted or taken by fraud; or
> [w]hoever, having devised or intending to devise any scheme or artifice to
> defraud, or for obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises, transports or causes to be transported, or
> induces any person or persons to travel in, or to be transported in interstate or
> foreign commerce in the execution or concealment of a scheme or artifice to
> defraud that person or those persons of money or property having a value of
> $5,000 or more…[shall be subject to a fine and/or imprisonment].

Section 2315 criminalizes the sale or receipt of stolen property:

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any
> goods, wares, or merchandise, securities, or money of the value of $5,000 or
> more, or pledges or accepts as security for a loan any goods, wares, or
> merchandise, or securities, of the value of $500 or more, which have crossed a
> State or United States boundary after being stolen, unlawfully converted, or
> taken, knowing the same to have been stolen, unlawfully converted, or
> taken…[shall be subject to a fine and/or imprisonment].

Section 1957 criminalizes the use of proceeds derived from stolen property:

> Whoever…knowingly engages or attempts to engage in a monetary transaction
> in criminally-derived property of a value greater than $10,000 and is derived
> from specified unlawful activity[25]…[shall be subject to a fine and/or
> imprisonment].

The JTTF Defendants argue that Mr. Rajaratnam has not adequately pleaded violations of

these statutes because he has failed to allege that the documents in which Defendants trafficked

---

[25] "[T]he term 'specified unlawful activity' means…any act or activity constituting an offense
listed in section 1961(1)," with exceptions not relevant here. 18 U.S.C. § 1956.

were (a) not the sort of property covered by the relevant statutes and (b) not "stolen." As a matter of law, the JTTF Defendants' arguments are wrong.

### (i)       The Stolen Documents are "Property"

It is well-settled in this Circuit that *purely* intangible information, such as electronic data transmitted over the Internet, does not constitute "goods, wares, or merchandise" under the NSPA. *United States v. Agarwal*, 726 F.3d 235, 252 (2d Cir. 2013). It is equally well-settled, however, that the same data, when reduced to tangible form, can be stolen and transported in violation of the NSPA. *See, e.g., id.* (computer code printed to sheets of paper).

Contrary to the JTTF Defendants' contention, Mr. Rajaratnam has explicitly alleged that the defendants trafficked in **hard copies** of unlawfully-obtained government documents. For example, Mr. Rajaratnam alleges that, "[o]n multiple occasions between 2009 and 2018, the JTTF Defendants "transported, transmitted, and/or transferred to Motley Rice…by travelling across state lines, **copies** of documents and materials received from Rudra and which Rudra had obtained while working on behalf of the FBI." *Id.* ¶ 75 (emphasis added). Similarly, Mr. Rajaratnam alleges that "the Former Agents mailed Motley Rice **hard copies** of documents and materials received from Rudra, which Rudra obtained by working on behalf of the FBI." *Id.* ¶ 141 (emphasis added).

Mr. Rajaratnam also has alleged additional facts which further support the inference that the documents at issue were in tangible form. For example, Mr. Rajaratnam alleges that Motley Rice and Asimos "transmitted, or caused to be transmitted," unlawfully-obtained documents *via the United States Postal Service*, which they could only have done with physical items. *See id*. ¶¶ 39-46. Similarly, Mr. Rajaratnam alleges that agents of the enterprise physically traveled with certain government documents. *See, e.g., id.* ¶¶ 39, 47.

### (ii)    The Defendants "Stole" the Property

To establish that the Defendants' conduct falls within the ambit of the NSPA, Mr. Rajaratnam need only allege facts sufficient to support a reasonable inference that the documents they obtained were "stolen, converted, or taken by fraud." 18 U.S.C. § 2314.[26] "Stolen" is not a term of art. *United States v. Turley*, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Rather, it is to be broadly interpreted to encompass all felonious takings with the intent to deprive the owner of the rights and benefits of ownership. *Id.* at 417.[27] Mr. Rajaratnam has more than satisfied that standard.

The Amended Complaint describes with specificity multiple occasions on which Motley Rice, Elsner, and the JTTF Defendants transported, transmitted, transferred, received, possessed, and/or stored nonpublic information regarding national security investigations, which they obtained through fraud and without the proper authorizations. *See, e.g.,* Am. Compl. ¶¶ 55-60, 72-79, 138-141. By taking those materials in that manner they deprived the government of the rights and benefits of exclusive domain over investigative materials and, thus, "stole" the documents.

The JTTF Defendants argue that the government documents the Defendants took were not "stolen" because the former agents' actions did not violate two specific federal statutes (18 U.S.C. § 798 and 18 U.S.C. § 1905), which the JTTF Defendants appear to have picked as straw

---

[26] 18 U.S.C. § 2315, the section directed at the sale or receipt of stolen property, uses slightly different phrasing: "stolen, unlawfully converted or taken…."

[27] The JTTF Defendants' contention that property cannot be "stolen" under the NSPA if the act of taking qualifies only as a misdemeanor misses the mark. JTTF MTD at 5. The Supreme Court specifically clarified that, in this context, "felonious is used in the sense of having criminal intent rather than with reference to any distinction between felonies and misdemeanors." *Turley* at 399 n.4.

men. *See* JTTF MTD at 5. Mr. Rajaratnam does not allege the defendants violated these specific statutes, nor does he need to. Moreover, even if Mr. Rajaratnam were required to plead violations of a separate federal larceny statute in order to allege that property was "stolen" under the NSPA (and he is not), Defendants' actions violated 18 U.S.C. § 641, the federal larceny statute that applies to public records.[28] *See United States v. Jones*, 677 F.Supp. 238, 240 (S.D.N.Y. 1998) ("Under Second Circuit precedent, it is clear that information about an ongoing criminal investigation, despite its intangible nature, is a thing of value under Section 641.").

In short, Mr. Rajaratnam has alleged sufficient facts to establish that the government documents at issue were "stolen, converted or taken by fraud." For the same reasons, Mr. Rajaratnam has alleged that the documents were "criminally-derived property" under 18 U.S.C. § 1957, thus overcoming the JTTF Defendants' sole attack on Mr. Rajaratnam's pleading of predicate acts in violation of that statute. *See* JTTF MTD at 8 ("Similarly, 18 U.S.C. § 1957 applies to 'criminally-derived property,' which cannot include these 'documents' if they were not stolen.").

## B. The Amended Complaint Alleges a "Pattern of Racketeering Activity"

To establish a pattern of racketeering activity pursuant to the civil RICO statute, a plaintiff must identify "at least two acts of racketeering activity..., the last of which occurred within ten years…after the commission of a prior act of racketeering activity." 18. U.S.C. § 1961(5). As discussed above, Mr. Rajaratnam has alleged the requisite predicate acts. To satisfy

---

[28] "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys, or disposes of any record…or thing of value of the United States or any department or agency thereof...[or] receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—Shall be fined under this title or imprisoned not more than ten years, or both…."

the "pattern" requirement, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). It is the combination of continuity plus relationship that establishes pattern. *Id.*

### 1.    The Predicate Acts are Related

"Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F. 3d 91, 97 (2d Cir. 1997) (quoting *H.J. Inc.,* 492 U.S. at 240). "It is not the number of predicates, but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged' to constitute a pattern of racketeering activity." *H.J. Inc.,* 492 U.S. at 238; *United States v. Coppola*, 671 F.3d 220, 243 (2d Cir. 2012) (pattern element is "fairly flexible" and serves simply to prevent application of the racketeering statute to "perpetrators of isolated or sporadic criminal acts"); *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (pattern of racketeering may be defined and proved by reference to unifying principles including temporal proximity of the predicates, their common goals, similarity of methods, or repetitions); *see also H.J. Inc.,* 492 U.S. at 240 (Congress did not intend a "constrained" notion of pattern).

The Amended Complaint sufficiently pleads a pattern of racketeering established by the coordinated commission of predicate acts directed towards the enterprise's goal of wrongfully deriving pecuniary gain. The enterprise and its members work toward a shared goal of coercing settlements from its victims through a pattern of criminal interference with government institutions, systems, assets, and personnel. The Amended Complaint establishes the relatedness

27

of these acts by alleging facts showing a significant overlap in each of the factors articulated by the Supreme Court in *H.J. Inc.*: similar purposes, results, participants, victims, and methods of commission. Specifically, the Amended Complaint details alleged predicate acts that establish:

o The **shared purpose** of furthering Defendants' criminal scheme by criminal interference with each of the branches of government to illicitly obtain sensitive information from federal law enforcement and national security agencies, exploit that information for profit, and "shake down" high-profile, deep-pocket targets. Am. Compl. ¶¶ 30-33, 38-42, 43-71, 75-78.

o The activities of the criminal enterprise were carried out by **common participants**/ similar classes of participants over time. In particular, Motley Rice has remained continuously involved in the enterprise's racketeering activities throughout its decades of wrongdoing. Over time, Motley Rice has been assisted by an evolving but overlapping cast of past and present law enforcement and other government agents and officials. Individual agent participants have been involved in multiple elements of the over-arching scheme and have, in various instances, introduced new agents to the enterprise. *Id*. ¶¶ 42, 46, 47, 49, 55, 61, 72, 74.

o The **common results** achieved by the enterprise: massive settlements. *Id*. ¶¶ 30-31, 34.

o The **victims** of the scheme are unified by the enterprise's perception of them as high-profile, deep-pocket targets likely to be willing to pay to avoid litigation and public embarrassment. *Id*. ¶¶ 30-31, 34, 36, 41, 80-84.

o The enterprise's **methodology** has remained similar over the years as the enterprise has consistently engaged in the exploitation of criminally-derived sensitive information,

28

bribery and witness tampering, and extensive use of the mail and wires to effectuate its schemes, primarily through litigation brought on behalf of sham plaintiffs.[29] *Id.* ¶¶ 30-3, 38-42, 43-71, 75-8, 91-8, 100-8.

In light of the above, the Amended Complaint more than clears the low bar for pleading relatedness.

In an effort to undermine the sufficiency of these allegations, Defendants urge an application of relatedness that is unsupported by the case law. Defendants principally rely on the factually distinct case of *Reich v. Lopez*, in which the court found that two distinct sets of alleged crimes directed at entirely different targets for entirely separate purposes could not, in the absence of some over-arching coordination or defined purpose satisfy RICO's pattern requirement. *Reich v. Lopez*, 858 F.3d 55, 62 (2d Cir. 2017) (only link between predicate crimes was "the overlap of participants"). Here, however, the Amended Complaint alleges Defendants engaged in a coordinated series of predicate acts in furtherance of the enterprise's over-arching scheme to defraud. *See* Statement of Facts, *supra*.

The Motley Rice Defendants also claim—improbably—that the Amended Complaint fails to sufficiently allege a pattern of racketeering because it pleads multiple schemes within the overall pattern. MR MTD at 10. Not only does this argument contradict Defendants' core contention that the Amended Complaint amounts to a mere malicious prosecution lawsuit, it also conflicts with Supreme Court precedent to the effect that, far from somehow eroding the

---

[29] In the asbestos cases, Motley Rice coerced settlements on behalf of plaintiffs with no asbestos-related illnesses (*see* Original Complaint ¶¶ 79-82); in the New Jersey litigation, Motley Rice has sued on behalf of individuals who were either dead or with whom it had no contact (*id.* ¶¶ 25-27).

pleadings, involvement in multiple schemes strongly supports a finding of pattern. *See, e.g., H.J. Inc.,* 492 U.S. at 239-43 (1989).

### 2.      The Pattern is Continuing

Continuity may be established either by open-ended or closed-ended continuity. *Id.* 237. Mr. Rajaratnam alleges an open-ended pattern. A plaintiff satisfies open-ended continuity by alleging "a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc*., 187 F.3d 229, 242 (2d Cir. 1999). Where an enterprise is primarily engaged in facially legitimate businesses, the courts look to external factors suggestive of a threat of continued criminal activity. *Id.* at 243. To this end, threatened continuity may be inferred from evidence tending to show that the predicate acts are the regular way in which the enterprise operates. *Id.* Alternatively, the nature of the predicate acts themselves may imply a threat of continued criminal activity. *Id.*

Here, the Amended Complaint provides a sufficient basis for the Court to infer a threat of continuing criminal activity by pleading that the enterprise regularly conducts its business through the alleged pattern of racketeering. The Amended Complaint alleges that the enterprise has been bribing/tampering with witnesses and federal agents for decades, including in the asbestos cases in the 1990s and early 2002 (*id.* ¶¶ 30-33), the 9/11 litigation (*id.* ¶¶ 38-42, 43-54), the "Rosetta" scheme (*id.* ¶¶ 55-60, 66-67, 68-71) and the New Jersey Action (*id.* ¶¶ 91-96).

The Amended Complaint also alleges a long and continuous pattern of trafficking in criminally-derived government information. *Id.* ¶¶ 43-71. Defendants' long running and continuing efforts to fraudulently conceal their own wrongdoing are further indicia of continuity. *Id.* ¶¶ 109, 133-47. These allegations are sufficient, at the pleading stage, to give rise to a favorable inference of the threat of continuity. *H.J. Inc.,* 492 U.S. at 242.

Notwithstanding the above, the Former Agents try to argue that the predicates they committed amount to a "single scheme", *i.e.*, the New Jersey Action, and thus fail to establish continuity. Even if Mr. Rajaratnam had pleaded only a single scheme (and he has not), the Supreme Court has specifically ruled that continuity may be manifest in a single scheme. *H.J. Inc.,* 492 U.S. 229, 237 (1989) ("Congress…envision[ed] a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related to, and that amounted to, or threatened the likelihood of, continued criminal activity"). The "single scheme" cases relied upon by the Former Agents arose in the context of "inherently terminable" schemes specific to the immediate parties to the RICO claim. *See Pier Connection, Inc. v. Lakhani*, 907 F.Supp. 72, 77 (S.D.N.Y. 1995) (plaintiff had not alleged any risk of repetition with respect to an alleged fraudulent scheme perpetrated against him by a former business partner); *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 228 (S.D.N.Y. 2001) (alleged scheme to obtain personal funds through material misrepresentations regarding the parties' joint venture unlikely to be repeated).

Far from alleging any kind of "inherently terminable" scheme, the Amended Complaint alleges a methodology involving long-term criminal interference with government and exploitation of criminally-derived information of which the New Jersey Action is an inseparable part. Am. Compl. ¶¶ 30-33, 38-42, 43-71, 75-78, 91-98, 100-108. As discussed above, the Amended Complaint alleges facts from which it can be inferred that the predicate acts form part of the enterprise's regular way of doing business, thereby supporting an inference of open-ended continuity. And there are other facts alleged in the Amended Complaint that support the inference that the JTTF Defendants will continue to be involved in the criminal enterprise. To wit:

Each of the JTTF Defendants was a federal law enforcement officer. *Id*. ¶¶ 20, 21, 23. Given their respective backgrounds and experience, the Former Agents must have been aware

that what they were doing for the enterprise violated federal laws and regulations. Their willingness to commit those crimes speaks to their commitment to the enterprise. Moreover, the Former Agents have taken no steps to distance themselves from the enterprise. To the contrary, the Former Agents continue to maintain their relationship with Motley Rice as part of a broader class of federal agents and investigators employed by the enterprise to further its fraudulent scheme. *Id*. ¶¶ 156-57, 165, 167-68.

The JTTF Defendants are clearly of great value to Motley Rice, and vice versa. That value is not limited to their role in the New Jersey Action. Mallon, of course, has been involved in many aspects of the enterprise's overall pattern of racketeering, including the 9/11 litigation (*id*. ¶¶ 43-54), the Rosetta scheme (*id*. ¶¶ 55-60), the recruitment of foreign agents (*id*. ¶¶ 68-71), and the New Jersey Action (*id*. ¶¶ 75-78, 91-96). The enterprise perpetuates itself by having existing agents recruit and coopt new agents. (*id*. ¶¶ 42, 46, 47, 49, 55, 61, 72, 74). Just as Mallon recruited Kanetkar and Allison and the former agents recruited Rudra, each of the former agents is a hub of government connections and inside knowledge that the enterprise has and will continue to exploit.

Recognizing that Mallon's involvement in predicate acts committed across multiple elements of the scheme since 2003 underscores the very real threat of continuing criminal activity, the JTTF Defendants ask the Court to disregard his extensive work for the enterprise in connection with Rosetta and the 9/11 Litigation. JTTF MTD at II.B. The JTTF Defendants seek to characterize these activities as "disparate transactions" with "unrelated victims" but—as discussed above at I.B(1)—that plainly is not the case. Even the cases on which the JTTF Defendants rely do not support this characterization. *See Reich, supra* (no over-arching coordination or common goal alleged as between two sets of predicate acts directed at different

32

targets and for separate purposes). In *In re Basic Food Grp., LLC,* 2016 WL 3677673 (Bankr. S.D.N.Y. July 1, 2016), the plaintiffs did not even allege the subject criminal acts as predicate acts for purposes of pleading the alleged scheme to defraud. Rather, those allegations were meant to "demonstrate the illegitimate purpose of the enterprise." Here, by contrast, the Amended Complaint alleges repeated criminal conduct effectuated via a shared methodology of similar predicate acts. The fact that the enterprise has deployed this criminal methodology across several interrelated schemes targeting similar victims is strongly indicative of the threat of continuity.

Because of the enterprise's continuing concealment, we cannot know at this time the full extent to which the Former Agents were or are presently involved in litigations or schemes beyond those identified in the Amended Complaint. We do know that Kanetkar founded his own private investigation company shortly after joining the enterprise, which appears to have been meant to serve a similar function as Rosetta. Am. Compl. at p. 16, n. 4. Discovery is needed to determine the role of that company in the enterprise—for example, whether Kanetkar has any clients other than the Motley Rice enterprise.

In short, the Amended Complaint alleges sufficient facts to support the inference that the JTTF Defendants will continue their participation in the criminal enterprise—participation that for some dates back to 2003—and alleges *no* facts to suggest that such an inference would be unreasonable under the circumstances.

**C.      The JTTF Defendants are Liable for RICO Violations**

> **1.      The JTTF Defendants Participated in the Operation or Management of the RICO Enterprise**

The gist of the Former Agents' defense to the Amended Complaint is that they should receive a "free pass" because they did not participate in *all* of the enterprise's racketeering activities. In that regard, we reiterate that one of the hallmarks of the enterprise has been its

assiduous efforts to conceal the existence, nature and scope of its agents' involvement. As alleged in the Amended Complaint, it took Mr. Rajaratnam years of investigation, discovery, and motion practice just to discover the JTTF Defendants' *identities*. Am. Compl. ¶ 114. Much of what the JTTF Defendants have done for Motley Rice and the enterprise remains shielded by the DCO in the New Jersey Action. Under the circumstances, Mr. Rajaratnam is entitled to discovery before the Court decides the extent of the Former Agents' involvement. In any event, as set forth below, Mr. Rajaratnam's allegations are sufficient to establish that the Former Agents participated in the operation or management of the enterprise.

In *Reves v. Ernst & Young*, the Supreme Court held that in order to "conduct or participate" in an enterprise's affairs "one must participate in the operation or management of the enterprise itself" and play "some part in directing the enterprise's affairs." 507 U.S. 170, 179, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The court acknowledged, however, that even "lower rung participants in the enterprise who are under the direction of upper management" may nevertheless "conduct" the affairs of the enterprise for purposes of the RICO statute. *Id.* at 184.

In applying *Reves*, the Second Circuit has explained that the commission of crimes by non-management members of a RICO enterprise "may be found to indicate participation in the operation or management of the enterprise." *United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998) (affirming denial of summary judgment). Importantly, the Second Circuit has made clear that whether criminal activity constitutes the operation or management of a RICO enterprise is a question of fact. *See id.* As to a lower-level RICO participant, his conduct "*must be assessed by a fact-finder* to determine whether or not his criminal activity, assessed in the context of all the

relevant circumstances, constitutes participation in the operation or management of the enterprise's affairs." *Id.* (emphasis added).

The JTTF Defendants argue for dismissal on the grounds that "[t]here are no allegations in the Amended Complaint that any of the JTTF Defendants were consulted—at any point—in decision-making by more senior members of the alleged enterprise." JTTF MTD at 18. That argument is based on a misreading of the applicable law. As noted above, even "lower rung participants in the enterprise who are under the direction of upper management" may nevertheless "conduct" the affairs of the enterprise for purposes of the RICO statute. *Reves*, 507 U.S. at 184. The Amended Complaint thus need not specifically allege that the JTTF Defendants were consulted in decision making.[30]

*Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995), is on point. In that case, the Second Circuit affirmed a RICO conviction where the defendants—investigators working pursuant to directions from attorneys to bribe witnesses and falsify evidence supporting tort claims—though not acting in a managerial role, "exercised broad discretion" in "carry[ing] out instructions from the law firm principals." Here, as in *Napoli*, although the JTTF Defendants worked pursuant to directions from attorneys at Motley Rice in committing RICO predicate acts, the facts alleged give rise to a strong inference that the JTTF Defendants also exercised broad discretion in carrying out the instructions of the law firm principals. For example, the Amended Complaint alleges that:

---

[30] The JTTF Defendants also argue that "the Complaint…fails to allege plausibly that the JTTF Defendants were aware of the scope of the alleged enterprise, that they stood to profit from the alleged enterprise or, in fact, did profit." JTTF MTD at 18. The JTTF Defendants cite no case for the proposition that the Amended Complaint *must* allege any such facts to sufficiently plead a RICO claim. Their knowledge of the broader scheme is addressed in Section I.C.2.

o   Mallon and Asimos had broad discretion to control and operate Rosetta (Am. Compl. ¶¶ 55-59);

o   Mallon and Asimos managed the enterprise's relationship with Haji Noorzai (*id.* ¶¶ 68-71);

o   Mallon involved various individuals in the enterprise (*id.* ¶¶ 61, 65, 72);

o   the JTTF Defendants introduced Rudra to Motley Rice (*id.* ¶ 74);

o   the JTTF Defendants shared with Motley Rice documents and materials they received from Rudra or from their prior work with the JTTF (*id.* ¶ 75); and

o   "[i]t was entirely within the Former Agents' discretion and control what representation, if any, they made to the Court [in submitting affidavits] in connection with the Motley Rice Enterprise's fraudulent scheme" (*id.* ¶ 134).

These allegations show that the JTTF agents acted with a high degree of independence and autonomy. Mallon decided how to run Rosetta. The JTTF Defendants decided to disclose Rudra's identity to Motley Rice. They decided what information to share with Motley Rice. They decided what information to include in their affidavits. Thus, Mr. Rajaratnam has adequately alleged that the JTTF Defendants participated in the operation or management of the Motley Rice Enterprise's affairs. In any event, the extent of their participation is a question of fact that cannot be resolved on a motion to dismiss. Rather, they "must be assessed by a fact-finder . . . in the context of all the relevant circumstances." *Allen*, 155 F.3d at 42.

## 2.   The JTTF Defendants Conspired to Violate RICO

Even if the JTTF Defendants are found not to be liable under the "operation or management" test for substantive RICO violations, they still are liable for conspiracy to violate

RICO (18 U.S.C. § 1962(d)), asserted as Count IV of the Amended Complaint, because they "know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles." *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (quoting *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989)). Mr. Rajaratnam has alleged sufficient facts to support the inference that the JTTF Defendants were aware of the broader scope of the enterprise. For example, Mallon was involved with the enterprise for at least a decade before he brought Kanetkar and Allison into the fold. Am. Compl. ¶ 72. It is reasonable to infer that Mallon told Kanetkar and Allison about his work with Asimos and Motley Rice in connection with the 9/11 Litigation, their exploits with Rosetta, and the deception of Haji Noorzai. Also, as federal agents, the JTTF Defendants must have been aware that their actions were criminal.

### D. Mr. Rajaratnam has Alleged a Cognizable RICO Injury

To state a civil RICO claim, Mr. Rajaratnam must allege that he was injured in his "business or property by reason of such violation." 18 U.S.C. § 1964(c). As the Supreme Court declared in *Sedima, S.P.R.L. v. Imrex Co.*:

> the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct as an enterprise.

473 U.S. 479, 497, n.15, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The standard for pleading compensable injury is low. *See Blue Cross and Blue Shield of New Jersey, Inc., v. Philip Morris Inc.*, 36 F. Supp. 2d. 560, 569 (E.D.N.Y 1999) ("[The] Supreme Court's expansive definition of the term 'property' has greatly reduced the need for plaintiffs to allege or for the court to address a claim of injury to business."). Mr. Rajaratnam alleges:

o Defendants' fraudulent scheme caused Mr. Rajaratnam to lose numerous investment opportunities in Sri Lanka (Am. Compl. ¶ 14);

    o   Defendants' fraudulent scheme caused regulatory and banking officials in Sri Lanka to block the return and repatriation to Mr. Rajaratnam of $3 million in funds (*id.* ¶15); and

    o   Defendants' fraudulent scheme forced Mr. Rajaratnam to incur substantial legal costs fighting to uncover the truth about Defendants' criminal conduct (*id*. ¶ 16).

These allegations of harm to Mr. Rajaratnam's business and property are more than adequate to meet the relaxed pleading standard articulated in *Blue Cross*.

    The Motley Rice Defendants nevertheless contend that these allegations are insufficient to plead RICO injury because (1) the pre-2006 acts alleged in the Amended Complaint were not directed at Mr. Rajaratnam and thus did not cause him any cognizable RICO injury, (2) Defendants did not derive benefit from Mr. Rajaratnam's injury, (3) "injury to reputation is not a compensable RICO injury", and (4) Mr. Rajaratnam has failed to allege proximate cause. MR MTD at 14-15. Defendants are wrong on all four counts.

    First, Defendants' argument regarding pre-2006 acts is a *non-sequitur*. Defendants appear to conflate the standing requirement that Mr. Rajaratnam have been injured by the scheme (*see* 18 U.S.C. § 1964(c)) with allegations of criminal conduct that, while not directed at Mr. Rajaratnam, nevertheless establish a "pattern of racketeering" that spans multiple victims, transactions, lawsuits, and decades.

    Second, Defendants cite no authority for the supposed requirement that Defendants derive benefit from Mr. Rajaratnam's injury. *Cf. National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1990) (neither a RICO enterprise nor the predicate acts of racketeering must have economic motivation). That said, Mr. Rajaratnam's financial troubles inured—and continue to inure—to Defendants' benefit as they continue to pressure Mr. Rajaratnam to settle.

Third, courts in this Circuit have rejected Defendants' contention that reputational harm is insufficient to establish injury for civil RICO. *See Frydman v. Verschleiser*, 172 F.Supp.3d at 667 (defendant's dissemination of defamatory statements by email, website posts and blogs, flyers and posters caused plaintiff economic harm and constituted valid RICO predicate acts); *see also Dandong v. Hu*, 2017 WL 3328239 (reputational harm caused to plaintiff by defamatory statement that it "did not honor contracts" sufficient to state a claim for civil RICO).

Fourth, Mr. Rajaratnam *has* alleged that his injuries were proximately caused by Defendants' fraudulent scheme. Defendants' co-opting of federal agents and a Confidential Human Source enabled them to sue Mr. Rajaratnam six days after he was arrested for insider trading. *See* Am. Compl. ¶¶ 85, 89.[31] Had Defendants not committed multiple instances of wire fraud, bribery, and witness tampering, Mr. Rajaratnam would not have been publicly branded a terrorist by seemingly unimpeachable (from the public's perspective) government sources.

Mr. Rajaratnam has alleged sufficient facts to support the reasonable inference that Defendants' theft of government secrets, bribery, witness tampering, and rampant fraud (a) directly caused potential investors relying on Defendants' fraudulent statements to decide not to do business with Mr. Rajaratnam; (b) directly caused regulatory and banking officials relying on Defendants' fraudulent statement to decide not to release Mr. Rajaratnam's funds; and (c) directly caused the cost of defending Motley Rice's already meritless litigation to increase substantially. Put simply, Mr. Rajaratnam has alleged that Defendants' criminal conduct caused

---

[31] The timing of that lawsuit was calculated to hit Mr. Rajaratnam when he was down, to bring to bear the maximum amount of coercive pressure. But for its criminal acquisition of government documents, information, and resources, Motley Rice would have had to follow the requisite *Touhy* process, which would have (a) substantially delayed Motley Rice's receipt of the information and (b) given the Government the opportunity to redact or withhold information (like Rudra's identity) not intended for disclosure to the public.

Mr. Rajaratnam to lose money, and that is all that is required at this stage. *See Blue Cross*, 36 F. Supp. 2d. at 569 ("[M]oney constitutes "property" within the meaning of RICO."); *Reiter v. Sonotone*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 ("[W]hen a commercial enterprise suffers loss of money it suffers injury in both business and its property.").

Finally, Defendants contend that "[t]he conduct of third parties in deciding not to engage in business with Plaintiff—a convicted felon—is a decision *wholly independent* from the challenged 'RICO activities' of Motley Rice." MR MTD at 14-15 (emphasis in original). Defendants surely are free to explore in discovery whether those decisions were made because Mr. Rajaratnam was a convicted felon or because he is embroiled in litigation in which he has been branded a terrorist sympathizer. However, on a pre-answer motion to dismiss, the Court must accept as true Mr. Rajaratnam's allegation that it was the latter.

## II.    THE RICO CLAIMS ARE NOT TIME-BARRED

Defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense. *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F.Supp. 3d 191, 209 (S.D.N.Y. 2014). Thus, a pre-answer motion to dismiss on the grounds that the statute of limitations has expired may be granted only if the complaint "clearly shows the claim is out of time." *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir. 1999).

RICO claims are subject to a four-year statute of limitations. *Rotella v. Wood*, 528 U.S. 549, 552, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). The Second Circuit applies an "inquiry notice" standard to the accrual of civil RICO claims. *See Koch v. Christie's Intern. PLC,* 699 F.3d 141, 153 (2d Cir. 2012). A plaintiff is on "inquiry notice" once there are sufficient "storm warnings" to suggest to a reasonably intelligent person the probability that the person has

suffered RICO injury. *Id.* However, "[t]he existence of 'storm warnings' sufficient to trigger inquiry notice does not begin the clock when plaintiff actually pursues an investigation." *Id.*

Defendants argue that Mr. Rajaratnam was on "inquiry notice" in either 2009, when Motley Rice commenced the New Jersey Action, or in 2011 when the *Vanity Fair* article containing Defendants' defamatory statements was published. However, the clock did not begin to run then because, as alleged in the Amended Complaint, Mr. Rajaratnam spent the years after Motley Rice commenced the New Jersey Action investigating the source of Motley Rice's false claims while Defendants were engaged in a campaign of fraudulent concealment that prevented Mr. Rajaratnam from discovering that he was the victim of a RICO enterprise. *See* Am. Compl. ¶¶ 109-111, 131. Notwithstanding Mr. Rajaratnam's diligent investigation, in which he repeatedly sought the assistance of the court in the New Jersey Action, the first "storm warnings" that Mr. Rajaratnam was the victim of something more than malicious prosecution came in 2016, when Motley Rice was forced to disclose that it had retained former JTTF agents and a Confidential Human Source to provide information and contacts for their litigation. *Id.* ¶¶ 112-113.

On the basis of these facts, it is hardly "clear" that Mr. Rajaratnam's RICO claim is time-barred. Rather, the equitable principles underlying the doctrines of equitable tolling and fraudulent concealment require rejection of the Defendants' statute of limitations defense. *See generally Klehr v. A&O Smith Corp.*, 521 U.S 179, 192–193, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1984); *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36–37 (2d Cir. 2002) (equitable tolling of a RICO statute of limitations period occurs where defendants engaged in fraudulent concealment).

As the Second Circuit held in *State of N.Y. v. Hendrickson Bros*, a plaintiff meets his burden to successfully allege fraudulent concealment "by showing either that the defendant took

affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself

was of such a nature as to be self-concealing." 840 F.2d 1065, 1083 (2d Cir. 1988). The rationale

behind the doctrine "is to prevent a defendant from 'concealing a fraud, or committing a fraud in

a manner that it concealed itself until such time as the party committing the fraud could plead the

statute of limitations to protect it.'" *Id.* (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22

L.Ed. 636 (1874)).  Moreover, "because resolution of a claim of fraudulent concealment is

intimately bound up with the facts of the case, it often cannot be decided at the motion to dismiss

stage." *In re Commodity Exch., Inc.*, 213 F.Supp.3d 631, 675 (S.D.N.Y. 2016).[32]

The facts as alleged in the Amended Complaint, which here are assumed to be true, lay

out with specificity Defendants' multi-year coverup. Unbeknownst to Mr. Rajaratnam, Motley

Rice had been working with the Former Agents prior to the commencement of the New Jersey

Action or the publishing of the *Vanity Fair* article. It was only in late 2016—seven years after the

commencement of the New Jersey Action—that the veil of secrecy shrouding Defendants' covert

and illegal activity finally began to lift. Between September 2016 and August 2018, Mr.

Rajaratnam learned that the Defendants had, among other things, bribed Rudra, procured and

given false testimony, and trafficked in stolen goods:

o on September 30, 2016, Motley Rice finally revealed that one of its witnesses was a

former Confidential Human Source for the FBI and a long-standing asset for Motley Rice

(Am. Compl. ¶¶ 94, 113);

---

[32] Similarly, the Second Circuit opined that whether a plaintiff had sufficient facts to place him
on inquiry notice is often inappropriate for resolution on a motion to dismiss. *Cohen v. SAC
Trading Corp.*, 711 F.3d 353, 361-362 (2013) (ex-wife's general awareness that ex-husband
concealed and unreported his income did not put her on inquiry notice for purposes of discovery
accrual rule for commencing the limitations periods for fraud).

o   in November 2016, after years of delay and fraudulent concealment, Motley Rice

begrudgingly disclosed that it had retained former law enforcement agents who had

investigated the very same facts while still working for the government (*id*. ¶ 114);

o   in December 2016, counsel for Mr. Rajaratnam learned that Motley Rice had paid at least

$40,000 for Rudra's testimony; this ran counter to Allison's sworn statement that he

"provided no payments or promise payment to Rudra on [his] own behalf or on behalf of

Motley Rice" and Mallon's sworn statement that he "provided no payments or promise of

payments to [Rudra] on my own behalf or on behalf of Motley Rice LLC other than to

pay for his out-of-pocket expenses and travel expenses related to his role as a fact witness

in this case" (*id*. ¶¶ 135-136);

o   in August 17, 2018, Motley Rice produced a 2009 memorandum that revealed that the

Former Agents mailed Motley Rice hard copies of documents and materials received

from Rudra, which he obtained while working for the FBI, directly contradicting sworn

statements by Mallon, Kanetkar, Allison and Elsner (*id*. ¶¶ 138, 141); and

o   in August 2018, Motley Rice asserted work-product protection over documents created

by the JTTF Agents before October 22, 2009, thus admitting that the Former Agents were

working for Motley Rice prior to the filing of the complaint in the New Jersey Litigation

(*id.* ¶ 142);

In short, Mr. Rajaratnam has alleged that, once he perceived the "storm warnings," he

conducted a diligent investigation that was thwarted, for years, by Defendants' fraudulent

concealment. On this record, Defendants have not met their burden to show that Mr.

Rajaratnam's RICO claims are "clearly" time-barred.

43

## III.    THE DEFAMATION CLAIM IS NOT TIME-BARRED

### A.    Defendants' Fraudulent Concealment Tolled the Statute of Limitations

As with the RICO claims, Defendants' concerted efforts to conceal, mislead, misconstrue, and obfuscate the true nature of their criminal enterprise tolled the statute of limitations as to Mr. Rajaratnam's defamation claims against Rudra, Kanetkar, and Motley Rice.

Defendants argue that Mr. Rajaratnam should have been able to infer that Rudra and Kanetkar, at Motley Rice's direction, leaked false information concerning the November event to *Vanity Fair* simply by reading the *Vanity Fair* article and the complaint in the New Jersey Action together. JTTF MTD at 23-25. And, that because Mr. Rajaratnam was on inquiry notice upon the publication of the *Vanity Fair* article in 2011, Mr. Rajaratnam's defamation claim is time-barred.[33] This argument ignores the fact that the *Vanity Fair* article treats Rudra and Kanetkar as "independent sources" unconnected to Motley Rice, and thus Mr. Rajaratnam would have had no reason to infer a relationship between them, much less to compare the 2011 *Vanity Fair* article word for word with the 2009 complaint.

Motley Rice worked hard to conceal the existence and nature of its relationship with Kanetkar and Rudra and their collaboration in connection with the *Vanity Fair* article. *See* Am. Compl. ¶¶ 100, 105, 109, 145-47. Among other things, Elsner falsely represented to the court that Motley Rice was "not involved in the creation or orchestration of the *Vanity Fair* article." *Id*. ¶ 145. It was not until November 17, 2016 that Mr. Rajaratnam learned that Rudra and Kanetkar were working together at the direction of Motley Rice. Thereafter, Mr. Rajaratnam did not sleep

---

[33] The cases on which Motley Rice relies for the proposition that the limitations period for allegedly libelous statements begins running upon publication do not address fraudulent concealment.

on his rights; he timely sued Rudra and Kanetkar for defamation in New York Supreme Court on

November 14, 2017.[34]

*Richards v. Mileski*, 662 F.2d 65 (D.C. Cir. 1981) is on point. In that case, the DC Circuit

tolled the one-year statute of limitations for defamation for 23 years based on the doctrine of

fraudulent concealment. In order to force plaintiff Richards to resign from his position in the

State Department, former government investigators concocted, with the aid of an unreliable

informant, a false declaration that Richards engaged in homosexual activities. Finding that

Richards obviously knew of the facts (*i.e.*, that he was not a homosexual), the Circuit Court

determined that the basis of the tortious conduct was defendants' "knowing and malicious" use

of false information to obtain Richard's resignation under duress." *Id.* at 69. The court found

Richard's allegations of fraudulent concealment sufficient to toll the statute of limitations:

> Defendants affirmatively suppressed the truth in 1955 by misrepresenting to
> Richards that they had testimony they considered reliable indicating that he was
> a homosexual, when in fact they had no evidence. Their affirmative acts
> prevented Richards from realizing that he had a cause of action against them.
> Moreover, because the defendants misrepresented their belief in the reliability
> of the alleged informer, the statute was tolled until Richards discovered their
> misrepresentation, whether or not that misrepresentation concealed the
> underlying cause of action.

*Id.* at 70.

Here, Kanetkar, Elsner, and Motley Rice "knowingly and maliciously" disseminated

Rudra's false account of the November event to *Vanity Fair* and "affirmatively suppressed" the

truth to prevent Mr. Rajaratnam from discovering that Motley Rice was behind the defamatory

---

[34] In August 2018, Motley Rice produced documents revealing that Kanetkar, *at Motley Rice's direction*, forwarded detailed information about Rudra to *Vanity Fair* as early as April 29, 2011 (five months before the article was published). Am. Compl. ¶146.

statements in the article. As in *Richards*, the doctrine of fraudulent concealment requires the tolling of the statute of limitations to at least 2018.

### B. The Statute of Limitations was Tolled as to Kanetkar for Jurisdictional Reasons

Although the defamation claim against Kanetkar is subject to a one-year statute of limitations running from the date the *Vanity Fair* article was published, the statute was tolled under New York CPLR § 207 because Kanetkar is a New Jersey resident who was not subject to long-arm jurisdiction in New York for his defamatory statements against Mr. Rajaratnam. Mr. Rajaratnam's defamation claim against Kanetkar is thus timely.

Although they concede that Kanetkar was a non-domiciliary during the limitations period, the JTTF Defendants argue that CPLR § 207 is inapplicable to Kanetkar because "he was subject to long-arm jurisdiction under CPLR § 302(a)(1), thereby triggering the exception to the statutory tolling." JTTF MTD 28. The JTTF Defendants are wrong: Kanetkar was not subject to long-arm jurisdiction, because Kanetkar did not transact business in New York that had a substantial relationship to the defamation.

In *SPCA of Upstate New York v. American Working Collie Association* 18 N.Y.3d 400 (2012), the Court of Appeals clarified the application of New York's long-arm statute in the context of defamation claims against non domiciliaries. On its face, the long-arm statute does not confer jurisdiction over non domiciliaries for either (i) defamation that occurred in New York or (ii) defamation that occurred outside New York but caused injury in New York. *Id.* at 403 (discussing CPLR § 302(a)(2), (3)). "Although defamation claims therefore cannot form the basis for 'tortious act' jurisdiction, such claims may proceed against non-domiciliaries who transact business within the state and thereby satisfy the requirements of CPLR § 302(a)(1)." *Id.* at 403-04. To establish long-arm jurisdiction under CPLR § 302(a)(1), "there must be a

46

'substantial relationship' between the purposeful activities and the transaction out of which the cause of action arose." *Id.* at 404 (internal quotation marks and alterations omitted).

The JTTF Defendants argue that their statute of limitations defense is supported by Mr. Rajaratnam's allegations "that Kanetkar and his colleagues 'handled' Defendant Rudra as a Confidential Human Source and procured much of the information allegedly misused by Motley Rice against Rajaratnam in connection with investigations conducted in (and prosecutions brought) in the Eastern District of New York," and "that Kanetkar allegedly shared information obtained over the course of that Eastern District of New York investigation with a *Vanity Fair* reporter, and the magazine published the information, allegedly defaming Rajaratnam in the process." JTTF MTD 28-29 (quoting Am. Compl. ¶¶ 27, 29).

Those allegations do not establish that Kanetkar transacted business through purposeful activities in New York at the time of the *Vanity Fair* article. At best, they establish that work Kanetkar performed *years before* the *Vanity Fair* article[35] was subsequently used by prosecutors in New York. The Amended Complaint does not allege that Kanetkar performed any of his investigation work in New York, or that he traveled to New York in connection with the prosecutions or for any other purpose. Rather, the Amended Complaint alleges that Kanetkar resides in *New Jersey*, works in *New Jersey*, and is an active member of the *New Jersey* bar. (Am. Compl. ¶ 23.) In short, none of the allegations on which the JTTF Defendants rely establishes any connection between Kanetkar's activities and New York—let alone the substantial relationship necessary to establish long-arm jurisdiction.

As noted above, pre-answer dismissal on statute of limitations grounds is only appropriate if the complaint "clearly shows the claim is out of time." *Harris*, 186 F.3d at 250.

---

[35] Kanetkar left the FBI in 2006. Am. Compl. ¶ 101.

That is not the case here. Perhaps in discovery Kanetkar will produce evidence that sufficiently connects him to New York at the appropriate time, and that his activities in New York bore a substantial relationship to the alleged defamation, but for now the record places him in New Jersey, working for a South Carolina law firm, beyond the jurisdiction of New York.

## CONCLUSION

For all the reasons stated above, Plaintiff Rajaratnam respectfully requests that the Court deny the motions brought, respectively, by the Motley Rice Defendants and the JTTF Defendants to dismiss with prejudice the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated:   New York, New York
         June 26, 2019

Respectfully submitted,

**LUPKIN PLLC**

By: _____

Michael B. Smith (MS-3281)
Jonathan D. Lupkin (JL-0792)

80 Broad Street, Suite 1301
New York, NY 10004
Tel: (646) 367-2771
Fax: (646) 219-4870
msmith@lupkinpllc.com
jlupkin@lupkinpllc.comp

*Counsel for Plaintiff Raj Rajaratnam*

4853-2641-4490, v. 11