UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
RAJ RAJARATNAM,

     *Plaintiff*,

       -against-

MOTLEY RICE, LLC, a South Carolina
limited liability company, MICHAEL
E. ELSNER, an individual, JAYAT P.
KANETKAR aka JAY KANETKAR, an
individual, RUDRA, an individual
named pseudonymously, BRIAN P.
MALLON, an individual, and JOHN
"HANK" ALLISON, an individual,

     *Defendants*.
--------------------------------X

**MEMORANDUM & ORDER**

18-cv-3234(KAM)(RML)

**MATSUMOTO, United States District Judge:**

     Nearly eleven years ago, plaintiff Raj Rajaratnam
("plaintiff" or "Rajaratnam") was named as a defendant in a
civil action in New Jersey federal court alleging he provided
material support to the Liberation Tigers of Tamil Eelam
("LTTE"), a terrorist group more commonly known as the "Tamil
Tigers."  In 2011, a *Vanity Fair* article published statements by
a confidential FBI informant claiming that Rajaratnam had
expressed support for LTTE's terrorist activities in prepared
remarks delivered at a 2002 fundraiser.  Seven years later, with
his civil action in New Jersey federal court still pending,
Rajaratnam filed a suit in the Eastern District alleging federal
racketeering violations by the law firm representing plaintiff

in the New Jersey action, the confidential FBI informant, and three former federal agents associated with the Joint Terrorism Task Force.  Plaintiff asserts that the defendants comprise a racketeering enterprise, the purpose of which is to illegally obtain confidential investigatory materials from federal law enforcement officials, which are used to identify wealthy targets, like Rajaratnam, and then defame and file lawsuits against them, in order to coerce a lucrative settlement. Plaintiff's action against the above-captioned defendants alleges violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law defamation. (ECF No. 42, Amended Complaint ("Compl.").)

Before the court are motions to dismiss by two sets of defendants: (1) the law firm Motley Rice LLC ("Motley Rice") and its member, Michael E. Elsner (collectively, "Motley Defendants"), (ECF No. 53-1, Mem. of Law in Supp. of Mot. by Defendants Motley Rice and Michael E. Elsner to Dismiss Amended Complaint ("Motley Mot.")); and (2) defendants Jayat Kanetkar, Brian Mallon, and John "Hank" Allison, all former members of the federal Joint Terrorism Task Force ("JTTF Defendants"), (ECF No. 56-1, Mem. of Law in Supp. of Defendants Allison, Kanetkar and Mallon's Mot. to Dismiss Amended Complaint ("JTTF Mot.")). Plaintiff served an opposition to both motions, (ECF No. 58, Consol. Mem. of Law in Opp. to Defendants' Motions to Dismiss

("Opp.")), to which both sets of defendants replied.  (ECF No.
61, Motley Reply; ECF No. 60, JTTF Reply.)

For the reasons that follow, the court GRANTS
defendants' motions, and DISMISSES the Amended Complaint in its
entirety.

**BACKGROUND**

The following facts are derived from the allegations
in plaintiff's complaint, which the court assumes are true for
the purposes of defendants' motions.

## I.  Parties

Plaintiff, an ethnic Sri Lankan Tamil, left Sri Lanka
when he was 14 years old and has a permanent residence in New
York, New York, though he was incarcerated in Massachusetts at
the time the Amended Complaint was filed.  (Compl. ¶ 24.)
Defendant Motley Rice was founded in 2003 and is a "well-known"
South Carolina litigation firm representing primarily
plaintiffs.  Motley Rice is registered to practice in New York
and maintains an office in this state.  (*Id.* ¶ 18.)[1]  Michael
Elsner is a member of Motley Rice.  (*Id.* ¶ 19.)  Brian P. Mallon
is a former Special Agent with the United States Immigration and
Naturalization Service ("INS") assigned to the Joint Terrorism
Task Force ("JTTF").  (*Id.* ¶ 20.)  John "Hank" Allison is a

---

[1]      Motley Rice's predecessor-in-interest was the law firm of Ness, Motley,
Loadholt, Richardson & Poole ("Ness Motley").  (*Id.*)

former Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the JTTF. (*Id.* ¶ 21.) Jayat P. "Jay" Kanetkar (together, with Allison and Mallon, "JTTF Defendants"), is also a former FBI Special Agent. (*Id.* ¶ 23.) The complaint alleges that Kanetkar was the "handler" for defendant "Rudra," the pseudonym used for an FBI "Confidential Human Source." (*Id.* ¶¶ 22-23.)[2]

## II. Pertinent Allegations

### A. Origins of the Enterprise[3]

Beginning in the 1970's, Motley Rice's predecessor, Ness Motley, engaged in high volume personal injury asbestos litigation, filing at least tens of thousands of lawsuits in state and federal courts. (Compl. ¶ 30.) Ness Motley entered into mass settlements to resolve asbestos claims, the merits of which varied, and in the process, netted hundreds of millions of dollars in contingency fees. (*Id.* ¶ 31.) In 2001, a lawsuit alleged that Ness Motley improperly induced medical experts to submit false testimony in asbestos personal injury suits, and also thwarted legislative attempts to reform asbestos litigation

---

[2]     Plaintiff states that he has been unable to effect service of the complaint on Rudra, whom he believes resides abroad in Sri Lanka. (*See* ECF No. 63.)  Rudra has not answered or otherwise moved to dismiss the complaint.

[3]     The court adopts certain words or phrases in the "Background" section of this Memorandum and Order solely to describe the complaint's allegations, and not to endorse factual or legal assertions made by either party.

through the use of threats and intimidation. (*Id.* ¶ 33.)[4]  Ness

Motley's successor, Motley Rice, also earned substantial fees

through "bulk" settlements in litigation against tobacco

companies. (*Id.* ¶ 34.)

## B. Use of Government Secrets

After the terrorist attacks on September 11, 2001,

Ness Motley filed a trillion-dollar lawsuit accusing Saudi

banks, charities, and members of the Saudi royal family of

financing al Qaeda ("9/11 Action"). (Compl. ¶ 36.)  In 2002,

Motley Rice hired Jean-Charles Brisard as its lead investigator.

(*Id.* ¶ 38.)  Brisard, a French author and analyst, claimed to

have ties with French intelligence. (*Id.*)  Motley Rice sent

Brisard to Bosnia in 2003 to obtain a secret document in the

possession of the Central Intelligence Agency ("CIA"). (*Id.* ¶

39.)  The Department of Justice ("DOJ") initially opposed Motley

Rice's efforts to obtain the document, but acquiesced after the

Bosnian Supreme Court "ask[ed]" the government to share to

document. (*Id.* ¶¶ 39-40.)

The document that Motley Rice sent Brisard to retrieve

"supposedly" included a list of donors to Osama bin Laden. (*Id.*

¶ 41.)  Brisard changed the spelling of one name on the list

---

[4]     Plaintiff asserts Ness Motley's alleged conduct constituted witness
tampering and obstruction under federal law, *see* 18 U.S.C. §§ 1512, 1505.
(*Id.*)  The complaint does not state how the 2001 lawsuit was resolved.

from "bin Mahfoodh" to "Khalid bin Mahfouz," the latter being one of the richest men in Saudi Arabia. (*Id.*) Motley Rice named Khalid bin Mahfouz as a defendant in the 9/11 Action. (*Id.* ¶ 42.) When Brisard's alteration of the document came to light, however, Motley Rice replaced him with Michael Asimos. (*Id.*)

Using his access to information about the 9/11 Action, Asimos shared intelligence with "low-level government operatives," including personnel at the Department of Defense ("DoD"). (*Id.* ¶ 43.)[5] Though Elsner, along with other Motley Rice attorneys, knew that Asimos shared information collected and generated for the 9/11 Action with DoD personnel, he encouraged Asimos's information-sharing because Motley Rice wanted access to sensitive information about ongoing government investigations. (*Id.*) Plaintiff claims that each government operative that Asimos offered to share intelligence with was a "public official." (*Id.* ¶ 44.)[6]

### C. Use of Military Intelligence

After the United States invasion of Iraq in March

---

[5] The complaint refers to the "9/11 cases," but the only 9/11-related case mentioned is the 9/11 Action.

[6] The complaint also claims that Asimos once travelled to Kabul, Afghanistan, purportedly on behalf of the U.S. government, and returned with a document identifying al Qaeda operatives who were authorized to carry weapons in Afghanistan, but instead of delivering the document straight to the Pentagon, like he was supposed to, he disclosed it to Motley Rice attorneys first. (*Id.* ¶ 47.) The complaint does not allege this constituted a predicate act under RICO.

2003, Asimos sought entry into Iraq to "gather intel for Motley Rice." (Compl. ¶ 50.)  Asimos called Mark Heilbrun, a congressional staffer who worked with Senator Arlen Specter, and falsely represented that Paul Wolfowitz, the Deputy Secretary of Defense at the time, wanted Asimos in Iraq on a covert basis. (*Id.*)  To bolster his story, Asimos gave Heilbrun the cell phone number of a contact at the Office of the Secretary of Defense, Col. Steven Bucci, who corroborated Asimos's story to Heilbrun. (*Id.* ¶¶ 49, 51.)  Asimos was eventually able to enter Iraq, and gained "access" to the Iraqi National Congress ("INC") by posing as a representative of the Pentagon.  (*Id.* ¶ 52.)  Asimos's INC access begat further access to Iraqi governmental and intelligence documents.  (*Id.*)  Eventually, Asimos was forced to flee Iraq when an Iraqi government official inquired into his credentials.  (*Id.* ¶ 53.)  Asimos's and Bucci's fabrication had been perpetrated on Motley Rice's behalf.  (*Id.* ¶ 54.)

**D. Rosetta**

After Asimos returned from Iraq, Motley Rice helped him form Rosetta Research and Consulting LLC ("Rosetta"). (Compl. ¶ 55.)  Rosetta's stated mission was to perform investigative work to support the 9/11 Action.  (*Id.* ¶ 56.)  In reality, Asimos, along with Brian Mallon and other investigators, used Rosetta to exploit government contacts to obtain information to build a database of government

intelligence on terrorism. (*Id.*) From June 2003 until 2006, Motley Rice, Asimos, and Mallon used Rosetta to "obtain, transport, transmit, and/or transfer in interstate or foreign commerce documents worth more than $5,000 obtained by means of false or fraudulent pretenses." (*Id.* ¶ 57.) The complaint does not specify the nature of the documents or how they were falsely obtained.

### E. Use of Bribes to Access FBI Databases

Rosetta offered valuable information to Mike Dick, Mallon's friend at the FBI, in exchange for his assistance with Rosetta's operations, and even gave Dick a Rosetta email address. (Compl. ¶ 61.) According to plaintiff, Rosetta's offers of valuable information were bribes because Dick was a "public official." (*Id.* ¶ 62.) Dick's relationship with Rosetta drew the scrutiny of the DOJ's Office of the Inspector General and, eventually, he was reprimanded. (*Id.* ¶ 63.) In addition, an "unnamed FBI analyst" who worked for Rosetta and searched confidential FBI databases on behalf of the "Motley Rice Enterprise" was also a "public official." (*Id.* ¶¶ 64-65.) Plaintiff "believes" that discovery will show that "Asimos, Mallon, and/or another agent of Rosetta and/or the Motley Rice Enterprise offered things of value" to the analyst in violation of the federal bribery statute. (*Id.* ¶ 65.)

## F. Witness Manipulation

In 2004, Motley Rice wanted to bring Haji Bashir Noorzai, an Afghan drug lord, into the United States to serve as a witness in the 9/11 Action. (Compl. ¶ 68.) Rosetta contacted a DEA employee, who agreed to facilitate Noorzai's entry into the country. (*Id.*) Motley Rice reversed course when it learned that the DEA planned to arrest Noorzai; Mallon and Asimos delivered Noorzai to the DEA once he arrived in the United States. (*Id.* ¶¶ 69-70.) Mallon and Asimos's false promise of "employment" to Noorzai was transmitted "via international wire," purportedly an act of criminal wire fraud. (*Id.* ¶ 71.)

## G. Access to JTTF Materials and Information

In or before 2009, Mallon "enlisted" Kanetkar and Allison, former JTTF colleagues, "into the conspiracy." (Compl. ¶ 72.) While working as JTTF agents, Kanetkar and Mallon worked with Rudra, a Confidential Human Source. (*Id.* ¶ 73.) Kanetkar and Mallon introduced Rudra to Motley Rice circa 2009. (*Id.* ¶ 74.)[7] Between 2009 and 2018, Mallon, Kanetkar, Allison, and Rudra transported "via interstate or foreign wire or by travelling across state lines" documents and materials that Rudra obtained while working on behalf of the FBI, and which

---

[7]     The complaint asserts that Rudra's identity was a government secret and that, by disclosing his identity to Motley Rice, Kanetkar and Mallon violated the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources. (*Id.*)

were "worth more than $5,000 to Motley Rice." (*Id.* ¶ 75.)

**H. Targeting Rajaratnam**

The JTTF Defendants previously worked together on a criminal investigation into the Tamil Tigers, which led to a series of prosecutions in the Eastern District of New York. (Compl. ¶ 80.) Investigators working on the case approached Rajaratnam about donations he and his father made to the Tamil Rehabilitation Organization ("TRO"), a Maryland-based 501(c)(3) entity, between 2002 and 2006. (*Id.* ¶ 81.) In 2007, after allegations surfaced that TRO was funding the Tamil Tigers, the United States Department of the Treasury designated the TRO as an organization supporting a terrorist group. (*Id.* ¶ 82.) As a result, Rajaratnam promptly ceased donations to TRO and cooperated with the JTTF investigation of LTTE. (*Id.* ¶¶ 82-83.) He was not prosecuted in connection with the investigation. (*Id.* ¶ 83.) The JTTF Defendants did, however, learn sensitive information about Rajaratnam's wealth, and "along with far more sensitive government materials," passed this information along to Motley Rice. (*Id.* ¶ 84.)

**I. Unlawful Use of Government Assets to Target Rajaratnam**

On October 16, 2009, the FBI arrested Rajaratnam for insider trading. Six days later, he was named as a defendant in a civil suit in the District of New Jersey, captioned *Krishanthi*

*v. Rajaratnam*, 09-cv-5395 ("NJ Action").  (Compl. ¶ 85.)[8]  Motley

Rice filed the complaint initiating the NJ Action.  (*See* NJ ECF

No. 1, NJ Complaint ("NJ Compl.").)  The NJ Complaint alleges,

*inter alia*, that:

> In November 2002, Raj Rajaratnam was a guest speaker
> at an ITSA's [(Ilanka Tamil Sangam USA, a non-profit
> Tamil-related organization)] fundraising event held in
> North Brunswick, New Jersey. An LTTE flag and
> informational brochures concerning the LTTE were
> placed on a table in the conference hall. In his
> speech to the organization, Rajaratnam referred to the
> struggle in Sri Lanka and asked those in attendance to
> support the struggle. As if to clarify, Rajaratnam
> described those in attendance who support the struggle
> in Sri Lanka as terrorists, noting that he was married
> to a terrorist because his wife is an Indian Punjabi.
> . . . He further described those supporters in
> attendance as not just terrorists but as freedom
> fighters.

(NJ Compl. ¶ 113.)  This allegation was false.  Plaintiff's

speech focused on the importance of philanthropy and support for

the Tamil community; plaintiff did not encourage those present

at the November 2002 event ("November Event") to support LTTE

and he did not describe them as both "terrorists" and "freedom

fighters."  (Compl. ¶ 87.)  At the time Motley Rice filed the NJ

Action, the FBI possessed a recording and transcript of the

November 2002 event that belied Motley Rice's allegations about

Rajaratnam's remarks at the November 2002 Event. (*Id.*)

---

[8]      The caption "NJ ECF No. _" is used herein to refer to filings on the NJ
Action electronic docket.  The court takes judicial notice of the docket in
the NJ Action.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75
(2d Cir. 1998) (a court may rely on "matters of public record" in deciding
a motion to dismiss under Rule 12(b)(6)).

**J. Bribery of a Government Witness**

        The JTTF Defendants shared Rudra's identity with the Motley Defendants, even though Rudra was a confidential source for the United States government.  (Compl. ¶ 90.)  Between 2009 and 2018, "Motley Rice and/or the [JTTF Defendants]" made payments to Rudra in excess of $75,000.  (*Id.* ¶ 91.)  Rudra was not an expert witness in, and did not prepare an expert report for, the NJ Action.  (*Id.*)  Though Rudra was deposed in the NJ Action in 2018, as of January 18, 2019, he had not appeared as a witness at trial or at an evidentiary hearing.  (*Id.*) "Apparently, the payments [to Rudra] were used to fund living arrangements, consumer goods, and extraneous travel unrelated to Rudra's testimony in the [NJ Action] . . . ."  (*Id.*)

        In addition, on February 5, 2010, Motley Rice filed an affidavit from Rudra in the NJ Action.  (*Id.* ¶ 94.)[9]  Motley Rice "hid that affidavit" by filing it right before the close of discovery in the NJ Action.  (*Id.*)  Rajaratnam's NJ Action counsel took Rudra's deposition for four days in July 2018. (*Id.* ¶ 95.)  Plaintiff "is informed and believes that, since at

---

[9]    The complaint cites to ECF No. 325 in the NJ Action, but that document is a December 13, 2016 letter by Rajaratnam's NJ Action counsel requesting a conference to address "disclosures by Motley Rice . . . that the investigators whose identity Motley Rice was ordered to disclose . . . are in fact three former [JTTF] law enforcement officials who investigated on behalf of the government the very same subject matter that Motley Rice is now pursuing in its civil litigation."  (NJ ECF No. 325.)  The complaint does not cite to the Rudra affidavit itself.

least 2009, Motley Rice, Elsner, and the [JTTF Defendants] . . .

persuaded, or attempted to persuade, Rudra to cooperate, . . .

with the intent to influence his testimony in the [NJ Action]."

(*Id.* ¶ 96.)[10]  The complaint alleges that these acts constituted

witness tampering.  (*Id.*)

### K. The *Vanity Fair* Article and the 2009 Press Release

On October 23, 2009, Motley Rice issued a press

release stating, *inter alia*, "[i]n November 2002, Rajaratnam,

speaking at a fundraiser for the Association of Tamils of Sri

Lankan USA ("ITSA"), called those supporting the Tamils'

struggle in Sri Lanka 'terrorists,' later adding that they were

not just terrorists but also 'freedom fighters'" ("2009 Press

Release").  (Compl. ¶ 97.)  Then, on September 30, 2011, *Vanity

Fair* published an article by David Rose entitled "Crouching

Tiger, Hidden Raj" ("*Vanity Fair* Article" or "Article").  (*Id.* ¶

100.)[11]  According to the *Vanity Fair* Article, Rajaratnam was the

"star speaker" of the November 2002 Event, but "[u]nbeknownst to

Rajaratnam," the audience that night included an FBI informant,

nicknamed Rudra, who was equipped with a concealed recording

---

[10]     The complaint does not indicate what aspect of Rudra's testimony
defendants influenced or attempted to influence, or otherwise identify the
"false statements" in Rudra's affidavit or his deposition.

[11]     The *Vanity Fair* Article is attached as Exhibit D to the Declaration of
Larry H. Krantz, counsel for the JTTF Defendants, in Support of their Motion
to Dismiss ("Krantz. Decl.").  (ECF No. 56-2, Krantz Decl. at Ex. D, pp. 119-
123.)  The Article, on which the complaint relies and bases certain critical
allegations, is appropriately incorporated by reference.

device.  (*Id.* 1-2.)  Rudra, the article explains, had worked

undercover for eleven years, and his secret recordings had been

used by the DOJ in 20 successful criminal prosecutions.  (*Id.*

2.)

The *Vanity Fair* Article related Rudra's recollection

of the November 2002 Event:

> Rudra says his memory of what Rajaratnam said at the
> gala is clear, and it is supported by his former
> F.B.I. handlers, who heard the recordings when they
> were made.  "He got up and, flanked by L.T.T.E. flags,
> he said, 'Everyone must support the Tigers' cause,'"
> Rudra recalls.  "He mentioned the fact that his wife
> was an Indian Sikh [a minority group from which some
> had also mounted a terrorist campaign aimed at
> creating a separate state].  Rajaratnam said: 'They're
> terrorists.  We're terrorists.  We are all freedom
> fighters.'  Everyone laughed.  Then he added: 'They're
> our terrorists, and you all must support this
> struggle.'"

(*Id.* (brackets in original).)  The *Vanity Fair* Article also

identifies Kanetkar as "Rudra's main F.B.I. handler from 1999

until he left the bureau in June 2006 . . . ."  (*Id.*; Compl. ¶

101.)  Though the Article notes that Elsner's firm filed a claim

against Rajaratnam on behalf of LTTE victims, it did not

"indicate that Kanetkar and Rudra were working for Motley Rice

at the time they gave their interviews to *Vanity Fair*."  (Compl.

¶ 101.)

According to plaintiff, a "now-unclassified

transcript" of Rudra's recording at the November 2002 Event

demonstrates that Rudra's quotation of Rajaratnam's remarks was

false.  (*Id.* ¶ 103.)  In addition to Rudra's false quotation of plaintiff, the complaint alleges the *Vanity Fair* Article published other falsehoods promoted by Rudra and Kanetkar, such as a claim by Kanetkar that two Tamil Tiger members once went to Rajaratnam's house to "arrange" to get money.  (*Id.* ¶ 104.) Kanetkar and Rudra were "agents and/or employees of Motley Rice" at the time they made these statements to *Vanity Fair*, and the dissemination of these statements to *Vanity Fair* was "coordinated" by Motley Rice, Elsner, Kanetkar, and Rudra.  (*Id.* ¶¶ 105-06.)

**L. Fraudulent Concealment**

A series of "red flags" brought Motley Rice's "criminal enterprise" to plaintiff's attention.  *First*, in September 2016, two years after the close of discovery, Motley Rice disclosed that one of its witnesses was a former Confidential Human Source with the United States government. (Compl. ¶ 113.)  When Motley Rice finally disclosed Rudra's existence, it misspelled his real name in different ways to prevent Rajaratnam's counsel from investigating him or connecting him to documents in which he was referenced.  (*Id.*) *Second*, in November 2016, Motley Rice disclosed that it had retained three former JTTF law enforcement agents to serve as "non-testifying experts."  (*Id.* ¶ 114.)  Once Rajaratnam learned the identities of these agents, *i.e.* the JTTF Defendants, he was

15

able to discover that they had participated in the JTTF investigation into LTTE terrorism.  (*Id.*)  *Third*, in December 2016, Rajaratnam's counsel in the NJ Action learned that Motley Rice had, up to that point, paid Rudra approximately $40,000. (*Id.* ¶ 115.)

When Rudra retained independent counsel in late 2017, he began producing documents that "hint[ed] at the extent to which Motley Rice and the [JTTF Defendants] have been working to conceal their crimes and thus protect their longstanding and highly profitable enterprise."  (*Id.* ¶ 117.)  In 2018, Motley Rice and Rudra made additional disclosures in the NJ Action, including: (1) a 17-page print-out of cell phone text messages between Rudra and Elsner; (2) over 3,000 pages of documents and correspondence between Rudra and "Motley Rice and/or the [JTTF Defendants];" (3) 60 pages of expense records, "which revealed $35,000 of previously-undisclosed payments to Rudra;" and (4) a limited production of documents that had been in the JTTF Defendants' possession since the NJ Complaint was filed.  (*Id.* ¶¶ 118-26.)[12]  Furthermore, a 2009 memorandum produced on August 17, 2018 revealed that the JTTF Defendants mailed Motley Rice "hard copies of documents and materials received from Rudra, which Rudra obtained by working on behalf of the FBI."  (*Id.* ¶

---

[12]    With the exception of the $35,000 payment to Rudra, plaintiff does not describe the contents of these disclosures.

141.)

Motley Rice also opposed Rajaratnam's efforts to modify a Discovery Confidentiality Order ("DCO") governing the disclosure of documents produced in the NJ Action.  Though plaintiff alleges the DCO prevents him from viewing or learning the contents of documents designated as confidential, Jones Day, his counsel in the NJ Action, informs him that "many of the documents Defendants have designated directly support the allegations herein, and evidence additional wrongdoing by Defendants."  (*Id.* 1 n.1.)  Because "Jones Day is currently constrained by the DCO—to which they object—from sharing substantively the information in these documents," plaintiff is "constrained in [his] ability to fully describe the criminal enterprise and its acts."  (*Id.*)

**M. Bribery of Rudra is Revealed**

On December 20, 2016, Elsner filed affidavits by the three JTTF Defendants.  (Compl. ¶ 133; NJ ECF No. 382.) Allison's affidavit stated, "I have provided no payments or promise of payments to [Rudra] on my own behalf or on behalf of Motley Rice LLC."  (Compl. ¶ 135.)  Mallon's affidavit echoed Allison's statements, with the caveat that payments were made for Rudra's "out-of-pocket expenses and travel expenses related to his role as a fact witness in this case."  (*Id.*)  However, in 2018, Rudra produced documents "that revealed that Allison and

17

Mallon's statements were false."  (*Id.* ¶ 136.)[13]  Plaintiff

further alleges that Elsner's filing of Allison's and Mallon's

affidavits violated the federal wire fraud statute.  (*Id.* ¶

137.)

### N. Orchestration of the *Vanity Fair* Article is Revealed

On May 17, 2017, Elsner filed a letter in the NJ

Action which stated that Motley Rice was "not involved in the

creation or 'orchestration' of the *Vanity Fair* article."

(Compl. ¶ 145.)  But metadata from Motley Rice's August 17, 2018

production in the NJ Action reveals that the JTTF Defendants

forwarded information about Rudra to the author of the *Vanity*

*Fair* Article as early as April 29, 2011, five months before the

Article was published.  (*Id.* ¶ 146.)  Allison's and Mallon's

affidavits were thus false, and the Motley Defendants' filing of

those false affidavits in the NJ Action constituted wire fraud.

(*Id.* ¶ 147.)

### O. Defendants Concede That They Lied About Rajaratnam

After Rudra's 2018 disclosures in the NJ Action,

Rajaratnam's counsel moved for sanctions pursuant to Rule 11 of

the Federal Rules of Civil Procedure.  (Compl. ¶ 149.)  On

October 3, 2018, Motley Rice moved to amend its complaint to

---

[13]     The complaint cites NJ ECF Nos. 382 and 344 (Exs. H, Q, D, U, V), with
parenthetical explanations suggesting the JTTF Defendants "loaned" money to
Rudra.  Though the court attempted to review these documents on the NJ
Action's electronic docket, access to the documents was restricted.

withdraw the allegation regarding Rajaratnam's remarks at the November 2002 Event. (*Id.*) On November 13, 2018, Motley Rice filed an amended complaint in the NJ Action striking the allegation regarding Rajaratnam's speech. (*Id.*; NJ ECF No. 384.) Motley Rice insisted the amendment was "not an acknowledgement that the withdrawn allegations are incorrect or false." (Compl. ¶ 150; NJ ECF No. 375-2.) But plaintiff alleges that Motley Rice knew the allegations concerning the November 2002 Event were false when it filed the NJ Complaint because Rudra described the speech to Motley Rice's investigators months before the firm initiated the NJ Action, and the transcript and record of Rajaratnam's speech made clear that the allegations regarding the November 2002 Event were not as Rudra claimed. (Compl. ¶ 150.) Motley Rice's pleadings in the NJ Action, dated October 22, 2009, June 13, 2014, and March 8, 2016, all contained these falsehoods, and therefore, plaintiff alleges, were all separate instances of wire fraud. (*Id.* ¶ 152.)

### III. Causes of Action

Claims One and Two of the complaint assert claims under RICO, 18 U.S.C. § 1962(c), against all defendants. (Compl. ¶¶ 155-75.) Claim Three asserts a cause of action under 18 U.S.C. § 1962(a) of the RICO statute against the Motley Defendants for deriving income from a pattern of racketeering

activity, and Claim Four asserts a RICO conspiracy under 18 U.S.C. § 1962(d) against the individual defendants. (*Id.* ¶¶ 176-86.) The complaint alleges that "Motley Rice had an ongoing business relationship with one or more of: [Motley Rice founders] Joe Rice [and] Ron Motley, Michael Elsner, Jay Kanetkar, Brian Mallon, John Allison, Rosetta, Mike Asimos, Jean-Charles Brisard, Steven Bucci, Mike Dick, and Rudra, such that their relationship constituted an 'association in fact' enterprise [("Enterprise")]." (*Id.* ¶ 156.) This Enterprise allegedly caused plaintiff damage through an "open-ended" pattern of racketeering activity that began as early as the 1990's. (*Id.* ¶¶ 159-61.)

Finally, Claim Five of the complaint asserts a defamation claim relating to the publication of the *Vanity Fair* Article in 2011. (*Id.* ¶¶ 187-99.) Plaintiff alleges that Kanetkar and Rudra, in coordination with Motley Rice, made "false and defamatory" statements about plaintiff to David Rose of *Vanity* Fair. (*Id.* ¶ 188-89.) When *Vanity Fair* published these statements, plaintiff suffered "public contempt, disgrace, personal and professional harm, and ridicule;" his personal safety was jeopardized; and he can no longer "integrate back into, and interact with, society in the United States" and elsewhere. (*Id.* ¶¶ 192-95.) Plaintiff claims he did not learn of Rudra's identity "until on or after November 14, 2016," and

did not learn that Kanetkar was acting at the direction of Motley Rice until the same date.  (*Id.* ¶¶ 196-97.)

## IV.   The Motions

Defendants move to dismiss the complaint in its entirety.  In the main, they assert that plaintiff's RICO allegations are thinly-clothed malicious prosecution and defamation claims.  Defendants contend that any allegedly improper litigation activity in the NJ Action, or defamatory statements to *Vanity Fair*, do not constitute "predicate acts" under RICO, (Motley Mot. 9-10), and that the purported crimes committed before the NJ Action commenced in 2009 are not sufficiently related to the Enterprise's alleged racketeering activity in the NJ Action.  (*Id.* 6-7, 22; JTTF Mot. 16.) Defendants assert that these pleading deficiencies are incompatible with a "pattern of racketeering activity" under 18 U.S.C. § 1961(5), a threshold requirement for RICO, without which, plaintiff's RICO claims cannot be sustained.  (Motley Mot. 10, 22.)  Defendants further attack the RICO claims as time-barred, and maintain that plaintiff's alleged injuries are too attenuated to sustain a RICO claim.  (*Id.* 14, 24; JTTF Mot. 19.)

Plaintiff counters that each predicate act has been adequately alleged and, at the very least, raises factual questions that preclude dismissal at the motion to dismiss

stage.  (Opp. 19-26.)  Plaintiff asserts that the complaint alleges cognizable injuries that resulted in investors jettisoning business ventures with plaintiff, banks freezing his funds, and increasing the costs to defend the NJ Action.  (*Id.* 39.)  In addition, plaintiff acknowledges that RICO claims are subject to a four-year statute of limitations, but denies that his RICO claims accrued in 2009, when the NJ Action was filed, and instead asserts that he only discovered the first "storm warnings" in 2016, which alerted plaintiff that he was the victim of "something more than malicious prosecution."  (*Id.* 40-41.)  Plaintiff contends that, at a minimum, because the defendants' fraudulent concealment raises questions as to whether plaintiff's claims are "clearly" time-barred, dismissing the RICO claims at this stage is improper.  (*Id.* 40-43.)

Defendants also urge the court to retain supplemental jurisdiction over plaintiff's state law defamation claim, and to dismiss it with prejudice.  (Motley Mot. 26-30; JTTF Mot. 26-29.)  New York's Civil Practice Law and Rules ("CPLR") § 215(3) imposes a one-year limitations period for defamation claims, running from the date of publication of the statements at issue. Defendants note plaintiff filed suit for defamation well beyond the one-year limitation period, and deny the applicability of any recognized tolling doctrine.  Even if New York had a "discovery rule" for defamation claims, defendants say, Rudra

and Kanetkar were both clearly identified in the *Vanity Fair*
Article in 2011. (Motley Mot. 28-30.) Plaintiff, on the other
hand, insists New York's one-year statute of limitations was
tolled on both equitable and statutory grounds, and that, at the
very least, the application of any tolling doctrine is a
question of fact that cannot be resolved at the pleading stage.
(*Id.* 44-46.)

## LEGAL STANDARD

"To survive a motion to dismiss pursuant to Rule
12(b)(6), a complaint must contain sufficient facts that if
accepted as true 'state a claim to relief that is plausible on
its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
"A well-pleaded complaint must contain 'a short and plain
statement of the claim showing that the pleader is entitled to
relief, in order to give the defendant fair notice of what the .
. . claim is and the grounds upon which it rests.'" *Carson
Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 252 (E.D.N.Y.
2016) (citing *Twombly*, 550 U.S. at 555). A complaint providing
only "labels and conclusions" or "a formulaic recitation of the
elements of a cause of action will not do." *Twombly*, 550 U.S.
at 555.

In deciding the motion, "courts must consider the

complaint in its entirety, as well as other sources courts
ordinarily examine when ruling on Rule 12(b)(6) motions to
dismiss, in particular, documents incorporated into the
complaint by reference, and matters of which a court may take
judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308, 322 (2007). The court may also consider documents
that the plaintiff relied on in bringing the action and that are
either in the plaintiff's possession or that the plaintiff knew
of when bringing suit. *Chambers v. Time Warner, Inc.,* 282 F.3d
147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.,* 987
F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding
L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,* 503 U.S.
960 (1992); *McKevitt v. Mueller,* 689 F. Supp. 2d 661, 665
(S.D.N.Y. 2010).  Where the complaint cites or quotes from
excerpts of a document, the court may consider other parts of
the same document submitted by the parties on a motion to
dismiss. *131 Main St. Assocs. v. Manko,* 897 F. Supp. 1507, 1532
n. 23 (S.D.N.Y. 1995).  If "the documents contradict the
allegations of a plaintiff's complaint, the documents control
and the [c]ourt need not accept as true the allegations in the
complaint." *2002 Lawrence R. Buchalter Alaska Tr. v.
Philadelphia Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 199
(S.D.N.Y. 2015) (quoting *Bill Diodato Photography LLC v. Avon
Prods., Inc.,* No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y.

Sept. 21, 2012)) (collecting authorities).

**DISCUSSION**

## I. RICO Claims

Section 1964(c) of RICO provides a private right of action to any person injured in his business or property by reason of a violation of RICO's substantive provisions, codified in section 1962. "To establish a RICO claim, a plaintiff must show: (1) a violation of . . . 18 U.S.C. § [1962]; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). To establish a violation under 18 U.S.C. § 1962, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *DeFalco*, 244 F.3d at 306)).

A "pattern of racketeering activity" is defined by the statute as "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). "Racketeering activity" is defined to include any "act" indictable under various specified federal statutes, including, as relevant here, the mail and wire fraud statutes, the bribery statute, and the witness tampering statute. *See* 18 U.S.C. § 1961(1) (defining

25

"racketeering activity" to include offenses indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 201 (bribery), and 1512 (witness tampering)).  Two predicate acts are necessary to constitute a pattern, though not always sufficient.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,496 n. 14 (1985) ("The implication is that while two acts are necessary, they may not be sufficient."); *see also United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir. 1989) ("The legislative history is . . . inconsistent with a rule that any two acts of racketeering activity, without more, suffice to establish a RICO pattern.").

Courts have cautioned that RICO is as "an unusually potent weapon—the litigation equivalent of a thermonuclear device."  *Halvorssen v. Simpson*, No. 218CV2683ENVRLM, 2019 WL 4023561, at *3 (E.D.N.Y. Aug. 26, 2019) (quoting *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (citation omitted), *aff'd*, 113 F.3d 1229 (2d Cir. 1997)).  Given the "powerful incentive for plaintiffs to attempt to fit garden variety fraud claims within the standard of civil RICO" due to "the allure of treble damages, attorney's fees, and federal jurisdiction," courts must "scrutinize civil RICO claims early in the litigation to separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud."  *Holmes v. Parade Place, LLC*, No. 12-CV-6299 (GBD) (DF), 2013 WL 5405541, at *14 (S.D.N.Y. Sept. 26, 2013)

(citation omitted); *see also Olympicorp Int'l LLC v. Farm Rich Foods, LLC,* No. 13-CV-4094 (ENV), 2013 WL 6194238, at *2 (E.D.N.Y. Nov. 25, 2013) (observing that RICO, when "often invoked inappropriately," becomes "a mere saber to be rattled").

### A. Relatedness

#### 1. <u>Legal Standard</u>

The Supreme Court has interpreted the phrase "pattern of racketeering activity" to require both that the RICO predicates pose a threat of continuous criminal activity (the "continuity" requirement) and that they be related to each other (the "relatedness" requirement). *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). RICO targets conduct that "amount[s] to or pose[s] a threat of continued criminal activity." *H.J.*, 492 U.S. at 239. Because RICO does not apply to "isolated or sporadic criminal acts," it has a relatedness requirement in addition to the continuity requirement. *Indelicato*, 865 F.2d at 1383 (internal quotation marks omitted). Predicate crimes must be related both to each other ("horizontal relatedness") and to the enterprise as a whole ("vertical relatedness"). *Reich*, 858 F.3d at 60-61 (citing *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)).

In *H.J. Inc. v. Northwestern Bell Telephone Company*,

the Supreme Court clarified that predicate acts are *horizontally* related when they: "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  492 U.S. at 240.  Where the putative enterprise is primarily a legitimate business, courts must determine whether there is a relationship between the predicate crimes themselves; to do so, courts inquire whether the crimes share "purposes, results, participants, victims, or methods of commission."  *Id.; see also Indelicato*, 865 F.2d at 1382 (looking to "temporal proximity, or common goals, or similarity of methods, or repetitions").  "'[W]here the enterprise in question is not primarily in the business of racketeering,' overlapping participants, without more, are insufficient to show horizontal relatedness."  *Halvorssen*, 2019 WL 4023561, at *5 (quoting *Reich*, 858 F.3d at 62).

The Second Circuit's 2017 decision in *Reich v. Lopez* is instructive.  Plaintiff Otto J. Reich, the principal of a consulting firm specializing in anti-corruption, alleged that Derwick Associates ("Derwick"), a Venezuelan energy company, bribed Venezuelan energy officials to secure energy contracts at inflated prices without public bidding, then subcontracted out the work while retaining significant profits.  858 F.3d at 58. In 2012, Derwick's principals filed state court defamation suits

28

against a Venezuelan bank that was threatening to expose Derwick's criminal activities. *Id.* Derwick hatched a plan to sever the bank's relationship with Reich. *Id.* A Derwick agent called a major shareholder of the bank and falsely stated that Reich was in cahoots with Derwick. *Id.* The call achieved Derwick's goal: the bank cut ties with Reich. *Id.* at 58-59. Around the same time, one of Derwick's principals peddled the same falsehood to another client of Reich's, Eligio Cedeño, and achieved the same result: Cedeño fired Reich. *Id.* All told, Derwick's actions cost Reich thousands of dollars monthly in consulting fees. *Id.*

Reich filed a RICO action against Derwick's principals alleging predicate crimes of wire fraud arising from the false phone calls, and violations of the Travel Act arising from Derwick's bribery of Venezuelan officials. *Id.* The district court dismissed Reich's RICO claim for failure to plead a "pattern of racketeering activity," and the Second Circuit affirmed. Applying the *H.J.* factors to assess relatedness, the Second Circuit found that even though Derwick's principals partook in both the alleged wire fraud and bribery, "little else" linked the two predicates:

> As to the Travel Act violations, they were *accomplished* by the payment of bribes; the *result* was that Derwick secured energy contracts; and the *victims* were competing energy contractors and the government

> of Venezuela; whereas the wire fraud was *accomplished* by false phone calls, the *result* was that two clients terminated Reich, and the *victims* were Reich himself and his firm. The methods of commission, victims, and results of the predicate acts are all dissimilar and weigh against relatedness.

*Id.* at 62 (emphasis in original).

The Second Circuit also considered the purpose of the underlying wire fraud and Travel Act violations. Though both predicates were committed for the purpose of helping Derwick, Judge Jacobs, writing for a unanimous panel, reasoned that construing purpose at so broad a level of generality "would make the factor meaningless" because "virtually all crimes committed on behalf of an enterprise are done to help it." *Id.* (citations omitted). Rather, the acts of wire fraud were intended to get Reich fired; the Travel Act violations were committed to secure energy contracts. *Id.* The distinct motives underlying the wire fraud and Travel Act violations weighed against relatedness, as did the other *H.J.* factors and, therefore, plaintiff failed to plead a "pattern of racketeering activity.

*H.J.* and *Reich* thus delineate the contours of the "relatedness" inquiry under RICO. The court will now apply the relatedness test, which has been called "a bulwark against the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts," *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006) (citation and internal quotation marks

omitted), to the instant complaint.

    2. Application

        Plaintiff alleges that the Enterprise committed acts
of racketeering activity prior to the NJ Action against
Rajaratnam, some dating as far back as the 1970s, before Motley
Rice even existed.  The sprawling nature of the scheme alleged
by plaintiff necessitates a relatedness inquiry to separate the
wheat of the complaint from its chaff.   The complaint avers
that Motley Rice is a legitimate business that is primarily
engaged in the practice of law.  (Compl. ¶ 18 ("Defendant Motley
Rice, LLC is a well-known plaintiff side litigation firm founded
in 2003.").)  The relatedness analysis thus begins with the
factors identified in *H.J.*: similar "purposes, results,
participants, victims, [and] methods of commission."  492 U.S.
at 240.

        The *participants* in the NJ Action-related predicates
were Motley Rice and Michael Elsner, who filed the NJ Complaint,
the JTTF Defendants, with whom Motley Rice coordinated, and
Rudra, who was allegedly bribed by members of the Enterprise.
The participants *accomplished* their crimes by planting false
information about plaintiff in the *Vanity Fair* Article,
unlawfully obtaining and exploiting confidential government
information, and concealing evidence of their criminality by,

31

among other things, resisting disclosures in the NJ Action and lying to the court. The *victim*, obviously, was Rajaratnam. The *purpose* of the Motley Rice Enterprise's predicate crimes was to pressure Rajaratnam into settling the NJ Action, thus enriching the Enterprise.

The alleged racketeering acts that preceded the NJ Action ultimately have no apparent relation to the predicates committed in the course of the NJ Action. These unrelated acts may be grouped as follows:

***Asbestos Litigation***. According to the complaint, Motley Rice's predecessor, Ness Motley, began "flooding" courts in the 1970s with voluminous personal injury cases claiming asbestos-related injuries. (Compl. ¶ 30.) Ness Motley's founders supposedly used "threats" and "intimidation" to obstruct a bill related to asbestos claims, in violation of 18 U.S.C. § 1505,[14] and improperly induced medical experts to provide false testimony, in violation of 18 U.S.C. § 1512. (*Id.* ¶ 33.)

The actions of Motley Rice's predecessor are not related in any conceivable way to the NJ Action or Rajaratnam. Plaintiff does not claim that Elsner, Rudra, or the JTTF

---

[14] Violations of 18 U.S.C. § 1505 are not predicate acts of racketeering activity as defined by RICO. *See* 18 U.S.C. § 1961(1).

Defendants were involved in Ness Motley's asbestos litigation lawsuits. The complaint also does not allege that defendants used threats or intimidation in connection with the NJ Action. The complaint claims defendants procured Rudra's testimony through bribes, but does not allege that Ness Motley bribed the experts in the asbestos cases. The result of Ness Motley's asbestos suits were "bulk" settlements. Though plaintiff insists the overarching goal of the NJ Action is to coerce him into a quick settlement, settlement is a goal that can be ascribed to nearly every plaintiff litigating a civil case. Whatever the purported goal of the NJ Action, the only results, thus far, have been a protracted, decade-long federal litigation, attorneys' fees, and other intangible, alleged harms to plaintiff. No particular persons or entities are identified as the victims of Ness Motley's asbestos suits and related conduct, but suffice it to say, the victims did not include Rajaratnam, who is the lone alleged victim of the NJ Action.

*The 9/11 Action*. Plaintiff alleges that, in the years following the terrorist attacks of September 11, Jean-Charles Brisard, Motley Rice's lead investigator, falsified a document listing donors to Osama bin Laden and, as a result, a wealthy Saudi man by the name of Khalid bin Mahfouz was wrongly named in a suit brought by Motley Rice on behalf of 9/11 terror attack victims. (Compl. ¶¶ 39-42.) Brisard was then "replaced" with

Michael Asimos, who supposedly shared information about the 9/11 Action with DoD personnel in order to receive a "quid pro quo"—the receipt of sensitive government information—from those same DoD officials.  Plaintiff claims Brisard's and Asimos's actions violated the federal mail and wire fraud and bribery statutes.

As a preliminary matter, plaintiff's fraud and bribery claims in connection with Brisard, Asimos, and the 9/11 Action are wholly conclusory and do not pass muster under basic notice pleading requirements, much less Rule 9(b) of the Federal Rules of Civil Procedure, applicable to claims sounding in fraud. That glaring deficiency aside, there is plainly no relation between the NJ Action and the allegations relating to the 9/11 Action.  Asimos and Brisard are not parties to this proceeding, and are not alleged to have participated in the NJ Action; the victim of Brisard's "falsification" was Khalid bin Mahfouz, not Rajaratnam, and the complaint does not identify any victim of Asimos's conduct; bin Mahfouz was named in the 9/11 Action but there is no mention of any settlement, the supposed goal of the NJ Action; and falsifying an intelligence document, the method whereby the Enterprise targeted bin Mahfouz, is not the same as planting a story in a national magazine, or leveraging government secrets for litigation advantage.

*Rosetta*.  Asimos allegedly lied to a congressional

staffer and fabricated a story so that he could insinuate his way into Iraq after the 2003 invasion by the United States. (Compl. ¶¶ 49-54.) Asimos, Mallon, and other investigators also used an entity called Rosetta, allegedly funded by Motley Rice, to "secure profitable government contracts" and sell information gathered in connection with the 9/11 Action. (*Id.* ¶ 55.) Rosetta built "a massive database of government intelligence on terrorism," (*id.* ¶ 56), though plaintiff neglects to explain why that project was criminal. Rosetta also offered information to an FBI agent in the hopes he would return the favor, received information from a different FBI agent, and took yet another FBI agent on a "house-hunting trip 'in anticipation of being hired by Rosetta.'" (*Id.* ¶¶ 61-67.) Even ignoring the pleading deficiencies in these allegations, which plaintiff conclusorily asserts constitute bribery and sale of stolen property across state lines, *see* 18 U.S.C. §§ 201, 2314, 2315, Rosetta's acts bear no plausible relation to the NJ Action.

***Arrest of Afghan Drug Lord*.** In 2004 and 2005, at the DEA's request, Motley Rice allegedly induced a "notorious Afghan drug lord" to come to the United States under false pretenses, where he was arrested and sentenced to life in prison, thereby committing wire fraud against the drug lord, 18 U.S.C. § 1343. (Compl. ¶¶ 68-71.) Motley Rice's allegedly duplicity in luring an Afghan drug lord to his arrest is clearly unrelated to the NJ

Action or any act that allegedly harmed plaintiff.

Plaintiff has not pled any plausible connection between the NJ Action, on the one hand, and Ness Motley's asbestos litigation, the 9/11 Action, Rosetta, or the deception of an Afghan drug lord, on the other. Accordingly, these alleged acts fail to establish a pattern of racketeering activity. The court next turns to the remaining predicate acts alleged in the complaint, which relate to the NJ Action and the *Vanity Fair* Article.

## B. Predicate Acts

Though defendants have raised a number of issues with respect to plaintiff's RICO claims, including whether Rajaratnam actually suffered an injury, or whether the JTTF Defendants participated in the management of the enterprise, the court need proceed no further than considering the sufficiency, or lack thereof, of the predicate acts alleged in the complaint. In order to state a claim for a violation of RICO, plaintiff must allege a pattern of racketeering activity, which, at a minimum, requires the commission of "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5); *see* 18 U.S.C. §§ 1962(a)-(d).

### 1. Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343

"The essential elements of [mail and wire fraud] are

(1) a scheme to defraud[;] (2) money or property as the object of the scheme[;] and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (citing *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). "For both wire and mail fraud, the object of the scheme to defraud must be *money* or *property*." *Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 600 (S.D.N.Y. 2015) (citing *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)) (emphasis in original). "In the context of mail fraud and wire fraud, the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Pierce*, 224 F.3d at 165 (internal quotations omitted). "A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." *Id.* (citing *Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)).

As fraud-based predicates, wire fraud and mail fraud "must be pleaded with particularity in accordance with Federal Rule of Civil Procedure 9(b)." *Jus Punjabi, LLC* v. *Get Punjabi US, Inc.*, 640 Fed. Appx. 56, 58 (2d Cir. 2016) (summary order) (citing *Lundy* v. *Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013)). This particularity requirement

extends "to each defendant." *Fuji Photo Film U.S.A., Inc.* v.
*McNulty*, 640 F. Supp. 2d 300, 314 (S.D.N.Y. 2009). "To satisfy
this requirement, a complaint must specify the time, place,
speaker, and content of the alleged misrepresentations, explain
how the misrepresentations were fraudulent and plead those
events which give rise to a strong inference that the
defendant[] had an intent to defraud, knowledge of the falsity,
or a reckless disregard for the truth." *Jus Punjabi*, 640 Fed.
Appx. at 58 (bracket in original, internal quotation marks
omitted) (quoting *Cohen* v. *S.A.C. Trading Corp.*, 711 F.3d 353,
359 (2d Cir. 2013)); *see also First Capital Asset Mgmt., Inc. v.
Satinwood, Inc.*, 385 F.3d 159, 178-79 (2d Cir. 2004).

The complaint's mail and wire fraud allegations break
down into two categories. The first consists of electronic
court filings on the New Jersey District Court's docket,
including "false statements" regarding Motley Rice's acquisition
and use of confidential government information, allegedly
obtained through Rudra and the JTTF Defendants, (Compl. ¶¶ 138-
44), as well as Allison and Mallon's affidavits, electronically
filed by Elsner in the NJ Action, which represented that the
JTTF Defendants had not paid Rudra to be a fact witness in the
case. (*Id.* ¶¶ 135-37.) The second false statement category
concerns Motley Rice's dissemination of the 2009 Press Release
and its "orchestrating and planting 'fake news'" about

Rajaratnam's remarks and the November 2002 Event in the *Vanity Fair* Article, which was thereafter "disseminated via interstate wires on *Vanity Fair*'s website."  (*Id.* ¶¶ 97-99, 106-07.)

For the reasons discussed below, these allegations fail to state a claim for mail or wire fraud.

### a. *False Statements in the NJ Action*

Plaintiff's allegation, that defendants committed mail and wire fraud by disseminating false statements to the New Jersey District Court with the intent to coerce plaintiff into settling, runs headlong into "the overwhelming weight of authority [that] bars a civil RICO claim based on the use of the mail or wire to conduct allegedly fraudulent litigation activities as predicate racketeering acts."  *Carroll v. U.S. Equities Corp.*, No. 118CV667TJMCFH, 2019 WL 4643786, at *12 (N.D.N.Y. Sept. 24, 2019); *see also Kim*, 884 F.3d 98.[15]

---

[15]    *See Estate of Izzo v. Vanguard Funding, LLC,* No. 15-CV-7084 (ADS/GRB), 2017 WL 1194464, at *11 (E.D.N.Y. Mar. 30, 2017)("[E]ven assuming that Urban Financial's August 29, 2011 mailing satisfies the elements of mail fraud—a proposition that is questionable on the current record—the RICO claim fails because the service and filing of litigation documents in the Foreclosure Action cannot plausibly support a cognizable claim."); *see also Avraham v. Lakeshore Yacht & Country Club, Inc.*, No. 5:15-CV-1297, 2016 WL 6585589, at *12 (N.D.N.Y. Nov. 7, 2016) ("[A] defendant's 'use of mail and wire to conduct allegedly fraudulent 'litigation activities' is insufficient to establish predicate acts of racketeering.' ")(citation omitted); *Saluzzo v. Greenbaum*, No. 110-CV-649 (GLS\RFT), 2011 WL 13234286, at *3 (N.D.N.Y. Feb. 4, 2011)("[W]hile mail and wire fraud do constitute predicate acts under RICO, . . . allegations of mail or wire fraud are nonetheless insufficient to plead the necessary predicate act where the focus of those allegations is the defendant's litigation activities in pending litigation.")(citation omitted). Courts outside the Second Circuit are similarly skeptical of mail and wire fraud predicates based on litigation activities.  *See Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 61 (D.D.C. 2019)("Courts do not allow allegedly

In *Kim v. Kimm*, the Second Circuit reviewed a district court decision dismissing a RICO action against parties who had previously brought a trademark infringement action against the plaintiff. 884 F.3d 98. The crux of plaintiff's RICO claim was "four declarations" that defendants had prepared, signed, and filed in the trademark action "with full knowledge that they contained fraudulent representations intended to persuade the district court to find in favor of [defendants]." *Id.* at 103. The district court determined that these alleged litigation activities could not provide a basis for predicate acts under Section 1962(c). *Id.* Affirming on substantially identical grounds, the panel noted the consensus among its sister circuits that litigation activities were improper predicates for civil RICO claims. *Id.* at 104 (collecting cases). The Second Circuit was particularly concerned that allowing litigation activities to state a claim under RICO could "spawn a retaliatory action"

fraudulent 'litigation activities,' such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for RICO . . . where such acts constitute 'the only allegedly fraudulent conduct.'") (citation omitted); *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 141–42 (D.D.C. 2018) ("As Plaintiffs' RICO claim is premised entirely on mailings done for the purpose of litigation activity, they have failed to state a claim."); *see also Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016) ("[P]rosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system. Moreover, allowing such charges would arguably turn many state-law actions for malicious prosecutions into federal RICO actions.") (quoting *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002)); *Auburn Med. Ctr., Inc. v. Andrus*, 9 F. Supp.2d 1291, 1298 (M.D. Ala. 1998) ("Numerous other courts have found that the actions underlying claims for malicious prosecution, or analogous actions in the litigation context, will not support a RICO action.").

for every unsuccessful lawsuit, "inundate federal courts with procedurally complex RICO pleadings," and undermine the principles buttressing the *res judicata* and collateral estoppel doctrines by raising doubts about the validity of documents presented in the underlying litigation, and, *ipso facto*, the judicial decisions that relied on those documents. *Id.*[16]

Plaintiff asserts that *Kim* and similar decisions do not establish an "unqualified 'safe harbor' that immunizes litigation-related activities from RICO liability." (Opp. 10.) Plaintiff relies on four cases in which litigation activities supposedly comprised the basis for sufficiently pled RICO claims. But none of those cases sustains the instant pleading.

*United States v. Eisen*, (cited at Opp. 11), concerned the criminal prosecution of seven attorneys, investigators, and office personnel of a Manhattan law firm ("Eisen Firm"), which specialized in personal injury suits. 974 F.2d 246, 251 (2d Cir. 1992). The evidence at trial in that case showed that the defendants conducted the affairs of the Eisen Firm through a "pattern of mail fraud and witness bribery by pursuing counterfeit claims" by, among other things, "pressuring accident

_____

[16] Plaintiff argues that *Kim* left the door open to RICO claims based, in part, on litigation activities, where defendants "also engaged in a variety of other out-of-court actions to further this activity." *Id.* at 105. As discussed throughout this Memorandum and Order, any "other out-of-court actions" alleged in the complaint are either deficiently pled, or fail to establish relatedness or continuity, as are necessary to establish a pattern of racketeering activity.

41

witnesses to testify falsely, paying individuals to testify falsely . . . , paying unfavorable witnesses not to testify, and creating false . . . evidence for use before and during trial." *Id.* Defendants operated this scheme to pursue over a dozen counterfeit personal injury claims. *Id.* Defendants were convicted by a jury and appealed. The appeal was denied.

As an appeal following a criminal jury trial and verdict, *Eisen* is of limited utility in determining whether plaintiff has pleaded mail and wire fraud with particularity in a civil matter. Further, as another court observed, "the predicate acts in *Eisen* amounted to far more than mere 'litigation activities,' and instead involved an extensive and broader scheme to defraud defendants in the personal injury lawsuits commenced by the Eisen Firm." *Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.,* 758 F.Supp.2d 153, 176 (E.D.N.Y. 2010). Thus, in *Eisen*, the defendant attorneys "went well beyond their capacities as legal representatives" in conducting their fraudulent scheme. *See Morrow v. Blessing*, No. 04-1161, 2004 WL 2223311, at *5 (E.D. Pa. Sept. 29, 2004).

In another case cited by plaintiff, *Sykes v. Mel Harris and Assocs., LLC*, (cited at Opp. 11), the defendants—Mel Harris, LLC, a Manhattan law firm primarily engaged in debt

collection, and Leucadia, a group of entities that purchased and collected defaulted debts—entered into agreements to purchase debt portfolios, pursued high volume debt collection litigation against the purported debtors, and sought collection of millions of dollars in fraudulently obtained default judgments. 757 F. Supp. 2d 413, 419 (S.D.N.Y. 2010). Leucadia and Mel Harris used sewer service to effectuate their scheme. Over 90% of the consumers named in the actions defaulted because they were not actually served. *Id.* After a consumer failed to appear in court, the defendants would move for default judgment by providing the court with proofs of service and affidavits attesting to personal knowledge of facts comprising the basis for their legal claims. *Id.* The *Sykes* plaintiffs, consumers who had been sued by defendants in state debt collection actions, commenced a RICO action in federal court alleging that defendants engaged in a scheme to defraud consumers of money through fraudulent statements involving the use of the mail and wires. *Id.* at 425.[17]

*Sykes* is readily distinguishable from the allegations before this court. The gravamen of Mel Harris's racketeering activity was not so much litigation activities, as it was the

---

[17]    Judge Chin did not dismiss the RICO claim in *Sykes* but his decision did not address whether litigation activities can support allegations of mail and wire fraud for RICO purposes, *see id.*, perhaps because the argument had not been raised.

use of courts to obtain default judgments *en masse* against defendants who had not been served. The "litigations" in *Sykes* were mere perfunctory steps to cash in on a portfolio of defaulted debts. Plaintiff cannot reasonably claim that the NJ Action, a decade-long court battle in which Rajaratnam is one of only three named defendants, is remotely akin to the industrial scale state court litigations filed for the exclusive purpose of obtaining default judgments in *Sykes*. Indeed, the concerns about civil RICO litigation based on litigation activities that so troubled the Second Circuit in *Kim*, were altogether inapplicable in *Sykes*: there was little chance of "retaliatory action" by the non-appearing consumers, and the RICO action brought by those consumers did not risk eroding *res judicata* and collateral estoppel doctrines because default judgments typically are not preclusive. *See Artmatic USA Cosmetics, a Div. of Arthur Matney Co. v. Maybelline Co., a Div. of Schering Plough*, 906 F. Supp. 850, 856 (E.D.N.Y. 1995) ("The majority view is that collateral estoppel based on default judgments is undesirable.") (collecting cases).

In *Guzman v. Hecht*, (cited at Opp. 11-12), a New York law firm misrepresented the nature of the legal services it would provide to clients seeking immigration relief. No. 18CV3947(DLC), 2019 WL 1315888, at *1 (S.D.N.Y. Mar. 22, 2019). Though Judge Cote denied a motion to dismiss plaintiff's RICO

44

claim, further explication of the facts and holding in *Guzman* is unnecessary. *Guzman* is inapt because, unlike here, the RICO claim did not arise from adversarial litigation activities, but rather, defendants' misrepresentations to putative clients about the nature of legal services their law firm would provide.

Lastly, plaintiff relies on *Feld Entertainment Inc. v. American Society for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288 (D.D.C. 2012). (Opp. 12.) Feld Entertainment was the defendant in an earlier, long-running suit asserting violations of the Endangered Species Act, based on its use of Asian elephants in circus productions ("ESA Action"). 873 F. Supp. 2d at 299. The plaintiffs in the ESA Action were several non-profit animal rights organizations and one individual plaintiff, Thomas Rider. *Id.* Following a bench trial, the court in the ESA Action concluded that Rider did not have Article III standing, and further found that he was "not credible" because he was "essentially a paid plaintiff and fact witness" whose sole source of income throughout the litigation was provided by the animal advocacy organizations which had been his co-plaintiffs in the ESA Action. *Id.* Feld then turned around and sued the animal rights organizations and their counsel of record, arguing that the ESA plaintiffs' payments to Rider during that litigation violated RICO. *Id.* at 300.

Judge Emmet Sullivan denied defendants' motion to dismiss and permitted discovery on the RICO claim. *Id.* at 322. Judge Sullivan acknowledged "that courts have refused to allow litigation activities such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for RICO," but considered this restriction limited to "circumstances where such acts constitute the only allegedly fraudulent conduct." *Id.* at 318 (internal quotations and citations omitted). Feld's lawsuit went beyond those limited circumstances:

> [W]here additional allegations of extortion or some other pattern of racketeering activity are involved, courts have found that alleged mail and wire fraud violations arising out of malicious prosecution or abuse of process could be RICO predicate acts. This case, at least at the pleading stage, falls into the latter category. Plaintiff's allegations in the FAC are not limited to claims that defendants filed false documents with the Court or otherwise engaged in frivolous and harassing litigation; they claim the *entire lawsuit was based on bribery of the lead plaintiff and witness*.

*Id.* at 318-319 (emphasis added, internal citation and quotation marks omitted).

Though Rajaratnam has alleged that the NJ Action was facilitated by bribes paid to Rudra, a claim the court deals with below, the complaint does not allege that the NJ Action was based entirely on information or testimony provided by Rudra, or confidential government documents stolen by the JTTF Defendants

46

and transmitted to Motley Rice.  The initial NJ Complaint alleged Rajaratnam and his father made donations to TRO, including a $1 million personal contribution from Rajaratnam to TRO that was allegedly funneled to Sri Lanka; that TRO provided LTTE with material support; and incorporated written statements by Rajaratnam's father in support of LTTE.  (NJ Compl. ¶¶ 12, 96, 102, 110-11.)  Even after Motley Rice retracted the allegations arising from Rajaratnam's purported statements at the November 2002 Event, which Rudra claimed to have recorded, the bulk of the allegations in the initial NJ Complaint remain pending, (NJ ECF No. 384, ¶¶ 11, 267-68, 314, 320), and there is no allegation by Rajaratnam that they are each based on bribery or other crimes.  The court, therefore, finds that *Feld*, which is not controlling in any event, is distinguishable.

Based on the foregoing, plaintiff cannot rely on defendants' litigation activities in the NJ Action to plead the predicate acts of mail or wire fraud for his civil RICO claim. A civil RICO action in a neighboring federal district is not the appropriate mechanism to seek redress for false statements made in court filings by a litigation adversary.  More appropriate measures may include a motion for Rule 11 sanctions, motions to preclude or strike testimony, and, if necessary, a motion for relief under Federal Rule of Civil Procedure 60(b)(3) for fraud on the court.

b. *The Vanity Fair Article and 2009 Press Release*

Plaintiff alleges that Motley Rice committed wire fraud when it issued the 2009 Press Release falsely representing that Rajaratnam made pro-LTTE remarks at the November 2002 Event.  (Compl. ¶ 97-98.)  Elsner, Kanetkar, and Rudra, in coordination with Motley Rice, allegedly committed wire fraud again in 2011 when they parroted the same misrepresentations about Rajaratnam to *Vanity Fair*.  (*Id.* ¶ 103-07.)  Plaintiff claims these statements were made as part of a scheme to "wrongfully obtain money" from him by increasing pressure on plaintiff to settle the NJ Action.  (*Id.* ¶ 97.)

Just as courts are loath to permit litigation activities to be shoehorned into civil RICO predicates, courts express similar reticence towards attempts to recast defamatory statements as mail and wire fraud violations.  "The mere fact that a statement is negative or even defamatory . . . does not make it fraudulent.  In order for a statement to be actionable under the mail and wire fraud statutes, a plaintiff must allege the existence of a scheme, conscious and knowing intent to defraud on the part of the speaker, and the materiality of the misrepresentation."  *Li Jun An v. Hui Zhang*, No. 13 Civ. 5064(PKC), 2013 WL 6503513, at *6 (S.D.N.Y. Dec. 6, 2013); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904

F.2d 786, 791 (1st Cir. 1990) ("[N]ot every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud.").

The *Vanity Fair* Article and 2009 Press Release are not suitable foundations for wire fraud. At the outset, plaintiff claims the widely-disseminated falsehoods published in the *Vanity Fair* Article caused him to suffer "public contempt, disgrace, personal and professional reputational harm, and ridicule." (Compl. ¶ 192.) It is well-established, however, that reputational harm alone, cannot support a claim for mail or wire fraud. *Kimm v. Lee*, No. 04 CIV. 5724 (HB), 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005), *aff'd sub nom. Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14 (2d Cir. 2006) ("Though Kimm may well have suffered reputational injury as a result of the defendants' alleged acts, no one was induced to part with anything of value as a result.") (internal quotation marks and citation omitted); *United States v. Ferrara*, 701 F. Supp. 39, 43 (E.D.N.Y. 1988), *aff'd*, 868 F.2d 1268 (2d Cir. 1988) ("[I]f one's reputation-standing alone-could be construed as property, then any ordinary defamation action could be brought under the mail fraud statute-a startling proposition.").

Plaintiff also alleges that the *Vanity Fair* Article and 2009 Press Release caused him financial harm. (Compl. ¶

49

190.)  The complaint does not specify what financial harm
plaintiff actually suffered, a pleading deficiency under Rule
9(b), but avers that Motley Rice intended the publication of the
false statements about Rajaratnam's speech to increase pressure
on him to settle the NJ Action.  The court declines to credit
this allegation because it rests on the implausible notion that
Rajaratnam somehow would have been deceived or tricked into
settling the NJ Action based on claims that he knew had no basis
in fact.  It defies common sense that plaintiff relied on
statements he knew were false, or that Motley Rice plausibly
expected to induce Rajaratnam's reliance on falsehoods about his
remarks at the November 2002 Event, when Rajaratnam himself was
the one who made the speech.  Indeed, the complaint neglects to
explain why or how *Vanity Fair*'s broader publication of
statements that had already been presented to the court in the
NJ Action would, suddenly, prompt plaintiff to settle that case,
especially if plaintiff knew he could disprove the false
statements about his remarks at the November 2002 Event in the
course of discovery.

Construing the allegations liberally, plaintiff
appears to claim that Motley Rice intended to compel a
settlement offer from Rajaratnam by leveraging against him the
reputational stigma that flowed from the 2009 Press Release and
*Vanity Fair* Article.  Plaintiff's attempt to "spin an alleged

scheme to harm a plaintiff's [] reputation" into a RICO claim
fails, *see Kimm*, 2005 WL 89386, at *5, and federal courts
routinely and soundly reject such attempts. *See, e.g., Ctr. for
Immigration Studies v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C.
2019) (dismissing RICO claim where plaintiff has "clearly tried
to shoehorn a defamation claim into the RICO framework");
*Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL
1242763, at *9 (D. Md. Mar. 17, 2015) (dismissing plaintiff's
RICO claim for the additional reason that it "reflect[ed] more
of an attempt to spin an alleged scheme to harm his reputation
than it reflects a viable RICO claim"); *Ritchie v. Sempra
Energy*, No. 10-cv-1513, 2013 WL 12171757 at *4 (S.D. Ca. Oct.
15, 2013) (finding that allegations of a smear campaign, through
a website and press releases, containing false statements
regarding market analysis, designed to injure the company's good
will and lower its stock prices, did not state a predicate
offense under RICO); *Manax v. McNamara*, 660 F. Supp. 657, 660
(W.D. Tex. 1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988) (where
defendant coordinated false and misleading press articles
harmful to plaintiff, the scheme was not a fraud on tangible or
intangible rights, but rather was an effort to damage his
reputation, and thus, could not be a predicate act under RICO).[18]

---

[18]    Plaintiff's principal authority to the contrary, *Frydman v.
Verschleiser*, 172 F. Supp. 3d 653 (S.D.N.Y. 2016), is distinguishable.  (Opp.

Accordingly, plaintiff has failed to plead the predicate acts of mail or wire fraud. The court now turns to the other predicate acts alleged in the complaint.

## 2. Witness Tampering, 18 U.S.C. § 1512

The federal witness tampering statute sanctions persons who "corruptly persuade[] another person, or attempt[] to do so . . . with intent to . . . cause or induce any person to . . . withhold testimony, or withhold a record, document, or other object, from an official proceeding." 18 U.S.C. § 1512(b)(2)(A). The complaint alleges two incidences of witness tampering, both of which fail for pleading purposes. First, on February 5, 2010, Motley Rice procured an affidavit from Rudra in connection with the NJ Action that contained "demonstrably false statements." (Compl. ¶ 94.) However, the complaint does not state what these false statements are, much less how Motley Rice "corruptly persuad[ed]" Rudra to furnish the purported falsehoods. Though plaintiff alleges that Rudra received bribes for his testimony in the NJ Action, there is no allegation concerning the payment of money or other means of corrupt

---

18.) In *Frydman*, the defendants accessed the plaintiff's email account to learn about his impending business transactions and then sent emails to potential business partners that defamed plaintiff, costing him a $10 million loan and $1.4 million sublease. *Id.* at 600. The court distinguished *Kimm*, which involved spreading false information in news articles with intent to injure, but not the intent to defraud, *i.e.* to induce reliance. *Id.* at 669 (citing *Kimm*, 2005 WL 89386, at *4). The same distinction obtains here: plaintiff fails to plausibly claim that he or anyone else relied on the alleged falsehoods published in *Vanity Fair* and the 2009 Press Release.

persuasion in return for Rudra's affidavit.

Second, plaintiff is "informed and believes" that Motley Rice still has not produced documents in the NJ Action that Rudra requested from the FBI, then passed on to the JTTF Defendants, and which the JTTF Defendants, in turn, passed on to Motley Rice.  (*Id.* ¶ 130.)  Plaintiff also "believes" that if given the opportunity for further discovery, he will show that Motley Rice and Elsner "corruptly persuaded, or attempted to persuade" the JTTF Defendants and Rudra to withhold key evidence from plaintiff.  (*Id.* ¶ 131.)

Though "matters peculiarly within a defendant's knowledge" may be pled "on information and belief," that does not sanction the pleading of such matters without any detail whatsoever.  *First Capital Asset Mgmt.*, 385 F.3d at 179.  "Where a plaintiff is permitted to plead on information and belief, the 'complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.'"  *Fuji Photo Film U.S.A.*, 640 F. Supp. 2d at 310 (quoting *Wood ex rel. U.S.* v. *Applied Research Assocs., Inc.*, 328 Fed. Appx. 744, 747 n.1 (2d Cir. 2009) (summary order)); *see also DiVittorio* v. *Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987) ("[T]he allegations must be accompanied by a statement of the facts upon which the

belief is based.").

Plaintiff has adduced no factual basis for his assertions of witness tampering, and, instead, alleges a "formulaic recitation of the elements," which *Twombly* prohibits. 550 U.S. at 555. Plaintiff also does not allege how Motley Rice persuaded or attempted to persuade Rudra or the JTTF Defendants to withhold documents or provide false statements. To the extent plaintiff believes that Motley Rice has not complied with its discovery obligations in the NJ Action, the appropriate means of redress is a motion to compel before the New Jersey District Court.

### 3. Violations of 18 U.S.C. §§ 1957, 2314, and 2315

The complaint alleges that Motley Rice received and transported FBI documents that Rudra had "obtained while working on behalf of the FBI" or had "requested . . . outside the *Touhy* process," and "compensated Rudra" for them. (Compl. ¶¶ 75, 77, 78, 141.) The RICO statute defines racketeering activity to include, *inter alia*, acts indictable under Sections 1957, 2314, and 2315 of Title 18 of the United States Code. *See* 18 U.S.C. § 1961(1). Section 1957, a money laundering statute, outlaws monetary transactions in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity. *Id.* § 1957. Section 2314 prohibits, among

54

other things, the interstate or foreign transport of goods valued at $5,000 or more, that have been stolen, converted, or taken by fraud.  *Id.* § 2314.  Section 2315 prohibits the knowing receipt, sale, concealment, possession, or disposition of stolen goods that have been transported interstate or abroad after being stolen, unlawfully converted, or taken.  *Id.* § 2315.

Plaintiff fails to plausibly allege violations of sections 1957, 2314, and 2315 for three distinct reasons. First, under sections 2314 and 2315, FBI documents are not "goods" because they are not ordinarily bought or sold in commerce.  "The Second Circuit has held that the phrase 'goods, wares, or merchandise' is 'a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce.'"  *United States v. Farraj*, 142 F. Supp. 2d 484, 487 (S.D.N.Y. 2001) (quoting *In re Vericker*, 446 F.2d 244, 248 (2d Cir. 1971)).  In *Vericker*, the Second Circuit explicitly held that FBI documents were not "goods, wares, or merchandise" within the meanings of 18 U.S.C. §§ 2314 and 2315 because "the substance contained in the documents was not ordinarily the subject of commerce."  446 F.2d at 248.  Here, plaintiff conspicuously fails to allege the nature or contents of documents that were the subject of the 18 U.S.C. §§ 2314 and 2315 violations, much less that the documents' substance was "ordinarily the subject of commerce."

Second, notwithstanding the Second Circuit's ruling in
*Vericker*, plaintiff fails to plausibly allege that the documents
in question were "stolen," *see* 18 U.S.C. § 2314, 2315, or
"criminally derived." *Id.* § 1957. The complaint alleges that
Rudra "obtained" "copies of documents and materials . . . while
working on behalf of the FBI," "requested [and presumably
received] additional documents from the FBI," and the JTTF
Defendants then transported those copies across state lines to
Motley Rice. (Compl. ¶¶ 75, 77.) Aside from formulaic
recitations of legal elements, the complaint does not allege
that the documents were "stolen, converted or taken by fraud."
*See United States v. Schultz*, 333 F.3d 393, 399 (2d Cir. 2003)
("[18 U.S.C. § 2314] applies to goods that are 'stolen,
unlawfully converted, or taken.'") (citation omitted); *see also*
*United States v. Aleynikov*, 676 F.3d 71, 78 (2d Cir. 2012)
("However, there is no violation of the statute [18 U.S.C. §
2314] unless the good is transported with knowledge that 'the
same' has been stolen."). Plaintiff merely alleges that Rudra
"obtained" the documents but offers no allegations to support
the claim that the documents were taken by theft, conversion, or
fraud. In fact, plaintiff alleges in one instance that Rudra
*requested* documents from the FBI, but did not follow proper
protocol,[19] and then passed the documents on to the JTTF

---

[19]    According to plaintiff, Rudra acted "outside the *Touhy* process." The

Defendants.  (Compl. ¶ 77.)  Plaintiff does not claim that

Rudra's purported breach of protocol constituted a criminal act

or could be reasonably construed as theft, conversion, or taking

by fraud.

Third, the court cannot discern any basis for

plaintiff's assignment of "value" to the allegedly stolen

documents.  Plaintiff claims the documents were worth at least

$5,000 or $10,000, but, without more, this is clearly just an

attempt to satisfy statutory thresholds.  *See* 18 U.S.C. §§ 1957

(property must be worth at least $10,000); *id.* §§ 2314, 2315

(goods must be worth at least $5,000).  Like the other

allegations in the complaint, plaintiff offers a bare recital of

the elements of a cause of action.  That is insufficient under

*Twombly*.  In a similar vein, the allegations in support of the

stolen property predicates assert that, over a nine-year period,

the JTTF Defendants received from Rudra, and transmitted to

Motley Rice, some unspecified number of documents, with no

detail as to their contents or the means of transmission.  This

falls far short of notice pleading requirements under Rule 8 of

complaint does not elaborate what this means, but the Motley Defendants
reasonably surmise that this refers to the so-called "*Touhy* regulations" at
28 C.F.R. § 16.22, a Department of Justice regulation prohibiting the
production of DOJ materials in a civil proceeding.  (Motley Mot. 21.)
Plaintiff's opposition does not cite to a single authority stating that 28
C.F.R. § 16.22 imposes criminal penalties or otherwise creates a private
civil cause of action for breaches of the *Touhy* protocol, or any instance in
which an alleged violation of 18 U.S.C. §§ 1957, 2314, or 2315, was based on
disclosure or receipt of documents in contravention of 28 C.F.R. § 16.22.

the Federal Rules of Civil Procedure.

In sum, the complaint fails to adequately plead violations of 18 U.S.C. §§ 1957, 2314, and 2315.

### 4. Bribery, 18 U.S.C. § 201

Finally, plaintiff claims that Motley Rice made "over $75,000" in payments to Rudra in connection with the NJ Action between 2009 and 2018. (Compl. ¶¶ 91-92, 115.) Though Motley Rice classified the payments as expense reimbursements related to Rudra's role as a fact witness in the NJ Action, (*see id.* ¶ 135), plaintiff alleges the payments were actually bribes that Rudra "used to fund living arrangements, consumer goods, and extraneous travel unrelated to Rudra's testimony." (*Id.* ¶ 91). Plaintiff concludes that the payments to Rudra could not have been reasonably related to time spent providing testimony, but were in fact intended to "secure and influence" his testimony in the NJ Action. (*Id.* ¶ 92.) Rajaratnam further alleges, on information and belief, that Motley Rice "gave, offered, or promised [Rudra] additional things of value," and otherwise "corruptly persuaded, or attempted to persuade Rudra to cooperate" as well as to withhold discovery documents from plaintiff in the NJ Action. (*Id.* ¶¶ 93, 96, 131.)

Neither the complaint nor plaintiff's opposition clarifies which subparagraph of the federal bribery statute

defendants supposedly violated.  Because the complaint alleges

bribery of a witness, the court assumes that plaintiff is

alleging defendants violated 18 U.S.C. § 201(b)(3) and (c)(2),

which prohibit payments or promises of value to a witness for or

because of their testimony.[20]  Critically, however, subparagraph

(d) of the statute exempts "the payment, by the party upon whose

behalf a witness is called and receipt by a witness, of the

reasonable cost of travel and subsistence incurred and the

reasonable value of time lost in attendance at any such trial,

hearing, or proceeding."  18 U.S.C. § 201(d).

     Plaintiff contends that whether or not the $75,000 in

---

[20]    Section 201(b)(3) imposes criminal penalties on a person who:

> directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom[.]

18 U.S.C. § 201(b)(3).  Section 201(c)(2) imposes criminal penalties on a person who:

> directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom[.]

18 U.S.C.A. § 201(c)(2).

payments to Rudra reasonably reflects the cost of his expenses and time is a question of fact that cannot be decided at this stage.  (Opp. 21.)  The court disagrees.  The Second Circuit does not appear to have spoken as to what constitutes appropriate payments to fact witnesses, but district courts in this Circuit and elsewhere that have considered the issue hold that "[a] witness may be compensated for the time spent preparing to testify or otherwise consulting on a litigation matter in addition to the time spent providing testimony in a deposition or at trial."  *Prasad v. MML Inv'rs Servs., Inc.*, No. 04 CIV. 380 (RWS), 2004 WL 1151735, at *5-6 (S.D.N.Y. May 24, 2004);  *New York v. Solvent Chemical Co.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996) ("Of course, the court finds nothing improper in the reimbursement of expenses incurred by [the witness] in travelling to New York to provide [a party] factual information, or in the payment of a reasonable hourly fee for [his] time.") (internal quotation marks and citations omitted); *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679-80 (D. Kan. 2000) (concluding that a fact witness was properly and reasonably compensated "for the time he lost in order to give testimony in the litigation, review documents produced in the litigation, and otherwise consult with [a party] and its counsel on matters related to the litigation"); *cf. Biovail Labs. Int'l SRL v. Abrika, LLLP*, No. 04-61704-CIV, 2007 WL 788849, at *2

(S.D. Fla. Mar. 14, 2007) ("Abrika presents no evidence to demonstrate that the retention of Mr. Maes was designed to secure his cooperation at trial.  Indeed, the fact that Mr. Maes consults for a Biovail Corporation subsidiary, Biovail Ireland, demonstrates that he is not likely to be a witness hostile to Biovail.  Thus, Mr. Maes' previous employment relationship does not raise any significant concerns.").

The complaint alleges that Rudra is "believed currently to be a resident of Sri Lanka."  (Compl. ¶ 22.) Plaintiff further portrays Rudra as playing an integral role in Motley Rice's continued prosecution of the NJ Action.  For example, plaintiff alleges that from 2009 to 2018, Rudra was intricately involved in obtaining and transmitting key documents to Motley Rice for use in the NJ Action.  (*Id.* ¶¶ 73-77, 94-95, 101-103, 105-107.)  The complaint also does not allege that Rudra demanded, asked for, or otherwise required compensation as a condition to provide evidence or testimony against plaintiff. To the contrary, the *Vanity Fair* Article, on which the complaint relies, notes that Rudra was committed to "bring[ing] [LTTE] down."  (Article 2.)[21]  Plaintiff also notes that, in July of 2018, Rudra was deposed over a period of four days.  (Compl. ¶

---

[21]    Plaintiff disputes *Vanity Fair*'s description of the November 2002 Event but does not dispute those parts of the Article that detail Rudra's work to undermine LTTE, which date as far back as 1999, ten years before the NJ Action was filed.  (Article 2.)

95.)  Though plaintiff notes that Rudra received the entire sum

of $75,000 from Motley Rice prior to his deposition, (*see* Opp.

21), the length of the deposition itself is indicative of

Rudra's centrality to the NJ Action, and his pivotal role in the

case would warrant frequent travel to the United States from Sri

Lanka, and back, and any related expense reimbursements.  A

total of $75,000 in payments over the course of nine years,

including thousands of miles travelled, equates to less than

$8,500 per year.  This figure hardly strikes the court as an

unreasonable amount of expenses to reimburse, given the

importance of Rudra to Motley Rice's case.  Finally, Motley Rice

disclosed Rudra's expense reimbursements to Rajaratnam in the NJ

Action, producing over 160 pages of expense records in 2016 and

2018.  (NJ ECF No. 382, p. 2.)  Motley Rice's fulsome disclosure

of its expense reimbursements, which exposed in plain sight its

payments to Rudra, is not consonant with the often-covert nature

of bribes.[22]  And despite having possession of these voluminous

records, plaintiff fails to provide any examples of suspect

reimbursements that would warrant the plausible inference of a

bribe to secure or influence Rudra's testimony.[23]

---

[22]     *Cf.* Alexander Avery, *Foreign Corrupt Practices Act: Pleading Parent-Subsidiary Liability*, 35 J. Nat'l Ass'n Admin. L. Judiciary 131, 157 (2015) ("[E]mployees who knowingly bribe will also attempt to conceal their bribes . . . .").

[23]     Plaintiff avers that he has been hamstrung from providing documents to support his pleading by the DCO governing the confidentiality of documents

Moreover, even if plaintiff had adequately alleged that the reimbursements of Rudra's expenses were in fact bribes, this lone predicate would not constitute a "pattern of racketeering activity." The purported bribes to Rudra involved a single scheme with a limited goal, namely, to procure or influence Rudra's testimony against Rajaratnam in the NJ Action. Though plaintiff insists that "[e]ach payment Motley Rice and the [JTTF Defendants] directly or indirectly made to Rudra was a separate violation of 18 U.S.C. § 201," the Second Circuit has admonished district courts to "take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO."[24] *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91 (2d Cir. 1997). The *Schlaifer* principle has been applied with particular force where a plaintiff alleges "a single scheme promulgated for the limited

produced in the NJ Action. (*See, e.g.*, Opp. 8 ("Mr. Rajaratnam has alleged that many of the documents Defendants have designated directly support the allegations herein, and evidence additional wrongdoing by Defendants. Unfortunately, the terms of the DCO prevent Mr. Rajaratnam from making more specific allegations—even on 'information and belief'—concerning that wrongdoing.") (citing Compl. 1 n.1).) Plaintiff essentially employs the DCO as a sword, rather than a shield, by urging the court to overlook his pleading deficiencies as a by-product of circumstances beyond his control. This is perplexing, given the representation of plaintiff's counsel in a September 2018 conference before this court that he was "in the process" of seeking a modification from the District Court in New Jersey to permit co-extensive usage of NJ Action documents in this case. (Krantz Decl. at Ex. C, pp. 83-117 (Tr. 6:4-17).) A review of the NJ Action docket shows no indication that plaintiff has indeed moved for such relief, and plaintiff has not otherwise claimed that such action has been taken.

[24] Despite having possession of defendants' expense records, plaintiff does not allege how many payments defendants made to Rudra.

purpose of defrauding a single victim." *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 228 (S.D.N.Y. 2001). Under such circumstances, courts hold that "continuity cannot be established." *Id.*; *see, e.g.*, *Cote v. Tennant,* No. 6:09-CV-1273, 2010 WL 1930572, at *4 (N.D.N.Y. May 10, 2010) (complaint failed to state a plausible claim for relief under RICO, where it "allege[d] only a single isolated act with a single victim," and where allegations of additional meetings and mailings "simply reflect[ed] plaintiff's attempt to fragment the single isolated act into a pattern of separate acts"); *Stein v. N.Y. Stair Cushion Co., Inc.,* No. 04-CV-4741, 2006 WL 319300, at *8 (E.D.N.Y. Feb. 10, 2006) (finding that "the racketeering activity alleged here does not constitute the sort of 'long-term criminal conduct' that Congress sought to target in RICO," where plaintiffs alleged only "a single scheme of narrow scope, including one victim and a limited number of related participants"); *FD Prop. Holding, Inc. v. U.S. Traffic Corp.,* 206 F. Supp. 2d 362, 372 (E.D.N.Y. 2002) ("Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity. This is the case even when the scheme's duration exceeds one year.").

Plaintiff alleges that defendants engaged in an "open-ended pattern of racketeering activity." (Compl. ¶ 161, 173.)

But plaintiff cannot establish open-ended continuity because the payments to Rudra, even if construed as bribes, were single-victim acts carried out by a handful of participants for the singular purpose of procuring or influencing Rudra's testimony in a specific litigation, and therefore, were not the "multi-faceted scheme" required to establish continuity. *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) ("[A] plaintiff must provide some basis for a court to conclude that defendants' activities were 'neither isolated nor sporadic.'"); *see also CPF Premium Funding, Inc. v. Ferrarini,* No. 95 Civ. 4621, 1997 WL 158361, at *9 (S.D.N.Y. April 3, 1997) (finding thirty-five specific acts of misconduct carried out against the same victim did not constitute continuity as required under RICO); *China Tr. Bank of N.Y. v. Standard Chartered Bank, PLC,* 981 F. Supp. 282, 287-88 (S.D.N.Y. 1997) (finding that although a number of acts of misconduct were alleged, they were all carried out by a single defendant against one victim, pursuant to a single scheme, and thereby failed both open and close-ended continuity requirement); *Dempsey*, 132 F. Supp. 2d at 228 ("There was no open-ended continuity here. The alleged fraud involved was designed to extract money from the Plaintiff. Given this limited goal, the scheme was inherently terminable.").[25]  Therefore, even if this court were to find

---

[25]     Courts in the Second Circuit have routinely held that a plaintiff fails

that plaintiff adequately alleged that defendants had bribed

Rudra for his testimony in the NJ Action, plaintiff cannot

fragment that single bribery scheme into more than one predicate

act.

*    *    *

The complaint fails to plead at least two acts of

racketeering activity, and thus, fails to allege a pattern of

---

to plead a pattern of racketeering activity where the complaint alleges a single-victim scheme with a singular end. *Morris v. Zimmer*, No. 10 CV 4146 VB, 2011 WL 5533339, at *11 (S.D.N.Y. Nov. 10, 2011) ("There is one main fraudulent act: Zimmer's alleged fraudulent retention of the NASD settlement proceeds for use in his business. The other acts complained of all flow from that main fraud against plaintiffs. Zimmer's continued misrepresentations to plaintiff and alleged misrepresentations to this Court are all 'subparts of the singular act, and not a 'pattern' of separate acts with an underlying purpose.'"); *Andrea Doreen Ltd. v. Bldg. Material Local Union 282*, 299 F. Supp. 2d 129, 153 (E.D.N.Y. 2004) ("Here, there is allegedly one act attempted by the same officials against the same victims on two occasions. Doreen implicitly admits that these acts are actually only one attempt to extort money by claiming that after no money was provided to Local 282 Officials in response to the first shakedown, these officials made a '[r]evised [d]emand for a bribe [raised to almost $500,000].' Thus, this Court holds that Doreen's classification of this 'shakedown' as two predicate acts 'is an attempt . . . to go beyond Congress's intent and fragment an act that plainly is unitary into multiple acts.") (case and record citations omitted); *Shamis v. Ambassador Factors Corp.*, No. 95 CIV. 9818 (RWS), 1997 WL 473577, at *16–17 (S.D.N.Y. Aug. 18, 1997) (plaintiff failed to plead a continuous pattern of racketeering where alleged wrongdoing revolved around a single act, a limited number of perpetrators were involved, there was only one target of the scheme, and a discreet, limited goal); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 945 (S.D.N.Y. 1989) ("Although these statutory violations directly result from two separate actions—the sale of Plastics' shares and Polycast's issuance of debt securities to finance the purchase—both actions were undertaken in reliance on the same set of misrepresentations concerning Plastics' earnings. The defendants are alleged to have committed a single illegal act that, because of the plaintiffs' own actions, happened to have produced two statutory violations. Defendants' single set of fraudulent statements cannot be split into two separate acts of racketeering activity in this manner."); *cf. Marini v. Adamo*, 812 F. Supp. 2d 243, 264–65 (E.D.N.Y. 2011) (plaintiffs did not "artificially fragment a singular act" to invoke RICO based on evidence of, *inter alia*, 144 distinct coin transactions, numerous allegedly fraudulent communications, and targeting of victims other than plaintiffs) (citations and brackets omitted).

racketeering activity.  This dooms each of plaintiff's RICO causes of action asserted in Claims One through Four, and those claims are thus dismissed.  *GICC,* 67 F.3d at 465 ("Under any prong of § 1962 a plaintiff in a civil RICO suit must establish a pattern of racketeering activity."); *Schlesinger v. Schlesinger*, No. 05-CV-5016-ADS-WDW, 2007 WL 9706975, at *15 (E.D.N.Y. Nov. 15, 2007) ("[T]here can be no RICO conspiracy without a substantive RICO violation.") (citation omitted); *Knoll v. Schectman*, No. 02 cv 692, 2006 WL 839428, at *6 (W.D.N.Y. Sept. 25, 2003) ("Inasmuch as the plaintiff has failed to state a claim under § 1962(c), the RICO conspiracy claim must fail as well.").  Based on the foregoing, the court need not address defendants' other contentions in support of dismissing the RICO claims, and will now address plaintiff's defamation claim under New York state law.

## II.   DEFAMATION

Defendants urge the court to dismiss plaintiff's defamation claim as time-barred.  As an initial matter, the court must decide whether or not to exercise supplemental jurisdiction over plaintiff's state law defamation claim.

### A. Supplemental Jurisdiction

A district court "may decline to exercise supplemental jurisdiction" over a claim arising under state law if the court

"has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  The court's dismissal of plaintiff's RICO claims removes 28 U.S.C. § 1331 and 18 U.S.C. § 1964 as bases for jurisdiction, (*see* Compl. ¶ 25), because there are no other federal claims pending before the court.[26]

"The exercise of supplemental jurisdiction is left to the discretion of the district court . . . ."  *Ametex Fabrics, Inc. v. Just In Materials, Inc.,* 140 F.3d 101, 105 (2d Cir. 1998) (internal quotation marks omitted).  "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *First Capital Asset Mgmt.*, 385 F.3d at 182-83 (quoting *Castellano v. Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir. 1991)) (internal quotation marks omitted, brackets in original). "Moreover, the discretion implicit in the word 'may' in subdivision (c) of [28 U.S.C.] § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."  *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994).

Though the RICO claims have been dismissed at an early stage of the litigation, the court finds that its discretion is

---

[26]     The complaint does not allege that the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

properly exercised by adjudicating the remaining state law defamation claim.  As discussed immediately below, the defamation claim may be readily disposed of on timeliness grounds, does not involve the application of novel or complex state law, and does not raise concerns of unfairness to plaintiff, given his selection of the instant forum.

**B. Timeliness**

Plaintiff alleges that Motley Rice, Kanetkar, and Rudra defamed him by making false and misleading statements to *Vanity Fair* about, *inter alia*, Rajaratnam's remarks at the November 2002 Event.  (Compl. ¶¶ 103, 104.)  *Vanity Fair* published the Article disseminating these "defamatory statements", "Crouching Tiger, Hidden Raj," on September 30, 2011.  (*Id.* ¶ 100.)[27]

An action alleging defamation under New York law must be commenced within one year.  CPLR § 215(3).  "The limitations period begins accruing when 'the libelous material first was published, that is, displayed to a third party.'"  *Mirage*

---

[27]     A plaintiff asserting defamation under New York law must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability.  *Mestecky v. New York City Dep't of Educ.*, No. 18-3186, 2019 WL 5783302, at *2 (2d Cir. Nov. 6, 2019) (quoting *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)).  Plaintiff asserts that defendants' remarks "charg[ing] Rajaratnam with a serious crime (to wit, funding terrorists), are of the sort that tend to injure a plaintiff in his or her business, trade, or profession," and therefore constitute defamation *per se*.  (Compl. ¶ 195.)

*Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 35 (S.D.N.Y. 2018) (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F.Supp.3d 583, 596–97 (S.D.N.Y. 2014)).  *Vanity Fair* published the Article on September 30, 2011.  The statute of limitations thus expired on September 30, 2012.  Plaintiff did not file his defamation claim until November 14, 2017, when he commenced suit in New York Supreme Court.[28]  Absent tolling, plaintiff's defamation claim is plainly time-barred and must be dismissed.

### 1. Equitable Tolling

Plaintiff asserts that the applicable limitations period should be equitably tolled, and should not accrue from the date of publication of the Article, because Motley Rice fraudulently concealed the fact that it was coordinating with Kanetkar and Rudra when the latter two peddled falsehoods to *Vanity Fair*.  According to plaintiff, he did not learn that Rudra and Kanetkar were working on Motley Rice's behalf until November 17, 2016.  (Opp. 44.)

Defamation claims are subject to equitable tolling under certain circumstances.  The Second Circuit has characterized the doctrine of equitable tolling as applicable

---

[28]    Plaintiff agreed to voluntarily dismiss his state court action without prejudice, and defendants agreed to toll the limitations period from November 14, 2017 until the filing of this federal action on June 1, 2018.  (*See* Motley Mot. 27-28; *id.* 28 n.18.)

"'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights . . . .'" *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). Fraudulent concealment, such that a defendant prevents a putative claimant from discovering a defamation claim, is a paradigmatic basis for equitable tolling. *Wellesley v. Debevoise & Plimpton LLP*, No. 06 CV 3518 (ARR), 2007 WL 9710545, at *4 (E.D.N.Y. Jan. 11, 2007) ("The doctrine was developed in large part 'to address situations in which fraudulent or other conduct concealed the existence of a claim.'") (quoting *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir. 1990)). In considering claims for equitable tolling, district courts are to consider "whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. New York City Transit Authority*, 333 F.3d 74, 80 (2d Cir. 2003).

Plaintiff confuses the fraudulent concealment of Motley Rice's relationship with Kanetkar and Rudra, with concealment of the publication itself. Here, only the latter form of concealment would trigger equitable tolling. Plaintiff surely knew the statements attributed to him in the *Vanity Fair*

Article were false at the time they were published on September 30, 2011.  The Article disclosed that Rudra was the source of the purported falsehoods because the author, David Rose, made it clear that Rudra was reciting Rajaratnam's remarks at the November 2002 Event from memory.  (Article 2.)  *Vanity Fair* also identified Kanetkar as Rudra's main FBI handler.  (*Id.*; Compl. ¶ 101.)  Yet, plaintiff nowhere alleges or claims that he made any efforts to contact *Vanity Fair* about the Article, or to ascertain Rudra or Kanetkar's whereabouts.  Plaintiff justifies his delay as a by-product of the late discovery that Motley Rice "was behind" Rudra and Kanetkar's defamatory statements, (Opp. 45-46), but plaintiff fails to explain why uncovering Motley Rice's alleged involvement forestalled his investigation of the defamatory remarks until well after the limitations period accrued.

Plaintiff provides no legal basis to toll what he knew was a claim for defamation against Rudra and Kanetkar at the time the Article was published.  There is no indication that plaintiff acted with reasonable diligence to pursue a defamation claim against Kanetkar and Rudra in the twelve months following publication of the Article, thus, the equitable tolling doctrine cannot, and does not, save his claim.  *See Chisolm v. City of New York*, No. 17-CV-5327 (MKB), 2018 WL 3336451, at *5 (E.D.N.Y. July 6, 2018) (holding equitable tolling was not available where

"the Complaint alleges no facts" in support of these components)
(quoting *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir.
2010)).  Further, even if Motley Rice had coordinated the
dissemination of the purported falsehoods to *Vanity Fair*,
plaintiff's failure to file a timely defamation suit against
Kanetkar and Rudra precludes a viable defamation claim against
Motley Rice.  *See LeBlanc v. Skinner*, 103 A.D.3d 202, 209 (N.Y.
App. Div. 2d Dep't 2012) ("Under the relation-back doctrine, a
plaintiff may interpose a cause of action against a person or
entity after the statute of limitations has expired, provided
that the plaintiff had *timely commenced* the action against
another defendant . . . .") (citing CPLR § 203(b)) (emphasis
added).

Further, plaintiff fails to plausibly allege "that the
defendant[s] took affirmative steps to prevent the plaintiff's
discovery of his claim or injury or that the wrong itself was of
such a nature as to be self-concealing." *De Sole v. Knoedler
Gallery, LLC*, 974 F. Supp. 2d 274, 318–19 (S.D.N.Y. 2013)
(quoting *State of New York v. Hendrickson Bros.*, 840 F.2d 1065,
1083 (2d Cir. 1988)).  Generalized or conclusory allegations of
fraudulent concealment are not sufficient to toll a statute of
limitations.  *See Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir.
1983).  Plaintiff alleges that he first learned of Motley Rice's
coordination with Kanetkar and Rudra, "putting the *Vanity Fair*

article in a whole new light," beginning in 2016, when Motley
Rice made certain disclosures in the NJ Action.  (Compl. ¶¶ 116;
*see also id.* ¶¶ 112-15.)  But Motley Rice's purported connection
to Kanetkar and Rudra was not requisite to Rajaratnam's
discovery of Kanetkar and Rudra's roles in publishing the
defamatory statement, which, according to the complaint,
Rajaratnam had good cause to believe was false on its face.
Thus, equitable tolling does not save plaintiff's time-barred
defamation claim.

    2. <u>Statutory Tolling</u>

       Finally, plaintiff asserts that the defamation claim
against Kanetkar remains timely under an obscure tolling
provision, CPLR § 207, because Kanetkar is a New Jersey resident
who was "not subject to long-arm jurisdiction in New York for
his defamatory statements against Mr. Rajaratnam."  (Opp. 46;
*see also* Compl. ¶ 23.)  Section 207 provides, in pertinent part,
that "if, when a cause of action accrues against a person, he is
without the state, the time within which the action must be
commenced shall be computed from the time he comes into or
returns to the state."  CPLR § 207.  Section 207 does not apply,
however, "while jurisdiction over the person of the defendant
can be obtained without personal delivery of the summons to the
defendant within the state."  *Id.* § 207(3).  As relevant here,

74

CPLR § 313 authorizes service outside of New York State where a person is subject to the jurisdiction of New York courts under CPLR § 302.

In *Yarusso v. Arbotowicz,* the New York Court of Appeals held that CPLR § 207(3) prohibits tolling under section 207 whenever an authorized method of service other than in-state personal service is available. 41 N.Y.2d 516 (N.Y. 1977). "Thus, all that § 207(3) requires is 'merely the availability of an authorized method of service by which personal jurisdiction could be obtained.'" *Plitman v. Leibowitz*, 990 F. Supp. 336, 339 (S.D.N.Y. 1998) (quoting *Yarusso*, 41 N.Y.2d at 518). It matters not whether the alternative means of service would have been effective: "[t]he standard looks to what is *possible,* not what is *practicable.*" *Id.* (citation omitted).

Plaintiff argues that the *Yarusso* principle is cabined with respect to defamation claims against a non-domiciliary. (Opp. 46-47.) Plaintiff's contention relies on the Court of Appeals' decision in *SPCA of Upstate New York v. American Working Collie Association.* 18 N.Y.3d 400 (N.Y. 2012). In *SPCA*, the Court of Appeals confirmed that CPLR §§ 302(a)(2) and (3), which typically permit long-arm jurisdiction "premised on the commission of a tortious act—perpetrated either within the state or outside the state, causing injury within the state,"

are inapplicable bases for long-arm jurisdiction for defamation claims. *Id.* at 403. Instead, jurisdiction over a non-domiciliary for defamation must satisfy CPLR § 302(a)(1), which provides that a court may exercise personal jurisdiction over a non-domiciliary that "transacts any business within the state" so long as the cause of action arises from the in-state activity. In order to demonstrate that an individual is transacting business within the state under CPLR § 302(a)(1), there must be a "substantial relationship" between the defendant's purposeful activities within New York State and "the transaction out of which the cause of action arose." *Id.* at 404 (internal quotation marks and citations omitted). Critically, the Court of Appeals in *SPCA* did not address the tolling provision at issue here, CPLR § 207, and it does not appear, in the eight years since it was decided, that any court has cited *SPCA* as a basis for tolling under section 207.

The crux of the defamation claim is that Kanetkar and Rudra were in cahoots with Motley Rice; made false statements about Rajaratnam to *Vanity Fair*; and Kanetkar knew these statements were false because he had learned the extent of Rajaratnam's support (or lack thereof) for the Tamil Tigers during a criminal investigation into LTTE in the Eastern District of New York. (Compl. ¶¶ 100-08.) According to Kanetkar's counsel, the allegations that Kanetkar "handled"

Rudra and "procured much of the information misused by Motley Rice against Mr. Rajaratnam in connection with investigations (and prosecutions brought) in the Eastern District of New York," establish a substantial relationship between Kanetkar's purposeful New York State activities and the *Vanity Fair* Article. (JTTF Mot. 28-29.) Plaintiff counters that these allegations do not establish that Kanetkar actually handled Rudra, or procured the information used against plaintiff, *within* New York. (Opp. 47.) He concludes that while discovery may yield evidence that establishes long-arm jurisdiction over Kanetkar, "for now the record places him in New Jersey, working for a South Carolina law firm, beyond the jurisdiction of New York." (*Id.* 47-48.)

Plaintiff's argument is flawed because it wrongly presumes the burden lies with defendants to rebut the application of CPLR § 207 by demonstrating that Kanetkar *was* subject to jurisdiction in New York State. (*See* Opp. 47 ("In short, none of the allegations on which the JTTF Defendants rely establishes any connection between Kanetkar's activities and New York—let alone the substantial relationship necessary to establish long-arm jurisdiction.").) Here, because plaintiff's "claims are time-barred on the face of [his] own complaint, [plaintiff] has the burden of pleading facts sufficient to establish that the statute[] of limitations should be tolled."

*Voiceone Commc'ns, LLC v. Google Inc.*, No. 12 Civ. 9433 (PGG), 2014 WL 10936546, at *7 (S.D.N.Y. Mar. 31, 2014) (quoting *OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 504 (D. Conn. 2007)).  Thus, plaintiff bears the burden of pleading facts supporting the tolling of the statute of limitations under Section 207.  *See Plitman*, 990 F. Supp. at 338; *Weimer v. Lake*, 268 A.D.2d 741, 741–42 (N.Y. App. Div. 3d Dep't 2000) ("The burden is on the plaintiff to demonstrate that the Statute of Limitations is tolled by the defendant's absence from the State.").  Further, courts rarely grant tolling relief pursuant to Section 207 because CPLR § 308(5) "nearly always allows a plaintiff to obtain jurisdiction over a defendant by obtaining a court order proscribing [*sic*] the means of service where other attempts at service have been unsuccessful."  *See Plitman*, 990 F. Supp. at 338 ("under governing New York case law, the tolling provision in § 207 is almost never available to a plaintiff, even to a plaintiff who can show that he unsuccessfully attempted to serve a hard-to-locate defendant out of state").  Here, neither the complaint nor opposition remotely suggest that plaintiff made any effort whatsoever to effect service on Kanetkar since the publication of the *Vanity Fair* Article, including by seeking a court order pursuant to CPLR § 308(5).

At bottom, plaintiff seeks to benefit from his failure

to adequately plead that Kanetkar was subject to the long-arm jurisdiction of New York State. It is plaintiff's burden, however, to demonstrate that the statute of limitations is tolled, and this he does not do. Therefore, the court grants defendants' motion to dismiss plaintiff's defamation claim.[29]

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the Amended Complaint are granted in their entirety. Plaintiff's RICO claims asserted in Claims One, Two, Three, and Four of the Amended Complaint are dismissed for failure to plead a "pattern of racketeering activity." Plaintiff's defamation claim under New York law, asserted against defendants Motley Rice, Jay Kanetkar, and "Rudra," is dismissed as untimely.

The court also denies plaintiff a second opportunity to amend his pleading. Although plaintiff has not requested leave to replead, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999), *overruled on other grounds by Gonzaga v. Doe*, 536 U.S. 273 (2002). "However, a district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the complaint that a valid claim might be stated."

---

[29] Plaintiff's opposition does not assert that the same tolling provision applies to Rudra.

*Perri v. Bloomberg*, No. 11-CV-2646, 2012 WL 3307013, at *4
(E.D.N.Y. Aug. 13, 2012) (citing *Chavis v. Chappius*, 618 F.3d
162, 170 (2d Cir. 2010)).  Here, the court finds that any
further pleading amendments would be futile.  *See Lucente v.
Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2003)
("Where it appears that granting leave to amend is unlikely to
be productive, . . . it is not an abuse of discretion to deny
leave to amend"); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112
(2d Cir. 2000) (holding that leave to amend the pleadings is not
required where "the problem with [the litigant's] causes of
action is substantive" such that "better pleading will not cure
it").  Plaintiff's RICO claims rest on the flawed theory that
defendants' litigation activities and alleged defamatory
statements, combined with scattershot allegations of unrelated
conduct spanning decades and bearing no relation to plaintiff,
can be spun into a coherent pattern of racketeering activity.
The court does not envision any factual supplementation that can
cure this deficiency in a subsequent pleading.  Likewise,
plaintiff's defamation claim is facially time-barred and his
equitable tolling argument rests of a meritless theory of
fraudulent concealment.  With respect tolling under CPLR § 207,
plaintiff was well aware, or should have been, that he was
required to plead or offer additional facts in support of
tolling, and his counsel acknowledged as much to the court four

months before he filed the Amended Complaint.  (*See* ECF No. 39,
Tr. 15:6-13 ("One of arguments that was advanced in favor of
tolling the statute with respect to the agents is that the
agents are non-domiciliaries of the United States -- in New
York, and as a result of that, while they're outside of the
jurisdiction, the statute doesn't run. And so it may become
necessary for me to put in supplemental papers in connection
with the fact that the agents are outside of New York . . .
.").)  Plaintiff presented no such facts in either the Amended
Complaint or his opposition.  Therefore, additional leave to
amend is denied.

The Clerk shall enter judgment in favor of defendants
and close the case.

**SO ORDERED.**

Dated: Brooklyn, New York
       March 26, 2020

                                    _____
                                             /s/
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York